CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
IJEOMA U. EKE (Bar No. 331938)
(E-Mail: Ijeoma_Eke@fd.org)
J. ALEJANDRO BARRIENTOS (Bar No. 346676)
(E-Mail: Alejandro_Barrientos@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Eke Telephone: (213) 894-3107
Barrientos Telephone: (213) 894-7568
Facsimile: (213) 894-7556

Attorneys for Defendant
KEITH LAWRENCE MIDDLEBROOK

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>KEITH LAWRENCE MIDDLEBROOK,<br>Defendant. | Case No. CR 20-229-DSF<br>**NOTICE OF MOTION AND MOTION TO SUPPRESS DIGITAL DEVICES; EXHIBITS**<br>Hearing Date: April 22, 2024<br>Hearing Time: 8:30 a.m. |

To the United States Attorney and counsel of record:

Please take notice that on April 22, 2024, or as soon thereafter as may be heard, Keith Lawrence Middlebrook, through his counsel, will move the Court for the following:

//

//

//

//

//

**MOTION**

KEITH LAWRENCE MIDDLEBROOK moves the Court for an order suppressing any evidence obtained from the searches based on two separate search warrants obtained March 25, 2020, and March 27, 2020. The search warrants issued were overbroad in violation of Mr. Middlebrook's Fourth Amendment rights. This motion is based upon the attached memorandum of points and authorities, exhibits, and any evidence introduced at the hearing on this matter.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: March 13, 2024,

By */s/ Ijeoma U. Eke*

Ijeoma U. Eke
J. Alejandro Barrientos
Deputy Federal Public Defenders
Attorneys for Keith Lawrence Middlebrook

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........ 1
II. STATEMENT OF FACTS ........ 1
III. ARGUMENT ........ 2
A. The Search Warrants are Grossly Overbroad. ........ 2
1. The search warrants lack particularity as to the digital content to be searched on each iPhone. ........ 5
IV. CONCLUSION ........ 12

# TABLE OF AUTHORITIES


Page(s)

**Federal Cases**

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ........ 3

*Demaree v. Pederson*, 887 F.3d 870 (9th Cir. 2018) ........ 8

*In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66 (2d Cir. 2016) ........ 5

*In re Grand Jury Subpoena*, 828 F.3d 1083 (9th Cir. 2016) ........ 8

*Marron v. United States*, 275 U.S. 192 (1927) ........ 5

*Maryland v. Garrison*, 480 U.S. 79 (1987) ........ 5

*Matter of Search of Info. Associated With Four Redacted Gmail Accts.*, 371 F. Supp. 3d 843 (D. Or. 2018) ........ 8

*Matter of the Search of Info. Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.*, 25 F. Supp. 3d 1 (D.D.C. 2014) ........ 9

*Riley v. California*, 134 S. Ct. 2473 (2014) ........ 3, 8

*United States v. Adjani*, 452 F.3d 1140 (9th Cir. 2006) ........ 3, 4

*United States v. Comprehensive Drug Testing (“CDT”)*, 621 F.3d 1162 (9th Cir. 2010) ........ 4, 8

*United States. v. Flores*, 802 F.3d 1028 (9th Cir. 2015) ........ 8, 9, 10

*United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013) ........ 10

*United States v. Johnson*, 2006 U.S. Dist. LEXIS 6762 (D. Ariz. Feb. 15, 2006) ........ 7

**TABLE OF AUTHORITIES**

Page(s)

*United States v. Lofstead*,
2021 WL 5501101 (D. Nev. 2021) ........ 9, 10

*United States v. Roberts*,
430 F. Supp. 3d 693 (D. Nev. 2019) ........ 9

*United States v. Roberts*,
2020 WL 1952501 (9th Cir. 2020) ........ 9

*United States v. Rosa*,
626 F.3d 56 (2d Cir. 2010) ........ 10

*United States v. Tamura*,
694 F.2d 591 (9th Cir. 1982) ........ 4

*United States v. Wey*,
256 F.Supp.3d 355 (S.D.N.Y. 2017) ........ 4, 6, 7

*United States v. Winn*,
79 F.Supp.3d 904 ........ 10

**Statutes**

NYS Penal Law ........ 10

**Other Authorities**

Fourth Amendment ........ *passim*

Cellebrite, UFED Ultimate (2022), available at
https://www.cellebrite.com/en/products/ufed-ultimate/ ........ 11

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

On March 25, 2020, the government obtained a search warrant to search KEITH LAWRENCE MIDDLEBROOK and, *inter alia,* any digital devices discovered on his person. Officers executed the warrant that same day. They arrested Mr. Middlebrook, searched his body, and seized an iPhone X found during the search of his person. Officers also seized a second cell phone, an iPhone 8, from inside Mr. Middlebrook's vehicle, which Mr. Middlebrook did not occupy at the time of arrest and which, in fact, sat several feet away from Mr. Middlebrook as officers arrested and searched him.[1] The government obtained a second search warrant to search the contents of this second iPhone on March 27, 2020.

However, the warrants were overbroad in allowing for too wide-ranging forensic evaluation of the seized devices without any temporal limitation on the search in violation of Mr. Middlebrook's Fourth Amendment right to be free from unreasonable search and seizures. For this reason, this Court should grant this motion and suppress any and all evidence found on the two iPhones.

## II. STATEMENT OF FACTS[2]

**March 25, 2020:** On March 25, 2020, a complaint was filed against Mr. Middlebrook charging him with one count of attempted wire fraud in violation of 18 U.S.C. § 1349. *See* Dkt. 1, Complaint.

Also on March 25, 2020, FBI Special Agent Madison MacDonald applied for a search warrant for the person of Keith Lawrence Middlebrook and, *inter alia, any*

---

[1] The defense has separately moved to suppress evidence recovered from the warrantless search of Mr. Middlebrook's vehicle, including this second cell phone and any data recovered from the digital search of the device as fruit of the poisonous tree. This motion does not address those arguments and only focuses on the constitutional deficiencies with the search warrants.

[2] The defense relies upon the warrant applications to establish a factual background but reserves the right to challenge any factual assertions at an evidentiary hearing.

digital devices found on his person. *See* Ex. A, Search Warrant No. 1, Application and Warrant. Specifically, the warrant indicated that Mr. Middlebrook was likely to be in possession of an iPhone X with a phone number ending in 4488 and on which there was probable cause to believe "evidence, fruits, and instrumentalities of the Subject Offense" would be found. *Id.* The search warrant was issued by the Honorable John E. McDermott. *Id.*

Officers executed the warrant on March 25, 2020. They arrested Mr. Middlebrook and searched his person. They discovered and seized an iPhone X.

But officers also entered Mr. Middlebrook's car, which he did not occupy at the time of his arrest, and searched it. *See* Ex. B, Search Warrant No. 2, Application and Warrant, at p. 5, ¶ 10-11. They seized, among other things, a second iPhone (the "car iPhone"). *Id.*

**March 26, 2020:** Mr. Middlebrook made his initial appearance. *See* Dkt. 4, Minutes of Initial Appearance on Local Complaint.

**March 27, 2020:** Mr. Middlebrook was ordered released from custody on a $150,000 appearance bond with $50,000 secured by real property held by Mr. Middlebrook's mother among other conditions. Release was not forthwith. *See* Dkt. 10, Minutes of Detention Hearing.

Also on March 27, 2020, the government obtained a search warrant to search the digital contents of the car iPhone. *See* Ex. B.

**June 5, 2020**: Mr. Middlebrook was released forthwith pending the posting of the property bond. *See* Dkt. 31.

**June 12, 2020:** The grand jury returned the indictment against Mr. Middlebrook. Dkt. 40.

## III. ARGUMENT

### A. The Search Warrants are Grossly Overbroad.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place

to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment was adopted largely to prevent "general, exploratory rummaging in a person's belongings" and the attendant privacy violations. *Coolidge v. New Hampshire,* 403 U.S. 443, 467 (1971)).

While law enforcement agents have long been permitted to search the person of a defendant incident to a lawful arrest for whatever evidence they may find of his offense, a warrant is required to search a cell phone, "even when a cell phone is seized incident to arrest." *See Riley v. California*, 134 S. Ct. 2473, 2482, 2493 (2014). The Supreme Court has reasoned that, because of the vast array of data that individuals can and do store on their cell phones, "a cell phone search would typically expose to the government far more than the most exhaustive search of a house. A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form." *Id*. at 2491. "The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions[.]" *Id*. at 2489. The Court extended this logic to both "smart phones" and "flip phones." *Id*. at 2480–81.

Thus, courts must give special attention to whether a warrant to search a cell phone is impermissibly overbroad. "The Fourth Amendment's specificity requirement prevents officers from engaging in general, exploratory searches by limiting their discretion, and providing specific guidance as to what can and cannot be searched and seized." *United States v. Adjani*, 452 F.3d 1140, 1147 (9th Cir. 2006). In assessing whether a warrant is sufficiently particular, courts consider "one or more of the following factors: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued. *Id*. at 1148 (internal citation omitted).

There are "heightened specificity concerns in the computer context, given the vast amount of data they can store." *Id*. at 1149. A warrant that purports to "authorize the seizure of, essentially, all documents" exceeds the scope of probable cause. *United States v. Wey*, 256 F. Supp. 3d 355, 393 (S.D.N.Y. 2017). In *United States v. Tamura*, 694 F.2d 591, 595-96 & n.3 (9th Cir. 1982), the Ninth Circuit approved a procedure for the government to follow in order to avoid violating Fourth Amendment rights when a search requires sifting through large amounts of data. The Ninth Circuit adopted the *Tamura* procedures for the search of electronic devices in *United States v. Comprehensive Drug Testing ("CDT")*, 621 F.3d 1162, 1177 (9th Cir. 2010) (en banc) (per curiam). In *CDT*, the Court wrote that "[t]he point of the *Tamura* procedures is to maintain the privacy of materials that are intermingled with seizable materials, and to avoid turning a limited search for particular information into a general search . . ." *Id*. at 1170. Thus, the Court held, search warrants authorizing a search through large amounts of digital data should provide "sufficiently specific guidelines for identifying the documents sought" and, if officers want to confiscate entire electronic devices, they must explain why "on-site [searching] is infeasible and no other practical alternative exists." *Tamura*, 694 F.2d at 596; CDT, 621 F.3d at 1162 (adopting *Tamura* for searches of electronic devices).

For example, the Court continued, "the warrant application should normally include, or the issuing judicial officer should insert, a protocol for preventing agents involved in the investigation from examining or retaining any data other than that for which probable cause is shown." *CDT*, 621 F.3d at 1178. "The government should [ ] agree that [ ] computer personnel [used to examine and segregate data] will not communicate any information they learn during the segregation process absent further approval of the court." *Id*. at 1179. "Once the data has been segregated . . . the government agents involved in the investigation should be allowed to examine only the information covered by the terms of the warrant." *Id*. The particularity requirement "makes general searches . . . impossible and prevents the seizure of one thing under a

warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927)).

**1. The search warrants lack particularity as to the digital content to be searched on each iPhone.**

The warrants to search Mr. Middlebrook's digital devices are general warrants that lack the specificity required for any kind of tailored search.[3] In "items to be seized," the warrants list broad categories of digital data without temporal boundaries and, accordingly, without particularity. *See* Ex. A, at p. ii-iv, ¶ 1-2. This is impermissible.

The particularity requirement "is necessarily tied to the . . . probable cause requirement." *In re 650 Fifth Ave. & Related Props*., 830 F.3d 66, 98 (2d Cir. 2016). That is because "[b]y limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

But the warrants here authorize the government to search for information with no articulated connection to the alleged criminal conduct *so long as* the information exists on a "digital device containing evidence falling within the scope of the foregoing categories of items to be seized." *See* Ex. A, at p. ii, ¶ 2. In other words, once police identified a device containing *some* evidence relating to Subject Offense, they were then permitted to seize digital data from that device whether or not the data itself related to the Subject Offense.

[3] The defense has attached both Search Warrant Nos. 1 and 2, which are identical in the substantive terms pertaining to seizure of evidence from digital devices. The only difference that is that Search Warrant No. 1 refers to "any digital device" and Search Warrant No. 2 refers to the "Subject Device." *See* Exs. A & B.

For example, the warrant permitted seizure of "records of information about the device's Internet activity, including firewall logs, caches, browser history and cookies, 'bookmarked' or 'favorite' web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses." *Id*. at p. iii, ¶ 2(i). On its face, this one provision permits seizure of data concerning Mr. Middlebrook's entire life on the Internet and requires no logical connection to the Subject Offense. Other district courts have found narrower warrants than those issued in Mr. Middlebrook's case overly broad. *See e.g., United States v. Wey*, 256 F.Supp.3d 355, 385 (S.D.N.Y. 2017) (finding a warrant lacked particularity where it set forth "expansive categories of often generic items subject to seizure—several of a 'catch-all' variety—without, crucially, any linkage to the suspected criminal activity).

Further, both warrants here permit seizure of digital evidence during an illogically and unreasonably broad time frame. In Search Warrant No. 1, for example, the affiant pins the origin of the investigation into Mr. Middlebrook on March 13, 2020—just twelve days before the application for the warrant. *See* Ex. A, at p. 7, ¶ 12. Given this, the application should have contained *at least* an approximate date range around which to confine the search. But it did not.

Further, Mr. Middlebrook's allegedly fraudulent activities concerned an alleged cure to the COVID-19 virus, the first U.S. cases of which were only detected in January 2020 and the worldwide pandemic of which was only declared on March 11, 2020.[4] In other words, evidence of an alleged scheme relating to COVID-19 could not logically have existed anywhere on Mr. Middlebrook's devices much farther back than January 2020. This, too, should have enabled the government to confine their data search to a relatively predictable, narrow range of dates.

---

[4] *See* CDC Museum COVID-19 Timeline, https://www.cdc.gov/museum/timeline/covid19.html (last visited Jan. 2, 2024).

But the government did no such thing. A survey of Section 2 of Exhibit A, or the attachment titled "Items To Be Seized," reveals a long list of digital "items" to be seized but lacks a restrictive date range. *See* Ex. A, at p. i-iv. Only Section 2(a) contains a temporal limit, albeit a vague one: "evidence of who used, owned, or controlled the device *at the time the things described in this warrant were created, edited, or deleted…*" *Id.* at p. ii, ¶ (2(a) (emphasis added).

For contrast, Section 2(i) does not even contain such a vague time frame. *Id*. at p. iii, ¶ 2(i). Instead, by remaining silent as to a time frame, it permits an expansive search of *any time and manner* Mr. Middlebrook used an Internet browser on his device, including: "records of information about the device's Internet activity, including firewall logs, caches, browser history and cookies, 'bookmarked' or 'favorite' web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses." *Id*. This would be too broad in any case, but especially in this case, where facts giving rise to the specific charge—namely, the outbreak of the COVID-19 virus—were non-existent only months earlier.

In short, the warrants here do not contain a date range but instead authorize a nearly boundless search of personal data on two devices. *See United States v. Johnson*, 2006 U.S. Dist. LEXIS 6762 *34 (D. Ariz. Feb. 15, 2006) ('applying these principles, courts have found search warrants to be insufficiently particular where, for example, the government failed to set forth the 'suspected criminal activity' or 'did not limit the scope of the seizure to a time frame within which the suspected criminal activity took place.'") (quoting *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995)). Such an open-ended intrusion is unsupported by probable cause, constitutionally overboard, and devoid of the particularity demanded by the Fourth Amendment. *See, e.g., Wey*, 256 F. Supp. 3d at 387 (finding warrant lacked particularity for failing to include a date range, despite "rather precise timeframes" identified in an unincorporated affidavit).

As the Ninth Circuit has noted, the overbroad nature of search warrants for digital devices creates a "serious risk that every warrant for electronic information will

become, in effect, a general warrant, rendering the Fourth Amendment irrelevant." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010). "The Supreme Court, too, has emphasized recently the ability of digital troves to contain '[t]he sum of an individual's private life, and the corresponding need for our jurisprudence to reflect the changing technological landscape." *In re Grand Jury Subpoena,* JK-15-029, 828 F.3d 1083, 1089–90 (9th Cir. 2016) (quoting *Riley v. California*, 573 U.S. 373, 134 S.Ct. 2473, 2489, 189 L.Ed.2d 430 (2014)). The Supreme Court has noted the difference that access to such troves of data could have for law enforcement: "A decade ago police officers searching an arrestee might have occasionally stumbled across a highly personal item such as a diary." *Riley*, 573 U.S. at 395 (citation omitted). "Today, by contrast, it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from mundane to the intimate." *Id*. (citation omitted). Thus, "[a]llowing the police to scrutinize such records on a routine basis is quite different from allowing them to search a personal item or twin in the occasional case." *Id*.

To be sure, there are unique challenges to searching electronically stored information. The Ninth Circuit has recognized that "[b]y necessity, government efforts to locate particular files will require examining a great many other files to exclude the possibility that the sought-after data are concealed there." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc) (per curiam), overruled in part on other grounds as recognized by *Demaree v. Pederson*, 887 F.3d 870, 876 (9th Cir. 2018). This kind of "'over-seizing'" has become "an accepted reality in electronic searching because '[t]here is no way to be sure exactly what an electronic file contains without somehow examining its contents.'" *U.S. v. Flores*, 802 F.3d 1028, 1044-45 (9th Cir. 2015).

However, as other courts have begun to recognize, "[t]hat 'accepted reality' has evolved," explicitly rejecting the ruling in *Flores*. *Matter of Search of Info. Associated*

*With Four Redacted Gmail Accts.*, 371 F. Supp. 3d 843, 844–46 (D. Or. 2018) (finding application to search email accounts "overbroad because it is unreasonable to compel a provider to disclose every email in its client's account when the provider is able to disclose only those emails the government has probable cause to search" by limiting the search to relevant times); *see also Matter of the Search of Info. Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.*, 25 F. Supp. 3d 1, 7 (D.D.C. 2014) (criticizing the government's repeated habit of "submit[ting] overly broad warrants" where, even using the "two-step" process to seize and then search, "the seizure of a potentially massive amount of data without probable cause has still occurred—and the end result is that the government has in its possession information to which it has no right").

In *United States v. Roberts*, 430 F. Supp. 3d 693, 716–18 (D. Nev. 2019), *appeal dismissed*, No. 20-10026, 2020 WL 1952501 (9th Cir. Mar. 18, 2020), the court acknowledged the Ninth Circuit's ruling in *Flores*, yet suppressed the contents of a defendant's phone, in part, because the warrant "lack[ed] procedural safeguards to prevent the seizure and retention of information outside the scope of related criminal activity." 430 F. Supp. 3d at 717. The warrant contained "no standards for its execution, such as providing search methodology for segregating nonresponsive information." *Roberts*, 430 F. Supp. 3d at 717. "The absence of more definite limitations, both in timeframe and methodology, raises great due process concerns given that '[w]ith all that they contain and all they may reveal, [cell phones] hold for many Americans the privacies of life.'" *Id*. (quoting *Riley*, 573 U.S. at 403) (internal quotes omitted).

In another instructive case, *United States v. Lofstead*, No. 20-CR-00053 (MMD) WGC, 2021 WL 5501101, at *7 (D. Nev. Nov. 22, 2021), the court stated that the "Ninth Circuit has not definitely resolved whether a complete lack of temporal limitation on searches for ESI are facially broad." *See Flores*, 802 F.3d at 1045 ('Ultimately we need not decide whether the warrant was overboard for lack of

temporal limit because even if it was, suppression of the evidence used at trial was not required.')" *Id*. The court then suppressed the contents of a defendant's phone, in part, because the warrant contained no meaningful limits. There, the warrant sought virtually all materials on the phone even though the government knew of specific dates at issue. *Lofstead*, 2021 WL 5501101, at *7 (D. Nev. Nov. 22, 2021). "Although the items listed in the Warrant are not exactly vague, they are so numerous and unspecific to create an unrestricted 'dragnet' search." *Lofstead*, 2021 WL 5501101, at *7 (citing *Flores*, 802 F.3d at 1045). The court there analyzed "Item 1," a portion of the search warrant which allowed the government "to search for '[a]ny and all records and materials that may be found within [the phone], in any format and media (including, but not limited to; images videos, emails, chat logs, text messages, instant messages and electronic messages), pertaining to the Target Offenses.'" *Id*.

Like other warrants for digital data that have been deemed defective, the warrants to search Mr. Middlebrook's digital devices "lack[] the requisite specificity to allow for a tailored search of [the defendant's] electronic media" and "fail[] to link the items to be searched and seized to the suspected criminal activity." *United States v. Rosa*, 626 F.3d 56, 62 (2d Cir. 2010); *see also United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) (warrant to search electronics for "evidence of violations of NYS Penal Law or Federal Statutes" violated particularity requirement); *United States v. Winn*, 79 F. Supp. 3d 904. 920 (S.D. Ill. 2015) (warrant to search a cell phone "was overbroad, because it allowed the police to search for and seize broad swaths of data without probable cause to believe it constituted evidence of [the offense]"); *United States v. Jolly,* No. 2:20-cr-00438-MCS-1, ECF No. 218 (suppressing evidence derived from illegal search of digital devices due to insufficient search warrants).

The warrants here leave too much to the discretion of the searching agents and opened them up to seizing information which bore no temporal or subject matter connection to the Subject Offense. Because the warrant fails to describe the items to be seized and their relation to the offense with particularity, it is facially deficient.

Moreover, the warrants authorized the government's use of forensic extraction tools "such as 'EnCase' and 'FTK' (Forensic Tool Kit).'" Ex. A, at p. viii, ¶ 15c. Both tools are developed by private companies (Guidance Software and Exterro, respectively). EnCase "finds digital evidence no matter where it hides" and "[a]utomatically identifies images of particular interest, including nudity, drugs, weapons and explicit sexual content using artificial intelligence and machine learning."[5] These are troubling capabilities, given that the warrants here do not authorize a search for data "no matter where" it exists but only in enumerated locations, and also given that the warrants definitely do not permit artificial intelligence to automatically sweep for "images of particular interest" bearing no connection to the Subject Offense.

Here, the government seized the entire contents of Mr. Middlebrook's digital devices using a forensic extraction tool manufactured by Cellebrite, a private company. Cellebrite makes a Universal Forensics Extraction Device ("UFED") that can "extract and decode every ounce of data" on a cell phone.[6] That is exactly what the government did here; it copied every bit of data on the digital devices. This much is clear from the two complete copies of Mr. Middlebrook's digital devices provided to defense counsel using the Cellebrite software format. The Cellebrite report indicates that the government performed full logical extractions on all devices, a full file system extraction of the phones.

There is no prudent reading of the Fourth Amendment or art. I, ¶ 7, that would justify this type of seizure based on the information provided in search warrant applications.

---

[5] *See* OpenText EnCase Forensic, available at https://www.opentext.com/products/encase-forensic#features

[6] *See, e.g.*, Cellebrite, UFED Ultimate (2022), available at https://www.cellebrite.com/en/products/ufed-ultimate/.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant this motion and suppress any and all evidence seized from Mr. Middlebrook's digital devices.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: January 16, 2024,

By */s/ Ijeoma U. Eke*

Ijeoma U. Eke
J. Alejandro Barrientos
Deputy Federal Public Defenders
Attorneys for Keith Lawrence Middlebrook

**DECLARATION OF KEITH LAWRENCE MIDDLEBROOK**

I, Keith Lawrence Middlebrook, declare:

1. I am the defendant in *United States v. Keith Lawrence Middlebrook*, Case No. CR 20-229-DSF. I make this declaration in support of the motion to suppress based on personal knowledge and as compelled by Local Rule 12-1.1 to assert my Fourth Amendment rights.

2. On March 25, 2020, I was arrested by law enforcement. At the time of my arrest, officers seized two iPhones: an iPhone X and an iPhone 8, both of which are owned by me.

3. To seize the iPhone 8, officers entered a parked black Land Rover bearing California License Plate Number 7YJB275, which was the car I drove to the parking lot where I was arrested. At that time, I was leasing the Land Rover.

4. I did not provide officers consent to enter the black Land Rover.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 11, 2024, at Los Angeles, California.

KEITH LAWRENCE MIDDLEBROOK

# Exhibit A

AO 93 (Rev. 11/13) Search and Seizure Warrant (USAO CDCA Rev. 04/17)

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

The body of KEITH LAWRENCE MIDDLEBROOK and any digital device found on MIDDLEBROOK'S person

Case No. 20MJ01342

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before 14 days from the date of its issuance *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ___ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of ______.

Date and time issued: 3/25/2020 at 4pm

[signature] *Judge's signature*

City and state: Los Angeles

Honorable John E. McDermott
*Printed name and title*

AUSA: Valerie L. Makarewicz ((213) 894-0756)

USAO_00000119

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

USAO_00000120

## ATTACHMENT A

PERSON TO BE SEARCHED:

The SUBJECT PERSON is KEITH LAWRENCE MIDDLETON, date of birth [redacted] further described as a white male, approximately 6' tall and approximately 255 pounds with black hair and hazel eyes. SUBJECT PERSON includes any items on his person capable of containing items to be seized, including clothing pockets, containers such as briefcases, backpacks, boxes and any digital devices on his person.

Below is the SUBJECT PERSON'S DMV picture:



**ATTACHMENT B**

**I. ITEMS TO BE SEIZED**

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violation of 18 U.S.C. § 1349 (Attempted Fraud by Wire, Radio, and Television) (the "Subject Offense"), namely:

a. Records, documents, programs, application or materials related to:

i. Quantum Prevention CV Inc.;

ii. QP20;

iii. Quantum Cure;

iv. QC20;

v. A purported serum injectable cure for the COVID-19 virus;

vi. A purported treatment that prevents a person from being infected by the COVID-19 virus;

vii. Solicitations for, or receipt of, funds as investments into Quantum Prevention CV Inc., QP20, Quantum Cure, QC20 or any other entity purportedly developing a serum injectable cure for the COVID-19 virus and/or a treatment that prevents a person from being infected by the COVID-19 virus; and

viii. Information relating to credit card records, check registers, cancelled checks, and deposit and withdrawal records of funds received or spent for the purpose of creating, testing, marketing, and/or distributing a purported serum injectable cure for the COVID-19 virus and/or a purported

treatment that prevents a person from being infected by the COVID-19 virus.

ix. Information relating to any actions by Keith Lawrence Middleton or taken at his direction to create, test, market and/or distribute a cure and/or preventative treatment for the COVID-19 virus.

b. Any digital rolodex, contact list, or address book, contained on any digital devices containing information identified in paragraph 1(a) above.

c. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense, and forensic copies thereof.

2. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h. records of or information about Internet Protocol addresses used by the device;

i. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

5. The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged communications between KEITH LAWRENCE MIDDLEBROOK and any attorney:

Non-Digital Evidence

6. Prior to reading any document or other piece of evidence ("document") in its entirety, law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") will conduct a limited review of the document in order to determine whether or not the document appears to contain or refer to communications between MIDDLEBROOK and any attorney, or contain the work product of an attorney, and any person ("potentially privileged information"). If a Search Team member determines that a document appears to contain potentially

privileged information, the Search Team member will not continue to review the document and will immediately notify a member of the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case). The Search Team will not further review any document that appears to contain potentially privileged information until after the Privilege Review Team has completed its review.

7. In consultation with a Privilege Review Team Assistant United States Attorney ("PRTAUSA"), if appropriate, the Privilege Review Team member will then review any document identified as appearing to contain potentially privileged information to confirm that it contains potentially privileged information. If it does not, it may be returned to the Search Team member. If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant. Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further review or seizure absent subsequent authorization. Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information. The Privilege Review Team member will also make sure that the

locations where the documents containing potentially privileged information were seized have been documented.

8. The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA. If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Search Team. If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

Digital Evidence

9. The Search Team will search for digital devices capable of being used to facilitate the subject offense or capable of containing data falling within the scope of the items to be seized. The Privilege Review Team will then review the identified digital devices as set forth herein. The Search Team will review only digital device data which has been released by the Privilege Review Team.

10. The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

11. The Privilege Review Team and the Search Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of

execution of the warrant. The government will not search the digital device(s) beyond this 180-day period without first obtaining an extension of time order from the Court.

12. The Search Team will provide the Privilege Review Team with a list of "privilege key words" to search for on the digital devices, to include generic words like "attorney," "attorney-client privilege," "privileged," or "work product"]. The Privilege Review Team will conduct an initial review of the data on the digital devices using the privilege key words, and by using search protocols specifically chosen to identify documents or data containing potentially privileged information. The Privilege Review Team may subject to this initial review all of the data contained in each digital device capable of containing any of the items to be seized. Documents or data that are identified by this initial review as not potentially privileged may be given to the Search Team.

13. Documents or data that the initial review identifies as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information. Documents or data that are determined by this review not to be potentially privileged may be given to the Search Team. Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA. Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Search Team. If, after review, the PRTAUSA determines it to be appropriate, the

PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies. Documents or data that are the subject of such a finding may be given to the Search Team. Documents or data identified by the PRTAUSA after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

14. The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team at any step listed above in order to locate documents and data that are within the scope of the search warrant. The Search Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant. The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.

15. In performing the reviews, both the Privilege Review Team and the Search Team may:

a. search for and attempt to recover deleted, "hidden," or encrypted data;

b. use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c. use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

16. If either the Privilege Review Team or the Search Team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

17. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

18. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

19. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain the digital device and any forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

20. After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

21. In order to search for data capable of being read or interpreted by a digital device, the Search Team is authorized to seize the following items:

a. Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

22. During the execution of this search warrant, with respect to any person who is located at the SUBJECT PREMISES

during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

23. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, MADISON MACDONALD, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since March 2018. I am currently assigned a Los Angeles Field Division, White Collar Crimes Squad, which is responsible for investigating financial institution fraud, including bank fraud and wire fraud. Since joining the FBI in 2018, I have received 22 weeks of formal training at the FBI Training Academy in Quantico, Virginia. Prior to being employed by the FBI, I served as a Special Agent with the Arizona Attorney General's Office for four years, where I was assigned to the Major Fraud Unit and was responsible for conducting and participating in numerous investigations of fraudulent schemes and artifices, thefts, and forgeries.

2. This affidavit is made in support of an application for a warrant to search the body of KEITH LAWRENCE MIDDLEBROOK ("MIDDLEBROOK") (Year of Birth: 1967; Social Security No. XXX-XX-1638) (hereinafter "MIDDLEBROOK") and any digital device found on MIDDLEBROOK's person, described in Attachment A, for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1349 (Attempted Fraud by Wire, Radio, and Television) (the "Subject Offense"), as described in Attachment B. Attachments A and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **SUMMARY OF PROBABLE CAUSE**

4. Based on my investigation as described more fully below, there is probable cause to believe that MIDDLEBROOK is engaging in a scheme to defraud victim-investors by falsely promising enormous returns on the monetary investments he is soliciting in his company, Quantum Prevention CV Inc. (hereinafter "QP20"), which MIDDLEBROOK falsely claims has developed a patent-pending cure for the COVID-19 virus and a treatment that prevents a person from being infected by the COVID-19 virus. MIDDLEBROOK is promoting his "cure" and his preventative treatment on the Internet and communicating with potential victim-investors through interstate e-mails.

5. In furtherance of his fraudulent scheme, MIDDLEBROOK posted a series of videos and written statements on his Instagram page, in which he represented that he had developed a liquid that, when injected, would cure an individual who had contracted the COVID-19 virus within 24 hours. In addition, the posts on MIDDLEBROOK's Instagram page assert that MIDDLEBROOK

has developed a pill that, when ingested, will prevent an individual from contracting the COVID-19 virus. MIDDLEBROOK has made similar statements on videos posted to YouTube.

6. MIDDLEBROOK solicits investors to provide substantial funds for working capital for his corporation, QP20, a non-existent entity that MIDDLEBROOK falsely claims is incorporated in Nevada, and which MIDDLEBROOK promises will be used to mass produce and market the pill he claims will prevent an individual from contracting COVID-19. COVID-19, or coronavirus disease 2019, is a respiratory illness currently spreading through person-to-person contact throughout the world. MIDDLEBROOK provided potential investors wiring instructions to enable the investors to wire funds to MIDDLEBROOK's Bank of America and JPMorgan Chase accounts located in Los Angeles, California, and promised that, upon receipt of wired investment funds into his bank accounts, he would immediately issue shares in both QP20 and in another alleged corporation, Quantum Cure CV 2020 Inc. ("QC20"), which MIDDLEBROOK claimed had developed a patent-pending injectable serum that would "cure" those who had already contracted COVID-19 within 48 to 72 hours after injection.

## IV. STATEMENT OF PROBABLE CAUSE

**BACKGROUND**

7. I have reviewed California Department of Motor Vehicles ("DMV") records relevant to MIDDLEBROOK and learned the following:

a. I have seen the picture associated with MIDDLEBROOK's driver's license and am thus familiar with his appearance.

b. MIDDLEBROOK uses a residential address on Wilshire Boulevard in the Westwood neighborhood of Los Angeles, and, as of March 5, 2020, a mailing address of [redacted] Newport Beach, California 92660, and an additional address on Wilshire Boulevard in Santa Monica, California. I have checked open-source information and confirmed that the Newport Beach address is a UPS Store.

8. I have reviewed wireless subscriber information from AT&T regarding accounts held by MIDDLEBROOK, which was opened on or around July 23, 2018. The phone number associated with MIDDLEBROOK's account is [redacted] 4488 (the "4488 number"). The address associated with MIDDLEBROOK's wireless account with AT&T is the Newport Beach address, above. The home email address associated with MIDDLEBROOK's account is [redacted]

9. I have reviewed MIDDLEBROOK's Instagram page and records from Facebook regarding said page and learned the following:

a. MIDDLEBROOK is the subscriber for the page that can be accessed at https://www.instagram.com/keithmiddlebrook/?hl=en ("MIDDLEBROOK's Instagram page"). According to subscriber records which I reviewed, MIDDLEBROOK's Instagram account was created on July 8, 2013. The verified phone number associated

with MIDDLEBEROOK's Instagram account the 4488 Number. The registered email address was [redacted]

b. MIDDLEBROOK's Instagram page displays numerous photos and videos. I have reviewed the photos and videos on the Instagram page and determined that the person who appears in these photos and videos is the same person who is depicted in MIDDLEBROOK's DMV photo.

c. On or before March 24, 2020, MIDDLEBROOK described himself on his Instagram page as "Real Iron Man, Genius Entrepreneur Icon, Cleaner to the Pros, Speaker, 800 Scores Business Real Estate, Actor Writer Producer Reverse Aging Technology." On or around March 24, 2020, MIDDLEBROOK's description on his Instagram page read as follows: "Real Iron Man, Genius Entrepreneur, Inventor: COVID19 Immunity & Coronavirus Cure, Speaker, 800 Scores Business Real Estate, Actor, Reverse Aging Inc." [emphasis added].

d. As of March 24, 2020, MIDDLEBROOK had 2.4 million followers of his Instagram page.

e. MIDDLEBROOK's Instagram page contains a link to the website "[redacted] that displays numerous photos. I have viewed the photos on this website and determined that the person who appears in these photos is the same as the person depicted in MIDDLEBROOK's DMV photo. In the "Contact" section of the website, one email address listed for "directly" contacting MIDDLEBROOK is [redacted]

10. MIDDLEBROOK maintains at le[redacted] accounts with Google relevant to this investigation.

a. I have reviewed subscriber information regarding MIDDLEBROOK's first Gmail email, [redacted]. This Gmail email account was created on September 3, 2007. The account's recovery email was listed as [redacted] and the recovery Short Message Service ("SMS") the 4488 Number. According to Google records, this email address was last logged into on March 19, 2020.

b. I have reviewed subscriber information regarding MIDDLEBROOK's second Gmail email account [redacted] This Gmail email account was created on November 7, 2017. The account's recovery email was listed as [redacted] and the recovery SMS was the 4488 Number.

c. I have reviewed subscriber information regarding MIDDLEBROOK's third Gmail email account, [redacted]. This Gmail email account was created on March 19, 2020. The account's recovery email was listed [redacted], and the recovery SMS was the 4488 Number.

d. Based on my investigation, I know that emails sent via Gmail travel by wire transmission via locations outside of California.

11. MIDDLEBROOK has an account with YouTube that enables him to maintain a channel and upload videos to the Internet. The channel can be accessed at: http://www.youtube.com/channel/UCdv-BxfNfaRPAisqSSIhXOA. I have reviewed the subscriber information regarding MIDDLEBROOK's YouTube account and learned that MIDDLEBROOK created the account

on November 7, 2017, and the email listed when the account was created was [redacted]

**ORIGIN OF INVESTIGATION**

12. On or about March 13, 2020, San Diego FBI Special Agent Raymond Pitesky received information from a cooperating witness (CW-1), who resides in Orlando, Florida, regarding MIDDLEBROOK. CW-1 provided information about MIDDLEBROOK to the FBI in connection with a separate investigation and prosecution of MIDDLEBROOK in the Southern District of California, United States of America v. Keith Middlebrook, Case No. 14-CR-2950-H. (This case was dismissed without prejudice based on a Speedy Trial Act violation and not refiled.)[1]

According to Special Agent Pitesky, CW-1 reported that MIDDLEBROOK was soliciting investments to fund the mass production of a vaccination that could cure COVID-19. According to CW-1, MIDDLEBROOK offered CW-1 a percentage or finder's fee for any investors he referred to MIDDLEBROOK. CW-1 provided

---

[1] In 2006, CW-1 was indicted on charges of violating 18 U.S.C. §§ 371 (conspiracy), 1343 and 1349 (wire fraud and attempted wire fraud), and 15 U.S.C. § 78j(b) and ff (securities fraud), in the United States District Court for the District of Columbia, arising from a telemarking and securities fraud matter. CW-1 pleaded guilty to violations of 18 U.S.C. §§ 371 and 1343, and was sentenced to 60 months' probation including 8 months in a halfway house. In addition, CW-1 has informed Special Agent Pitesky that he was arrested in Florida in June 2019 on state charges of impersonating an attorney but that he believes the district attorney who filed these charges did so improperly. As of the filing of this affidavit, I have not been able to verifiy CW-1's statements or establish the status of any such proceedings.

Special Agent Pitesky with the 4488 Number which he identified as MIDDLEBROOK's telephone number.

**MIDDLEBROOK'S SOLICITATIONS AND ADVERTISEMENTS OF A PURPORTED COVID-19 PREVENTION AND CURE ON INSTAGRAM AND YOUTUBE**

13. Based on my investigation, I know that MIDDLEBROOK has made multiple statements, both in writing and in posted videos on his Instagram and YouTube pages, touting his purported injectable cure and prevention pills for COVID-19. MIDDLEBROOK has also made statements to two individuals to the same effect, both over the telephone and in writing via emails.

a. On March 13, 2020, MIDDLEBROOK posted a video titled "Keith Middlebrook on the truth about the Media, CoronaVirus and Secrets of Success" on his YouTube channel, which can be viewed at https://www.youtube.com/watch?v=wjo_H_KTMFI.

i. As of March 23, 2020, according to the page, MIDDLEBROOK's YouTube channel had 13,600 subscribers, and the video had been viewed 6,212 times.

ii. In addition, the following statement appears below the video:

> Keith Middlebrook aka The Real Iron Man breaks down the truth about the CoronaVirus and Secrets to Success. The Mainstream Media FEAR (False Entertainment Appearing Real) will use FEAR to Destroy a Great Economy, People, Families and Businesses. FACT: There is 1 Centillionth (.00000000001) of a chance of the Average person in America getting and dying of the CoronaVirus. * Minerals, Protein and Alkaline Water are the Super Secret to having and maintaining Incredible Health. * This Video will be ReShot, Keith has the Vaccine to the cure the CoronaVirus not Trump. Donald Trump will be signing the Accelerated Public Release of Keith's cure and Prevention. Much More to come, stay tuned. * Follow

Instagram @KeithMiddlebrook * KeithMiddlebrookProSports.com * Follow YouTube / Keith Middlebrook * Follow Twitter @4kmiddlebrook1 Keith Middlebrook aka The Real Iron Man Keith Middlebrook Net Worth 2020 $30 Million Keith Middlebrook Enterprise Net Worth 2020 $1 Billion

b. On March 16, 2020, at approximately 1:30 p.m., Special Agent Pitesky and I contacted CW-1 telephonically to discuss the investment solicitation MIDDLEBROOK made to CW-1.

i. CW-1 provided Special Agent Pitesky with numerous screenshots of text messages between himself and MIDDLEBROOK relating to both credit repair and MIDDLEBROOK's purported COVID-19 cure, which I viewed. Regarding COVID-19, on or around March 16, 2020, MIDDLEBROOK sent CW-1 a text containing a video, which showed a tackle box full of vials and syringes. On this video, MIDDLEBROOK can be heard discussing his cure for COVID-19.

ii. After the initial text, on or around March 16, 2020, MIDDLEBROOK sent additional text messages to CW-1 from the 4488 number that stated:

I have Developed the Cure for the CoronaVirus COVID-19

*LA Patient tested Positive for CoronaVirus got up and walked out 51 hours after my Injection

Blood Pressure Normal

Temperature Normal

Heart Rate Normal

Enzymes Normal

Sugar Levels Normal

CoronaVirus Negative

Investors who come in at ground level say $1M will parachute with $200M - $300M

Conservative Minimum

Plus retain Stock Shares

You Receive 25% Commission on ALL Funds you bring in plus Stock Shares for the IPO

iii. The last text CW-1 received from MIDDLEBROOK was a photo of former NBA player, Earvin "Magic" Johnson, and a statement, "We got MAGIC JOHNSON coming aboard!!!! CALL ME !!"

c. On March 17, 2020, MIDDLEBROOK posted a video on his Instagram account, which can be viewed at: https://www.instagram.com/tv/B90jig2ncED/?utm_source=ig_web_copy_link

i. Among other things, in the video, MIDDLEBROOK stated that he had created the cure for COVID-19. MIDDLEBROOK showed a syringe with a clear liquid and described how his cure worked. Instagram stated that, as of March 24, 2020, this video has been viewed 633,002 times.

ii. The following text appeared associated with the video:

Yes I have Developed the Cure for the CoronaVirus COVID-19.

After 6 Weeks of Intense Focus and Development (and very little sleep). I am currently going into Mass Production. * NOTE: All Haters and Ignorant responses are Deleted and Blocked as fast as they post. Give your Negative Energy to someone who has the time to waste on your worthless, uneducated, low self esteem ass. I am to busy saving the world. * The CDC, WHO and Mainstream Media have created a Pandemonium environment. To answer this (just because it's what I do) I have created a CoronaVirus Prevention Pill" (After 3 Days of taking it the person is Immune to the Virus and STAYS immune as long as they continue taking it once a day it the morning) and also the COVID-19 Formula Vaccine Cure to Satisfy the Physiological and Phycological Need at large. @realdonaldtrump @seanhannity * Much more to come, stay tuned! * Follow

YouTube / Keith Middlebrook for awesome complete video episodes. Many New ones are up and many more coming everyday. * Follow Twitter @4kmiddlebrook1

d. On March 17, 2020, at approximately 11:00 a.m., Special Agent Pitesky, an undercover FBI agent ("UCE") posing as an investor, and I contacted CW-1 to discuss an introduction to MIDDLEBROOK.

e. On March 18, 2020, at approximately 2:55 p.m., I conducted a three-way consensually recorded call between CW-1 (who was in Orlando, Florida), the UCE, and MIDDLEBROOK, and used the 4488 number.

i. On this call, MIDDLEBROOK solicited an investment from the UCE relating to a prevention pill and a serum formula-cure for COVID-19.

ii. For an initial investment of $300,000, MIDDLEBROOK guaranteed a return of $30 million, which MIDDLEBROOK said, was secured by a current $10 billion offer from an unnamed buyer in Dubai. For example, MIDDLEBROOK stated for someone who put "in $1 million" would "be looking at a $100 million" return. MIDDLEBROOK stated that his injection serum/prevention pills would be worth "$100 billion" before an initial IPO offering. MIDDLEBROOK said to the UCE "I'll guarantee you this...at least, you put in $300 grand, I'll guarantee you...I'll guarantee the value of your shares and stock...and you can do whatever you want...minimum $30 million..." Additionally, MIDDLEBROOK stated that six individuals had already invested, including "Dr. Patterson" who had invested $1 million.

f. During the call, MIDDLEBROOK sent the UCE a text message that contained his Bank of America account information and wiring instructions for the UCE to wire the money he would be investing, as follows:

KM Legal Power, LLC - Account # [redacted]3866

Business Address: [redacted] Newport Beach, CA 92660

g. On March 19, 2020, at approximately 3:17 a.m., MIDDLEBROOK sent an email from [redacted] to the UCE's Yahoo email account, with an attachment that outlined the investment opportunity. A PDF copy of the above-described document, which has been redacted to protect the identity of the UCE and MIDDLEBROOK's bank account information, is attached hereto as Exhibit A and incorporated hereto.

h. At approximately 3:31 a.m., MIDDLEBROOK sent the UCE a text message, stating:

1 Sheet in your email

Call Me

Call me after wire sent

Stock Share Docs to be prepared

and FedEx to you today

Conservative Projections:

First Level of 4-6 Levels

$400,000 splits to $4,000,000 plus

2nd Level $4M splits to $40M

And much more

i. At approximately 2:45 p.m., the UCE contacted MIDDLEBROOK telephonically for a follow-up recorded conversation, which I listened to without MIDDLEBROOK's knowledge. MIDDLEBROOK indicated that, since last speaking with the UCE, seven individuals had invested with MIDDLEBROOK, with an average investment of $750,000 to $1 million. MIDDLEBROOK ended the call to talk to "Dr. Robert Goldman" and called the UCE back shortly thereafter. MIDDLEBROOK indicated that he would provide the UCE (and his mother) the prevention pills after he [MIDDLEBROOK] received an initial wired deposit of $9,999.

j. At approximately 5:52 p.m., MIDDLEBROOK texted the UCE an account name and number at JPMorgan Chase of "MIDDLEBROOK Productions, LLC - Account #[redacted]7916" that the UCE should use to wire the funds to MIDDLEBROOK. MIDDLEBROOK then sent a text to the UCE that stated: "Shares & Docs are for $400k."

14. On March 21, 2020, MIDDLEBROOK posted a video on his Instagram page. Instagram has stated that, as of March 24, 2020, this video has been viewed 1,011,750 times. The video can be viewed at: www.instagram.com/tv/B9-PxmAnsuS/?utm_source=ig_web_copy_link

a. On this video, MIDDLEBROOK shows a pill that he states prevents him from contracting COVID-19. He states that if he took the pill and walked into the Staples Center filled with COVID-19 positive individuals, he could not contract the virus. Among other statements, MIDDLEBROOK claims that because of ingesting the pill, he is immune to COVID-19, as his cell

membrane walls cannot contract the virus. MIDDLEBROOK states that he "just got off the phone with" Dr. Ronald Goldman, President Donald Trump's physician for sports and health medicine, and that he (MIDDLEBROOK) is on his way to Mar-a-Lago to get the executive emergency order to override the FDA [i.e., the U.S. Food and Drug Administration]. MIDDLEBROOK stated that the preventive pill, which he takes once a day, is called QP20 and the injectable cure is called QC20.

b. In addition, the following comment appears posted with the video.

> Yes I have created the pill that makes you IMMUNE to COVID-19!
>
> I have created the Prevention Pill that is time released 24 Hours. This pill I have designed makes anyone completely IMMUNE to the Virus COVID-19 disease coronavirus. * NOTE: All Haters and Ignorant comments are Deleted and Blocked as Fast as they post. Give your incompetence and Negative Energy to someone who has time to waste with you and tolerate your worthless low self-esteem ass. * I am busy saving the world. * The Medical, Virus and Disease communities are lazy and trying to use old tricks on a new dog. Like the measles vaccine to cure coronavirus, it won't work. I have the True, Tried and Tested Cure and now the Prevention. I had to wait for Lab Results to post this. * I created this Preventative IMMUNE Pill (QP20) Quantum Prevention CV 2020 as the Answer to the "Pandemonium / Havoc environment" created by the "Negative Sensationalism for viewership" by the Mainstream Media, CDC and WHO as they Needlessly have caused a complete US shut down based on 249 deaths in 2 Months (all over the age of 80) and are attempting to completely destroy the Greatest economy in US History built by @realdonaldtrump. * Perception is Realty so I have developed the Prevention and the Cure to satisfy the physical and physiological Needs to save the World. * FACTS to REALIZE: US Deaths Year / Day: * Homicides 16,000 / 44 * Smoking 480,000 / 1,315 * 2nd Hand Smoke 41,000 / 112
>
> * Flu (Average) 50,000 / 137

* Alcohol 88,000 / 241 * Opioids 70,000 / 191 * Diabetes 4,200,000 / 11,506 * Car Accidents 38,000 / 104 * Total Self Inflicted Deaths per Year 4,967,000 * Total Self Inflicted Deaths per Day 13,616 * Notice the Mainstream Media didn't shut down all Businesses for these Real Numbers and more. * Much more to come stay tuned. * Follow YouTube / Keith Middlebrook * Follow KeithMiddlebrookProSports.com * Follow Twitter @4kmiddlebrook1

#KeithMiddlebrook

#XcceleratedSuccess

#COVID19

#Coronavirus

c. In response to the above narrative description, an individual commented that "it should be tested on people." MIDDLEBROOK replied, "it was, 3 patients who were injected with my formula tested Coronavirus NEGATIVE! I had to wait for the Test results before I could post the Video. Please learn to READ and listen to the [sic] All the Videos."

d. On March 22, 2020, MIDDLEBROOK posted a video on his Instagram page. Instagram stated that, as of March 24, 2020, this video had been viewed 449,396 times. The video can be viewed at: https://www.instagram.com/tv/B-BPZGanfhr/?utm_source=ig_web_copy_link

i. On this video, MIDDLEBROOK states that he created the cure for, and prevention of, COVID-19.

ii. The following comment appears with the video.

Secrets to Success from the Real Iron Man on Coronavirus.

Powerful Video of Knowledge to Empower You. NOTE: Ignorant Hater Followers and unintelligent comments are being Deleted and Blocked as Fast as they Post.

(Give your Follow, hate and negative energy to someone who has time to waste with you and tolerate your worthless, low self esteem ass). I am busy Saving the World. * Filmed at my Home / Office in Newport Beach California on March 21, 2020. FACT: The Mainstream Media, CDC, and the WHO started creating Mass Hysteria, Havoc and Pandemonium when they claimed "Pandemic" as Millions of People are dying in the streets when really total US Coronavirus deaths were at 38 (All above the age of 80) and only 1,361 cases. *All Designed and meant to Destroy the Greatest Economy in US History built by @realdonaldtrump. I encourage you to NOT GO ALONG with "We are all in this together". Do NOT SUCCUMB to their negative destructive mindset, if you go along with it, then they got you where they want you. * Instead Focus on your Goals and your brand. I am teaching you to Plow through the Negativity and WIN. - Keith Middlebrook Much more to come stay tuned. * SPECIAL NOTE: I was wrongfully indicted by the Government in 2014 and I BEAT them and WON on September 13, 2016. Now I am Suing them for $1 Billion and I am Winning. (I know first hand more than anyone how Sick and Evil 1/2 of them can be). Follow YouTube / Keith Middlebrook * Follow Twitter [redacted] @seanhannity
#KeithMiddlebrook
#XcceleratedSuccess
#COVID19
#coronavirus
#Cure
#Prevention

**HEALTH OFFICIALS' STATEMENTS RE: COVID-19 PREVENTION AND CURE**

15. As of March 24, 2020, the World Health Organization stated on its website, which can be viewed at https://www.who.int/news-room/q-a-detail/q-a-coronaviruses, the following:

> To date, there is no vaccine and no specific antiviral medicine to prevent or treat COVID-2019. However, those affected should receive care to relieve symptoms. People with serious illness should be hospitalized. Most patients recover thanks to supportive care. Possible vaccines and some specific drug treatments are under investigation. They are being tested through clinical trials. WHO is coordinating efforts to develop vaccines and medicines to prevent and treat COVID-19.

16. As of March 24, 2020, the United States Centers for Disease Control stated on their website, which can be viewed at https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf, that there is currently no vaccine to protect against COVID-19, and there is no specific antiviral treatment for COVID-19.

17. On February 25, 2020, the National Institutes of Health ("NIH"), the United States' national medical research agency and a component of the Department of Health and Human Services, announced that the National Institute of Allergy and Infectious Disease was the regulatory sponsor of the first clinical trial in the United States at the University of Nebraska Medical Center in Omaha, Nebraska. In addition, the NIH stated there were no specific therapeutics approved by the Food and Drug Administration to treat people with COVID-19. Furthermore, the NIH stated that Remdesivir, developed by Gilead Sciences Inc., was the investigational broad-spectrum antiviral treatment that was being tested. The announcement stated the following:

> "We urgently need a safe and effective treatment for COVID-19. Although remdesivir has been administered to some patients with COVID-19, we do not have solid data to indicate it can improve clinical outcomes," said NIAID Director and U.S. Coronavirus Task Force member Anthony S. Fauci, M.D. "A randomized, placebo-controlled trial is the gold standard for determining if an experimental treatment can benefit patients."

The announcement can be viewed at: https://www.nih.gov/news-events/news-releases/nih-clinical-trial-remdesivir-treat-covid-19-begins.

**MIDDLEBROOK'S FALSE STATEMENTS IN FURTHERANCE OF HIS FRAUDULENT INVESTMENT SCHEME**

18. In addition to stating on his videos and descriptions accompanying the videos that he has developed an injectable cure and prevention pills for COVID-19, MIDDLEBROOK made several false statements in the "1 Sheet for company QP20 and QC20" (see Exhibit A) that MIDDLEBROOK emailed to the UCE on March 19, 2020,

19. For example, MIDDLEBROOK falsely stated that QP20 and QC20, the injectable serum and prevention pills, are patent pending.

a. On March 23, 2020, I conducted several search queries for "Keith Middlebrook" using the United States Patent and Trademark Office's (USPTO) online database, http://patft.uspto.gov/netahtml/PTO/search-bool.html, to include, but not limited to the following fields: Inventor, Applicant Name, Assignee Name and All Fields. The aforementioned queries revealed "No patents have matched your query". Similar searches included "Dustin T. Johnston", "Earvin 'Magic' Johnson" and "Roderic Boling" using Inventor search field, which did not reveal any results. A search of "Dr. D. Patterson" as the Inventor yield multiple results; however, additional personal identifying information would be needed to verify these results. Lastly, searches using subject companies "Quantum Prevention CV Inc." and "KM Legal Power LLC" yielded negative results using the Assignee Name search field.

b. On March 24, 2020, an attorney in the Office of Policy and International Affairs of the United States Patent and Trademark Office confirmed that MIDDLEBROOK had not been awarded any patents/trademarks by said office. It should be noted, however, that approved patents are to remain confidential for a minimum of 18 months, before they are ultimately published on the USPTO website.

20. MIDDLEBROOK also falsely stated that, as of March 19, 2020, Earvin "Magic" Johnson ("Johnson"), the former NBA basketball player, was a director and/or officer of QC20. In addition, MIDDLEBROOK made false statements to CW-1 in a text message on March 16, 2020 that Johnson was "coming aboard."

a. On March 24, 2020, I contacted Christina Francis ("Francis"), President of Magic Johnson Enterprises, which is owned by Johnson.

b. Francis stated to me that she is responsible for handling financial matters on behalf of Johnson and advised me that Johnson was not involved in any investments related to COVID-19.

c. Immediately thereafter, according to Francis, she contacted Johnson and confirmed that Johnson had no involvement in any businesses or other investment opportunities being conducted by or offered by MIDDLEBROOK, and he had not been contacted by MIDDLEBROOK regarding making any investment. Moreover, Francis showed Johnson a photograph of MIDDLEBROOK and Johnson stated to Francis that he had never met, spoken to, or seen MIDDLEBROOK.

21. MIDDLEBROOK also falsely stated in the "1 Sheet" that he sent to the UCE that QP20 was a Nevada Corporation, foreign filing in Florida.

a. On March 24, 2020, I reviewed an email from the Chief Criminal Investigator of the Securities Division for the Secretary of State of Nevada, who searched the commercial recording database for MIDDLEBROOK, Quantum Prevention, and KM Legal Power, and did not locate any corporate filings for MIDDLEBROOK or said entities.

a. On March 23, 2020, I queried the online records for the Florida Division of Corporations, at search.sunbiz.org, for MIDDLEBROOK, Quantum Prevention, and KM Legal Power, and did not locate any corporate filings for MIDDLEBROOK or said entities.

**ADDITIONAL INFORMATION ESTABLISHING PROBABLE CAUSE TO BELIEVE THAT EVIDENCE OF THE SUBJECT OFFENSE, INCLUDING ON DIGITAL DEVICES, WILL BE FOUND ON MIDDLEBROOK'S PERSON**

23. As detailed above, the investigation has revealed that MIDDLEBROOK used digital devices, likely including an Apple IPhone X, to committed the Subject Offense, and there is probable cause to believe that evidence, fruits and instrumentalities of the Subject Offense will be found on the digital devices, including those found on his person, which MIDDLEBROOK operates.

24. My investigation has revealed that the 4488 number is an AT&T mobile number and likely, MIDDLEBROOK's cell phone. According to AT&T records, MIDDLEBROOK registered an Apple

iPhone X that bears International Mobile Equipment Identity number 354861091681541 5, as recently as March 18, 2020. MIDDLEBROOK communicated with CW-1 and the UCE by using the 4488 number, both by placing and receiving telephone calls, but also by transmitting text messages.

25. As detailed above, the investigation also revealed that MIDDLEBROOK uses e-mail and social media applications. For example, communicated with the UCE by using MIDDLEBROOK's Gmail account to send the "1 Sheet" at Exhibit A. MIDDLEBROOK also posted the videos and descriptions associated with the videos on Instagram and YouTube by a digital device. MIDDLEBROOK self-reported to Instagram and Google his verified phone number and SMS recovery was the 4488 number.

26. I also know, based on my training and experience, conversations with other law enforcement officers, and my investigation of this matter, that digital devices are needed to access e-mail services, including web-based e-mail services like Gmail, and that information associated with user's access of the e-mail service will be found on the digital devices that accessed the e-mail service. This may include the e-mail communications and attachments themselves as well as digital artifacts and metadata related to users' access. I also know that individuals use smart phones like Apple iPhones or tablets to access e-mail and social media applications, like the ones MIDDLEBROOK uses. Individuals often keep smart phones and other digital devices on their persons and individuals retain communications, including text messages and emails, on their

mobile phones regarding their business and financial information.

27. Therefore, based on the facts above and my training and experience, there is probable cause to believe that MIDDLEBROOK used digital devices to commit the Subject Offense, that MIDDLEBROOK will have on his person MIDDLEBROOK's mobile phone and other digital devices and that the digital devices used to commit the Subject Offense found on MIDDLEBROOK will contain evidence, fruits, and instrumentalities of the Subject Offense.

## V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

28. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and

others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A

single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35′ x 35′ x 10′ rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, <u>i.e.</u>, space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to

[2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently

associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on

the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime. In addition, decryption of devices and data stored thereon is a constantly evolving field,

and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

29. As discussed herein, based on my training and experience I believe that digital devices will be found during the search. I believe that MIDDLEBROOK possesses an iPhone X based on my review of AT&T subscriber records regarding the 4488 phone number.

a. I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition. Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the

"home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard. Fingerprint-recognition features are increasingly common on modern digital devices. For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint. The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. To activate the facial-recognition feature, a user must hold the device in front of his or her face. The device's camera analyzes and records data based on the user's facial characteristics. The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face. No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Several companies produce digital

devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017). Apple calls its facial-recognition unlock feature "Face ID." The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

d. While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that are unique and stable. Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light. Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels. A user can register one or both eyes to be used to unlock a device with these features. To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye. Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features. In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and

multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

30. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

31. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled. This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time. For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and

either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

32. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

33. For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is (a) located on MIDDLEBROOK's person and (b) falls within the scope of the warrant: (1) compel the use of MIDDLEBROOK's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of MIDDLEBROOK's face, and instruct him to hold his eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

34. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

35. For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of violation of 18 U.S.C. § 1349 (Attempted Fraud by Wire, Radio, and Television) will be found at the SUBJECT PREMISES.

MADISON MACDONALD
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me this 25th day of March, 2020.

HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE

# Exhibit B

AO 93C (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means ☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

BLACK IPHONE 8

Case No. 2:20-MJ-01377

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before 14 days from the date of its issuance *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for____days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of ____________________.

Date and time issued: March 27, 2020 11:30 a.m.

*Judge's signature*

City and state: Los Angeles, CA

Honorable Michael R. Wilner, United States Magistrate Judge
*Printed name and title*

AUSA: James C. Hughes (213-894-2579)

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

*Executing officer's signature*

*Printed name and title*

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

The property to be seized and search is composed of the following items currently maintained in the custody of the Federal Bureau of Investigation ("FBI") in Los Angeles, California:

1. A BLACK IPHONE 8, retrieved from the black Land Rover, License Plate # on March 25, 2020 (the "SUBJECT DEVICE"). A photo of the SUBJECT DEVICE at the time it was seized is shown below.



**ATTACHMENT B**

**I. ITEMS TO BE SEIZED**

1. The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1349 (attempted wire fraud) (the "Subject Offenses"), namely:

a. Records, documents, programs, application or materials related to:

i. Quantum Prevention CV Inc.;

ii. QP20;

iii. Quantum Cure;

iv. QC20;

v. A purported serum injectable cure for the COVID-19 virus;

vi. A purported treatment that prevents a person from being infected by the COVID-19 virus;

vii. Solicitations for, or receipt of, funds as investments into Quantum Prevention CV Inc, QP20, Quantum Cure, QC20 or any other entity purportedly developing a serum injectable cure for the COVID-19 virus and/or a treatment that prevents a person from being infected by the COVID-19 virus; and

viii. Information relating to credit card records, check registers, cancelled checks, and deposit and withdrawal records of funds received or spent for the purpose of creating, testing, marketing, and/or distributing a purported serum injectable cure for the COVID-19 virus and/or a purported

treatment that prevents a person from being infected by the COVID-19 virus.

b. Information relating to any actions by Keith Lawrence Middleton or taken at his direction to create, test, market and/or distribute a cure and/or preventative treatment for the COVID-19 virus.

c. Any digital rolodex, contact list, or address book, contained on any digital devices containing information identified in paragraph 1(a) above.

d. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense, and forensic copies thereof.

e. With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II. SEARCH PROCEDURE FOR THE SUBJECT DEVICE(S)

3. In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b. The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c. The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e. If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f. If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g. If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h. If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the

government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i. The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j. After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other court order.

## I. SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

1. The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or work product:

Non-Digital Evidence

2. Prior to reading any document or other piece of evidence ("document") in its entirety, law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") will conduct a limited review of the document in order to determine whether or not the document appears to contain or refer to communications between an attorney, or to contain the work product of an attorney and any person ("potentially privileged information"). If a Search Team member determines that a document appears to contain potentially privileged information, the Search Team member will not continue to review the document and will immediately notify a member of the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case). The Search Team will not further review any document that appears to

contain potentially privileged information until after the Privilege Review Team has completed its review.

3. In consultation with a Privilege Review Team Assistant United States Attorney ("PRTAUSA"), if appropriate, the Privilege Review Team member will then review any document identified as appearing to contain potentially privileged information to confirm that it contains potentially privileged information. If it does not, it may be returned to the Search Team member. If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant. Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further review or seizure absent subsequent authorization. Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information. The Privilege Review Team member will also make sure that the locations where the documents containing potentially privileged information were seized have been documented.

4. The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA. If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Search Team. If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

Digital Evidence

5. The Search Team will search for digital devices capable of being used to facilitate the subject offenses or capable of containing data falling within the scope of the items to be seized. The Privilege Review Team will then review the identified digital devices as set forth herein. The Search Team will review only digital device data which has been released by the Privilege Review Team.

6. The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

7. The Privilege Review Team and the Search Team shall complete both stages of the search discussed herein as soon as

is practicable but not to exceed 180 days from the date of execution of the warrant. The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

8. The Search Team will provide the Privilege Review Team with a list of "privilege key words" to search for on the digital devices, to include generic words such as "attorney" "privileged", or "work product." The Privilege Review Team will conduct an initial review of the data on the digital devices using the privilege key words, and by using search protocols specifically chosen to identify documents or data containing potentially privileged information. The Privilege Review Team may subject to this initial review all of the data contained in each digital device capable of containing any of the items to be seized. Documents or data that are identified by this initial review as not potentially privileged may be given to the Search Team.

9. Documents or data that the initial review identifies as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information. Documents or data that are determined by this review not to be potentially privileged may be given to the Search Team. Documents or data that are determined by this review to be potentially privileged will be given to the United

States Attorney's Office for further review by a PRTAUSA. Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Search Team. If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies. Documents or data that are the subject of such a finding may be given to the Search Team. Documents or data identified by the PRTAUSA after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

10. The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team at any step listed above in order to locate documents and data that are within the scope of the search warrant. The Search Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant. The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.

11. In performing the reviews, both the Privilege Review Team and the Search Team may:

a. search for and attempt to recover deleted, "hidden," or encrypted data;

b. use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c. use forensic examination and searching tools, such as “EnCase” and “FTK” (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

12. If either the Privilege Review Team or the Search Team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

13. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

14. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

15. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

16. The government may also retain a digital device if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

17. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

18. In order to search for data capable of being read or interpreted by a digital device, the Search Team is authorized to seize the following items:

a. Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

19. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other court order.

# AFFIDAVIT

I, Madison MacDonald, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since March 2018. I am currently assigned a Los Angeles Field Division, White Collar Crimes Squad, which is responsible for investigating financial institution fraud, including bank fraud and wire fraud. Since joining the FBI in 2018, I have received 22 weeks of formal training at the FBI Training Academy in Quantico, Virginia. Prior to being employed by the FBI, I served as a Special Agent with the Arizona Attorney General's Office for four years, where I was assigned to the Major Fraud Unit and was responsible for conducting and participating in numerous investigations of fraudulent schemes and artifices, thefts, and forgeries.

## II. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of an application for a warrant to seize and search the following items, which were recovered from the vehicle of KEITH LAWRENCE MIDDLEBROOK at the time of his arrest by federal authorities on March 25, 2020, and are currently held in the custody of FBI in Los Angeles, California:

a. A BLACK IPHONE 8, retrieved from the black Land Rover, License Plate #7YJB275 on March 25, 2020 (the "SUBJECT DEVICE").

A photo of the SUBJECT DEVICE at the time it was seized is shown below.



3. The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICE that constitutes evidence, contraband, instrumentalities, and/or fruits of violations of: 18 U.S.C. §§ 1343 (Wire Fraud), and 1349 (Attempted Wire Fraud), and any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

4. The items to be searched are identified in Attachment A to the search warrant application. The list of items to be seized is set forth in Attachment B to the search warrant application. Attachments A and B are incorporated herein by reference.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. PROBABLE CAUSE TO SEARCH AND SEIZE THE SUBJECT ITEMS

6. I am currently investigating Keith Lawrence Middlebrook (Year of Birth: 1967; Social Security No. XXX-XX-1638)(hereinafter "MIDDLEBROOK") regarding a scheme to defraud victim-investors by falsely promising enormous returns on the monetary investments he is soliciting in his company, Quantum Prevention CV Inc. (hereinafter "QP20"), which MIDDLEBROOK falsely claims has developed a patent-pending cure for the COVID-19 virus and a treatment that prevents a person from being infected by the COVID-19 virus. MIDDLEBROOK is promoting his "cure" and his preventative treatment on the Internet and communicating with potential victim-investors through interstate e-mails.

7. On March 25, 2020, the United States filed a complaint against MIDDLEBROOK charging him with one count of attempted wire fraud in violation of 18 U.S.C. § 1349. On the same day, I submitted an affidavit in support of a search warrant authorizing the search of MIDDLEBROOK's person. A true and

correct copy of this search warrant application and affidavit is attached to this affidavit as Exhibit 1, and is incorporated herein by reference.

8. On March 25, 2020, FBI agents arrested MIDDLEBROOK during a meeting an undercover FBI agent ("the UCE") posing as an investor. Prior to the meeting, the UCE engaged in a series of recorded telephone conversations, text messages, and email exchanges with MIDDLEBROOK in which the UCE posed as a potential investor looking to invest in MIDDLEBROOK'S business, allegedly engaged in the development, production, and sale of a patent-pending cure for the COVID-19 virus ("the cure") and a treatment that prevents a person from being infected by the COVID-19 virus ("the prevention pill"). I have reviewed copies and recordings of these conversations and correspondence. Through the abovementioned communications, the UCE arranged to meet with MIDDLEBROOK based on the representation that he would provide MIDDLEBROOK with $400,000 in cash in exchange for shares in a corporation allegedly formed by MIDDLEBROOK to engage in the research, manufacture, and sale of the cure and the prevention pill. MIDDLEBROOK also agreed to provide the UCE with several doses of the prevention pill for use by the UCE's mother, whom the UCE represented was of an advanced age and therefore particularly susceptible to COVID-19.

9. At approximately, 5:41 PM on March 25, 2020, MIDDLEBROOK met with the UCE in the parking lot of a shopping center located at 530 North Sepulveda Blvd., El Segundo, California. I participated in the arrest of MIDDLEBROOK and

have spoken with the UCE regarding his interactions with MIDDLEBROOK leading up to arrest. Based on my own recollections of these events and my conversations with the UCE, I state as follows:

a. At approximately 5:41 PM, MIDDLEBROOK called the UC and informed the UCE that MIDDLEBROOK had arrived in the parking lot of the abovementioned shopping center. After the UCE informed MIDDLEBROOK where he was located in the shopping center, MIDDLEBROOK parked his vehicle, a black Land Rover, License Plate Number 7YJB275, directly in front of the UCE and exited his vehicle.

b. After exiting the vehicle, MIDDLEBROOK greeted the UCE. After the two individuals exchanged pleasantries, the UCE asked MIDDLEBROOK if he had brought any doses of the “prevention pill” for the UCE’s mother. MIDDLEBOOK informed the UCE that he had brought doses of the “prevention pill”, and then opened the passenger side door of his vehicle and retrieved a medium sized plastic bag containing a large number of pills of different shapes and sizes. MIDDLEBROOK then retrieved four small plastic sandwich bags from his vehicle and placed approximately three pills into each plastic sandwich bag. MIDDLEBROOK then returned the medium sized bag containing the larger volume of pills to his vehicle.

10. During the execution of the arrest of MIDDLEBROOK, I looked inside the passenger side window of the black Land Rover driven by MIDDLEBROOK to his meeting with the UCE. In plain sight on the passenger seat of the vehicle was a medium sized

plastic bag containing a large volume of pills of different shapes and colors. Directly next to the bag of pills was a black iPhone (the SUBJECT DEVICE).

11. Incident to the arrest of MIDDLEBROOK, the arresting agents with the FBI seized the abovementioned items observed on the passenger seat of defendant’s vehicle. While processing the SUBJECT DEVICE, I observed that the SUBJECT DEVICE received a text message from a contact identified in the phone by the same name as CW-1, a cooperating witness who initially arranged an introduction between MIDDLEBROOK and the UCE. The text was visible on the “lock screen” of the SUBJECT DEVICE. Details regarding CW-1 are included in the affidavit previously submitted on March 25, 2020 in paragraphs 12 through 13. The portion of the text message visible on the lock screen of the SUBJECT DEVICE read as follows:

> "Ok, I will let them know, you need to tell Sean that, I told him the other Corp was already established and filed in Nevada and Florida like it says on the "One Sheet", I'll let you handle explaining that Corp shit to..."

## IV. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

12. As used herein, the term “digital device” includes the SUBJECT DEVICE.

13. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

14. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

15. Digital devices often contain electronic evidence related to a crime, the device’s user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

16. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

17. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

18. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

19. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

20. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

21. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V. CONCLUSION

22. For all the reasons described above, there is probable cause to believe that MIDDLEBROOK violated 18 U.S.C § 1343(Wire Fraud) and 18 U.S.C. § 1349 (Attempted Wire Fraud).

23. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT ITEMS, as described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this ____ day of __________, 2020.

UNITED STATES MAGISTRATE JUDGE

# Exhibit 1

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
The body of KEITH LAWRENCE MIDDLEBROOK and any digital device found on MIDDLEBROOK'S person

Case No.

FILED
CLERK, U.S. DISTRICT COURT
MAR 25 2020
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Fraud by Wire, Radio, and Television |
| 18 U.S.C. § 1349 | Attempted Fraud by Wire, Radio, and Television |

The application is based on these facts:

See Attached Affidavit

LODGED
2020 MAR 2 PM
CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. LOS ANGELES
BY

☒ Continued on the attached sheet.

☐ Delayed notice ____ days (give exact ending date if more than 30 days: ________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/S/
*Applicant's signature*

Madison MacDonald, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/25/2010

JOHN E. MCDERMOTT
*Judge's signature*

City and state: Los Angeles

Honorable John E. McDermott
*Printed name and title*

AUSA: Valerie L. Makarewicz ((213) 894-0756)

EXHIBIT 1

## ATTACHMENT A

PERSON TO BE SEARCHED:

The SUBJECT PERSON is KEITH LAWRENCE MIDDLETON, date of birth [redacted] further described as a white male, approximately 6′ tall and approximately 255 pounds with black hair and hazel eyes. SUBJECT PERSON includes any items on his person capable of containing items to be seized, including clothing pockets, containers such as briefcases, backpacks, boxes and any digital devices on his person.

Below is the SUBJECT PERSON'S DMV picture:



ATTACHMENT B

I. ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violation of 18 U.S.C. § 1349 (Attempted Fraud by Wire, Radio, and Television) (the "Subject Offense"), namely:

a. Records, documents, programs, application or materials related to:

i. Quantum Prevention CV Inc.;

ii. QP20;

iii. Quantum Cure;

iv. QC20;

v. A purported serum injectable cure for the COVID-19 virus;

vi. A purported treatment that prevents a person from being infected by the COVID-19 virus;

vii. Solicitations for, or receipt of, funds as investments into Quantum Prevention CV Inc., QP20, Quantum Cure, QC20 or any other entity purportedly developing a serum injectable cure for the COVID-19 virus and/or a treatment that prevents a person from being infected by the COVID-19 virus; and

viii. Information relating to credit card records, check registers, cancelled checks, and deposit and withdrawal records of funds received or spent for the purpose of creating, testing, marketing, and/or distributing a purported serum injectable cure for the COVID-19 virus and/or a purported

treatment that prevents a person from being infected by the COVID-19 virus.

ix. Information relating to any actions by Keith Lawrence Middleton or taken at his direction to create, test, market and/or distribute a cure and/or preventative treatment for the COVID-19 virus.

b. Any digital rolodex, contact list, or address book, contained on any digital devices containing information identified in paragraph 1(a) above.

c. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense, and forensic copies thereof.

2. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h. records of or information about Internet Protocol addresses used by the device;

i. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

5. The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged communications between KEITH LAWRENCE MIDDLEBROOK and any attorney:

Non-Digital Evidence

6. Prior to reading any document or other piece of evidence ("document") in its entirety, law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") will conduct a limited review of the document in order to determine whether or not the document appears to contain or refer to communications between MIDDLEBROOK and any attorney, or contain the work product of an attorney, and any person ("potentially privileged information"). If a Search Team member determines that a document appears to contain potentially

privileged information, the Search Team member will not continue to review the document and will immediately notify a member of the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case). The Search Team will not further review any document that appears to contain potentially privileged information until after the Privilege Review Team has completed its review.

7. In consultation with a Privilege Review Team Assistant United States Attorney ("PRTAUSA"), if appropriate, the Privilege Review Team member will then review any document identified as appearing to contain potentially privileged information to confirm that it contains potentially privileged information. If it does not, it may be returned to the Search Team member. If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant. Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further review or seizure absent subsequent authorization. Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information. The Privilege Review Team member will also make sure that the

locations where the documents containing potentially privileged information were seized have been documented.

8. The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA. If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Search Team. If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

<u>Digital Evidence</u>

9. The Search Team will search for digital devices capable of being used to facilitate the subject offense or capable of containing data falling within the scope of the items to be seized. The Privilege Review Team will then review the identified digital devices as set forth herein. The Search Team will review only digital device data which has been released by the Privilege Review Team.

10. The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

11. The Privilege Review Team and the Search Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of

execution of the warrant. The government will not search the digital device(s) beyond this 180-day period without first obtaining an extension of time order from the Court.

12. The Search Team will provide the Privilege Review Team with a list of "privilege key words" to search for on the digital devices, to include generic words like "attorney," "attorney-client privilege," "privileged," or "work product"]. The Privilege Review Team will conduct an initial review of the data on the digital devices using the privilege key words, and by using search protocols specifically chosen to identify documents or data containing potentially privileged information. The Privilege Review Team may subject to this initial review all of the data contained in each digital device capable of containing any of the items to be seized. Documents or data that are identified by this initial review as not potentially privileged may be given to the Search Team.

13. Documents or data that the initial review identifies as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information. Documents or data that are determined by this review not to be potentially privileged may be given to the Search Team. Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA. Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Search Team. If, after review, the PRTAUSA determines it to be appropriate, the

PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies. Documents or data that are the subject of such a finding may be given to the Search Team. Documents or data identified by the PRTAUSA after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

14. The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team at any step listed above in order to locate documents and data that are within the scope of the search warrant. The Search Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant. The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.

15. In performing the reviews, both the Privilege Review Team and the Search Team may:

a. search for and attempt to recover deleted, "hidden," or encrypted data;

b. use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c. use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

16. If either the Privilege Review Team or the Search Team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

17. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

18. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

19. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain the digital device and any forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

20. After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

21. In order to search for data capable of being read or interpreted by a digital device, the Search Team is authorized to seize the following items:

a. Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

22. During the execution of this search warrant, with respect to any person who is located at the SUBJECT PREMISES

during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

23. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, MADISON MACDONALD, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since March 2018. I am currently assigned a Los Angeles Field Division, White Collar Crimes Squad, which is responsible for investigating financial institution fraud, including bank fraud and wire fraud. Since joining the FBI in 2018, I have received 22 weeks of formal training at the FBI Training Academy in Quantico, Virginia. Prior to being employed by the FBI, I served as a Special Agent with the Arizona Attorney General's Office for four years, where I was assigned to the Major Fraud Unit and was responsible for conducting and participating in numerous investigations of fraudulent schemes and artifices, thefts, and forgeries.

2. This affidavit is made in support of an application for a warrant to search the body of KEITH LAWRENCE MIDDLEBROOK ("MIDDLEBROOK") (Year of Birth: 1967; Social Security No. XXX-XX-1638) (hereinafter "MIDDLEBROOK") and any digital device found on MIDDLEBROOK's person, described in Attachment A, for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1349 (Attempted Fraud by Wire, Radio, and Television) (the "Subject Offense"), as described in Attachment B. Attachments A and B are incorporated herein by reference.

Case 2:20-mj-01377-DUTY *SEALED* Document 2 *SEALED* Filed 03/27/20 Page 43 of 75 Page ID #:192

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. SUMMARY OF PROBABLE CAUSE

4. Based on my investigation as described more fully below, there is probable cause to believe that MIDDLEBROOK is engaging in a scheme to defraud victim-investors by falsely promising enormous returns on the monetary investments he is soliciting in his company, Quantum Prevention CV Inc. (hereinafter "QP20"), which MIDDLEBROOK falsely claims has developed a patent-pending cure for the COVID-19 virus and a treatment that prevents a person from being infected by the COVID-19 virus. MIDDLEBROOK is promoting his "cure" and his preventative treatment on the Internet and communicating with potential victim-investors through interstate e-mails.

5. In furtherance of his fraudulent scheme, MIDDLEBROOK posted a series of videos and written statements on his Instagram page, in which he represented that he had developed a liquid that, when injected, would cure an individual who had contracted the COVID-19 virus within 24 hours. In addition, the posts on MIDDLEBROOK's Instagram page assert that MIDDLEBROOK

has developed a pill that, when ingested, will prevent an individual from contracting the COVID-19 virus. MIDDLEBROOK has made similar statements on videos posted to YouTube.

6. MIDDLEBROOK solicits investors to provide substantial funds for working capital for his corporation, QP20, a non-existent entity that MIDDLEBROOK falsely claims is incorporated in Nevada, and which MIDDLEBROOK promises will be used to mass produce and market the pill he claims will prevent an individual from contracting COVID-19. COVID-19, or coronavirus disease 2019, is a respiratory illness currently spreading through person-to-person contact throughout the world. MIDDLEBROOK provided potential investors wiring instructions to enable the investors to wire funds to MIDDLEBROOK's Bank of America and JPMorgan Chase accounts located in Los Angeles, California, and promised that, upon receipt of wired investment funds into his bank accounts, he would immediately issue shares in both QP20 and in another alleged corporation, Quantum Cure CV 2020 Inc. ("QC20"), which MIDDLEBROOK claimed had developed a patent-pending injectable serum that would "cure" those who had already contracted COVID-19 within 48 to 72 hours after injection.

## IV. STATEMENT OF PROBABLE CAUSE

**BACKGROUND**

7. I have reviewed California Department of Motor Vehicles ("DMV") records relevant to MIDDLEBROOK and learned the following:

a. I have seen the picture associated with MIDDLEBROOK's driver's license and am thus familiar with his appearance.

b. MIDDLEBROOK uses a residential address on Wilshire Boulevard in the Westwood neighborhood of Los Angeles, and, as of March 5, 2020, a mailing address of [redacted] Newport Beach, California 92660, and an additional address on Wilshire Boulevard in Santa Monica, California. I have checked open-source information and confirmed that the Newport Beach address is a UPS Store.

8. I have reviewed wireless subscriber information from AT&T regarding accounts held by MIDDLEBROOK, which was opened on or around July 23, 2018. The phone number associated with MIDDLEBROOK's account is [redacted]-4488 (the "4488 number"). The address associated with MIDDLEBROOK's wireless account with AT&T is the Newport Beach address, above. The home email address associated with MIDDLEBROOK's account is [redacted]

9. I have reviewed MIDDLEBROOK's Instagram page and records from Facebook regarding said page and learned the following:

a. MIDDLEBROOK is the subscriber for the page that can be accessed at https://www.instagram.com/keithmiddlebrook/?hl=en ("MIDDLEBROOK's Instagram page"). According to subscriber records which I reviewed, MIDDLEBROOK's Instagram account was created on July 8, 2013. The verified phone number associated

with MIDDLEBEROOK's Instagram account the 4488 Number. The registered email address was [redacted]

b. MIDDLEBROOK's Instagram page displays numerous photos and videos. I have reviewed the photos and videos on the Instagram page and determined that the person who appears in these photos and videos is the same person who is depicted in MIDDLEBROOK's DMV photo.

c. On or before March 24, 2020, MIDDLEBROOK described himself on his Instagram page as "Real Iron Man, Genius Entrepreneur Icon, Cleaner to the Pros, Speaker, 800 Scores Business Real Estate, Actor Writer Producer Reverse Aging Technology." On or around March 24, 2020, MIDDLEBROOK's description on his Instagram page read as follows: "Real Iron Man, Genius Entrepreneur, Inventor: COVID19 Immunity & Coronavirus Cure, Speaker, 800 Scores Business Real Estate, Actor, Reverse Aging Inc." [emphasis added].

d. As of March 24, 2020, MIDDLEBROOK had 2.4 million followers of his Instagram page.

e. MIDDLEBROOK's Instagram page contains a link to the website "keithmiddlebrookprosports.com" that displays numerous photos. I have viewed the photos on this website and determined that the person who appears in these photos is the same as the person depicted in MIDDLEBROOK's DMV photo. In the "Contact" section of the website, one email address listed for "directly" contacting MIDDLEBROOK is "[redacted]"

10. MIDDLEBROOK maintains at least three Gmail email accounts with Google relevant to this investigation.

a. I have reviewed subscriber information regarding MIDDLEBROOK's first Gmail email, [redacted] This Gmail email account was created on September 3, 2007. The account's recovery email was listed as [redacted] and the recovery Short Message Service ("SMS") the 4488 Number. According to Google records, this email address was last logged into on March 19, 2020.

b. I have reviewed subscriber information regarding MIDDLEBROOK's second Gmail email account [redacted] This Gmail email account was created on November 7, 2017. The account's recovery email was listed as [redacted] and the recovery SMS was the 4488 Number.

c. I have reviewed subscriber information regarding MIDDLEBROOK's third Gmail email account, [redacted] This Gmail email account was created on March 19, 2020. The account's recovery email was listed [redacted] and the recovery SMS was the 4488 Number.

d. Based on my investigation, I know that emails sent via Gmail travel by wire transmission via locations outside of California.

11. MIDDLEBROOK has an account with YouTube that enables him to maintain a channel and upload videos to the Internet. The channel can be accessed at: http://www.youtube.com/channel/UCdv-BxfNfaRPAisqSSIhXOA. I have reviewed the subscriber information regarding MIDDLEBROOK's YouTube account and learned that MIDDLEBROOK created the account

on November 7, 2017, and the email listed when the account was created was kmprosports@gmail.com.

**ORIGIN OF INVESTIGATION**

12. On or about March 13, 2020, San Diego FBI Special Agent Raymond Pitesky received information from a cooperating witness (CW-1), who resides in Orlando, Florida, regarding MIDDLEBROOK. CW-1 provided information about MIDDLEBROOK to the FBI in connection with a separate investigation and prosecution of MIDDLEBROOK in the Southern District of California, United States of America v. Keith Middlebrook, Case No. 14-CR-2950-H. (This case was dismissed without prejudice based on a Speedy Trial Act violation and not refiled.)[1]

According to Special Agent Pitesky, CW-1 reported that MIDDLEBROOK was soliciting investments to fund the mass production of a vaccination that could cure COVID-19. According to CW-1, MIDDLEBROOK offered CW-1 a percentage or finder's fee for any investors he referred to MIDDLEBROOK. CW-1 provided

---

[1] In 2006, CW-1 was indicted on charges of violating 18 U.S.C. §§ 371 (conspiracy), 1343 and 1349 (wire fraud and attempted wire fraud), and 15 U.S.C. § 78j(b) and ff (securities fraud), in the United States District Court for the District of Columbia, arising from a telemarking and securities fraud matter. CW-1 pleaded guilty to violations of 18 U.S.C. §§ 371 and 1343, and was sentenced to 60 months' probation including 8 months in a halfway house. In addition, CW-1 has informed Special Agent Pitesky that he was arrested in Florida in June 2019 on state charges of impersonating an attorney but that he believes the district attorney who filed these charges did so improperly. As of the filing of this affidavit, I have not been able to verifiy CW-1's statements or establish the status of any such proceedings.

Special Agent Pitesky with the 4488 Number which he identified as MIDDLEBROOK's telephone number.

**MIDDLEBROOK'S SOLICITATIONS AND ADVERTISEMENTS OF A PURPORTED COVID-19 PREVENTION AND CURE ON INSTAGRAM AND YOUTUBE**

13. Based on my investigation, I know that MIDDLEBROOK has made multiple statements, both in writing and in posted videos on his Instagram and YouTube pages, touting his purported injectable cure and prevention pills for COVID-19. MIDDLEBROOK has also made statements to two individuals to the same effect, both over the telephone and in writing via emails.

a. On March 13, 2020, MIDDLEBROOK posted a video titled "Keith Middlebrook on the truth about the Media, CoronaVirus and Secrets of Success" on his YouTube channel, which can be viewed at https://www.youtube.com/watch?v=wjo_H_KTMFI.

i. As of March 23, 2020, according to the page, MIDDLEBROOK's YouTube channel had 13,600 subscribers, and the video had been viewed 6,212 times.

ii. In addition, the following statement appears below the video:

> Keith Middlebrook aka The Real Iron Man breaks down the truth about the CoronaVirus and Secrets to Success. The Mainstream Media FEAR (False Entertainment Appearing Real) will use FEAR to Destroy a Great Economy, People, Families and Businesses. FACT: There is 1 Centillionth (.00000000001) of a chance of the Average person in America getting and dying of the CoronaVirus. * Minerals, Protein and Alkaline Water are the Super Secret to having and maintaining Incredible Health. * This Video will be ReShot, Keith has the Vaccine to the cure the CoronaVirus not Trump. Donald Trump will be signing the Accelerated Public Release of Keith's cure and Prevention. Much More to come, stay tuned. * Follow

Instagram @KeithMiddlebrook * KeithMiddlebrookProSports.com * Follow YouTube / Keith Middlebrook * Follow Twitter @4kmiddlebrook1 Keith Middlebrook aka The Real Iron Man Keith Middlebrook Net Worth 2020 $30 Million Keith Middlebrook Enterprise Net Worth 2020 $1 Billion

b. On March 16, 2020, at approximately 1:30 p.m., Special Agent Pitesky and I contacted CW-1 telephonically to discuss the investment solicitation MIDDLEBROOK made to CW-1.

i. CW-1 provided Special Agent Pitesky with numerous screenshots of text messages between himself and MIDDLEBROOK relating to both credit repair and MIDDLEBROOK's purported COVID-19 cure, which I viewed. Regarding COVID-19, on or around March 16, 2020, MIDDLEBROOK sent CW-1 a text containing a video, which showed a tackle box full of vials and syringes. On this video, MIDDLEBROOK can be heard discussing his cure for COVID-19.

ii. After the initial text, on or around March 16, 2020, MIDDLEBROOK sent additional text messages to CW-1 from the 4488 number that stated:

I have Developed the Cure for the CoronaVirus COVID-19

*LA Patient tested Positive for CoronaVirus got up and walked out 51 hours after my Injection

Blood Pressure Normal

Temperature Normal

Heart Rate Normal

Enzymes Normal

Sugar Levels Normal

CoronaVirus Negative

Investors who come in at ground level say $1M will parachute with $200M - $300M

> Conservative Minimum
>
> Plus retain Stock Shares
>
> You Receive 25% Commission on ALL Funds you bring in plus Stock Shares for the IPO

iii. The last text CW-1 received from MIDDLEBROOK was a photo of former NBA player, Earvin "Magic" Johnson, and a statement, "We got MAGIC JOHNSON coming aboard!!!! CALL ME !!"

c. On March 17, 2020, MIDDLEBROOK posted a video on his Instagram account, which can be viewed at: https://www.instagram.com/tv/B90jig2ncED/?utm_source=ig_web_copy_link

i. Among other things, in the video, MIDDLEBROOK stated that he had created the cure for COVID-19. MIDDLEBROOK showed a syringe with a clear liquid and described how his cure worked. Instagram stated that, as of March 24, 2020, this video has been viewed 633,002 times.

ii. The following text appeared associated with the video:

> Yes I have Developed the Cure for the CoronaVirus COVID-19.
>
> After 6 Weeks of Intense Focus and Development (and very little sleep). I am currently going into Mass Production. * NOTE: All Haters and Ignorant responses are Deleted and Blocked as fast as they post. Give your Negative Energy to someone who has the time to waste on your worthless, uneducated, low self esteem ass. I am to busy saving the world. * The CDC, WHO and Mainstream Media have created a Pandemonium environment. To answer this (just because it's what I do) I have created a CoronaVirus Prevention Pill" (After 3 Days of taking it the person is Immune to the Virus and STAYS immune as long as they continue taking it once a day it the morning) and also the COVID-19 Formula Vaccine Cure to Satisfy the Physiological and Phycological Need at large. @realdonaldtrump @seanhannity * Much more to come, stay tuned! * Follow

YouTube / Keith Middlebrook for awesome complete video episodes. Many New ones are up and many more coming everyday. * Follow Twitter [redacted]

d. On March 17, 2020, at approximately 11:00 a.m., Special Agent Pitesky, an undercover FBI agent ("UCE") posing as an investor, and I contacted CW-1 to discuss an introduction to MIDDLEBROOK.

e. On March 18, 2020, at approximately 2:55 p.m., I conducted a three-way consensually recorded call between CW-1 (who was in Orlando, Florida), the UCE, and MIDDLEBROOK, and used the 4488 number.

i. On this call, MIDDLEBROOK solicited an investment from the UCE relating to a prevention pill and a serum formula-cure for COVID-19.

ii. For an initial investment of $300,000, MIDDLEBROOK guaranteed a return of $30 million, which MIDDLEBROOK said, was secured by a current $10 billion offer from an unnamed buyer in Dubai. For example, MIDDLEBROOK stated for someone who put "in $1 million" would "be looking at a $100 million" return. MIDDLEBROOK stated that his injection serum/prevention pills would be worth "$100 billion" before an initial IPO offering. MIDDLEBROOK said to the UCE "I'll guarantee you this...at least, you put in $300 grand, I'll guarantee you...I'll guarantee the value of your shares and stock...and you can do whatever you want...minimum $30 million..." Additionally, MIDDLEBROOK stated that six individuals had already invested, including "Dr. Patterson" who had invested $1 million.

f. During the call, MIDDLEBROOK sent the UCE a text message that contained his Bank of America account information and wiring instructions for the UCE to wire the money he would be investing, as follows:

KM Legal Power, LLC - Account # [redacted]3866

Business Address: [redacted] Newport Beach, CA 92660

g. On March 19, 2020, at approximately 3:17 a.m., MIDDLEBROOK sent an email from [redacted] to the UCE's Yahoo email account, with an attachment that outlined the investment opportunity. A PDF copy of the above-described document, which has been redacted to protect the identity of the UCE and MIDDLEBROOK's bank account information, is attached hereto as Exhibit A and incorporated hereto.

h. At approximately 3:31 a.m., MIDDLEBROOK sent the UCE a text message, stating:

1 Sheet in your email

Call Me

Call me after wire sent

Stock Share Docs to be prepared

and FedEx to you today

Conservative Projections:

First Level of 4-6 Levels

$400,000 splits to $4,000,000 plus

2nd Level $4M splits to $40M

And much more

i. At approximately 2:45 p.m., the UCE contacted MIDDLEBROOK telephonically for a follow-up recorded conversation, which I listened to without MIDDLEBROOK's knowledge. MIDDLEBROOK indicated that, since last speaking with the UCE, seven individuals had invested with MIDDLEBROOK, with an average investment of $750,000 to $1 million. MIDDLEBROOK ended the call to talk to "Dr. Robert Goldman" and called the UCE back shortly thereafter. MIDDLEBROOK indicated that he would provide the UCE (and his mother) the prevention pills after he [MIDDLEBROOK] received an initial wired deposit of $9,999.

j. At approximately 5:52 p.m., MIDDLEBROOK texted the UCE an account name and number at JPMorgan Chase of "MIDDLEBROOK Productions, LLC - Account #[redacted]7916" that the UCE should use to wire the funds to MIDDLEBROOK. MIDDLEBROOK then sent a text to the UCE that stated: "Shares & Docs are for $400k."

14. On March 21, 2020, MIDDLEBROOK posted a video on his Instagram page. Instagram has stated that, as of March 24, 2020, this video has been viewed 1,011,750 times. The video can be viewed at: www.instagram.com/tv/B9-PxmAnsuS/?utm_source=ig_web_copy_link

a. On this video, MIDDLEBROOK shows a pill that he states prevents him from contracting COVID-19. He states that if he took the pill and walked into the Staples Center filled with COVID-19 positive individuals, he could not contract the virus. Among other statements, MIDDLEBROOK claims that because of ingesting the pill, he is immune to COVID-19, as his cell

membrane walls cannot contract the virus. MIDDLEBROOK states that he "just got off the phone with" Dr. Ronald Goldman, President Donald Trump's physician for sports and health medicine, and that he (MIDDLEBROOK) is on his way to Mar-a-Lago to get the executive emergency order to override the FDA [i.e., the U.S. Food and Drug Administration]. MIDDLEBROOK stated that the preventive pill, which he takes once a day, is called QP20 and the injectable cure is called QC20.

b. In addition, the following comment appears posted with the video.

> Yes I have created the pill that makes you IMMUNE to COVID-19!
>
> I have created the Prevention Pill that is time released 24 Hours. This pill I have designed makes anyone completely IMMUNE to the Virus COVID-19 disease coronavirus. * NOTE: All Haters and Ignorant comments are Deleted and Blocked as Fast as they post. Give your incompetence and Negative Energy to someone who has time to waste with you and tolerate your worthless low self-esteem ass. * I am busy saving the world. * The Medical, Virus and Disease communities are lazy and trying to use old tricks on a new dog. Like the measles vaccine to cure coronavirus, it won't work. I have the True, Tried and Tested Cure and now the Prevention. I had to wait for Lab Results to post this. * I created this Preventative IMMUNE Pill (QP20) Quantum Prevention CV 2020 as the Answer to the "Pandemonium / Havoc environment" created by the "Negative Sensationalism for viewership" by the Mainstream Media, CDC and WHO as they Needlessly have caused a complete US shut down based on 249 deaths in 2 Months (all over the age of 80) and are attempting to completely destroy the Greatest economy in US History built by @realdonaldtrump. * Perception is Realty so I have developed the Prevention and the Cure to satisfy the physical and physiological Needs to save the World. * FACTS to REALIZE: US Deaths Year / Day: * Homicides 16,000 / 44 * Smoking 480,000 / 1,315 * 2nd Hand Smoke 41,000 / 112
>
> * Flu (Average) 50,000 / 137

* Alcohol 88,000 / 241 * Opioids 70,000 / 191 * Diabetes 4,200,000 / 11,506 * Car Accidents 38,000 / 104 * Total Self Inflicted Deaths per Year 4,967,000 * Total Self Inflicted Deaths per Day 13,616 * Notice the Mainstream Media didn't shut down all Businesses for these Real Numbers and more. * Much more to come stay tuned. * Follow YouTube / Keith Middlebrook * Follow KeithMiddlebrookProSports.com * Follow Twitter @4kmiddlebrook1

#KeithMiddlebrook

#XcceleratedSuccess

#COVID19

#Coronavirus

c. In response to the above narrative description, an individual commented that "it should be tested on people." MIDDLEBROOK replied, "it was, 3 patients who were injected with my formula tested Coronavirus NEGATIVE! I had to wait for the Test results before I could post the Video. Please learn to READ and listen to the [sic] All the Videos."

d. On March 22, 2020, MIDDLEBROOK posted a video on his Instagram page. Instagram stated that, as of March 24, 2020, this video had been viewed 449,396 times. The video can be viewed at: https://www.instagram.com/tv/B-BPZGanfhr/?utm_source=ig_web_copy_link

i. On this video, MIDDLEBROOK states that he created the cure for, and prevention of, COVID-19.

ii. The following comment appears with the video.

Secrets to Success from the Real Iron Man on Coronavirus.

Powerful Video of Knowledge to Empower You. NOTE: Ignorant Hater Followers and unintelligent comments are being Deleted and Blocked as Fast as they Post.

> (Give your Follow, hate and negative energy to someone who has time to waste with you and tolerate your worthless, low self esteem ass). I am busy Saving the World. * Filmed at my Home / Office in Newport Beach California on March 21, 2020. FACT: The Mainstream Media, CDC, and the WHO started creating Mass Hysteria, Havoc and Pandemonium when they claimed "Pandemic" as Millions of People are dying in the streets when really total US Coronavirus deaths were at 38 (All above the age of 80) and only 1,361 cases. *All Designed and meant to Destroy the Greatest Economy in US History built by @realdonaldtrump. I encourage you to NOT GO ALONG with "We are all in this together". Do NOT SUCCUMB to their negative destructive mindset, if you go along with it, then they got you where they want you. * Instead Focus on your Goals and your brand. I am teaching you to Plow through the Negativity and WIN. - Keith Middlebrook Much more to come stay tuned. * SPECIAL NOTE: I was wrongfully indicted by the Government in 2014 and I BEAT them and WON on September 13, 2016. Now I am Suing them for $1 Billion and I am Winning. (I know first hand more than anyone how Sick and Evil 1/2 of them can be). Follow YouTube / Keith Middlebrook * Follow Twitter ([redacted] @seanhannity
> #KeithMiddlebrook
> #XcceleratedSuccess
> #COVID19
> #coronavirus
> #Cure
> #Prevention

**HEALTH OFFICIALS' STATEMENTS RE: COVID-19 PREVENTION AND CURE**

15. As of March 24, 2020, the World Health Organization stated on its website, which can be viewed at https://www.who.int/news-room/q-a-detail/q-a-coronaviruses, the following:

> To date, there is no vaccine and no specific antiviral medicine to prevent or treat COVID-2019. However, those affected should receive care to relieve symptoms. People with serious illness should be hospitalized. Most patients recover thanks to supportive care. Possible vaccines and some specific drug treatments are under investigation. They are being tested through clinical trials. WHO is coordinating efforts to develop vaccines and medicines to prevent and treat COVID-19.

16. As of March 24, 2020, the United States Centers for Disease Control stated on their website, which can be viewed at https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf, that there is currently no vaccine to protect against COVID-19, and there is no specific antiviral treatment for COVID-19.

17. On February 25, 2020, the National Institutes of Health ("NIH"), the United States' national medical research agency and a component of the Department of Health and Human Services, announced that the National Institute of Allergy and Infectious Disease was the regulatory sponsor of the first clinical trial in the United States at the University of Nebraska Medical Center in Omaha, Nebraska. In addition, the NIH stated there were no specific therapeutics approved by the Food and Drug Administration to treat people with COVID-19. Furthermore, the NIH stated that Remdesivir, developed by Gilead Sciences Inc., was the investigational broad-spectrum antiviral treatment that was being tested. The announcement stated the following:

> "We urgently need a safe and effective treatment for COVID-19. Although remdesivir has been administered to some patients with COVID-19, we do not have solid data to indicate it can improve clinical outcomes," said NIAID Director and U.S. Coronavirus Task Force member Anthony S. Fauci, M.D. "A randomized, placebo-controlled trial is the gold standard for determining if an experimental treatment can benefit patients."

The announcement can be viewed at: https://www.nih.gov/news-events/news-releases/nih-clinical-trial-remdesivir-treat-covid-19-begins.

**MIDDLEBROOK'S FALSE STATEMENTS IN FURTHERANCE OF HIS FRAUDULENT INVESTMENT SCHEME**

18. In addition to stating on his videos and descriptions accompanying the videos that he has developed an injectable cure and prevention pills for COVID-19, MIDDLEBROOK made several false statements in the "1 Sheet for company QP20 and QC20" (see Exhibit A) that MIDDLEBROOK emailed to the UCE on March 19, 2020,

19. For example, MIDDLEBROOK falsely stated that QP20 and QC20, the injectable serum and prevention pills, are patent pending.

a. On March 23, 2020, I conducted several search queries for "Keith Middlebrook" using the United States Patent and Trademark Office's (USPTO) online database, http://patft.uspto.gov/netahtml/PTO/search-bool.html, to include, but not limited to the following fields: Inventor, Applicant Name, Assignee Name and All Fields. The aforementioned queries revealed "No patents have matched your query". Similar searches included "Dustin T. Johnston", "Earvin 'Magic' Johnson" and "Roderic Boling" using Inventor search field, which did not reveal any results. A search of "Dr. D. Patterson" as the Inventor yield multiple results; however, additional personal identifying information would be needed to verify these results. Lastly, searches using subject companies "Quantum Prevention CV Inc." and "KM Legal Power LLC" yielded negative results using the Assignee Name search field.

b. On March 24, 2020, an attorney in the Office of Policy and International Affairs of the United States Patent and Trademark Office confirmed that MIDDLEBROOK had not been awarded any patents/trademarks by said office. It should be noted, however, that approved patents are to remain confidential for a minimum of 18 months, before they are ultimately published on the USPTO website.

20. MIDDLEBROOK also falsely stated that, as of March 19, 2020, Earvin "Magic" Johnson ("Johnson"), the former NBA basketball player, was a director and/or officer of QC20. In addition, MIDDLEBROOK made false statements to CW-1 in a text message on March 16, 2020 that Johnson was "coming aboard."

a. On March 24, 2020, I contacted Christina Francis ("Francis"), President of Magic Johnson Enterprises, which is owned by Johnson.

b. Francis stated to me that she is responsible for handling financial matters on behalf of Johnson and advised me that Johnson was not involved in any investments related to COVID-19.

c. Immediately thereafter, according to Francis, she contacted Johnson and confirmed that Johnson had no involvement in any businesses or other investment opportunities being conducted by or offered by MIDDLEBROOK, and he had not been contacted by MIDDLEBROOK regarding making any investment. Moreover, Francis showed Johnson a photograph of MIDDLEBROOK and Johnson stated to Francis that he had never met, spoken to, or seen MIDDLEBROOK.

21. MIDDLEBROOK also falsely stated in the "1 Sheet" that he sent to the UCE that QP20 was a Nevada Corporation, foreign filing in Florida.

a. On March 24, 2020, I reviewed an email from the Chief Criminal Investigator of the Securities Division for the Secretary of State of Nevada, who searched the commercial recording database for MIDDLEBROOK, Quantum Prevention, and KM Legal Power, and did not locate any corporate filings for MIDDLEBROOK or said entities.

a. On March 23, 2020, I queried the online records for the Florida Division of Corporations, at search.sunbiz.org, for MIDDLEBROOK, Quantum Prevention, and KM Legal Power, and did not locate any corporate filings for MIDDLEBROOK or said entities.

**ADDITIONAL INFORMATION ESTABLISHING PROBABLE CAUSE TO BELIEVE THAT EVIDENCE OF THE SUBJECT OFFENSE, INCLUDING ON DIGITAL DEVICES, WILL BE FOUND ON MIDDLEBROOK'S PERSON**

23. As detailed above, the investigation has revealed that MIDDLEBROOK used digital devices, likely including an Apple IPhone X, to committed the Subject Offense, and there is probable cause to believe that evidence, fruits and instrumentalities of the Subject Offense will be found on the digital devices, including those found on his person, which MIDDLEBROOK operates.

24. My investigation has revealed that the 4488 number is an AT&T mobile number and likely, MIDDLEBROOK's cell phone. According to AT&T records, MIDDLEBROOK registered an Apple

iPhone X that bears International Mobile Equipment Identity number 354861091681541 5, as recently as March 18, 2020. MIDDLEBROOK communicated with CW-1 and the UCE by using the 4488 number, both by placing and receiving telephone calls, but also by transmitting text messages.

25. As detailed above, the investigation also revealed that MIDDLEBROOK uses e-mail and social media applications. For example, communicated with the UCE by using MIDDLEBROOK's Gmail account to send the "1 Sheet" at Exhibit A. MIDDLEBROOK also posted the videos and descriptions associated with the videos on Instagram and YouTube by a digital device. MIDDLEBROOK self-reported to Instagram and Google his verified phone number and SMS recovery was the 4488 number.

26. I also know, based on my training and experience, conversations with other law enforcement officers, and my investigation of this matter, that digital devices are needed to access e-mail services, including web-based e-mail services like Gmail, and that information associated with user's access of the e-mail service will be found on the digital devices that accessed the e-mail service. This may include the e-mail communications and attachments themselves as well as digital artifacts and metadata related to users' access. I also know that individuals use smart phones like Apple iPhones or tablets to access e-mail and social media applications, like the ones MIDDLEBROOK uses. Individuals often keep smart phones and other digital devices on their persons and individuals retain communications, including text messages and emails, on their

mobile phones regarding their business and financial information.

27. Therefore, based on the facts above and my training and experience, there is probable cause to believe that MIDDLEBROOK used digital devices to commit the Subject Offense, that MIDDLEBROOK will have on his person MIDDLEBROOK's mobile phone and other digital devices and that the digital devices used to commit the Subject Offense found on MIDDLEBROOK will contain evidence, fruits, and instrumentalities of the Subject Offense.

## V. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

28. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and

others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A

single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35′ x 35′ x 10′ rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to

---

[2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently

associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on

the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime. In addition, decryption of devices and data stored thereon is a constantly evolving field,

and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

29. As discussed herein, based on my training and experience I believe that digital devices will be found during the search. I believe that MIDDLEBROOK possesses an iPhone X based on my review of AT&T subscriber records regarding the 4488 phone number.

a. I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition. Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the

"home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard. Fingerprint-recognition features are increasingly common on modern digital devices. For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint. The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. To activate the facial-recognition feature, a user must hold the device in front of his or her face. The device's camera analyzes and records data based on the user's facial characteristics. The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face. No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Several companies produce digital

devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017). Apple calls its facial-recognition unlock feature "Face ID." The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

d. While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that are unique and stable. Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light. Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels. A user can register one or both eyes to be used to unlock a device with these features. To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye. Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features. In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and

multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

30. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

31. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled. This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time. For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and

either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

32. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

33. For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is (a) located on MIDDLEBROOK's person and (b) falls within the scope of the warrant: (1) compel the use of MIDDLEBROOK's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of MIDDLEBROOK's face, and instruct him to hold his eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

34. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

35. For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of violation of 18 U.S.C. § 1349 (Attempted Fraud by Wire, Radio, and Television) will be found at the SUBJECT PREMISES.

/s/

MADISON MACDONALD
Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 25th day of March, 2020.

JOHN E. MCDERMOTT

HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

BLACK IPHONE 8

Case No. 2:20-MJ-01377

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. §1349 | Attempted Wire Fraud |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_________days (*give exact ending date if more than 30 days*:_____________) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

Madison Macdonald, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: March 27, 2020

*Judge's signature*

City and state: Los Angeles, CA

Honorable Michael R. Wilner, United States Magistrate Judge
*Printed name and title*

AUSA: James C. Hughes (213-894-2579)

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

The property to be seized and search is composed of the following items currently maintained in the custody of the Federal Bureau of Investigation ("FBI") in Los Angeles, California:

1. A BLACK IPHONE 8, retrieved from the black Land Rover, License Plate # on March 25, 2020 (the "SUBJECT DEVICE"). A photo of the SUBJECT DEVICE at the time it was seized is shown below.



## ATTACHMENT B

### I. ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1349 (attempted wire fraud) (the "Subject Offenses"), namely:

a. Records, documents, programs, application or materials related to:

i. Quantum Prevention CV Inc.;

ii. QP20;

iii. Quantum Cure;

iv. QC20;

v. A purported serum injectable cure for the COVID-19 virus;

vi. A purported treatment that prevents a person from being infected by the COVID-19 virus;

vii. Solicitations for, or receipt of, funds as investments into Quantum Prevention CV Inc, QP20, Quantum Cure, QC20 or any other entity purportedly developing a serum injectable cure for the COVID-19 virus and/or a treatment that prevents a person from being infected by the COVID-19 virus; and

viii. Information relating to credit card records, check registers, cancelled checks, and deposit and withdrawal records of funds received or spent for the purpose of creating, testing, marketing, and/or distributing a purported serum injectable cure for the COVID-19 virus and/or a purported

treatment that prevents a person from being infected by the COVID-19 virus.

b. Information relating to any actions by Keith Lawrence Middleton or taken at his direction to create, test, market and/or distribute a cure and/or preventative treatment for the COVID-19 virus.

c. Any digital rolodex, contact list, or address book, contained on any digital devices containing information identified in paragraph 1(a) above.

d. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense, and forensic copies thereof.

e. With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II. SEARCH PROCEDURE FOR THE SUBJECT DEVICE(S)

3. In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b. The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c. The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as “EnCase” and “FTK” (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e. If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f. If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g. If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h. If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the

government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i. The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j. After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other court order.

## I. SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

1. The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or work product:

Non-Digital Evidence

2. Prior to reading any document or other piece of evidence ("document") in its entirety, law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") will conduct a limited review of the document in order to determine whether or not the document appears to contain or refer to communications between an attorney, or to contain the work product of an attorney and any person ("potentially privileged information"). If a Search Team member determines that a document appears to contain potentially privileged information, the Search Team member will not continue to review the document and will immediately notify a member of the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case). The Search Team will not further review any document that appears to

contain potentially privileged information until after the Privilege Review Team has completed its review.

3. In consultation with a Privilege Review Team Assistant United States Attorney ("PRTAUSA"), if appropriate, the Privilege Review Team member will then review any document identified as appearing to contain potentially privileged information to confirm that it contains potentially privileged information. If it does not, it may be returned to the Search Team member. If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant. Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further review or seizure absent subsequent authorization. Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information. The Privilege Review Team member will also make sure that the locations where the documents containing potentially privileged information were seized have been documented.

4. The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA. If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Search Team. If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

Digital Evidence

5. The Search Team will search for digital devices capable of being used to facilitate the subject offenses or capable of containing data falling within the scope of the items to be seized. The Privilege Review Team will then review the identified digital devices as set forth herein. The Search Team will review only digital device data which has been released by the Privilege Review Team.

6. The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

7. The Privilege Review Team and the Search Team shall complete both stages of the search discussed herein as soon as

is practicable but not to exceed 180 days from the date of execution of the warrant. The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

8. The Search Team will provide the Privilege Review Team with a list of "privilege key words" to search for on the digital devices, to include generic words such as "attorney" "privileged", or "work product." The Privilege Review Team will conduct an initial review of the data on the digital devices using the privilege key words, and by using search protocols specifically chosen to identify documents or data containing potentially privileged information. The Privilege Review Team may subject to this initial review all of the data contained in each digital device capable of containing any of the items to be seized. Documents or data that are identified by this initial review as not potentially privileged may be given to the Search Team.

9. Documents or data that the initial review identifies as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information. Documents or data that are determined by this review not to be potentially privileged may be given to the Search Team. Documents or data that are determined by this review to be potentially privileged will be given to the United

States Attorney's Office for further review by a PRTAUSA. Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Search Team. If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies. Documents or data that are the subject of such a finding may be given to the Search Team. Documents or data identified by the PRTAUSA after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

10. The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team at any step listed above in order to locate documents and data that are within the scope of the search warrant. The Search Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant. The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.

11. In performing the reviews, both the Privilege Review Team and the Search Team may:

a. search for and attempt to recover deleted, "hidden," or encrypted data;

b. use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c. use forensic examination and searching tools, such as “EnCase” and “FTK” (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

12. If either the Privilege Review Team or the Search Team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

13. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

14. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

15. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

16. The government may also retain a digital device if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

17. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

18. In order to search for data capable of being read or interpreted by a digital device, the Search Team is authorized to seize the following items:

a. Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

19. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other court order.

# AFFIDAVIT

I, Madison MacDonald, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since March 2018. I am currently assigned a Los Angeles Field Division, White Collar Crimes Squad, which is responsible for investigating financial institution fraud, including bank fraud and wire fraud. Since joining the FBI in 2018, I have received 22 weeks of formal training at the FBI Training Academy in Quantico, Virginia. Prior to being employed by the FBI, I served as a Special Agent with the Arizona Attorney General’s Office for four years, where I was assigned to the Major Fraud Unit and was responsible for conducting and participating in numerous investigations of fraudulent schemes and artifices, thefts, and forgeries.

## II. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of an application for a warrant to seize and search the following items, which were recovered from the vehicle of KEITH LAWRENCE MIDDLEBROOK at the time of his arrest by federal authorities on March 25, 2020, and are currently held in the custody of FBI in Los Angeles, California:

a. A BLACK IPHONE 8, retrieved from the black Land Rover, License Plate #7YJB275 on March 25, 2020 (the “SUBJECT DEVICE”).

A photo of the SUBJECT DEVICE at the time it was seized is shown below.



3. The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICE that constitutes evidence, contraband, instrumentalities, and/or fruits of violations of: 18 U.S.C. §§ 1343 (Wire Fraud), and 1349 (Attempted Wire Fraud), and any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

4. The items to be searched are identified in Attachment A to the search warrant application. The list of items to be seized is set forth in Attachment B to the search warrant application. Attachments A and B are incorporated herein by reference.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. PROBABLE CAUSE TO SEARCH AND SEIZE THE SUBJECT ITEMS

6. I am currently investigating Keith Lawrence Middlebrook (Year of Birth: 1967; Social Security No. XXX-XX-1638)(hereinafter "MIDDLEBROOK") regarding a scheme to defraud victim-investors by falsely promising enormous returns on the monetary investments he is soliciting in his company, Quantum Prevention CV Inc. (hereinafter "QP20"), which MIDDLEBROOK falsely claims has developed a patent-pending cure for the COVID-19 virus and a treatment that prevents a person from being infected by the COVID-19 virus. MIDDLEBROOK is promoting his "cure" and his preventative treatment on the Internet and communicating with potential victim-investors through interstate e-mails.

7. On March 25, 2020, the United States filed a complaint against MIDDLEBROOK charging him with one count of attempted wire fraud in violation of 18 U.S.C. § 1349. On the same day, I submitted an affidavit in support of a search warrant authorizing the search of MIDDLEBROOK's person. A true and

correct copy of this search warrant application and affidavit is attached to this affidavit as Exhibit 1, and is incorporated herein by reference.

8. On March 25, 2020, FBI agents arrested MIDDLEBROOK during a meeting an undercover FBI agent ("the UCE") posing as an investor. Prior to the meeting, the UCE engaged in a series of recorded telephone conversations, text messages, and email exchanges with MIDDLEBROOK in which the UCE posed as a potential investor looking to invest in MIDDLEBROOK'S business, allegedly engaged in the development, production, and sale of a patent-pending cure for the COVID-19 virus ("the cure") and a treatment that prevents a person from being infected by the COVID-19 virus ("the prevention pill"). I have reviewed copies and recordings of these conversations and correspondence. Through the abovementioned communications, the UCE arranged to meet with MIDDLEBROOK based on the representation that he would provide MIDDLEBROOK with $400,000 in cash in exchange for shares in a corporation allegedly formed by MIDDLEBROOK to engage in the research, manufacture, and sale of the cure and the prevention pill. MIDDLEBROOK also agreed to provide the UCE with several doses of the prevention pill for use by the UCE's mother, whom the UCE represented was of an advanced age and therefore particularly susceptible to COVID-19.

9. At approximately, 5:41 PM on March 25, 2020, MIDDLEBROOK met with the UCE in the parking lot of a shopping center located at 530 North Sepulveda Blvd., El Segundo, California. I participated in the arrest of MIDDLEBROOK and

have spoken with the UCE regarding his interactions with MIDDLEBROOK leading up to arrest. Based on my own recollections of these events and my conversations with the UCE, I state as follows:

a. At approximately 5:41 PM, MIDDLEBROOK called the UC and informed the UCE that MIDDLEBROOK had arrived in the parking lot of the abovementioned shopping center. After the UCE informed MIDDLEBROOK where he was located in the shopping center, MIDDLEBROOK parked his vehicle, a black Land Rover, License Plate Number 7YJB275, directly in front of the UCE and exited his vehicle.

b. After exiting the vehicle, MIDDLEBROOK greeted the UCE. After the two individuals exchanged pleasantries, the UCE asked MIDDLEBROOK if he had brought any doses of the "prevention pill" for the UCE's mother. MIDDLEBOOK informed the UCE that he had brought doses of the "prevention pill", and then opened the passenger side door of his vehicle and retrieved a medium sized plastic bag containing a large number of pills of different shapes and sizes. MIDDLEBROOK then retrieved four small plastic sandwich bags from his vehicle and placed approximately three pills into each plastic sandwich bag. MIDDLEBROOK then returned the medium sized bag containing the larger volume of pills to his vehicle.

10. During the execution of the arrest of MIDDLEBROOK, I looked inside the passenger side window of the black Land Rover driven by MIDDLEBROOK to his meeting with the UCE. In plain sight on the passenger seat of the vehicle was a medium sized

plastic bag containing a large volume of pills of different shapes and colors. Directly next to the bag of pills was a black iPhone (the SUBJECT DEVICE).

11. Incident to the arrest of MIDDLEBROOK, the arresting agents with the FBI seized the abovementioned items observed on the passenger seat of defendant's vehicle. While processing the SUBJECT DEVICE, I observed that the SUBJECT DEVICE received a text message from a contact identified in the phone by the same name as CW-1, a cooperating witness who initially arranged an introduction between MIDDLEBROOK and the UCE. The text was visible on the "lock screen" of the SUBJECT DEVICE. Details regarding CW-1 are included in the affidavit previously submitted on March 25, 2020 in paragraphs 12 through 13. The portion of the text message visible on the lock screen of the SUBJECT DEVICE read as follows:

> "Ok, I will let them know, you need to tell Sean that, I told him the other Corp was already established and filed in Nevada and Florida like it says on the "One Sheet", I'll let you handle explaining that Corp shit to..."

## IV. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

12. As used herein, the term "digital device" includes the SUBJECT DEVICE.

13. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

14. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

15. Digital devices often contain electronic evidence related to a crime, the device’s user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

16. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

17. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

18. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

19. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

20. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

21. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V. CONCLUSION

22. For all the reasons described above, there is probable cause to believe that MIDDLEBROOK violated 18 U.S.C § 1343(Wire Fraud) and 18 U.S.C. § 1349 (Attempted Wire Fraud).

23. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT ITEMS, as described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 27th day of March, 2020.

Michael R. Wilner
UNITED STATES MAGISTRATE JUDGE

# Exhibit 1

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
The body of KEITH LAWRENCE MIDDLEBROOK and any digital device found on MIDDLEBROOK'S person

Case No.

FILED
CLERK, U.S. DISTRICT COURT
MAR 25 2020
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Fraud by Wire, Radio, and Television |
| 18 U.S.C. § 1349 | Attempted Fraud by Wire, Radio, and Television |

The application is based on these facts:

See Attached Affidavit

LODGED
2020 MAR 25
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

☒ Continued on the attached sheet.

☐ Delayed notice ____ days (give exact ending date if more than 30 days: ______) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/S/
*Applicant's signature*

Madison MacDonald, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/25/2010

JOHN E. MCDERMOTT
*Judge's signature*

City and state: Los Angeles

Honorable John E. McDermott
*Printed name and title*

AUSA: Valerie L. Makarewicz ((213) 894-0756)

EXHIBIT 1

**ATTACHMENT A**

PERSON TO BE SEARCHED:

The SUBJECT PERSON is KEITH LAWRENCE MIDDLETON, date of birth [redacted] further described as a white male, approximately 6′ tall and approximately 255 pounds with black hair and hazel eyes. SUBJECT PERSON includes any items on his person capable of containing items to be seized, including clothing pockets, containers such as briefcases, backpacks, boxes and any digital devices on his person.

Below is the SUBJECT PERSON'S DMV picture:



## ATTACHMENT B

### I. ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violation of 18 U.S.C. § 1349 (Attempted Fraud by Wire, Radio, and Television) (the "Subject Offense"), namely:

a. Records, documents, programs, application or materials related to:

i. Quantum Prevention CV Inc.;

ii. QP20;

iii. Quantum Cure;

iv. QC20;

v. A purported serum injectable cure for the COVID-19 virus;

vi. A purported treatment that prevents a person from being infected by the COVID-19 virus;

vii. Solicitations for, or receipt of, funds as investments into Quantum Prevention CV Inc., QP20, Quantum Cure, QC20 or any other entity purportedly developing a serum injectable cure for the COVID-19 virus and/or a treatment that prevents a person from being infected by the COVID-19 virus; and

viii. Information relating to credit card records, check registers, cancelled checks, and deposit and withdrawal records of funds received or spent for the purpose of creating, testing, marketing, and/or distributing a purported serum injectable cure for the COVID-19 virus and/or a purported

treatment that prevents a person from being infected by the COVID-19 virus.

ix. Information relating to any actions by Keith Lawrence Middleton or taken at his direction to create, test, market and/or distribute a cure and/or preventative treatment for the COVID-19 virus.

b. Any digital rolodex, contact list, or address book, contained on any digital devices containing information identified in paragraph 1(a) above.

c. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense, and forensic copies thereof.

2. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h. records of or information about Internet Protocol addresses used by the device;

i. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

5. The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged communications between KEITH LAWRENCE MIDDLEBROOK and any attorney:

Non-Digital Evidence

6. Prior to reading any document or other piece of evidence ("document") in its entirety, law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") will conduct a limited review of the document in order to determine whether or not the document appears to contain or refer to communications between MIDDLEBROOK and any attorney, or contain the work product of an attorney, and any person ("potentially privileged information"). If a Search Team member determines that a document appears to contain potentially

privileged information, the Search Team member will not continue to review the document and will immediately notify a member of the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case). The Search Team will not further review any document that appears to contain potentially privileged information until after the Privilege Review Team has completed its review.

7. In consultation with a Privilege Review Team Assistant United States Attorney ("PRTAUSA"), if appropriate, the Privilege Review Team member will then review any document identified as appearing to contain potentially privileged information to confirm that it contains potentially privileged information. If it does not, it may be returned to the Search Team member. If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant. Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further review or seizure absent subsequent authorization. Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information. The Privilege Review Team member will also make sure that the

locations where the documents containing potentially privileged information were seized have been documented.

8. The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA. If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Search Team. If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

Digital Evidence

9. The Search Team will search for digital devices capable of being used to facilitate the subject offense or capable of containing data falling within the scope of the items to be seized. The Privilege Review Team will then review the identified digital devices as set forth herein. The Search Team will review only digital device data which has been released by the Privilege Review Team.

10. The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

11. The Privilege Review Team and the Search Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of

execution of the warrant. The government will not search the digital device(s) beyond this 180-day period without first obtaining an extension of time order from the Court.

12. The Search Team will provide the Privilege Review Team with a list of "privilege key words" to search for on the digital devices, to include generic words like "attorney," "attorney-client privilege," "privileged," or "work product"]. The Privilege Review Team will conduct an initial review of the data on the digital devices using the privilege key words, and by using search protocols specifically chosen to identify documents or data containing potentially privileged information. The Privilege Review Team may subject to this initial review all of the data contained in each digital device capable of containing any of the items to be seized. Documents or data that are identified by this initial review as not potentially privileged may be given to the Search Team.

13. Documents or data that the initial review identifies as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information. Documents or data that are determined by this review not to be potentially privileged may be given to the Search Team. Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA. Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Search Team. If, after review, the PRTAUSA determines it to be appropriate, the

PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies. Documents or data that are the subject of such a finding may be given to the Search Team. Documents or data identified by the PRTAUSA after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

14. The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team at any step listed above in order to locate documents and data that are within the scope of the search warrant. The Search Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant. The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.

15. In performing the reviews, both the Privilege Review Team and the Search Team may:

a. search for and attempt to recover deleted, "hidden," or encrypted data;

b. use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c. use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

16. If either the Privilege Review Team or the Search Team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

17. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

18. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

19. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain the digital device and any forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

20. After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

21. In order to search for data capable of being read or interpreted by a digital device, the Search Team is authorized to seize the following items:

a. Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

22. During the execution of this search warrant, with respect to any person who is located at the SUBJECT PREMISES

during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

23. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, MADISON MACDONALD, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since March 2018. I am currently assigned a Los Angeles Field Division, White Collar Crimes Squad, which is responsible for investigating financial institution fraud, including bank fraud and wire fraud. Since joining the FBI in 2018, I have received 22 weeks of formal training at the FBI Training Academy in Quantico, Virginia. Prior to being employed by the FBI, I served as a Special Agent with the Arizona Attorney General's Office for four years, where I was assigned to the Major Fraud Unit and was responsible for conducting and participating in numerous investigations of fraudulent schemes and artifices, thefts, and forgeries.

2. This affidavit is made in support of an application for a warrant to search the body of KEITH LAWRENCE MIDDLEBROOK ("MIDDLEBROOK") (Year of Birth: 1967; Social Security No. XXX-XX-1638)(hereinafter "MIDDLEBROOK") and any digital device found on MIDDLEBROOK's person, described in Attachment A, for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1349 (Attempted Fraud by Wire, Radio, and Television) (the "Subject Offense"), as described in Attachment B. Attachments A and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. SUMMARY OF PROBABLE CAUSE

4. Based on my investigation as described more fully below, there is probable cause to believe that MIDDLEBROOK is engaging in a scheme to defraud victim-investors by falsely promising enormous returns on the monetary investments he is soliciting in his company, Quantum Prevention CV Inc. (hereinafter "QP20"), which MIDDLEBROOK falsely claims has developed a patent-pending cure for the COVID-19 virus and a treatment that prevents a person from being infected by the COVID-19 virus. MIDDLEBROOK is promoting his "cure" and his preventative treatment on the Internet and communicating with potential victim-investors through interstate e-mails.

5. In furtherance of his fraudulent scheme, MIDDLEBROOK posted a series of videos and written statements on his Instagram page, in which he represented that he had developed a liquid that, when injected, would cure an individual who had contracted the COVID-19 virus within 24 hours. In addition, the posts on MIDDLEBROOK's Instagram page assert that MIDDLEBROOK

has developed a pill that, when ingested, will prevent an individual from contracting the COVID-19 virus. MIDDLEBROOK has made similar statements on videos posted to YouTube.

6. MIDDLEBROOK solicits investors to provide substantial funds for working capital for his corporation, QP20, a non-existent entity that MIDDLEBROOK falsely claims is incorporated in Nevada, and which MIDDLEBROOK promises will be used to mass produce and market the pill he claims will prevent an individual from contracting COVID-19. COVID-19, or coronavirus disease 2019, is a respiratory illness currently spreading through person-to-person contact throughout the world. MIDDLEBROOK provided potential investors wiring instructions to enable the investors to wire funds to MIDDLEBROOK's Bank of America and JPMorgan Chase accounts located in Los Angeles, California, and promised that, upon receipt of wired investment funds into his bank accounts, he would immediately issue shares in both QP20 and in another alleged corporation, Quantum Cure CV 2020 Inc. ("QC20"), which MIDDLEBROOK claimed had developed a patent-pending injectable serum that would "cure" those who had already contracted COVID-19 within 48 to 72 hours after injection.

## IV. STATEMENT OF PROBABLE CAUSE

**BACKGROUND**

7. I have reviewed California Department of Motor Vehicles ("DMV") records relevant to MIDDLEBROOK and learned the following:

a. I have seen the picture associated with MIDDLEBROOK's driver's license and am thus familiar with his appearance.

b. MIDDLEBROOK uses a residential address on Wilshire Boulevard in the Westwood neighborhood of Los Angeles, and, as of March 5, 2020, a mailing address of 1048 Irvine Avenue, #1062, Newport Beach, California 92660, and an additional address on Wilshire Boulevard in Santa Monica, California. I have checked open-source information and confirmed that the Newport Beach address is a UPS Store.

8. I have reviewed wireless subscriber information from AT&T regarding accounts held by MIDDLEBROOK, which was opened on or around July 23, 2018. The phone number associated with MIDDLEBROOK's account is [redacted]488 (the "4488 number"). The address associated with MIDDLEBROOK's wireless account with AT&T is the Newport Beach address, above. The home email address associated with MIDDLEBROOK's account is fico911@gmail.com.

9. I have reviewed MIDDLEBROOK's Instagram page and records from Facebook regarding said page and learned the following:

a. MIDDLEBROOK is the subscriber for the page that can be accessed at https://www.instagram.com/keithmiddlebrook/?hl=en ("MIDDLEBROOK's Instagram page"). According to subscriber records which I reviewed, MIDDLEBROOK's Instagram account was created on July 8, 2013. The verified phone number associated

with MIDDLEBEROOK's Instagram account the 4488 Number. The registered email address was [redacted]

b. MIDDLEBROOK's Instagram page displays numerous photos and videos. I have reviewed the photos and videos on the Instagram page and determined that the person who appears in these photos and videos is the same person who is depicted in MIDDLEBROOK's DMV photo.

c. On or before March 24, 2020, MIDDLEBROOK described himself on his Instagram page as "Real Iron Man, Genius Entrepreneur Icon, Cleaner to the Pros, Speaker, 800 Scores Business Real Estate, Actor Writer Producer Reverse Aging Technology." On or around March 24, 2020, MIDDLEBROOK's description on his Instagram page read as follows: "Real Iron Man, Genius Entrepreneur, <u>Inventor: COVID19 Immunity & Coronavirus Cure</u>, Speaker, 800 Scores Business Real Estate, Actor, Reverse Aging Inc." [emphasis added].

d. As of March 24, 2020, MIDDLEBROOK had 2.4 million followers of his Instagram page.

e. MIDDLEBROOK's Instagram page contains a link to the website "keithmiddlebrookprosports.com" that displays numerous photos. I have viewed the photos on this website and determined that the person who appears in these photos is the same as the person depicted in MIDDLEBROOK's DMV photo. In the "Contact" section of the website, one email address listed for "directly" contacting MIDDLEBROOK is "[redacted]"

10. MIDDLEBROOK maintains at least three Gmail email accounts with Google relevant to this investigation.

a. I have reviewed subscriber information regarding MIDDLEBROOK's first Gmail email, [redacted] This Gmail email account was created on September 3, 2007. The account's recovery email was listed as [redacted] and the recovery Short Message Service ("SMS") the 4488 Number. According to Google records, this email address was last logged into on March 19, 2020.

b. I have reviewed subscriber information regarding MIDDLEBROOK's second Gmail email account [redacted] This Gmail email account was created on November 7, 2017. The account's recovery email was listed as [redacted] and the recovery SMS was the 4488 Number.

c. I have reviewed subscriber information regarding MIDDLEBROOK's third Gmail email account, [redacted] This Gmail email account was created on March 19, 2020. The account's recovery email was listed [redacted] and the recovery SMS was the 4488 Number.

d. Based on my investigation, I know that emails sent via Gmail travel by wire transmission via locations outside of California.

11. MIDDLEBROOK has an account with YouTube that enables him to maintain a channel and upload videos to the Internet. The channel can be accessed at: http://www.youtube.com/channel/UCdv-BxfNfaRPAisqSSIhXOA. I have reviewed the subscriber information regarding MIDDLEBROOK's YouTube account and learned that MIDDLEBROOK created the account

on November 7, 2017, and the email listed when the account was created was kmprosports@gmail.com.

**ORIGIN OF INVESTIGATION**

12. On or about March 13, 2020, San Diego FBI Special Agent Raymond Pitesky received information from a cooperating witness (CW-1), who resides in Orlando, Florida, regarding MIDDLEBROOK. CW-1 provided information about MIDDLEBROOK to the FBI in connection with a separate investigation and prosecution of MIDDLEBROOK in the Southern District of California, United States of America v. Keith Middlebrook, Case No. 14-CR-2950-H. (This case was dismissed without prejudice based on a Speedy Trial Act violation and not refiled.)[1]

According to Special Agent Pitesky, CW-1 reported that MIDDLEBROOK was soliciting investments to fund the mass production of a vaccination that could cure COVID-19. According to CW-1, MIDDLEBROOK offered CW-1 a percentage or finder's fee for any investors he referred to MIDDLEBROOK. CW-1 provided

---

[1] In 2006, CW-1 was indicted on charges of violating 18 U.S.C. §§ 371 (conspiracy), 1343 and 1349 (wire fraud and attempted wire fraud), and 15 U.S.C. § 78j(b) and ff (securities fraud), in the United States District Court for the District of Columbia, arising from a telemarking and securities fraud matter. CW-1 pleaded guilty to violations of 18 U.S.C. §§ 371 and 1343, and was sentenced to 60 months' probation including 8 months in a halfway house. In addition, CW-1 has informed Special Agent Pitesky that he was arrested in Florida in June 2019 on state charges of impersonating an attorney but that he believes the district attorney who filed these charges did so improperly. As of the filing of this affidavit, I have not been able to verifiy CW-1's statements or establish the status of any such proceedings.

Special Agent Pitesky with the 4488 Number which he identified as MIDDLEBROOK's telephone number.

**MIDDLEBROOK'S SOLICITATIONS AND ADVERTISEMENTS OF A PURPORTED COVID-19 PREVENTION AND CURE ON INSTAGRAM AND YOUTUBE**

13. Based on my investigation, I know that MIDDLEBROOK has made multiple statements, both in writing and in posted videos on his Instagram and YouTube pages, touting his purported injectable cure and prevention pills for COVID-19. MIDDLEBROOK has also made statements to two individuals to the same effect, both over the telephone and in writing via emails.

a. On March 13, 2020, MIDDLEBROOK posted a video titled "Keith Middlebrook on the truth about the Media, CoronaVirus and Secrets of Success" on his YouTube channel, which can be viewed at https://www.youtube.com/watch?v=wjo_H_KTMFI.

i. As of March 23, 2020, according to the page, MIDDLEBROOK's YouTube channel had 13,600 subscribers, and the video had been viewed 6,212 times.

ii. In addition, the following statement appears below the video:

> Keith Middlebrook aka The Real Iron Man breaks down the truth about the CoronaVirus and Secrets to Success. The Mainstream Media FEAR (False Entertainment Appearing Real) will use FEAR to Destroy a Great Economy, People, Families and Businesses. FACT: There is 1 Centillionth (.00000000001) of a chance of the Average person in America getting and dying of the CoronaVirus. * Minerals, Protein and Alkaline Water are the Super Secret to having and maintaining Incredible Health. * This Video will be ReShot, Keith has the Vaccine to the cure the CoronaVirus not Trump. Donald Trump will be signing the Accelerated Public Release of Keith's cure and Prevention. Much More to come, stay tuned. * Follow

Instagram @KeithMiddlebrook * KeithMiddlebrookProSports.com * Follow YouTube / Keith Middlebrook * Follow Twitter @4kmiddlebrook1 Keith Middlebrook aka The Real Iron Man Keith Middlebrook Net Worth 2020 $30 Million Keith Middlebrook Enterprise Net Worth 2020 $1 Billion

b. On March 16, 2020, at approximately 1:30 p.m., Special Agent Pitesky and I contacted CW-1 telephonically to discuss the investment solicitation MIDDLEBROOK made to CW-1.

i. CW-1 provided Special Agent Pitesky with numerous screenshots of text messages between himself and MIDDLEBROOK relating to both credit repair and MIDDLEBROOK's purported COVID-19 cure, which I viewed. Regarding COVID-19, on or around March 16, 2020, MIDDLEBROOK sent CW-1 a text containing a video, which showed a tackle box full of vials and syringes. On this video, MIDDLEBROOK can be heard discussing his cure for COVID-19.

ii. After the initial text, on or around March 16, 2020, MIDDLEBROOK sent additional text messages to CW-1 from the 4488 number that stated:

I have Developed the Cure for the CoronaVirus COVID-19

*LA Patient tested Positive for CoronaVirus got up and walked out 51 hours after my Injection

Blood Pressure Normal

Temperature Normal

Heart Rate Normal

Enzymes Normal

Sugar Levels Normal

CoronaVirus Negative

Investors who come in at ground level say $1M will parachute with $200M - $300M

Conservative Minimum

Plus retain Stock Shares

You Receive 25% Commission on ALL Funds you bring in plus Stock Shares for the IPO

iii. The last text CW-1 received from MIDDLEBROOK was a photo of former NBA player, Earvin "Magic" Johnson, and a statement, "We got MAGIC JOHNSON coming aboard!!!! CALL ME !!"

c. On March 17, 2020, MIDDLEBROOK posted a video on his Instagram account, which can be viewed at: https://www.instagram.com/tv/B90jig2ncED/?utm_source=ig_web_copy_link

i. Among other things, in the video, MIDDLEBROOK stated that he had created the cure for COVID-19. MIDDLEBROOK showed a syringe with a clear liquid and described how his cure worked. Instagram stated that, as of March 24, 2020, this video has been viewed 633,002 times.

ii. The following text appeared associated with the video:

Yes I have Developed the Cure for the CoronaVirus COVID-19.

After 6 Weeks of Intense Focus and Development (and very little sleep). I am currently going into Mass Production. * NOTE: All Haters and Ignorant responses are Deleted and Blocked as fast as they post. Give your Negative Energy to someone who has the time to waste on your worthless, uneducated, low self esteem ass. I am to busy saving the world. * The CDC, WHO and Mainstream Media have created a Pandemonium environment. To answer this (just because it's what I do) I have created a CoronaVirus Prevention Pill" (After 3 Days of taking it the person is Immune to the Virus and STAYS immune as long as they continue taking it once a day it the morning) and also the COVID-19 Formula Vaccine Cure to Satisfy the Physiological and Phycological Need at large. @realdonaldtrump @seanhannity * Much more to come, stay tuned! * Follow

YouTube / Keith Middlebrook for awesome complete video episodes. Many New ones are up and many more coming everyday. * Follow Twitter [redacted]

d. On March 17, 2020, at approximately 11:00 a.m., Special Agent Pitesky, an undercover FBI agent ("UCE") posing as an investor, and I contacted CW-1 to discuss an introduction to MIDDLEBROOK.

e. On March 18, 2020, at approximately 2:55 p.m., I conducted a three-way consensually recorded call between CW-1 (who was in Orlando, Florida), the UCE, and MIDDLEBROOK, and used the 4488 number.

i. On this call, MIDDLEBROOK solicited an investment from the UCE relating to a prevention pill and a serum formula-cure for COVID-19.

ii. For an initial investment of $300,000, MIDDLEBROOK guaranteed a return of $30 million, which MIDDLEBROOK said, was secured by a current $10 billion offer from an unnamed buyer in Dubai. For example, MIDDLEBROOK stated for someone who put "in $1 million" would "be looking at a $100 million" return. MIDDLEBROOK stated that his injection serum/prevention pills would be worth "$100 billion" before an initial IPO offering. MIDDLEBROOK said to the UCE "I'll guarantee you this...at least, you put in $300 grand, I'll guarantee you...I'll guarantee the value of your shares and stock...and you can do whatever you want...minimum $30 million..." Additionally, MIDDLEBROOK stated that six individuals had already invested, including "Dr. Patterson" who had invested $1 million.

f. During the call, MIDDLEBROOK sent the UCE a text message that contained his Bank of America account information and wiring instructions for the UCE to wire the money he would be investing, as follows:

KM Legal Power, LLC - Account # [redacted]3866

Business Address: [redacted] Newport Beach, CA 92660

g. On March 19, 2020, at approximately 3:17 a.m., MIDDLEBROOK sent an email from [redacted] to the UCE's Yahoo email account, with an attachment that outlined the investment opportunity. A PDF copy of the above-described document, which has been redacted to protect the identity of the UCE and MIDDLEBROOK's bank account information, is attached hereto as Exhibit A and incorporated hereto.

h. At approximately 3:31 a.m., MIDDLEBROOK sent the UCE a text message, stating:

1 Sheet in your email

Call Me

Call me after wire sent

Stock Share Docs to be prepared

and FedEx to you today

Conservative Projections:

First Level of 4-6 Levels

$400,000 splits to $4,000,000 plus

2nd Level $4M splits to $40M

And much more

i. At approximately 2:45 p.m., the UCE contacted MIDDLEBROOK telephonically for a follow-up recorded conversation, which I listened to without MIDDLEBROOK's knowledge. MIDDLEBROOK indicated that, since last speaking with the UCE, seven individuals had invested with MIDDLEBROOK, with an average investment of $750,000 to $1 million. MIDDLEBROOK ended the call to talk to "Dr. Robert Goldman" and called the UCE back shortly thereafter. MIDDLEBROOK indicated that he would provide the UCE (and his mother) the prevention pills after he [MIDDLEBROOK] received an initial wired deposit of $9,999.

j. At approximately 5:52 p.m., MIDDLEBROOK texted the UCE an account name and number at JPMorgan Chase of "MIDDLEBROOK Productions, LLC - Account #[redacted]7916" that the UCE should use to wire the funds to MIDDLEBROOK. MIDDLEBROOK then sent a text to the UCE that stated: "Shares & Docs are for $400k."

14. On March 21, 2020, MIDDLEBROOK posted a video on his Instagram page. Instagram has stated that, as of March 24, 2020, this video has been viewed 1,011,750 times. The video can be viewed at:
www.instagram.com/tv/B9-PxmAnsuS/?utm_source=ig_web_copy_link

a. On this video, MIDDLEBROOK shows a pill that he states prevents him from contracting COVID-19. He states that if he took the pill and walked into the Staples Center filled with COVID-19 positive individuals, he could not contract the virus. Among other statements, MIDDLEBROOK claims that because of ingesting the pill, he is immune to COVID-19, as his cell

membrane walls cannot contract the virus. MIDDLEBROOK states that he "just got off the phone with" Dr. Ronald Goldman, President Donald Trump's physician for sports and health medicine, and that he (MIDDLEBROOK) is on his way to Mar-a-Lago to get the executive emergency order to override the FDA [i.e., the U.S. Food and Drug Administration]. MIDDLEBROOK stated that the preventive pill, which he takes once a day, is called QP20 and the injectable cure is called QC20.

b. In addition, the following comment appears posted with the video.

> Yes I have created the pill that makes you IMMUNE to COVID-19!
>
> I have created the Prevention Pill that is time released 24 Hours. This pill I have designed makes anyone completely IMMUNE to the Virus COVID-19 disease coronavirus. * NOTE: All Haters and Ignorant comments are Deleted and Blocked as Fast as they post. Give your incompetence and Negative Energy to someone who has time to waste with you and tolerate your worthless low self-esteem ass. * I am busy saving the world. * The Medical, Virus and Disease communities are lazy and trying to use old tricks on a new dog. Like the measles vaccine to cure coronavirus, it won't work. I have the True, Tried and Tested Cure and now the Prevention. I had to wait for Lab Results to post this. * I created this Preventative IMMUNE Pill (QP20) Quantum Prevention CV 2020 as the Answer to the "Pandemonium / Havoc environment" created by the "Negative Sensationalism for viewership" by the Mainstream Media, CDC and WHO as they Needlessly have caused a complete US shut down based on 249 deaths in 2 Months (all over the age of 80) and are attempting to completely destroy the Greatest economy in US History built by @realdonaldtrump. * Perception is Realty so I have developed the Prevention and the Cure to satisfy the physical and physiological Needs to save the World. * FACTS to REALIZE: US Deaths Year / Day: * Homicides 16,000 / 44 * Smoking 480,000 / 1,315 * 2nd Hand Smoke 41,000 / 112
>
> * Flu (Average) 50,000 / 137

* Alcohol 88,000 / 241 * Opioids 70,000 / 191 * Diabetes 4,200,000 / 11,506 * Car Accidents 38,000 / 104 * Total Self Inflicted Deaths per Year 4,967,000 * Total Self Inflicted Deaths per Day 13,616 * Notice the Mainstream Media didn't shut down all Businesses for these Real Numbers and more. * Much more to come stay tuned. * Follow YouTube / Keith Middlebrook * Follow KeithMiddlebrookProSports.com * Follow Twitter @4kmiddlebrook1

#KeithMiddlebrook

#XcceleratedSuccess

#COVID19

#Coronavirus

c. In response to the above narrative description, an individual commented that "it should be tested on people." MIDDLEBROOK replied, "it was, 3 patients who were injected with my formula tested Coronavirus NEGATIVE! I had to wait for the Test results before I could post the Video. Please learn to READ and listen to the [sic] All the Videos."

d. On March 22, 2020, MIDDLEBROOK posted a video on his Instagram page. Instagram stated that, as of March 24, 2020, this video had been viewed 449,396 times. The video can be viewed at: https://www.instagram.com/tv/B-BPZGanfhr/?utm_source=ig_web_copy_link

i. On this video, MIDDLEBROOK states that he created the cure for, and prevention of, COVID-19.

ii. The following comment appears with the video.

Secrets to Success from the Real Iron Man on Coronavirus.

Powerful Video of Knowledge to Empower You. NOTE: Ignorant Hater Followers and unintelligent comments are being Deleted and Blocked as Fast as they Post.

> (Give your Follow, hate and negative energy to someone who has time to waste with you and tolerate your worthless, low self esteem ass). I am busy Saving the World. * Filmed at my Home / Office in Newport Beach California on March 21, 2020. FACT: The Mainstream Media, CDC, and the WHO started creating Mass Hysteria, Havoc and Pandemonium when they claimed "Pandemic" as Millions of People are dying in the streets when really total US Coronavirus deaths were at 38 (All above the age of 80) and only 1,361 cases. *All Designed and meant to Destroy the Greatest Economy in US History built by @realdonaldtrump. I encourage you to NOT GO ALONG with "We are all in this together". Do NOT SUCCUMB to their negative destructive mindset, if you go along with it, then they got you where they want you. * Instead Focus on your Goals and your brand. I am teaching you to Plow through the Negativity and WIN. - Keith Middlebrook Much more to come stay tuned. * SPECIAL NOTE: I was wrongfully indicted by the Government in 2014 and I BEAT them and WON on September 13, 2016. Now I am Suing them for $1 Billion and I am Winning. (I know first hand more than anyone how Sick and Evil 1/2 of them can be). Follow YouTube / Keith Middlebrook * Follow Twitter [redacted] @seanhannity
> #KeithMiddlebrook
> #XcceleratedSuccess
> #COVID19
> #coronavirus
> #Cure
> #Prevention

**HEALTH OFFICIALS' STATEMENTS RE: COVID-19 PREVENTION AND CURE**

15. As of March 24, 2020, the World Health Organization stated on its website, which can be viewed at https://www.who.int/news-room/q-a-detail/q-a-coronaviruses, the following:

> To date, there is no vaccine and no specific antiviral medicine to prevent or treat COVID-2019. However, those affected should receive care to relieve symptoms. People with serious illness should be hospitalized. Most patients recover thanks to supportive care. Possible vaccines and some specific drug treatments are under investigation. They are being tested through clinical trials. WHO is coordinating efforts to develop vaccines and medicines to prevent and treat COVID-19.

16. As of March 24, 2020, the United States Centers for Disease Control stated on their website, which can be viewed at https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf, that there is currently no vaccine to protect against COVID-19, and there is no specific antiviral treatment for COVID-19.

17. On February 25, 2020, the National Institutes of Health ("NIH"), the United States' national medical research agency and a component of the Department of Health and Human Services, announced that the National Institute of Allergy and Infectious Disease was the regulatory sponsor of the first clinical trial in the United States at the University of Nebraska Medical Center in Omaha, Nebraska. In addition, the NIH stated there were no specific therapeutics approved by the Food and Drug Administration to treat people with COVID-19. Furthermore, the NIH stated that Remdesivir, developed by Gilead Sciences Inc., was the investigational broad-spectrum antiviral treatment that was being tested. The announcement stated the following:

> "We urgently need a safe and effective treatment for COVID-19. Although remdesivir has been administered to some patients with COVID-19, we do not have solid data to indicate it can improve clinical outcomes," said NIAID Director and U.S. Coronavirus Task Force member Anthony S. Fauci, M.D. "A randomized, placebo-controlled trial is the gold standard for determining if an experimental treatment can benefit patients."

The announcement can be viewed at: https://www.nih.gov/news-events/news-releases/nih-clinical-trial-remdesivir-treat-covid-19-begins.

**MIDDLEBROOK'S FALSE STATEMENTS IN FURTHERANCE OF HIS FRAUDULENT INVESTMENT SCHEME**

18. In addition to stating on his videos and descriptions accompanying the videos that he has developed an injectable cure and prevention pills for COVID-19, MIDDLEBROOK made several false statements in the "1 Sheet for company QP20 and QC20" (see Exhibit A) that MIDDLEBROOK emailed to the UCE on March 19, 2020,

19. For example, MIDDLEBROOK falsely stated that QP20 and QC20, the injectable serum and prevention pills, are patent pending.

a. On March 23, 2020, I conducted several search queries for "Keith Middlebrook" using the United States Patent and Trademark Office's (USPTO) online database, http://patft.uspto.gov/netahtml/PTO/search-bool.html, to include, but not limited to the following fields: Inventor, Applicant Name, Assignee Name and All Fields. The aforementioned queries revealed "No patents have matched your query". Similar searches included "Dustin T. Johnston", "Earvin 'Magic' Johnson" and "Roderic Boling" using Inventor search field, which did not reveal any results. A search of "Dr. D. Patterson" as the Inventor yield multiple results; however, additional personal identifying information would be needed to verify these results. Lastly, searches using subject companies "Quantum Prevention CV Inc." and "KM Legal Power LLC" yielded negative results using the Assignee Name search field.

b. On March 24, 2020, an attorney in the Office of Policy and International Affairs of the United States Patent and Trademark Office confirmed that MIDDLEBROOK had not been awarded any patents/trademarks by said office. It should be noted, however, that approved patents are to remain confidential for a minimum of 18 months, before they are ultimately published on the USPTO website.

20. MIDDLEBROOK also falsely stated that, as of March 19, 2020, Earvin "Magic" Johnson ("Johnson"), the former NBA basketball player, was a director and/or officer of QC20. In addition, MIDDLEBROOK made false statements to CW-1 in a text message on March 16, 2020 that Johnson was "coming aboard."

a. On March 24, 2020, I contacted Christina Francis ("Francis"), President of Magic Johnson Enterprises, which is owned by Johnson.

b. Francis stated to me that she is responsible for handling financial matters on behalf of Johnson and advised me that Johnson was not involved in any investments related to COVID-19.

c. Immediately thereafter, according to Francis, she contacted Johnson and confirmed that Johnson had no involvement in any businesses or other investment opportunities being conducted by or offered by MIDDLEBROOK, and he had not been contacted by MIDDLEBROOK regarding making any investment. Moreover, Francis showed Johnson a photograph of MIDDLEBROOK and Johnson stated to Francis that he had never met, spoken to, or seen MIDDLEBROOK.

21. MIDDLEBROOK also falsely stated in the "1 Sheet" that he sent to the UCE that QP20 was a Nevada Corporation, foreign filing in Florida.

a. On March 24, 2020, I reviewed an email from the Chief Criminal Investigator of the Securities Division for the Secretary of State of Nevada, who searched the commercial recording database for MIDDLEBROOK, Quantum Prevention, and KM Legal Power, and did not locate any corporate filings for MIDDLEBROOK or said entities.

a. On March 23, 2020, I queried the online records for the Florida Division of Corporations, at search.sunbiz.org, for MIDDLEBROOK, Quantum Prevention, and KM Legal Power, and did not locate any corporate filings for MIDDLEBROOK or said entities.

**ADDITIONAL INFORMATION ESTABLISHING PROBABLE CAUSE TO BELIEVE THAT EVIDENCE OF THE SUBJECT OFFENSE, INCLUDING ON DIGITAL DEVICES, WILL BE FOUND ON MIDDLEBROOK'S PERSON**

23. As detailed above, the investigation has revealed that MIDDLEBROOK used digital devices, likely including an Apple IPhone X, to committed the Subject Offense, and there is probable cause to believe that evidence, fruits and instrumentalities of the Subject Offense will be found on the digital devices, including those found on his person, which MIDDLEBROOK operates.

24. My investigation has revealed that the 4488 number is an AT&T mobile number and likely, MIDDLEBROOK's cell phone. According to AT&T records, MIDDLEBROOK registered an Apple

iPhone X that bears International Mobile Equipment Identity number 3548610916815415, as recently as March 18, 2020. MIDDLEBROOK communicated with CW-1 and the UCE by using the 4488 number, both by placing and receiving telephone calls, but also by transmitting text messages.

25. As detailed above, the investigation also revealed that MIDDLEBROOK uses e-mail and social media applications. For example, communicated with the UCE by using MIDDLEBROOK's Gmail account to send the "1 Sheet" at Exhibit A. MIDDLEBROOK also posted the videos and descriptions associated with the videos on Instagram and YouTube by a digital device. MIDDLEBROOK self-reported to Instagram and Google his verified phone number and SMS recovery was the 4488 number.

26. I also know, based on my training and experience, conversations with other law enforcement officers, and my investigation of this matter, that digital devices are needed to access e-mail services, including web-based e-mail services like Gmail, and that information associated with user's access of the e-mail service will be found on the digital devices that accessed the e-mail service. This may include the e-mail communications and attachments themselves as well as digital artifacts and metadata related to users' access.. I also know that individuals use smart phones like Apple iPhones or tablets to access e-mail and social media applications, like the ones MIDDLEBROOK uses. Individuals often keep smart phones and other digital devices on their persons and individuals retain communications, including text messages and emails, on their

mobile phones regarding their business and financial information.

27. Therefore, based on the facts above and my training and experience, there is probable cause to believe that MIDDLEBROOK used digital devices to commit the Subject Offense, that MIDDLEBROOK will have on his person MIDDLEBROOK's mobile phone and other digital devices and that the digital devices used to commit the Subject Offense found on MIDDLEBROOK will contain evidence, fruits, and instrumentalities of the Subject Offense.

## V. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

28. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and

others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A

single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35′ x 35′ x 10′ rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to

[2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently

associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on

the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime. In addition, decryption of devices and data stored thereon is a constantly evolving field,

and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

29. As discussed herein, based on my training and experience I believe that digital devices will be found during the search. I believe that MIDDLEBROOK possesses an iPhone X based on my review of AT&T subscriber records regarding the 4488 phone number.

a. I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition. Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the

"home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard. Fingerprint-recognition features are increasingly common on modern digital devices. For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint. The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. To activate the facial-recognition feature, a user must hold the device in front of his or her face. The device's camera analyzes and records data based on the user's facial characteristics. The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face. No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Several companies produce digital

devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017). Apple calls its facial-recognition unlock feature "Face ID." The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

d. While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that are unique and stable. Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light. Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels. A user can register one or both eyes to be used to unlock a device with these features. To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye. Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features. In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and

multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

30. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

31. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled. This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time. For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and

either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

32. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

33. For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is (a) located on MIDDLEBROOK's person and (b) falls within the scope of the warrant: (1) compel the use of MIDDLEBROOK's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of MIDDLEBROOK's face, and instruct him to hold his eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

34. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

35. For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of violation of 18 U.S.C. § 1349 (Attempted Fraud by Wire, Radio, and Television) will be found at the SUBJECT PREMISES.

/S/
MADISON MACDONALD
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me this 25th day of March, 2020.

JOHN E. MCDERMOTT
HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE