UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

- - -

HONORABLE DALE S. FISCHER
UNITED STATES DISTRICT JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA, )
PLAINTIFF, )
VS. ) CASE NO.: CR 20-229-DSF
KEITH LAWRENCE MIDDLEBROOK, )
DEFENDANT. )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

WEDNESDAY, MAY 8, 2024

LOS ANGELES, CALIFORNIA

LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA 90012
PH: (213) 894-0374

APPEARANCES OF COUNSEL:

ON BEHALF OF PLAINTIFF:

BY: JOSEPH GUZMAN
KENNETH CARBAJAL
ASSISTANT UNITED STATES ATTORNEYS

1100 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CA 90012

ON BEHALF OF DEFENDANT:

OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: IJEOMA EKE
ALEJANDRO BARRIENTOS
DEPUTY FEDERAL PUBLIC DEFENDERS

321 EAST TEMPLE STREET
LOS ANGELES, CA 90012

INDEX


| WITNESSES FOR THE GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STERLE, SEAN | | | | |
| BY: MR. CARBAJAL | 9 | | | |
| BY: MR. BARRIENTOS | | 12 | | |
| JOHNSON, EARVIN | | | | |
| BY: MR. GUZMAN | 13 | | 48 | |
| BY: MS. EKE | | 24 | | |
| ST. MARY, EDWARD | | | | |
| BY: MR. GUZMAN | 51 | | | |
| JEFFERIES, WAYNE | | | | |
| BY: MR. GUZMAN | 54 | | | |
| BY: MS. EKE | | 59 | | |
| McKNIGHT, JAMILA | | | | |
| BY: MR. CARBAJAL | 61 | | | |
| MORGAN, RALPH | | | | |
| BY: MR. GUZMAN | 75 | | | |
| BY: MR. BARRIENTOS | | 79 | | |
| WITNESSES FOR THE DEFENSE: | | | | |
| DURISETI, RAM | | | | |
| BY: MR. BARRIENTOS | 89 | | | |
| McKNIGHT, JAMILA | | | | |
| BY: MR. BARRIENTOS | 108 | | | |
| McDONALD, MADISON | | | | |
| BY: MR. BARRIENTOS | 111 | | | |
| BY: MR. CARBAJAL | | 154 | | |
| ZELLHART, LYNNE | | | | |
| BY: MS. EKE | 159 | | | |
| JAWETZ, RYAN | | | | |
| BY: MS. EKE | 166 | | | |
| BY: MR. GUZMAN | | 174 | | |
| MIDDLEBROOK, KEITH | | | | |
| BY: MS. EKE | 176 | | | |

| EXHIBITS | ADMITTED |
|---|---|
| 114 | 10 |
| 210 | 29 |
| 134 | 52 |
| 136 | 55 |
| 2 | 56 |
| 42 | 57 |
| 43 | 63 |
| 45 | 64 |
| 44 | 67 |
| 68 | 71 |
| 64-66 | 73 |
| 129-130 | 73 |
| 135 | 77 |
| 56-57 | 79 |
| 270 | 128 |
| 230-238 | 168 |
| 285-291 | 168 |
| 200 | 178 |
| 201 | 180 |
| 202-203 | 183 |
| 204 | 188 |
| 205 | 191 |
| 206 | 195 |

LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 8, 2024; 7:50 A.M.

- - -

THE COURT: All right. Good morning.

Did you resolve your issue about two exhibits?

MR. CARBAJAL: Your Honor, we provided updated copies of the exhibits. Mr. Sterle is here to take the stand to authenticate them. The last I heard the defense will not agree to foundation; is that correct?

MS. EKE: That is correct, Your Honor. We explained to the government that because we did object in our motions in liminae, stipulating could be deemed as a waiver of the previous objections we had made. So we understand the Court's ruling, but to preserve our record we're not stipulating to the admissibility of the clips.

THE COURT: All right. Do you have a specific concern you want to express to me now that's different? Did you delete some things?

MR. CARBAJAL: Yes, Your Honor. I provided copies to the Court and to the defense.

MS. EKE: Your Honor, I will say they did provide one at 7:30 this morning that we have not had an opportunity to review. We reviewed the ones that they provided us last night. And we would raise a cumulative objection to those. The government has played a lot of clips so far. We've heard a lot of witness testimony. And we do believe that the clips

that they're intending to introduce are cumulative of the clips that were already introduced and played into evidence.

THE COURT: All right. Well, that objection's overruled. I've reviewed the defense brief. Obviously, I provided Adamson and Golecki so they didn't need to be arguing those to me. Did the government have anything it wanted to say in that regard?

MR. GUZMAN: Your Honor, we reviewed the Lew case last night.

THE COURT: Not Lew. We're talking Adamson and Golecki.

MR. GUZMAN: Yes, Your Honor. We haven't had a chance to review the brief that was filed yesterday or those other cases. So we'd ask if we can file a response this evening before jury instructions which I presume would be tomorrow.

THE COURT: Well, I don't know what's going on tomorrow, but there's a whole office full of AUSAs and others over there so somebody should have been working on them. But at this point, I should tell you that I do agree with the defense position on Adamson and Golecki that's why I provided them to all of you. I do not agree with the government's position -- with the defense position on Lew.

MR. GUZMAN: Thank you, Your Honor.

Would a filing at say 6 o'clock today be okay?

Would you like that earlier? We can get people working on it if you like.

THE COURT: Well, those are my statements. If you want to present something other than that or something to flesh out the record on that, you can.

MR. GUZMAN: Okay.

THE COURT: But those are my rulings for now.

MR. GUZMAN: Thank you, Your Honor.

THE COURT: So what's your plan today? Are you gonna call Sterle first or are you just gonna -- is Mr. Johnson here?

MR. GUZMAN: I believe Mr. Johnson is either here or close, but since Mr. Sterle is going to be extremely quick, we might get him out so he can get back to his job.

THE COURT: That's up to you.

Anything else we need to discuss?

MS. EKE: Nothing from the defense, Your Honor.

MR. GUZMAN: No, Your Honor.

THE COURT: All right. Was there something more that's going to be presented with regard to the second text to Mr. Friedman?

MR. GUZMAN: Well, Your Honor, the exhibit that we introduced, there's also another spreadsheet of text messages that were, um, it reflects that there were two text messages to Mr. Friedman.

THE COURT: That were actually sent?

MR. GUZMAN: Yes, and I think his testimony was clear that he received two text messages. It got confusing to us at least with respect to whether he was saying I didn't get these two text messages or whether it was just an impeachment issue as to whether when he spoke to the FBI, he received a text message. But his testimony as I heard it --

THE COURT: I heard it. I'm asking you whether you intend to present something else, just curious.

MR. GUZMAN: At this point, no, Your Honor.

THE COURT: So you're not gonna explain the document you provided. It's your case.

MR. GUZMAN: I think right now we're leaving it with his testimony.

THE COURT: All right. Anything else we need to discuss from the defense?

MS. EKE: Your Honor, I had one logistical question. If it becomes necessary is there a way for us to display something to the screen that just the witness sees before it's displayed to the jury?

THE COURT: That is a question far beyond my ability. Ms. Kim, do you know the answer to that?

THE CLERK: Yes, I could do that.

THE COURT: Anything else?

MR. GUZMAN: Nothing from the government.

MS. EKE: Nothing from the defense, Your Honor.

THE COURT: We'll let you know as soon as our jurors are here.

(Jury present.)

THE COURT: Everyone is back. We have our witness from yesterday back on the stand briefly, Mr. Sterle.

Has anyone heard anything about the case overnight? Anybody try to talk to you? Any -- any information that I need to know. I see no hands, great.

You may proceed.

MR. CARBAJAL: Thank you.

DIRECT EXAMINATION

BY MR. CARBAJAL:

Q. Good morning, Mr. Sterle.

A. Good morning.

Q. Yesterday you testified to having two calls with Mr. Middlebrook; is that correct? Sorry. On March 19, 2020 you had two calls.

A. Yes, I did.

Q. As far as that second call goes, can you please turn to Exhibit 114 in the binder to your left? Do you recognize Exhibit 114?

A. Yes, I do.

Q. What is it?

A. It is a DVD of a snippet of the call that I had with

Mr. Middlebrook on the 19th.

MR. CARBAJAL: Your Honor, government moves to admit Exhibit 114.

THE COURT: That's admitted.

(Exhibit 114 admitted.)

MR. CARBAJAL: I'm gonna play that call.

(Audio clip played.)

MR. CARBAJAL: Exhibit 114 has finished playing.

Q. Mr. Sterle, you testified you had a call with Mr. Middlebrook on March 23rd, 2020; is that correct?

A. That is correct.

Q. Can you please to turn Exhibit 116 in the binder in front of you? Do you recognize Exhibit 116?

A. I do.

Q. What is it?

A. It's a DVD of a snippet of the call I had with Mr. Middlebrook on March 23rd, 2020.

MR. CARBAJAL: Government moves to admit Exhibit 116, Your Honor.

THE COURT: That's admitted.

(Audio clip played.)

MR. CARBAJAL: Let's play Exhibit 116.

(Audio clip played.)

MR. CARBAJAL: Exhibit 116 has finished playing.

Q. Mr. Sterle, what did you understand patent pending to

mean?

MR. BARRIENTOS: Objection. The audio speaks for itself.

THE COURT: Sustained.

BY MR. CARBAJAL:

Q. During your time as a special agent with the FBI, did you become familiar with what's commonly referred to as coordinated universal time or UTC?

A. Yes, I have.

Q. What is that?

A. That's a time -- what is it universal coordinated time. I believe it's London time if you will. The majority of phone companies when they record or produce data of what's called the call detail records which is every call made from a phone, the time that it's listed being made and how long the call is usually in UTC time. And I believe the reason they do that is so if somebody was to start a call and they were in Pacific time, and then they were driving and they ended up in central time, it would mess things up or it wouldn't look right. The call would appear longer than it actually was. So by keeping everything to universal or UTC time, it keeps everything consistent. And this is usually for Pacific time here in California, it's gonna be either seven or eight hours different depending on whether it's daylight savings time or whether it's standard time.

Q. So in March 2020, how many hours behind UTC was it here?
A. It was seven hours.
MR. CARBAJAL: All right. Thank you, Mr. Sterle. No further questions.
THE COURT: Cross-examination?
MR. BARRIENTOS: Very briefly.

CROSS-EXAMINATION

BY MR. BARRIENTOS:
Q. Agent Sterle, we just listened to an audio clip from your call with Mr. Middlebrook on March 23rd of 2020; right?
A. Correct.
Q. And on that call, you asked him what he meant by patent pending, didn't you?
A. I did.
Q. And he did not say he had applied for a patent, did he?
A. No.
MR. BARRIENTOS: No further questions.
THE COURT: Anything further?
MR. CARBAJAL: No, Your Honor.
THE COURT: Thank you very much, sir. You're excused. Does the government have another witness?
MR. GUZMAN: Yes, Your Honor.
The government calls Earvin Johnson.
THE CLERK: Please raise your right hand.
(Witness sworn.)

THE CLERK: You can go ahead and take a seat.

Speaking into the microphone, can you please state and spell your name?

THE WITNESS: Yes. Earvin Johnson E-a-r-v-i-n J-o-h-n-s-o-n, Jr.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. GUZMAN:

Q. Good morning, Mr. Johnson.

A. Good morning.

Q. What is your occupation?

A. I am Chairman, CEO and Owner of Magic Johnson Enterprises.

Q. And I take it by its name, you started and created Magic Johnson Enterprises?

A. Yes.

Q. What is Magic Johnson Enterprises?

A. It's a holding company for other companies that I own whether it's part owner of the Dodgers and the Sparks, L.A. Sparks, I should say, um, we also have LAFC, MLS soccer team, uh, E Sports Team Liquid. And then I have other companies called, uh, joint venture with Sodexco called Sodexco Magic. It's a food service facility management company. Equa Trust which is an insurance company. So when you think about Magic Johnson Enterprises, there's a lot of companies that

roll up under Magic Johnson Enterprises.
Q. And when did you create Magic Johnson Enterprises?
A. About 1981.
Q. And during that time were you employed as something else? Did you have another job?
A. Yeah, I ran little shorts for the Lakers back in the day and played there for about 12 years for them and, uh, and so that was it right there.
Q. And how is that experience being an NBA player for the Lakers?
A. Oh, it was great cause we won championships. I think that we represented not only ourselves well, but the City of Los Angeles well winning five championships and going to the finals nine times in 12 years.
Q. You said you represented the Lakers well you felt. What, if any, media exposure did you personally receive as an NBA player for Lakers?
A. Well, I think I received a lot of media attention, but it was still about the team; right? If the team is successful, then you receive more attention, and, uh, I received both team publicity as well as individual winning MVPs and so on. But the main thing for me, I can't talk about myself. It's about the team and our success.
Q. Now, I want to go back your career as a businessperson.
A. Uh-huh.

Q. What is your investment thesis behind Magic Johnson Enterprises?

A. Well, my business thesis is we want to do well and do good at the same time. Yes, we want to turn a profit and make money, but we also want to enhance the community and give back to the community and that's big for me. And so Magic Johnson Foundation, we give scholarships to those who are in minority communities so the black and brown community.

We try to send -- we've sent over 10,000 African American and Latino students to college. We've also built technology centers in poorest neighborhoods so these kids can have access to a computer.

We've given toy drives. I know for me growing up, I never could own a bike cause I have six sisters and three brothers. So now I try to give kids bikes that can't afford to have one so that's important to me. So I want to make money on one hand, but I also want to make sure that I make the community and this city better.

Q. Can you describe your first major investment through Magic Johnson Enterprises?

A. Um, the first major one was really radio and TV. We used to own a radio TV station down in Denver that was the first one. Then after that, there was Magic Johnson Theaters a joint venture with Sony. As a matter of fact, that theater is still open not too far from here. Again, looking at the

numbers, we saw that minorities were the number one group of people going to the movies, but there was no theaters in our communities so I started Magic Johnson Theaters Crenshaw, in New York in Harlem and six other different markets across the country.

Q. After Magic Johnson Theaters was there another big investment that established your company?

A. Yeah, the biggest was Starbucks. Making sure that minorities had a chance to enjoy a great of cup coffee from Starbucks. And went up to Seattle and did a joint venture with Howard Schultz, chairman and CEO of Starbucks and founder. And I built 125 Starbucks in over 40 different cities and it wasn't just the coffee.

It was also employing people in the inner cities giving them job opportunities. And so I'm so happy about now to have so many managers of color that work in their own community. So it wasn't just getting a great cup of coffee. It's also employing those people who live in a three-mile radius of those Starbucks stores.

Q. Was that investment successful for you?

A. Very successful. You know, owning Starbucks actually gave me a stamp of being a serious business man and owning them at that time and owning the Lakers at the same time and selling both of those together brought me hundreds of millions of dollars of cash. And then that's how I was able

to buy into the Dodgers.
Q. Are there any other sports team that you own? You mentioned the Sparks.
A. Yeah, the biggest one now I'm in the NFL, the Washington Commanders. And being a man of color to say I'm in the NFL and represent people of color, it's just amazing for me. Never in my wildest dreams as a little boy growing up would I ever imagine me being an NFL owner. And so I'm so happy I saved my money and was able to write that check to become an owner, but it's not just for me. It's for all people of color.
Q. You mentioned Magic Johnson Foundation and you talked about scholarships. Are there any kind of public health initiatives that you've worked on either through Magic Johnson Foundation or Magic Johnson Enterprises?
A. Yeah, I just teamed up with GSK. We did RSV where we went into the communities and we were able to let people know who are 60 and over that RSV is out here and out here in a big way. And they should call their pharmacist, their doctor or health care provider to learn more about RSV because we knew about COVID, but a lot of people didn't know about RSV. So it was very important that I got the word out.

Then when you think about my community, high blood pressure so I go around and talk about that making sure that people understand all the health initiatives that we need to

be pushing in our community. Because we have a lot of health problems in the black and brown community.

And I try to help educate the black and brown community about all the things that affect us. Especially, black males and Latino males going out getting their physicals. So I try to make sure that I could go on use my platform, TV, radio to promote hey, make sure you're living a healthy lifestyle and go get your physicals.

Q. And what, if any, kind of initiatives did you work on with respect to Covid-19?

A. Well, COVID was -- it really devastated the black and brown community because we didn't want to take our shots. We didn't want to get the COVID shots that could really help us survive hopefully COVID. So I had to do something. A lot of people had called me and said Earvin, you need to do something to tell people they need to get vaccinated; right?

And so I decided to go and get my shot live on TV. And it was really important to show all blacks and Latinos that this is the safest way. This is the way we can survive COVID and so we did that. Even my own parents didn't want to get vaccinated until I got my vaccination. And then they said okay, Earvin, I'm gonna go get vaccinated now.

So that's what I did and I'm glad I did it because a lot of people responded to that. Because we got a lot of misinformation in the black and brown community and so it

hurts us and a lot of people die because of the misinformation.
Q. Mr. Johnson, you're obviously a busy man. How often do you get asked to invest in a company?
A. Uh, we probably get 20, 30 offers a week to invest.
Q. And how often do you get asked to endorse a product?
A. Mmm, a month, we'll probably get ten offers.
Q. All right. Now, when you're receiving these offers -- or these requests, actually, how do you decide whether you are going to actually invest in a company?
A. Well, we got a great vetting process. So a lot of people who work for me, um, my business managers, my team at my company, they will break down the opportunity, um, how long have the company been operating, who's the management team, what's their revenues because most times, I don't invest in the company unless it's already had revenues.
Um, and then what we wanna do is write small checks, right, in the beginning unless it's the Dodgers or a big sports team that you writing bigger, bigger checks, but um, if they pass what we call the smell test, then we will -- then they will pass it to me, I'll take a look at it and then decide if we -- when I say, we as a company that we will invest and what dollar amount that will be as well.
Q. Okay. And why is it important to you personally to vet these opportunities or these requests?

A. You know, we want growth like anybody else. And also, too, um, if these companies are not just -- they can't just be about profit. They have to be about also making investments in communities that make them better; right? So we got to do both. It's a balancing act of making money but also we gotta give back, too at the same time. And if they don't believe in that, then I don't invest. But it's important that we keep growing. I want sustainability. I have that now. And I have the growth that I'm looking for. So we turn down more deals than we actually do.

Q. Have you ever analyzed whether your endorsement impacts whether people purchase products?

A. Well, they have a system that they call Q rating, and whether people trust you and they believe you and will they follow you. And so when those Q ratings come out, usually in the State in California, at least I'm second. And then across the country, my numbers always range around 90 percent that people who follow me, they trust me and believe in me. Thank God that that happens. And I've tried to be a person who always have done the right thing and make the right decisions.

Q. And is that trust important to you personally?

A. Oh, very important. You know, I love that -- I love this city. I love helping people. I love the fact that, you know -- I like to work with the governor the mayor, city

council. I just like to make a difference in this city, and when people put their trust in me, that's sacred. That's everything to me as well as my company as well.

MR. GUZMAN: Mr. Flores, can you please pull up previously admitted Government's Exhibit 41? And can you blow up the first section?

Q. Now, Mr. Johnson, have you ever an heard of the company Quantum Prevention CV, Inc.?

A. No. Not that I can recall. No.

Q. Have you ever heard of QC 20?

A. No.

Q. Have you ever heard of QP 20?

A. No.

MR. GUZMAN: Mr. Flores, can you please turn to page 2?

And blow up that, please.

Q. Mr. Johnson, prior to this case, had you ever heard of QP 20 product?

A. No.

Q. Have you ever heard of QP 20 vending?

A. No.

Q. Have you ever heard of QP 20 online?

A. No.

MR. GUZMAN: Mr. Flores, can you blow up the bottom part of this?

Q. Mr. Johnson, prior to this case, have you ever heard of Dr. D. Patterson, PhD?
A. No.
Q. Had you ever heard of Dustin T. Johnston?
A. No.
Q. And had you ever heard of Roderick Bowling?
A. Not that I can recall so I'd have to say no.
Q. Okay. As of March 19th, 2020, were you a Director of the company Quantum Prevention CV, Inc.?
A. Uh, definitely not.
Q. And as of March 19th, 2020, were you an officer of the company Quantum Prevention CV, Inc.?
A. No.
Q. Mr. Johnson, have you ever invested in Quantum Prevention CV, Inc.?
A. No.
Q. Have you ever endorsed Quantum Prevention CV, Inc.?
A. No.
Q. Have you ever way in any way whatsoever supported Quantum Prevention CV, Inc.?
A. No.
Q. Have you ever in any way supported a product called QP 20?
A. No.
Q. Have you ever in any way supported a product called

QC 20?
A. No.
Q. Have you ever used either of those products?
A. No.
Q. About when did you learn that in March 2020, um, someone was using your name to sell a purported COVID cure and treatment?
A. Unfortunately when I got a call from you guys.
Q. What was your reaction at the time, sir?
A. I wasn't too happy. I don't like when people, uh, use my name, and I'm not really associated with the company or the product.

MR. GUZMAN: Mr. Flores, can you please play previously admitted Government's Exhibit 103?

(Audio played.)

BY MR. GUZMAN:
Q. Mr. Johnson, you were reacting to that audio. What happened?
A. Well, first, it never happened. Second, the only time I write a check that big is for sports teams, that's it, and for the insurance company that I bought. And so I don't, I've never had a conversation. Um, it's unfortunate that this is -- I'm here today.

MS. EKE: Objection, Your Honor. Relevance.

THE COURT: You've answered the question, sir.

Ask another question, Counsel.

BY MR. GUZMAN:

Q. Mr. Johnson, do you know anyone -- prior to this case at least, did you know anyone by the name of Keith Lawrence Middlebrook?

A. I don't think so, but I can't recall. But I don't think so.

Q. Um, now, looking around this room right now, just based on your personal experience, nothing to do with this particular case, would you even be able to identify somebody named Keith Lawrence Middlebrook?

A. No.

THE COURT: Cross-examination?

MS. EKE: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. EKE:

Q. Good morning, Mr. Johnson.

A. Good morning.

Q. You've been in the public eye for a long time; right?

A. Yes.

Q. You got the nickname Magic in high school, right, when you were a sophomore?

A. Yes.

Q. And this was based on your extraordinary basketball skills; right?

A. Yes.
Q. You were ten drafted first by the Los Angeles Lakers in 1979.
A. Yes.
Q. And you played 13 seasons with the Showtime Lakers; right?
A. Yes.
Q. And after retiring, you still remained in the public eye. Right?
A. Yes.
Q. You coached the Lakers?
A. Don't bring that up. Yes, I did.
Q. Even though the record wasn't good, you still coached the Lakers; right?
A. Yes.
Q. You served as the President of basketball operations for the Lakers?
A. Yes.
Q. And you testified, you own other sports teams; right?
A. Yes.
Q. You own the Washington Commanders.
A. Yes.
Q. You own the Dodger; right?
A. Yes.
Q. And you own the Los Angeles Sparks.

A. Yes.
Q. It's safe to say that the majority of your life has been in the public eye; right?
A. Yes.
Q. And as a person in the public eye, you've attended different events over the years; right?
A. Yes.
Q. You attend sporting events; right?
A. Yes.
Q. You attend Super Bowls?
A. Yes.
Q. You attend NBA games; right?
A. Yes.
Q. And that includes the Lakers when they're not losing to Denver; right?
A. Thank you. Yes.
Q. And, in fact, you attended a Lakers versus Denver playoff game on May 12th, 2012. Do you remember that?
A. Yes.
Q. I want to show you a video from that game.
MR. EKE: Um, Ms. Kim, if I can just show it to Mr. Johnson? I'm gonna show it without audio so he can review it.
THE COURT: Do you have concerns about it?
MR. GUZMAN: Yeah. I haven't seen the video. I

don't know what exhibit number this is.

MS. EKE: Your Honor, this is Exhibit No. 210 which was previously provided to the government.

MR. GUZMAN: Can we put it up on our screen as well?

MS. EKE: I don't know.

THE COURT: No, because it's facing the jury.

MR. GUZMAN: I think if it's not going to be introduced, if Mr. Johnson wants to see it, that's fine.

MS. EKE: And we will be seeking to introduce it into evidence, Your Honor.

THE COURT: Okay. Can you fix this?

THE CLERK: Yes, it's only the witness's screen.

THE COURT: Okay, thank you.

MS. EKE: Mr. Johnson, I'm gonna show you what's been marked as Defense Exhibit 210 for identification purposes? And I'm gonna show it to you without sound.

THE WITNESS: Okay.

MS. EKE: I' gonna play a clip of it first just to make sure that it shows up on your screen.

Q. Mr. Johnson, do you see the video on your screen?

A. No.

THE COURT: You see the seal?

THE WITNESS: Yes, the seal is there.

THE COURT: Can you see it now?

THE WITNESS: I see it's like frozen.

BY MS. EKE:

Q. Yes. Do you see it says X17 online? Do you see that?

A. Yes.

MS. EKE: Okay. I'm going to start playing it at one second. I'm gonna stop it right here at 26 seconds.

Q. Mr. Johnson, this is the VIP parking lot of the Staples Center; right?

A. Yes.

Q. And you've been in this area before.

A. Yes.

Q. And you recognize this area?

A. Yes.

MS. EKE: I'm gonna keep playing at 26 seconds. I'm gonna stop it at 34 seconds.

Q. Mr. Johnson, the person on the screen is Mr. Middlebrook; right?

MR. GUZMAN: Objection, Your Honor. It lacks foundation. Mr. Johnson testified he did not recognize Mr. Middlebrook.

THE COURT: Well, you can say yes, no or I don't know.

THE WITNESS: Um, I don't know.

MS. EKE: Okay. I'm gonna fast forward it to 2:30. Actually, we'll start at 2.29, and I'm gonna start playing

from there. And I'm gonna stop it at 2.44.
Q. Mr. Johnson, that's you in the video; right?
A. Yes.
Q. And you are leaving the Staples Center?
A. Yes.
Q. Right? And you recall this game, and you recall being there?
A. Yes.
MS. EKE: Your Honor, at this time, the defense introduces Exhibit 210 into evidence.
MR. GUZMAN: Objection, Your Honor.
That's irrelevant, lacks foundation.
THE COURT: Overruled.
(Exhibit 210 admitted.)
MS. EKE: I'm gonna now publish it to the jury and play it for the jury.
(Video played.)
MS. EKE: I'm stopping it at 2.40. I'm gonna fast forward to 2.30.
(Video played.)
MS. EKE: And I'm gonna stop it at 2.48.
You can take it down.
Q. Mr. Johnson, I wanna talk about that specific game. At that Laker game, you actually sat next to Mr. Middlebrook; right?

A. I can't recall.
Q. You don't remember who you sat next to at that game?
A. No.
Q. You don't remember who you may have talked to at that game; right?
MR. GUZMAN: Objection, Your Honor.
Asked and answered. And also lacks foundation. He said he didn't remember.
THE COURT: Overruled.
BY MS. EKE:
Q. You don't remember who you may have talked to at that game; right?
A. Of course not.
Q. Well, in addition to attending Lakers games, you also attend boxing matches; right?
A. Yes.
Q. You went to the Mayweather Maidana fight on September 13th, 2014; right?
A. I think so, yes.
Q. Well, will it refresh your recollection to see a tweet you made about attending that match?
A. That's fine.
MS. EKE: Ms. Kim, if I can show Mr. Johnson something just on his screen.
Q. Mr. Johnson, do you see it on your screen?

A. No. The screen is blank.
Q. Give me one second so I can pull it up.
A. It came up.
Q. Do you see it right now?
A. Mm-hmm.
Q. And if you can just review it? And look up at me when you're done reviewing it.
THE COURT: And what exhibit number does this have?
MS. EKE: Your Honor, I will provide a copy of it to the Court. It is not marked as an exhibit. It's not being introduced. It's just to refresh the witness's recollection.
THE WITNESS: Yes.
MS. EKE: And I can provide a copy to the government as well. May I approach Your Honor to provide your clerk a copy?
THE COURT: Yes.
BY MS. EKE:
Q. Mr. Johnson, is your memory refreshed?
A. Yes.
Q. You did attend that Mayweather Maidana fight back in September of 2014; right?
A. Yes.
Q. And you interacted with people at that fight; right?
A. Yes.

Q. And one of the people that you interacted with was Mr. Middlebrook; right?
A. I can't recall that and don't know if I did or didn't.
Q. You've also attended award shows over the years; right?
A. A lot of 'em.
Q. You've attended the ESPYs before?
A. Only the first one.
Q. And just so we're clear, the ESPYs is an awards show for sports; right?
A. That's right.
Q. And, again, these are just some of the events that you've attended over the years; right?
A. Yes.
Q. And because you are a public figure, you meet a lot of people; right?
A. I say hi to a lot of people.
Q. Right. And sometimes you can't remember people you've said hi to; right?
A. Well, I meet millions of people.
Q. Right. You interact with fans, for example?
A. Yes.
Q. You interact with other athletes?
A. Yes.
Q. You interact with other celebrities; right?
A. Yes.

Q. You even interact with politicians; right?
A. Yes.
Q. And it's fair to say that you're friendly; right?
A. Of course.
Q. So if somebody talks to you, you talk back; right?
A. I say hi.
Q. If somebody engages with you, you engage back.
A. I wave and -- and try to keep movin'.
Q. Mr. Johnson, you know John Salley; right?
A. Yes, I do.
Q. John Salley is a former NBA player as well?
A. Yes, he is.
Q. He's also a former Laker?
A. Yes.
Q. John Salley introduced you to Mr. Middlebrook back in 2005 or 2006.
A. Like I said, I meet a lot of people so I can't recall.
Q. Mr. Johnson, you know Gerald Tolliver right?
A. I probably know him by face, but I can't -- I can't say for sure. The name sounds familiar.
Q. Gerald Tolliver owned a luxury car business called Boss Auto Group. Does that ring a bell?
A. Probably by face if I saw him.
Q. If I show you a picture, would that help you?
A. Probably.

MR. GUZMAN: Your Honor, I just want to raise an objection. None of this is facts in evidence. Counsel is testifying now about Mr. Tolliver, and none --

THE COURT: Mr. Guzman, don't make speaking objections.

Overruled.

MS. EKE: I'm gonna show you what's been marked as Defense Exhibit 331 for identification purposes. I'm providing a copy to the government, and I'm providing a copy to the Court, and I will put it up on the screen in front of you.

THE COURT: Thank you. And I will remind the jury that questions are not evidence. The only purpose of the question is to help you understand the answer.

BY MS. EKE:

Q. Mr. Johnson, do you see the picture on your screen?

A. Yes.

Q. Does this refresh your recollection as to who Gerald Tolliver Junior is?

A. I've seen him. I wouldn't say I know him, but I've seen him.

Q. Okay. Well, Mr. Johnson, on direct examination, you testified that you didn't know about the company contained in that document, QC 20 and QP 20; right?

A. Yes.

Q. It's also your testimony that you weren't on the board of that company; right?
A. Yes.
Q. Now, Mr. Johnson, you testified that you don't know if you know Mr. Middlebrook; right?
A. Yes.
Q. And you talked to the prosecutor before coming in to testify today; right?
A. Yes.
Q. And just to be clear, you didn't speak with them in 2020; right?
A. 2020, I don't think so.
Q. You didn't speak with them 2021 either; right?
A. I can't remember the first time I talked to 'em, but I don't think so, 2021. I don't think so.
Q. Mr. Johnson, the first time you spoke with the government was March 2024; right?
A. I believe that's when it was, but I can't remember.
Q. Well, it's fair to say you spoke with the government twice in this case; right?
A. Yes.
Q. Once in March and once last Friday; right?
A. Like I said, I can't remember dates, but I talked to 'em last Friday for sure.
Q. And when you spoke with the government, you were

truthful; right?
A. Yes.
Q. You discussed your testimony; right?
A. He asked me questions about if I knew him and if I invested in this company, and I gave him the answers.
Q. It's your testimony that the government asked if you knew Mr. Middlebrook; right?
A. Yes.
Q. But you never told them that you didn't know Mr. Middlebrook. Right?
A. I had never seen the pictures of him, and, uh, so once I saw the pictures, I said I didn't know him.
Q. It's your testimony that you told the government that you don't know Mr. Middlebrook?
A. I don't know him.
Q. My question is whether or not you've ever told that to the government.
A. I think so.
Q. Well, Mr. Johnson, during that meeting with the government, they were taking notes; right?
A. Um, I can't remember.
Q. Would it refresh your recollection if I showed you the note or the report that the government took based on your conversation with them?
THE COURT: Refresh his recollection as to whether

they took notes?

MS. EKE: Yes, Your Honor.

THE COURT: I don't think that's helpful.

BY MS. EKE:

Q. Well, Mr. Johnson, would it refresh your recollection as to whether or not you told the government that you didn't know Mr. Middlebrook if you looked at those notes?

MR. GUZMAN: Objection, Your Honor. Um, I'm not sure he said he didn't remember that.

THE COURT: Well, why don't you ask that question again.

BY MS. EKE:

Q. Mr. Johnson, do you remember if you've ever told the government that you did not know Keith Middlebrook?

A. I can't remember.

Q. Would it refresh your recollection if you saw a report written by the FBI based on your interviews with the government?

A. Yes. I guess so.

MS. EKE: I'm gonna show you. . . I'm gonna put on your screen in front of you what's been marked as Defense Exhibit 219.

Ms. Kim, if I can just have it shown to the witness.

Q. Mr. Johnson, do you see this report on the screen?

A. Yes.
Q. And it's dated May 9th, 2024; right?
A. Yes.
Q. On the top right-hand corner?
A. Mm-hmm.
Q. And it's based on your conversation with FBI Special Agent Madison McDonald; right?
A. Yes.
Q. And the United States assistant attorneys who are present in court.
A. That's right.

THE COURT: Did you have an objection, Counsel?

MR. GUZMAN: Couple of objections.

First, it misstates the document. The document date is May 6, 2024. Um, and second, again, these are not his statements so I'm not sure what we are getting at.

THE COURT: I understand they're not his statements.

BY MS. EKE:
Q. Mr. Johnson, if you can just read this silently, and look up at me when you're done?
A. Okay.
Q. Does this refresh your recollection as to whether you ever told the government that you did not know Mr. Middlebrook?

THE COURT: Mr. Johnson, the question is not what you see or don't see there. The question is now that you've read it, is your recollection refreshed?

THE WITNESS: Yes. It's refreshed on. . . in this document, yes, on what we talked about.

MS. EKE: And I'm gonna take the document off of the screen.

Q. So Mr. Johnson, when you met with the government, you did not say that you didn't know Mr. Middlebrook.

A. Again, it was on Friday so I can't remember what I said, but I don't know him.

Q. And I -- I understand that's what you're saying today.

THE COURT: No comments. Just ask a question.

BY MS. EKE:

Q. Mr. Johnson, I just want to focus on what you said to the government. Did you tell the government that you didn't know Mr. Middlebrook?

A. I believe I did say I didn't know him.

Q. And when did you tell them that?

A. I guess that was Friday when we got together.

MS. EKE: Mr. Johnson, I want to show you a report from that Friday.

And if we can put Defense Exhibit 298 just for Mr. Johnson.

Q. Mr. Johnson, this is a report from your interview with

the government on Friday. If you can just read it to yourself silently, and look up at me when you're done. I'll go to the next page.

A. Okay.

Q. Mr. Johnson, this report adequately depicts what you said in that meeting on Friday; right?

A. Yes.

Q. And in that meeting on Friday, you did not tell the government that you didn't know Mr. Middlebrook. Right?

MR. GUZMAN: Objection, Your Honor.

Asked and answered.

THE COURT: Overruled.

Just one more time.

THE WITNESS: Again, I don't know Mr. Middlebrook.

BY MS. EKE:

Q. And when you spoke with the government on Friday, you did not tell them that; right?

A. I don't remember that, but if it's in there --

THE COURT: No, that's now how we work. No. The question is does that refresh your recollection.

THE WITNESS: No. No, it doesn't.

MS. EKE: Well, Your Honor, I -- I wasn't refreshing his recollection. If I may be heard on --

THE COURT: No.

BY MS EKE:

Q. Mr. Johnson, it's your testimony that you don't know Mr. Middlebrook; right?
A. Yes.
Q. Right? That's your testimony?
A. Yes, yes.
Q. And you can't recall if you told the government that prior to today.
A. I can't remember. We talked about a lot of things.
Q. Well, I wanna talk about your investment experience, something you spent a lot of time on direct examination talking about.
A. Mm-hmm.
Q. You've invested in companies before; right?
A. Yes.
Q. You get messages from people asking you to invest in their company. Right?
A. Letters.
Q. You get letters asking people --
A. Emails.
Q. Correspondence, is that fair?
A. Yes --
Q. To invest?
A. -- that's fair.
Q. And you would agree who one chooses to invest in is important; right?

A. Yes.
Q. And what one chooses to invest in is important; right?
A. Yes.
Q. And that's because you don't want your name attached to a bad investment; right?
A. Yes.
Q. And as you testified, you want to do good; right?
A. Yes.
Q. So before you invest, it's important to do your own due diligence; right?
A. Correct.
Q. It's important to do your own investigation.
A. Well, not me personally, but my team.
Q. It's important for your team to do an investigation; right?
A. Yes.
Q. It's important to go -- that you go through a vetting process to figure out which projects you wanna invest in; right?
A. Yes.
Q. You don't invest simply because someone else is investing?
MR. GUZMAN: Objection, Your Honor.
Vague as to you.
THE COURT: Sustained.

BY MS. EKE:
Q. Mr. Johnson, you or your company don't invest simply because someone else is investing.
A. Um. . . I think that we invest -- yes, we will take a look at a deal probably even more if great companies are invested in that company already.
Q. Right, but you'll still do your own vetting process; right?
A. Oh, of course.
Q. And you'll still do your own due diligence; right?
A. My team does, yes.
Q. And you or your team doesn't just take the word of the person asking you to invest; right?
A. Of course.
Q. Now, Mr. Johnson, since you've dealt with investments before, you know what a Private Placement Memorandum is; right?
A. Well, you're gonna have to break it down to me.
Q. Of course.
A. So we -- I got it right, you know.
Q. Mr. Johnson, you know there's contracts involved when it comes to investments; right?
A. Yes.
Q. And contracts outline the agreement between two sides; right?

A. That's true.
Q. It includes promises. Right?
A. Yes.
Q. It includes representations; right?
A. Yes.
Q. The contract can also include disclaimers; right?
A. It could.
Q. It can include a disclaimer that a person may lose their money from investing; right?
A. Mmm. . . not all contracts. I wouldn't say every one of 'em.
Q. But some of 'em could; right?
A. Could, yes.
Q. And, in fact, the contract generally tells you what is being agreed to and what is being promised; right?
A. Yes.
MR. GUZMAN: Objection, Your Honor.
Calls for a legal conclusion.
THE COURT: Sustained.
MS. EKE: Your Honor, if I may be heard?
THE COURT: I will instruct the jury on any law that's relevant in the case.
MS. EKE: Your Honor, if I may be heard?
(The following proceedings were held at side bar:)
MS. EKE: Your Honor, I'm not asking Mr. Johnson

for any legal opinion. On direct examination, he talked extensively about his investment experience and due diligence. And they go through asking about whether or not he knows that these things exist based on his experience. This is not a legal opinion.

MR. GUZMAN: Your Honor, the defense appears to be trying to qualify Mr. Johnson as an expert.

THE COURT: It does, and you're done with this line.

(Side bar concluded.)

BY MS. EKE:

Q. Mr. Johnson, you wouldn't invest in a company without knowing what you're agreeing to; right?

A. Right.

Q. Uh, Mr. Johnson, when you talked about your different investment experiences, you talked about investing in fitness and healthcare related organizations; right?

A. Yes.

Q. And you're a former athlete as we previously discussed; right?

A. Yes.

Q. And you own 24 Hour Fitness gyms across the state; right?

A. I used to, yes.

Q. You've also partnered with Cigna Group; right?

A. Yes.
Q. And Cigna Group is a healthcare and insurance company; right?
A. That's right.
Q. You've also partnered with GSK as you testified to.
A. Yes.
Q. And GSK is a pharmaceutical company; right?
A. Yes.
Q. And GSK has a partnership with Pfizer; right?
A. I think so, but I'm not for sure.
Q. Well, you're aware that Pfizer is one of the companies that created the Covid-19 vaccine; right?
A. Yes.
Q. You've also invested in Nature Aid; right?
A. Yes.
Q. Nature Aid is a health products company?
A. Yes.
Q. You've also brought awareness to different diseases as you testified to on direct examination.
A. Yes.
Q. You've brought awareness to RSV as you testified to?
A. Through GSK, yes.
Q. You've also brought awareness to HIV and AIDS; right?
A. Yes.
Q. And you've also spoken out about the importance of

vaccines; right?
A. Yes.
Q. You've spoken out about the Covid-19 vaccine as you testified to.
A. Yes.
Q. You encouraged NBA players to get vaccinated.
A. Yes.
Q. And you publicized when you took that Covid-19 vaccine.
A. That's right. Yes.
Q. And you were concerned about the spread of Covid-19 in March of 2020; right?
A. Yes.
Q. Now, Mr. Johnson, when Mr. Middlebrook was arrested, there was news coverage by different media outlets. Are you aware of that?
A. No.
Q. You didn't see any of the news outlets covering the case involving your name.
A. No.
Q. Mr. Johnson, you would agree, though, that bad publicity can be bad for business; right?
A. Of course.
Q. Bad publicity can cause you to severe ties with companies that you care about; right?
A. Well, they will probably severe ties with you.

Q. Exactly. Bad publicity can hurt causes that you care about; right?
A. Yes, it could.
Q. I'm sorry, I didn't hear.
A. Yes, it could.
Q. And you wouldn't want to do anything to jeopardize or hurt the causes that you care deeply about; right?
A. Of course not.
MS. EKE: Your Honor, if I could have one minute?
THE COURT: Yes.
MS. EKE: Your Honor, I have no further questions.
THE COURT: Cross-examination?
I'm sorry, redirect examination.

REDIRECT EXAMINATION

BY MR. GUZMAN:
Q. Mr. Johnson, just very briefly, what's the capacity approximately of Staples Center?
A. I really don't know. It's probably about 19,000, I would assume? 20,000? Somewhere in that neighborhood.
Q. And when you go to a sporting event, approximately how many people do you run into?
A. Thousands. I take pictures out front probably for about a half hour and inside for another half hour. Uh, I interface with probably a thousand fans between, uh, the Laker games and another thousand or so with the Dodgers. I'm

always -- I'm always saying hi to the fans and people.
Q. And, um, we've asked this a few times, but obviously, when you interact with thousands of fans, you don't remember meeting every single person you've ever taken a picture with.
MS. EKE: Objection, Your Honor. Leading.
THE COURT: That is leading.
Ask a non-leading question.
BY MR. GUZMAN:
Q. Mr. Johnson, just to clarify, uh, did you ever invest in the defendant's company?
A. No.
Q. And sitting here today, um, do you recall meeting defendant?
A. Like I said, I can't recall.
Q. Um, was -- that video that was shown to you -- did that video show you meeting the defendant?
A. No.
Q. Isn't it the case that you were exiting at the --
MS. EKE: Objection, Your Honor. Leading.
THE COURT: Ask it a non-leading form.
BY MR. GUZMAN:
Q. Do you recall the video that defense counsel showed you?
A. Yes.
Q. Do you recall, um, what time -- approximately what time of day it was when you were exiting that building?

A. I believe it was evening.
Q. Was it dark outside?
A. I think so. It looked like it was dark.
Q. And, um, Mr. Johnson, to clarify about when you met with the government.
A. Mm-hmm.
Q. Uh, do you recall whether or not you specifically said I don't know Mr. Middlebrook?
A. I think I said I don't know him, and, uh, yeah, that's what I think I said.
Q. Okay. And, again, sitting here today, is your testimony the same thing?
A. Definitely. I don't know him.
MR. GUZMAN: Thank you, Your Honor.
No further questions.
THE COURT: Recross?
MS. EKE: No, Your Honor.
THE COURT: Thank you very much, sir.
You're excused.
THE WITNESS: Thank you.
THE COURT: Does the government have another witness?
MR. GUZMAN: Your Honor, the government calls Carlos St. Mary.
THE CLERK: Please raise your right hand.

(Witness sworn.)

THE CLERK: Please take a seat. Speaking into the microphone, can you please state and spell your name for the record?

THE WITNESS: Um, Edward Carlos St. Mary, III, E-d-w-a-r-d, C-a-r-l-o-s, S-t period, M-a-r-y, III.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. GUZMAN:

Q. Good morning, Mr. St. Mary.

A. Good morning.

Q. Do you know the defendant, Keith Lawrence Middlebrook?

A. I do.

Q. Can you point out an item of clothing he is wearing?

A. Uh, he's wearing a black suit and tie.

MR. GUZMAN: Mr. Flores, can you please pull up Government's Exhibit 134.

Q. Before it's published, Mr. St. Mary, can you look at Exhibit 134 in your binders? There's a couple of binders to your left.

A. You said 134?

Q. Yes, sir, 134.

A. Got it.

MR. GUZMAN: Your Honor, I would ask that the record reflect that Mr. St. Mary identified the defendant.

THE COURT: Yes.

MR. GUZMAN: Thank you.

Q. Mr. St. Mary, do you recognize that document?

A. I do.

Q. What is it?

A. This is messages between Mr. Middlebrook and myself.

Q. And, um, are those messages true and accurate representations of the text messages that you received in March 2020?

A. Yes.

MR. GUZMAN: Your Honor, the government moves to admit Exhibit 134.

THE COURT: Any objection?

MR. BARRIENTOS: No objection.

THE COURT: That's admitted.

(Exhibit 134 admitted.)

MR. GUZMAN: Can you publish that, please, Mr. Flores? And turn to page 2. And can you zoom in on the first text message here.

Q. Mr. St. Mary, can you read the first sentence starting with I have?

A. I have developed a cure for the corona virus, Covid-19.

MR. GUZMAN: And Mr. Flores, can you pull up the second text message?

Q. Mr. St. Mary, can you please read the last sentence

starting with you receive?
A. You receive 25 percent commission on all funds you bring in plus stock shares for the IPO.
Q. Now, do you see that there appears to be attachments at the bottom?
A. Yes.
Q. Okay. Now, Mr. St. Mary, where were you in March 2020 when you received these text messages?
A. I was in Houston, Texas.
Q. And to clarify were there four text messages?
A. There were four text messages.
Q. How do you know that you were in Houston, Texas at the time?
A. During the pandemic, um, that's where I -- I chose to reside.
MR. GUZMAN: Thank you, sir. No further questions.
THE COURT: Cross-examination?
MR. BARRIENTOS: No, Your Honor.
THE COURT: Thank you very much, sir. You're excused.
THE WITNESS: Thank you.
THE COURT: Does the government have another witness?
MR. GUZMAN: Yes, Your Honor.
The government calls Wayne Jefferies.

THE CLERK: Please come forward to be sworn.

Raise your right hand.

(Witness sworn.)

THE CLERK: You can take a seat. Speaking into the microphone, can you please state and spell your name for the record?

THE WITNESS: Wayne Jefferies, W-a-y-n-e, last name J-e-f-f-e-r-i-e-s.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. GUZMAN:

Q. Good morning, Mr. Jefferies.

A. Yes.

Q. Do you know the defendant, Keith Middlebrook?

A. I do.

Q. And can you point out an item of clothing that he's wearing?

A. Um. . . a black tie and a white shirt and a blazer.

MR. GUZMAN: Your Honor, will the record reflect that Mr. Jefferies pointed out the defendant.

THE COURT: Yes.

BY MR. GUZMAN:

Q. Mr. Jefferies, can you look in your binder right there at Exhibit 136?

A. Yes.

Q. Do you recognize that?
A. I do.
Q. What is it?
A. It is a text message from Mr. Middlebrook.
MR. GUZMAN: Your Honor, the government moves to admit Government's Exhibit 136.
THE COURT: Any objection?
MS. EKE: No Your Honor.
THE COURT: Admitted.
(Exhibit 136 admitted.)
BY MR. GUZMAN:
Q. Mr. Jefferies, is this the text message that you received from the defendant in March 2020?
A. Uh, yes.
Q. And can you read the second full paragraph, investors who?
A. Investors who come in at ground level with say 1 million parachute with 200,000,000 to 300,000,000 conservative minimum plus retain stock shares.
Q. Mr. Jefferies, uh, did the defendant attach anything to that text message?
A. He did.
Q. What did he attach?
A. A short little movie.
Q. And can you turn in your binder to Government's

Exhibit 2?
A. Yes, I have.
Q. What is it?
A. It is a video that I reviewed yesterday.
Q. And is that video the same video that --
MS. EKE: Objection, Your Honor, leading.
THE COURT: Overruled.
BY MR. GUZMAN:
Q. Is that the same video that was attached to your text message?
A. Yes.
Q. How do you know?
A. Because I watched it.
MR. GUZMAN: Your Honor, the government moves to admit Exhibit 2.
THE COURT: Any objection?
MS. EKE: No, Your Honor.
THE COURT: Admitted.
(Exhibit 2 admitted.)
BY MR. GUZMAN:
Q. Mr. Jefferies, can you please turn in your binder, not sure which one, to Government's Exhibit 42?
A. Okay.
Q. Do you recognize that document?
A. I do.

Q. What is it?
A. It was an offering that was sent to me.
Q. And, um, is it a true and accurate representation of an offering that was sent to you?
A. It looks like what was emailed to me.
MR. GUZMAN: The government, Your Honor, moves to admit Exhibit 42.
THE COURT: Any objection?
MS. EKE: No, Your Honor.
THE COURT: That's admitted.
(Exhibit 42 admitted.)
MR. GUZMAN: And Mr. Flores, can you please publish? And can you blow up the bottom, please?
Q. Okay. Mr. Jefferies, um, who sent this email to you?
A. Uh, Keith.
Q. And, um, what date and time?
A. March 24th, 2020 at 6:19 p.m.
MR. GUZMAN: Mr. Flores, can turn to page 2, please?
Q. Mr. Jefferies, can you please read the subject matter of the email?
A. I created a Covid-19 prevention pill and a cure for the Corona virus. Your commission is 40 percent.
Q. Mr. Jefferies, can you please read the first -- one moment, please. Can you please read the first sentence up

through, uh, immunity?
A. Proceeds from this offering will be allocated to the working capital of the company Quantum Prevention CV, Inc., QP 20 and to pay for the purpose of mass production and marketing and the patent pending prevention or immunity product that builds, activate and supports the human cells and the body immune's system.
MR. GUZMAN: Mr. Flores, can you please turn to page 3.
Q. Mr. Jefferies, can you please read the first sentence up through Covid-19?
A. QP 20 has developed a patent pending product that builds, activates and supports symbiotic immunity, benefits deflecting the virus and disease Covid-19 corona virus.
Q. Now, Mr. Jefferies, where were you on March 16th, 2020 when you received that email?
A. I believe I was -- I was at home.
Q. Where is home?
A. Uh, Las Vegas, Nevada.
Q. And how do you know you were Las Vegas, Nevada in March 2020?
A. That's where I live and reside.
MR. GUZMAN: Thank you, Your Honor.
No further questions.
THE COURT: Cross-examination?

MS. EKE: Yes, Your Honor.

MR. GUZMAN: Your Honor, may we have a side bar before cross-examination?

THE COURT: Yes.

(The following proceedings were held at side bar:)

MR. GUZMAN: Sorry, Your Honor. I couldn't find my mask. For purposes of cross-examination, I want to raise an issue which was he has some criminal history very dated. I don't believe it is relevant or admissible. And for those reasons, I just wanted to raise that point before a question gets out.

THE COURT: Do you intend to go into his criminal history?

MS. EKE: No, Your Honor.

THE COURT: Excellent, thank you. In the future walk over to her and whisper do you intend to go into whatever it is so we don't have to waste time up here. Okay?

MR. GUZMAN: Okay.

(Side bar concluded.)

CROSS-EXAMINATION

BY MS. EKE:

Q. Good morning, Mr. Jefferies.

A. Good morning.

Q. You testified that you know Mr. Middlebrook; right?

A. I do.

Q. You met him through a mutual friend; right?
A. I did.
Q. And that mutual friend is Joe Judah?
A. It is.
Q. And Joe Judah is a professional boxer; right?
A. Uh, I believe he used to be.
Q. Now, on direct examination, you talked about the email that you received from Mr. Middlebrook; right?
A. Yes.
MS. EKE: I'm gonna put that back on the screen.
It's Government Exhibit 42.
Q. Do you see it on the screen in front of you?
A. I do.
MS. EKE: I'm going to scroll to the next page.
Now, you talked about the top portion of this document. If we can make the top part bigger right above the use of proceeds? Right above.
Q. Now, Mr. Jefferies, on the second to last line, it says read thoroughly and then call me; right?
A. Yes.
Q. You read through this document; right?
A. I did not read thoroughly through it. No, I did not.
Q. And you didn't call Mr. Middlebrook about it either.
A. I don't believe I called him, no.
MS. EKE: And, Your Honor, I have no further

questions.

THE COURT: Redirect?

MR. GUZMAN: No, Your Honor.

THE COURT: Thank you very much, sir.

You're excused.

Does the government have another witness?

MR. CARBAJAL: Yes, Your Honor.

Special Agent Jamila McKnight.

THE CLERK: Please raise your right hand.

(Witness sworn.)

THE CLERK: Thank you. You could take a seat.

Speaking into the microphone, can you please state and spell your name for the record?

THE WITNESS: Jamila, J-a-m-i-l-a, McKnight, M-c-K-n-i-g-h-t.

THE COURT: You may proceed.

MR. CARBAJAL: Thank you.

DIRECT EXAMINATION

BY MR. CARBAJAL:

Q. Good morning, Agent McKnight.

A. Good morning.

Q. Where do you work?

A. I work for the Federal Bureau of Investigation in the Los Angeles office.

Q. What do you do at the FBI?

A. I'm a Special Agent.
Q. Are you assigned to any particular squad?
A. Yes. I'm assigned to a White Collar squad that focuses on bank fraud.
Q. How long have you worked at the FBI?
A. For about eight years.
Q. Have you been a special agent the whole time?
A. No.
Q. How long have you been a special agent?
A. Almost two years.
Q. What did you do before you were a special agent?
A. I started off as a Honors intern, and that was at the headquarters in Washington, DC. I then became a Operational Support Technician working with a gang squad in Los Angeles. I then was promoted to a Research Analyst with our Information Management Division, and then I was a Management and Program Analyst in Washington, DC for the Office of the Chief Information Officer.
Q. What are your responsibilities as a special agent with the FBI?
A. Um, some of my responsibilities include, um, being that I'm on a White Collar squad, I do bank fraud investigations, some money laundering, um, embezzlement. I look at bank records. Um, I conduct interviews, searches and arrests and a plethora of other things. I assist where needed in the

Los Angeles area.

Q. Did you become involved in an investigation regarding Keith Middlebrook?

A. Yes.

Q. When did you become involved in that investigation?

A. In about March of 2024 of this year.

Q. What did you do as part of this investigation?

A. Among other things, I reviewed, uh, documents, uh, bank records, uh, created a sheet for those bank records, um, looked at patent information as well.

MR. CARBAJAL: I'm gonna ask you to turn to Exhibit 43 in the binder in front of you.

Your Honor, pursuant to the Court's order in Docket 87, the government moves to admit Exhibit 43.

THE COURT: Any objection?

MR. BARRIENTOS: No objection.

THE COURT: That's admitted.

(Exhibit 43 admitted.)

BY MR. CARBAJAL:

Q. Ms. McKnight, what is Exhibit 43?

A. This is a United States Patent and Trademark, uh, certification document.

Q. Can you please read what's on your screen as Exhibit 43?

A. Yes. It's dated April 17th, 2020. This is to certify that I, Brian E. Hamlin, performed a search of the patent

application locating and monitoring database system for the United States Patent and Trademark Office to identify any patent applications filed by Keith Middlebrook, Dustin T. Johnston, Roderick Bowling and/or Earvin Magic Johnson.

I also performed a search of the patent assignment search database of the United States Patent and Trademark Office to identify any patent applications assigned to or from the following entities: Quantum Prevention CV, Inc., Quantum Cure CV 2020, Inc. and Quantum Immunity CV 2020, LLC. Said searches did not produce any results. By the authority of the Director of the United States Patent and Trademark Office. Signed by Brian E. Hamlin, the certifying officer.

Q. Thank you.

MR. CARBAJAL: I'm gonna ask you turn to Exhibit 45 in the binder in front of you.

Your Honor, pursuant to the Court's order in Docket 238, the government moves to admit Exhibit 45.

THE COURT: Any objection?

MR. BARRIENTOS: No objection.

THE COURT: That's admitted.

(Exhibit 45 admitted.)

BY MR. CARBAJAL:

Q. Okay. Agent McKnight, what is Exhibit 45?

A. This is a Google document in reference to, uh, gmail servers.

Q. Can you please read what's zoomed in on the screen in front of you?
A. I have made or caused to be made a diligent search of those records. No records have been found reflecting that Google had gmail servers in the State of California on a date range of March 15th, 2020 to March 30th, 2020. If Google had gmail servers in the State of California during the relevant time period, I would expect its business records would reflect that fact.
Q. And who is this signed by?
A. It is signed by Corey Gatus, the Records Custodian.
Q. Thank you. Now, Agent McKnight, did you review bank records in this case?
A. I did.
Q. Approximately how many accounts did you review in this case?
A. Uh, over 30 accounts.
Q. And what financial institutions did you review records for?
A. Um, there was Bank of America, JP Morgan Chase, U.S. Bank, um, Discover, among others.
Q. Do you know who owned these accounts?
A. Yes.
Q. Who owned those accounts?
A. Keith Middlebrook.

Q. And how do you know that?
A. So on these accounts, there were signature cards, and on those signature cards, it had his name, Keith Middlebrook, his signature and other personally identifiable information including his address.
Q. Did you put together a chart summarizing bank records that you reviewed?
A. I did.
Q. Can you please turn to Exhibit 44?
A. Okay.
Q. Do you recognize Exhibit 44?
A. Yes, I do.
Q. What is it?
A. This is a chart I created to summarize the information from those bank accounts that were opened in March of 2020.
Q. Does it include credit cards as well or only bank accounts?
A. It includes credit cards as well. On that second page, uh, that's the credit card information.
Q. Does Exhibit 44 include all of the bank records that you reviewed in this case?
A. No. This is, again, just the bank accounts and records that were open in March of 2020.
Q. Uh, did you review the entirety of bank records from the financial institutions we just discussed?

A. Yes.
Q. Does Exhibit 44 include information for all the bank accounts that were opened as of March 2020?
A. Yes.
Q. For the accounts opened in March 2020, approximately how many pages were those records in total?
A. Um, approximately 200 pages.
Q. Does Exhibit 44 fairly and accurately summarize the records for the bank accounts that were opened as of March 2020?
A. Yes, they do.
MR. CARBAJAL: Your Honor, the government moves to admit pursuant to Federal Rule of Evidence 1006.
MR. BARRIENTOS: And Your Honor, we just stand by our previous objection.
THE COURT: All right. Those are admitted.
(Exhibit 44 admitted.)
BY MR. CARBAJAL:
Q. Agent McKnight, uh, this is the first page of Exhibit 44. Uh, is this summarizing the bank statements or the credit card statements?
A. This one is bank statements.
Q. And there's an address on the second line. What is the address referring to?
A. This is the address that was utilized in these, uh, bank

accounts, uh, for the financial institution. They were listed on the signature card.

Q. And can you just walk us through the -- the categories for each column? And explain to us, um, if any description is necessary what those columns are referring to.

A. Of course. So on the left-hand side, that's the bank so financial institution name so, for example, the first one, Bank of America.

Um, the second column is the account name so that would be the name that a person would open up that account under so in this case, for this first line, we have KM Legal Power, LLC.

And the next column is the last four of the account numbers so, again, for this first column, we have 3853.

The next column is authorized signer so that would be the person listed on that signature card. That's the authorized signer for this bank account. So we have Keith L. Middlebrook.

And the date would be the date range for the statement that was reviewed that this whole line is referring to. So in this instance, we have 03-01-2020 through 03-31-2020.

And the last four columns, that's going to be the financial information. So we start with the beginning balance which is just the balance at the beginning of that

statement.

Then we have deposit. So that will be the amount of deposits that was made throughout that time range, that date range.

We have withdrawals, debits and fees so that's the total amount that was taken out during that time range.

And then lastly, we have the ending balance. So at the end of that time range, that is what was left in the bank account.

Q. So is it fair to say if we use the first account as an example, the beginning balance, negative 535 --

MR. BARRIENTOS: Objection, leading.

THE COURT: Overruled.

BY MR. CARBAJAL:

Q. A total deposit in that range of $2,940.99. Then withdrawals totalling $3,059.81 with an ending balancing.

MR. BARRIENTOS: Objection, Your Honor, leading.

THE COURT: No.

BY MR. CARBAJAL:

Q. With an ending balance of $654 -- or sorry, negative $654.34. Is that accurate?

A. Yes, it is.

Q. Now, can you please explain -- so this is the second page of Exhibit 44. Just explain for us -- it appears that the first one, two, three four, five columns are the same.

The last two columns appear a little differently. Can you please explain the difference?

A. Yes. So these columns are different from the first set. These columns will just have the date range for that statement and then a beginning balance and then an end balance.

So for that first row, as an example, we have JP Morgan Chase with the account name being Keith Middlebrook, um, the last four, the authorized signer as Keith L. Middlebrook, the date range of February 19th, 2020 through March 12th, 2020, and then we have a beginning balance of negative $17,053.82 and an ending balance of negative $17,700.95.

Q. So that's what the parenthesis shows --

A. Yes.

Q. -- that that's the amount owed?

A. Correct.

MR. CARBAJAL: All right. Agent McKnight, I'm gonna ask you to turn to Exhibit 68.

Your Honor, pursuant to the Court's ruling in Docket 238, the government moves to admit Exhibit 68.

THE COURT: Any objection?

MR. BARRIENTOS: If I can have one moment? We stand by our previous objection as to bank records.

THE COURT: That's admitted.

(Exhibit 68 admitted.)

BY MR. CARBAJAL:

Q. All right. So we're opening up Exhibit 68. Please go to page 7.

A. Okay.

Q. What -- as a starting point, what is Exhibit 68?

A. So Exhibit 68 is going to be the bank statement for the bank accounting ending in 3866.

MR. CARBAJAL: I'm gonna ask you to take a look -- at so on the left of this page, there's a date category with several dates. If you go maybe two-thirds down -- just highlight on the screen. All right.

Q. So starting with 316, the words Von's in next to it. Can you please describe what this line indicates?

A. So this line -- do you want me to read it?

Q. Yes, read it and then describe what it means.

A. So this line is Von's No. 3160. And so it's saying it's a purchase from Von's in Huntington Beach with the amount of $54.06.

Q. And if you go a few a lines down, there's another 3-16-20 transaction. Can you just read the location next to Century Theaters?

MR. BARRIENTOS: Objection.

Document speaks for itself.

THE COURT: Overruled.

BY MR. CARBAJAL:

Q. Do you see what I'm talkin' about?

A. Yes. Century Theaters is Huntington Beach, California.

Q. And if you go two lines down, can you read the location for the next three items?

A. We have Costa Mesa, California, Costa Mesa, California, Huntington Beach, California.

Q. And if you go down to the 03-17-20 transaction at Chipotle?

A. Yes.

Q. Okay. Can you read the location for that?

A. Fountain Valley, California.

Q. If you go down two more columns, a 03-18-20 transaction at Regal Newport, can you please read the location for that?

A. Newport Beach, California.

Q. You could do the same for the next three items.

A. We have Fountain Valley, California, Huntington Beach, California and Huntington Beach, California.

Q. And then the last one, on 03-19-2020 at a Dave and Busters, what's the location for that?

A. Irvine, California.

Q. And just read the, uh, top portion, please, the red-bolded language?

A. Yes. It says withdrawals and other deposits -- I'm sorry, withdrawals and other debits continued.

MR. CARBAJAL: Your Honor, pursuant to the Court's ruling in Docket 238, the government moves to admit Exhibits 64, 65, 66, 129 and 130.

MR. BARRIENTOS: We stand by our previous objections, Your Honor.

THE COURT: All right. Those are admitted.

(Exhibits 64, 65, 66, 129 and 130 admitted.)

BY MR. CARBAJAL:

Q. And so we're opening up an exhibit. And Agent McKnight, if you can just look at the screen in front of you, this is Exhibit 64 in evidence. Uh, if you could just read, uh, that first chunk starting with service ending with date range.

A. Okay. We have service being Instagram, Target 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. Account identifier: Keith Middlebrook. Account type: Instagram user. Generated March 7, 2020.

Would you like the time as well.

Q. Yes. Please.

A. Okay. 1:58:58 UTC, date range, March 13th, 2019, 00:00 UTC to April 1st, 2020 at 23:59:59 UTC.

Q. And under registered email address, can you please read that as well?

A. The registered email address is keithactor@gmail.com.

Q. And finally vanity name? Please read that.

A. Keith Middlebrook.

THE COURT: I think it's time for a break.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We'll take a 15-minute break.

THE CLERK: All rise.

(Jury not present.)

THE CLERK: Anything we need to discuss?

MR. GUZMAN: No, Your Honor.

MS. EKE: Nothing from the defense, Your Honor.

THE COURT: All right.

THE CLERK: This court's in recess.

(Recess taken.)

MS. EKE: We received some discovery in the middle of trial in regards to Mr. Morgan that we need clarification on.

MR. GUZMAN: It's Jenks material, Your Honor. We produced an email that he sent to our travel people talking about how he had issues with his children and he asked to be paid as an expert. Obviously, he's not being paid as an expert, and we revised his schedule to allow him to come in last night and leave today given that he represented he had a bunch of childcare issues to deal with.

MS. EKE: Your Honor, we can accept the government's representation. The email's redacted so we couldn't tell what the resolution was and if Mr. Morgan was being paid. And so that was the extent of our email, if he

was getting paid. But we'll accept the government's representation if they say he's not getting paid.

THE COURT: All right.

THE CLERK: All rise.

(Jury present.)

THE COURT: You may be seated. Everyone is back. You can see we're switching out on you for a little bit.

Would you call your witness, Counsel.

MR. GUZMAN: Yes, Your Honor.

The government calls Ralph Morgan.

THE CLERK: Can you please raise your right hand?

(Witness sworn.)

THE CLERK: Thank you. And speaking into the microphone, can you please state and spell your name for the record?

THE WITNESS: My name is Ralph Morgan, R-a-l-p-h M-o-r-g-a-n.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. GUZMAN:

Q. Good afternoon, Mr. Morgan -- or good morning, Mr. Morgan.

A. Good morning.

Q. Can you look in your binder at Government's Exhibit 135, please? Do you have that?

A. Yes.
Q. Do you recognize this?
A. Yes, I do.
Q. What is it?
A. It's a message from Mr. Middlebrook.
Q. And, um, do you know Mr. Middlebrook?
A. I do.
Q. Can you point him out for the Court?
A. Yes, the gentleman there.
MR. GUZMAN: Let the record reflect that he pointed to the defendant?
THE COURT: He just said that gentleman there.
I don't know who he pointed to.
MR. GUZMAN: I'm sorry.
Q. Can you please point out, uh, an item of clothing that he's wearing?
A. Yes, the gentleman with the black tie, white shirt and glasses.
THE COURT: Indicating the defendant.
BY MR. GUZMAN:
Q. Um, is that text message a true and accurate representation of the text message that you received from Mr. Middlebrook in March 2020?
A. Yes, it is.
Q. And where were you when you received that text message?

A. I was at home in Evergreen, Colorado.
Q. And how do you know that?
A. Cause I was home schooling my -- my child, uh, during COVID.
MR. GUZMAN: Thank you, Your Honor.
No further questions.
Oh. Your Honor, I'm sorry. The government moves to admit Exhibit 135.
THE COURT: Any objection?
MR. BARRIENTOS: No objection.
THE COURT: That's admitted.
(Exhibit 135 admitted.)
MR. GUZMAN: With that, Your Honor, no further questions.
THE COURT: Cross-examination?
MR. BARRIENTOS: No cross-examination.
THE COURT: Thank you very much, sir.
You're excused.
Are we going to get Special Agent McKnight back?
MR. CARBAJAL: Yes, Your Honor.
THE COURT: All right, let's do that.
MR. CARBAJAL: The government recalls Special Agent McKnight.
THE COURT: Special agent, you're still under oath.
Counsel, you may proceed.

MR. CARBAJAL: Uh, thank you, Your Honor.

Can you please pull up Exhibit 64 again?

DIRECT EXAMINATION (CONTINUED)

BY MR. CARBAJAL:

Q. So just to make sure everything is clear, earlier, Agent McKnight, I asked to read towards the top of the page the generated, uh, section?

A. Yes.

Q. I believe you said March 7th, 2020. Can you just please reread that?

A. Generated?

Q. Generated. What -- what's it say?

A. Yes. May -- oh, sorry. May 7, 2020.

Q. So just to be clear, it's May, not March.

A. Correct.

Q. All right.

A. May, not March.

Q. Thank you.

MR. CARBAJAL: All right. And let's pull Exhibit 130. We're going to play Exhibit 130.

(Video played.)

MR. CARBAJAL: Lastly, pursuant to the Court's order in Docket 238, the government moves to admit Exhibits 56 and 57.

THE COURT: Any objection?

MR. BARRIENTOS: No objection.

THE COURT: All right. Those are admitted.

(Exhibits 56 and 57 admitted.)

BY MR. CARBAJAL:

Q. Agent McKnight, you heard broken sounds. Are those muted portions?

A. Yes, it is.

MR. CARBAJAL: I have no further questions.

THE COURT: Cross-examination?

MR. BARRIENTOS: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. BARRIENTOS:

Q. Agent McKnight, on direct, you testified about your responsibilities as an FBI special agent?

A. Correct.

Q. And you said that one of your responsibilities was conducting interviews; correct?

A. Correct.

MR. BARRIENTOS: Now, I want to pull up the Government's Exhibit 68. We're gonna go to page 7.

Q. And so now, it's correct that you see a blown up portion of page 7 of Exhibit 68 in front of you?

A. Yes.

Q. And that blown up portion documents a cash-out transfer, doesn't it?

A. That's what it says.
Q. Um, and it involves someone named Gerald; right?
A. I see the name Gerald.
Q. And then it also has the letters T-o-l; right?
A. Correct.
Q. Now, as part of your work in this case, you didn't talk to a Gerald Tolliver, did you?
A. I did not.
Q. You didn't talk to anyone named Larry Stockett?
A. I did not.
Q. You didn't talk to John Salley?
A. I did not.
Q. Shaquille O'Neal?
A. No.
Q. Matt Barnes?
A. No.
Q. Lamar Odom?
A. No.
Q. Floyd Mayweather?
A. No.
Q. Uh, Ahmad Alyasin?
A. No.
Q. And you didn't talk to a Prince Khalid bin Abdulaziz?
A. No.
Q. Or Prince Abdulaziz bin Turki Alsoud?

A. No.
Q. Now, this case has been pending for four years; right?
A. Yes.
Q. And you became involved in March of this year?
A. Correct.
Q. And you had a conversation with Mr. Magic Johnson, didn't you?
MR. CARBAJAL: Objection. Beyond the scope.
THE COURT: Sustained.
MR. BARRIENTOS: Your Honor, may we be heard?
(The following proceedings were held at side bar:)
MR. BARRIENTOS: Agent McKnight is on our witness list. May I recall her later to ask these questions?
THE COURT: Yes, you can. Presumably.
MR. BARRIENTOS: Okay. Thank you.
(Side bar concluded.)
BY MR. BARRIENTOS:
Q. Agent McKnight, you testified on direct about a video, um, that was taken from Instagram; is that right?
A. Correct.
Q. Um, and that video wasn't sent to Wayne Jefferies, was it.
MR. CARBAJAL: Objection, personal knowledge.
THE COURT: If you know.
THE WITNESS: I don't know.

BY MR. BARRIENTOS:
Q. You don't know if it was sent to Carlos St. Mary?
A. I don't know.
Q. You don't know if it was sent to Ari Friedman?
A. I don't know.
Q. You don't sent if it was sent to Ralph Morgan?
A. I don't know.
MR. BARRIENTOS: No further questions.
THE COURT: Redirect?
MR. CARBAJAL: No questions, Your Honor.
THE COURT: Thank you. You can step down.
Does the government have another witness.
MR. CARBAJAL: May we have a moment?
MR. GUZMAN: Your Honor, the government rests.
THE COURT: Is the defense ready to proceed?
MS. EKE: Your Honor, could we have a short break before the defense proceeds with its case-in-chief?
THE COURT: Sure. We'll take a 15 or 20-minute break.
Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.
THE CLERK: All rise.
(Jury not present.)
THE COURT: Anything we need to discuss?

MS. EKE: Your Honor, if I could have just have one moment? The defense will be making a Rule 29 motion. If I can just grab my notes real quick, Your Honor?

THE COURT: You can. I will deny it without prejudice and see what happens with the jury.

MR. GUZMAN: Your Honor, there's one issue as well for the government. I think yesterday, you said that we could get the exhibit list from the defendant or at least their expected order. Can we get that from them now?

THE COURT: Well, you can certainly ask them who they plan to call.

MS. EKE: Our first witness will be Dr. Duriseti.

MR. GUZMAN: And then after that?

MS. EKE: We have not determined who will be next, but we will let you know in a few minutes.

MR. CARBAJAL: Can we ask that payment information for Dr. Phillips be provided as well?

MS. EKE: Sure. We can provide it when we have a break.

THE COURT: Okay. Let's just --

MS. EKE: Your Honor, if I can make our Rule 29 motion?

THE COURT: Yes.

MS. EKE: We move for a judgment of acquittal because the government has not met its burden as to any of

the elements of the charged offenses. Without waiving or forfeiting any other grounds, we wanna specifically address the following deficiencies in the government's case. I wanna start with Count 2.

Your Honor, do you mind if I take the podium?

THE COURT: No. Go ahead.

MS. EKE: Yes, Your Honor. I wanna start with the Count 2, the wire communication with Ari Friedman.

In the government's own exhibit, Exhibit 137, it indicates that that specific wire communication shows two text messages between Mr. Middlebrook and Ari Friedman. However, the second message indicates that the status was unsent, and the government hasn't produced any additional information or evidence showing that that wire communication was actually sent.

THE COURT: That's not true.

They had a witness testify that he received two.

MS. EKE: If I may, Your Honor.

During cross-examination, the witness was asked about two messages, and then when he was impeached, he did say that he had only mentioned one message when he spoke with the government. However, it is the government's own evidence that indicates that that second message was unsent. That's something that they introduced into evidence themselves.

So if we're viewing the evidence in the light most

favorable to them, their own evidence indicates that the wire communication to Ari Friedman referenced in Count 2 was unsent.

In addition, Your Honor, one of the misrepresentations that the government has discussed over and over was about Mr. Middlebrook's Covid-19 cure and prevention. At this point in time, they have not introduced any evidence that Mr. Middlebrook falsely misrepresented that he had the cure or the prevention for Covid-19. We haven't heard any of that sort of evidence suggesting that the statements themselves were false or any evidence suggesting that Mr. Middlebrook, in fact, knew that those statements were false. We haven't been provided any evidence regarding the Covid-19 cure and prevention.

Additionally, Your Honor, I know we haven't quite settled on this point about whether or not the specific misrepresentations have to be made to the specific investors --

THE COURT: Yes, we have.

I've ruled that they do not have to be.

MS. EKE: Yes, Your Honor. I -- for the record, I will preserve our argument that we do believe that they do have to be made --

THE COURT: You have preserved it over and over.

We're in a break. The jury is waiting.

MS. EKE: I -- I understand --

THE COURT: Finish up.

MS. EKE: -- that, Your Honor.

I just note for the record --

THE COURT: Finish up.

MS. EKE: Yes, Your Honor, I will finish the argument.

Based on the evidence presented, the government has not established that any of the statements Mr. Middlebrook made were false or that Mr. Middlebrook knew himself that those statements were false which is required for a conviction for wire fraud.

Based on the arguments regarding Count 2, based on the arguments regarding the Covid-19 cure and prevention, and based on the arguments about the rest of the representations more generally, we feel as if a Rule 29 motion should be granted in this case.

THE COURT: All right.

Does the government oppose all of the motions?

MR. GUZMAN: Yes, Your Honor. And the government is happy to submit on the record unless Your Honor has questions.

THE COURT: No, you're submitting on the record. I'll take it under submission, and we'll see what the jury has to say.

MS. EKE: Your Honor, can I just add one more point to that?

THE COURT: Certainly.

MS. EKE: I just also want to argue that venue hasn't been established. The government had to establish that Mr. Middlebrook was in the Central District of California when he sent these wire communications. We haven't had any testimony as to Mr. Middlebrook's location during those wire communications.

They talked about, um, bank records and showed different transactions being made on certain dates, but they have not established that the wire communications in this case were sent when Mr. Middlebrook was within the Central District of California.

THE COURT: It would be very annoying if the government has, once again, failed to establish venue, but I'm not going to grant that motion.

All right. Do you need a 15-minute break now?

MS. EKE: Yes, Your Honor.

THE COURT: Okay.

(Recess taken.)

THE COURT: You ready?

MR. BARRIENTOS: Your Honor, there's just one issue we'd like to address before we get started.

THE COURT: All right.

MR. BARRIENTOS: We intend to call Agent McKnight and Agent McDonald in our case-in-chief. And we asked the government if they would stipulate to the use of leading questions for these witnesses. We think it's appropriate under Rule 611 which we have identified with the government. Of course, Agent McKnight has already testified for the government. Case Agent McDonald --

THE COURT: Are you asking to ask leading questions?

MR. BARRIENTOS: I am, Your Honor.

THE COURT: Granted.

MS. EKE: Your Honor, I'd like to make an additional point. There's three FBI case agents that are on our witness list. It's our understanding that only two are here currently. We have asked the government to insure that the other one is here as well cause we do intend to call her today.

MR. CARBAJAL: We have reached out to request that she come over.

THE COURT: All right. Thank you.

MS. EKE: Your Honor, our first witness, Dr. Duriseti, is in the courtroom. Would you like him to take the witness stand?

THE COURT: Why don't we wait. That way you can formally call him, and he can come up.

MS. EKE: Yes. Yes, Your Honor.

THE COURT: Thank you.

Looks like we need a venue instruction.

MS. EKE: Yes, Your Honor.

We can submit something tonight.

THE COURT: Thank you.

THE CLERK: All rise.

(Jury present.)

THE COURT: You may be seated.

Is the defense ready to proceed?

MR. BARRIENTOS: Yes, Your Honor.

The defense calls Dr. Ram Duriseti.

THE CLERK: Please raise your right hand.

(Witness sworn.)

THE CLERK: You could take a seat. And speaking into the microphone, can you please state and spell your name for the record?

THE WITNESS: Yes. My name is Ram Duriseti, R-a-m as in Mary, last name, Duriseti, D as in David u-r-i-s-e-t-i.

THE COURT: You may proceed.

MR. BARRIENTOS: Thank you.

DIRECT EXAMINATION

BY MR. BARRIENTOS:

Q. Um, Dr. Duriseti, you're a doctor, are you?

A. Yes.

Q. Um, medical doctor?
A. Yes.
Q. How long have you been working as a medical doctor?
A. As an independent practice, as a physician, 27 years.
Q. And where do you currently work as a doctor?
A. I work in a community practice as well as academic settings.
Q. You mentioned academic settings. What academic settings?
A. Clinical Associate Professor at Stanford.
Q. What does that work as a Clinical Associate Professor entail?
A. At this time, it's primarily physician research. So basically primary review, review of research. There's some teaching responsibility. I used to do clinical work at the Stanford Medical Center as well, but as of August of 2022, I no longer do.
Q. What does your work as a medical doctor entail?
A. A medical emergency physician. Again, I practiced both in academic and community settings, am still practicing in community settings.
Q. I want to talk to you about your education. Where did you receive your undergraduate degree?
A. Stanford University.
Q. What degree did you get?

A. A BS in Biology, a BA in Clinical Science.
Q. Where did you attend medical school?
A. I went to the University of Michigan in Ann Arbor.
Q. Did you receive any honors there?
A. I graduated with highest honors, top five percent of my class.
Q. After medical school, did you attend a residency?
A. I did.
Q. Can you just explain briefly to us what a residency is?
A. A residency is an apprenticeship, essentially where you train under people who are more experienced than you, and you gain knowledge in your craft and trade.
Q. And what did you focus on in your residency?
A. Emergency Medicine.
Q. Do you have any other degree?
A. I do. I have a PhD.
Q. What's that in?
A. It's in Engineering. Um, it's specifically around the computational modeling of complex decisions and specifically decision and risk analysis of probability.
Q. Aside from residencies, did you participate in any fellowships?
A. I did.
Q. What were those fellowships?
A. I completed a Veteran Affairs Clinical Informatics

fellowship.
Q. Can you briefly explain to us what that entailed?
A. It deals with the use of health information, cataloging it, uh, how it interfaces with electronic medical records in the delivery of healthcare.
Q. And since getting your medical degree, have you continued to participate in continuing education over the years?
A. Yes, as required by my board certification and the Medical Board of California.
Q. How often does that continuing education occur?
A. It's ongoing, every year.
Q. Are you a member of any professional organizations?
A. Uh, I'm a Diplomat at the American Board of Emergency Medicine.
Q. What does the American Board of Emergency Medicine do?
A. It's a certification board. Every medical specialty has a board that says -- provides a label, uh, certification to an individual. Every professional organization has one like this.
Q. As a doctor, have you participated in any panels to speak about medical issues?
A. Uh, numerous times throughout the course of my career.
Q. Um, and what have you presented on?
A. I mean, a variety of topics including topics relevant to

this case, I suppose.
Q. We'll get to that in a second. Um, you mentioned earlier that you do research; is that right?
A. Yes.
Q. Um, have you researched Covid-19?
A. I have performed primary research, reviewed other people's research and other authors' research, and I've published on the topic in peer-reviewed journals.
Q. And what specific issues of COVID-19 have you published on?
A. All aspects of it because of my background meaning the specific -- with respect to immunology, the impact of vaccines, the effect of masks, the effects of lockdowns, the impacts of school closures, the economic impacts of governmental measures. The range.
Q. I think you mentioned vaccines during that answer. Um, can you explain to us how many articles you've published about COVID vaccines?
A. There are -- there is one publication in the New England Journal of Medicine. Uh, there is another -- there are two other publications that are pending, um, further review in several journals around the topic of vaccines, both pediatric and adult topics.
Q. Have you written about COVID outside of the academic context?

A. I have.
Q. Where was that?
A. I was part of a group of individuals who are faculty at Johns Hopkins University, NIH researchers, uh, faculty at Stanford University as part of something that we call the Norfolk, N-o-r-f-o-l-k, Group. We publish a series of documents reviewing all aspects of pandemic response, pandemic data collection, uh, interventions, and those documents are available online and were meant to guide public discourse on the topic.
Q. Have you done any other work related to Covid-19?
A. I've testified in Sacramento. I have also been a witness in some federal trials, I think. I think they were federal, yes.
Q. Now, as a medical doctor, have you actually treated patients with COVID?
A. Many times.
Q. Do you have a sense of how many times?
A. Many hundreds. Whether or not it's in the thousands, I don't know, but easily could be.
Q. And when did you see your first patient with Covid-19?
A. In terms of formal diagnosis, uh, we didn't have testing kits widely available until about March of 2020, but I was clearly seeing cases in January and February of 2020.
Q. Um, has your approach to treating Covid-19 changed over

time?
A. Absolutely.
Q. Why is that?
A. Data changes, experience changes, uh, interventions change.
Q. And have you followed the changing data on COVID?
A. Very closely.
MR. BARRIENTOS: Uh, the defense offers Dr. Duriseti as an expert on Covid-19.
MR. GUZMAN: Your Honor, the government stands on its previous objections.
THE COURT: All right.
He may testify as an expert.
BY MR. BARRIENTOS:
Q. Doctor, I wanna start by going back to the beginning with COVID. Um, when was Covid-19 first discovered?
A. I think it was officially announced as a pandemic by the World Health Organization in December of 2019.
Q. And did -- was it first discovered in the United States?
A. No.
Q. When did it first reach the United States?
A. That's a matter of ongoing debate. Uh, prior -- more recent research indicates that it was probably at the latest by December of 2019, but that matter is somewhat in dispute.
Q. How did the medical community react to COVID reaching

the U.S.?
A. Chaotically.
Q. Why do you say chaotically?
A. I don't think there was a very effective response in terms of trying to draw on prior knowledge meaning the things that we could infer from things that we have known. There are over 220-some-odd respiratory viruses called endemic circulating around. Some of them are extraordinarily similar to the SARS Covid-2 which causes COVID. But on top of that, there was unfortunately a lot of fear-driven response, and I do think a lot of physicians also, uh, engaged in unhelpful ways with social media.
Q. You mentioned fear-driven response. What was driving fear?
A. Just messaging from various channels. I do think social media probably played a role. Again, I'm not deeply involved in that. But there was a general discoordinated or incoordinated response from the medical community initially.
Q. As a doctor, what was your approach to treating a new disease like Covid-19 back in 2020?
A. I think my general approach is to first do no harm in almost everything I do, um, especially when dealing with uncertainty so managing the patient before me and their presentation, uh, and making sure that if guidelines were provided, those guidelines were actually in the best interest

of the patient and not in the best interest of some larger response that was -- or larger notion or larger good that was not clearly defined.
Q. In March of 2020, was there a single approach in the medical community to treat COVID?
A. No.
Q. Did patients ask you about COVID in late 2019?
A. I don't know about late 2019, but certainly early 2020 in January and February.
Q. What kind of questions did your patients ask you at that time?
A. They were as susceptible as anyone else to fear, uh, and uncertainty, um, probably also driven at least by social media, but honestly formal media and government narratives as well.
Q. Um, did you have answers for all of your patients' questions --
A. No.
Q. -- in early 2020?
A. No.
Q. Why not?
A. I couldn't honestly give answers to some questions regarding outcomes, data, um, or what they should or should not fear, who was truly at risk and what they could do to stop or prevent getting COVID.

Q. Did your patients' questions change over time?
A. Absolutely.
Q. Why was that?
A. Aside from varying reports they would get from the community, we all experience something with our own eyes and our own personal experience, our own group. So, you know, those inform what we think and how we feel about things so inevitably, that informs our questions.
Q. You mentioned, I think, some guidelines earlier. Were there guidelines around Covid-19 in early 2020?
A. There were various guidelines at various time points. Even in early 2020, they were shifting.
Q. You mentioned shifting. Were they shifting dramatically?
A. Often, yes.
Q. Now, from the time that COVID reached the U.S. in December of 2019 through March 2020, was COVID being studied?
A. Please repeat the question.
Q. Yes. So in early 2020, was Covid-19 being studied?
A. Yes.
Q. What kind of studies were done?
A. Well, there were basically two types of studies, um, broadly speaking. There were studies where you look at data, uh, in terms of outcomes and what's happening with patients and what influences outcomes. And then there are studies

that involve looking at the virus itself, whether that's in a tissue sample or in a person or animal or in a test tube, what we call invitro. So it's a whole range.

Q. Did those studies change the understanding of COVID?

A. Yes.

Q. So I want to talk specifically, um, about potential COVID treatments in early 2020. And first, how are potential treatments for a new disease like COVID identified?

A. Well, there's specific pharmaceutical interventions that are targeted towards the specific agent. A vaccine is a good example. Uh, there are also repurposing of old drugs, things that we know that have possibly worked for viruses in the past so we think, well, why not this virus. Um, and we've also known that there are drugs that are generic, um, that in test tubes have shown benefit against some virus so people will say, well, why not look at its potential activity against this virus.

Q. In February of 2020, were doctors recommending medications that they would -- they thought would benefit patients with COVID?

A. Yes. In sometimes very destructive ways, yes.

Q. What were some of the medications that were being used at that time?

A. People were using agents that were, uh, designated for people with severe blood clots, and they had some belief

based upon stories or what have you or anecdote that patients with COVID were getting blood clots. People were prescribing all sorts of different vitamins. Some people were using anti-depressants because some of them thought they had effect the virus. Others were using major chemotherapeutic agents, um, on sicker patients in the hospital under the belief that it might help.
Q. So I think in your answer, you mentioned vitamins. Um, were any -- uh, or can you tell us what vitamins were identified as potentially beneficial for patients with COVID?
MR. GUZMAN: Objection, Your Honor. Facts not in the evidence.
THE COURT REPORTER: I'm sorry, what was your objection?
MR. GUZMAN: Facts not in evidence.
I don't think he said vitamins.
THE COURT: Well, rephrase your question.
BY MR. BARRIENTOS:
Q. Um, Dr. Duriseti, uh, were there any vitamins that were identified as potentially beneficial to patients with COVID in 2020?
MR. GUZMAN: Objection, leading.
THE COURT: Overruled.
THE WITNESS: Yes.
BY MR. BARRIENTOS:

Q. What vitamins were those?
A. The entire range. Vitamins have always been in the conversation about helping, um, people with viral infections or decreasing the risk of contracting a viral infection. This was no different. So the usual suspects being B Complex vitamins, Vitamin D, um, Vitamin C being the most prominent ones.
Q. All right. So let's break that down a little bit. You mentioned B vitamins. Um, can you explain to us what, if any, health benefits B complex might have?
A. B Complex is a wide range of vitamins. Some of the common ones you may have heard of are B12, B3, B6 or maybe you've heard of none of them, but it's a wide range of them, and they affect how your blood system works and how you immune system works, your skin health, um, uh, your nerves like the health of your nerves and your nervous system. It's just a wide range of functions.
Q. And what about Vitamin C? What health benefits does that have?
A. Vitamin C has long been theorized to have significant, broad health benefits. Since the 1950s, people have been -- very illustrious people like Linus Pauling who won several Nobels have talked about the benefits of Vitamin C and high dosing it.
Q. Was Vitamin C used to treat COVID patients in early

2020?

A. Yes.

Q. Does that include March of 2020?

A. Uh, yes.

Q. And then you mentioned Vitamin D. What health benefits does Vitamin D have?

A. So Vitamin D is involved in the metabolism of bone and bone health and has other impacts as well. Um, for a very long time, people have talked about Vitamin D supplement. There's a very good chance several of you are taking them because your doctor told you so. Um, there is ongoing debate about whether or not Vitamin D levels in someone is a marker of health or a cause of poor health. That debate is ongoing.

Q. And what about minerals? Were any minerals identified as being potentially beneficial for patients with COVID?

A. So, once again, as with many vitamins, many minerals have been in the conversation about aiding people in their ability to fight viruses or getting sick with the virus. The most common that is usually thrown around in Zinc. Um, so, yes, Zinc was in the conversation around COVID.

Q. And what kind of health benefits might Zinc have?

A. There are some studies that indicated that taking zinc supplements, especially sprays or lozenges, will decrease your risk of contracting a viral infection separate from SARS Covid-2 which causes COVID, but I suspect people felt the

same about Zinc and COVID.
Q. Was Hydroxychloroquine ever identified as a potential treatment for COVID?
A. Yes.
Q. And can just explain to us briefly what Hydroxychloroquine is?
A. Hydroxychloroquine is a drug that's had lots of uses from use in anti-malarial medications to auto-immune conditions, um, derivatives of it, uh, in other indications as well. It's a generic drug that been around or in use my guess is since the 1950s, '60s in some shape or form. I'm not -- can't remember specifically.
Q. Was Hydroxychloroquine being used to treat COVID patients in February of 2020?
A. Yes, it was. It was thought to have some invitro meaning in test tube anti-viral activity which then lead people to believe it might have some benefit in a COVID patient.
Q. What about in March of 2020, was it being used then?
A. Yes.
Q. And at that time in March of 2020, was there any data concerning the use of Hydroxychloroquine to treat COVID?
A. Not extensive. There was anecdotal data, small trials, and, in fact, it received an emergency use authorization from the FDA.

Q. Were doctors relying on that anecdotal data in making decisions about how to treat COVID?
A. Many were.
Q. Doctor, I want to talk to you about, um, some evidence that you reviewed. Uh, did you review evidence in this case?
A. Yes.
Q. What did you review?
A. I was provided some images of pills and bags. I was also provided a drug report, drug analysis report.
Q. And what's your understanding of what -- well, first off, how many bags of pills did you see?
A. I think I saw two if I recall.
Q. How many pills were -- first off, was one bag smaller or larger than the other?
A. Yes.
Q. Okay. Um, I'll start with the smaller bag. How many pills were in the smaller bag?
A. Well, I don't know the number.
Q. Would it refresh your recollection to look at some of the evidence that you reviewed in this case?
A. Yes.
Q. So I'm gonna ask you to turn to Exhibit 270. Just look at it, and let me know when you had a chance. I believe it's in the black binder.
A. Okay. I'm looking at it.

Q. Doctor, what is Exhibit 270?
A. It appears to be a plastic bag with, um, four different plastic bags, pictures.
Q. Um, are there pills in the bags?
A. Yes.
Q. How many are in each bag?
A. Appear to be three in each bag.
Q. Did you review this image as part of your work in this case?
A. I think so.
Q. And is your memory refreshed as to how many pills are in the bags?
A. Yes.
Q. Okay. Um, do you have understanding of what these pills contained?
A. Simply looking at them? No.
Q. Well, did you review, um, reports about analysis run on them?
A. Yes.
Q. Okay. And what did those reports show?
A. Uh, the reports to my best recollection showed that there were multiple compounds, and the majority of them, the overwhelming majority, were considered not restricted meaning they were not regulated. And then there were a few that were considered regulated. I think two if I recall correctly.

And only one of the compounds that was considered not regulated was typed as a specific compound.

Q. Doctor, were there any vitamins identified?

A. Yes.

Q. Which vitamin?

A. Well, the only one that I remember that they specifically characterized was Niacinamide.

Q. What is Niacinamide?

A. It's one of the B Complex vitamins.

Q. And, um, were the -- the Vitamin B Complex identified as potentially benefiting patients with COVID in March of 2020?

A. Specifically, I don't have a specific recollection of which Vitamin B complex vitamin was, uh, identified as beneficial, but people threw out the general notion about vitamins as a general rule as being beneficial.

Q. Yeah. And I'm not talking about any specific, um, B Vitamin, but just the B Vitamin Complex, was that identified as being potentially beneficial to patients with COVID in 2020?

A. So just to rephrase my answer, as with all the vitamins, the answer is yes.

Q. Now, the bag of -- uh, or, excuse me. The -- the images of pills that you looked at during this case, did any of the pills have any stamps or markings on them?

A. Yes. I think the bag that I recalled was the one with

lots of different pills in it, and one of them had a petite or some other similar stamp on it. The word petite.

Q. Was Citracal also stamped on that?

A. I -- I think so. I don't recall specifically.

MR. BARRIENTOS: Just one moment.

THE COURT: All right.

BY MR. BARRIENTOS:

Q. Would it refresh your recollection to look at some of the discovery in this case?

A. Yes.

Q. I want to ask you to turn to Exhibit 222, and I want you to look at the second page at the top. Please do not read. Just review it, and let me know when you've had that chance.

A. The second page top?

Q. Yes.

A. I've reviewed the top.

Q. Okay. Does that refresh your recollection about whether any of the pills were stamped with the word Citracal?

A. Yes. I think the image that I saw showed the petite side. Looks like the other side of the pills said Citracal so it confirms that.

Q. What is Citracal?

A. It's just a calcium supplement. Over-the-counter.

Q. Does it contain anything beyond calcium?

A. It might contain Vitamin D.

Q. And was Vitamin D identified as potentially beneficial to patients with Covid-19 in 2020?
A. Yes.
MR. BARRIENTOS: No further questions.
THE COURT: Cross-examination?
MR. GUZMAN: Your Honor, no further questions.
No questions.
THE COURT: All right.
Thank you, sir. You're excused.
Does the defense have another witness?
MR. BARRIENTOS: Uh, Your Honor, defense calls Special Agent Jamila McKnight.
THE COURT: Agent McKnight, you're still under oath.
You may proceed.
MR. BARRIENTOS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BARRIENTOS:
Q. Agent McKnight, this case has been pending for four years, hasn't it?
A. I believe so.
Q. And the FBI spoke directly to Mr. Earvin Magic Johnson twice in those four years?
A. I was only present for one.
Q. The one that you were present for occurred on May 3rd?

A. Yes.
Q. That was last Friday?
A. Yes.
Q. Now, during that meeting, Mr. Johnson never told you that he didn't know Mr. Keith Middlebrook, did he?
A. During that meeting, Mr. Johnson told us that he had never spoke with, did not recognize, uh, Mr. Keith Middlebrook.
Q. My question was did Mr. Johnson tell you that he did not know Mr. Keith Middlebrook?
A. Yes.
Q. So that's your testimony today, that Mr. Johnson said I do not know Keith Middlebrook?
A. Mr. Johnson said he had never spoke with or met with Mr. Keith Middlebrook.
Q. So you wrote a report about this interview with Mr. Johnson, didn't you?
A. Yes.
Q. And your report was complete?
A. Yes.
Q. It was accurate?
A. Yes.
Q. You even signed your name at the bottom of the report?
A. Yes.
Q. Because you were responsible for it; right?

A. Yes.
Q. And you knew that the report could be used in court proceedings like this.
A. Yes.
Q. I want you to turn to Exhibit 298 in the black binder that should be in front of you or near you.
A. Which one?
Q. 298 in the black binder.
A. Okay.
Q. That's your report, uh, of your May 3rd meeting with Mr. Middlebrook (sic); right?
A. Yes, it is.
Q. And it doesn't say, does it, that Mr. Johnson told you he doesn't know Keith Middlebrook.
A. No. He says I do not recognize the voice of Keith Middlebrook. I have never met with him.
Q. So to be clear, the answer is no, Mr. Johnson did not tell you that he did not know Mr. Keith Middlebrook.
A. Correct.
MR. BARRIENTOS: No further questions.
THE COURT: Any redirect?
MR. CARBAJAL: No questions, Your Honor.
THE COURT: Thank you. You're excused.
Does the defense have another witness?
MS. EKE: Yes, Your Honor.

The defense calls FBI Special Agent Lynn Zellhart.

MR. CARBAJAL: I believe we are still waiting on Agent Zellhart. Could I have a few moments to see what her ETA is?

THE COURT: Sure.

MS. EKE: Your Honor, we can call another witness if Agent Zellhart is not here yet.

THE COURT: Excellent.

MR. BARRIENTOS: Your Honor, the defense would call Special Agent Madison McDonald.

THE CLERK: Please raise your right hand.

(Witness sworn.)

THE CLERK: If you could take a seat.

Please state and spell your name for the record.

THE WITNESS: Madison MacDonald, M-a-c -- or, sorry, M-a-c-D-o-n-a-l-d, Madison, M-a-d-i-s-o-n.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. BARRIENTOS:

Q. Agent McDonald, you're the case agent in this matter; right?

A. I am one of the case agents, yes.

Q. And you were working on this case since 2020?

A. I have.

Q. And you were in charge of the FBI's investigation of

Mr. Middlebrook.
A. I was.
Q. And you're good at your job, aren't you?
A. I try to be.
Q. Part of your job is to investigate thoroughly?
A. Yes.
Q. You act with due diligence?
A. Yes.
Q. You collect evidence?
A. I do.
Q. And preserve it?
A. Yes.
Q. But as case agent, you're not conducting investigations all on your own, are you.
A. Not generally.
Q. You rely on other people?
A. Occasionally.
Q. Like other agents?
A. Yes.
Q. You might also rely on an undercover agent; right?
A. Sometimes.
Q. Well, you did in this case, didn't you?
A. We did.
Q. And undercover agents hide their identity. Right?
A. Yes.

Q. To get information?

A. Yes.

Q. Including information directly from the target of an investigation.

A. That's correct.

Q. And based on information you receive from an undercover agent, you might decide to do more investigation.

A. Yes.

Q. And you might decide what kind of investigation to do; right?

A. I guess I don't understand your question.

Q. Well, information that you get from an undercover agent might prompt to go to collect records; right?

A. Information gathered from an undercover agent may allow us to have additional questions that may need to be answered, yes.

Q. And one of those questions might be what do some records say?

A. Can you be more specific?

Q. Well, you said that, um. . . well, let me just back up. In this particular case, you relied an undercover; right?

A. Not solely.

Q. Not solely. You got records, didn't you.

A. Yes.

Q. Um, you spoke to, uh, witnesses?

A. We did.
Q. Now, as a case agent, you might also rely on a cooperating witness; right?
A. Yes.
Q. A cooperating witness can provide you information?
A. They can.
Q. They might record telephone calls?
A. Possibly.
Q. And they might help connect an undercover agent to the person you're investigating.
A. Yes.
Q. And you have to trust your cooperating witnesses, don't you?
A. We rely on information that we receive from the cooperating witness, yes.
Q. And you trust that information that you receive.
A. Could you be more specific about what information?
Q. I'm not asking you about any specific information. I'm just saying sometimes you get information from a cooperating witness; right?
A. Yes.
Q. And sometimes you rely on that information; right?
A. Correct.
Q. And when you rely on it, you have to trust it.
A. Sometimes we receive information from a variety of

sources that may or may not pan out to be true.

Q. So just to be clear, um, are you relying on information that you don't trust?

A. Part of my job as an investigator is to evaluate the information we receive based on multiple different sources of information. It's not solely based on a cooperating witness.

Q. Yeah, so I'm just asking you a pretty basic question. You as a case agent wouldn't rely on information that you don't trust; right?

A. Possibly.

Q. Now, a cooperating witness, um, might receive a benefit for cooperating; right?

A. Possibly.

Q. Could be money payment?

A. Possibly.

Q. Could be dismissal of a pending case?

A. Possibly.

Q. Maybe the government's recommendation for a less severe punishment in a pending case.

A. That's possible.

Q. Now, some investigations are more complicated than others; right?

A. Yes.

Q. Fraud investigations can be complex?

A. Sometimes.

Q. And you work in the White Color Division of the FBI, don't you?
A. I did.
Q. For a number of years?
A. Yes.
Q. Now, fraud investigations can require you to obtain a lot of documents?
A. They can.
Q. They can require you to talk to multiple witnesses?
A. Yes.
Q. And these investigations can take months to complete; right?
A. Sometimes.
Q. Because the FBI needs to be as thorough as possible.
A. Yes.
Q. And depending on the complexity, an investigation might even take years?
A. That's true.
Q. I wanna talk to you about your investigation in this case. Now, you started investigating Mr. Middlebrook on March 13th of 2020?
A. On or about, yes.
Q. And then he was arrested on March 25th of 2020?
A. Yes.
Q. So it 12 days to arrest Mr. Middlebrook; right?

A. That's correct.
Q. Now, a gentleman named Roderick Bowling approached the FBI about Mr. Middlebrook's COVID business; right?
A. Yes.
Q. And in this case, the government alleges that Mr. Middlebrook made false statements; right?
A. Yes.
Q. And that he made false statements with, uh, the intent to deceive; right?
A. That's correct.
Q. And so a case agent, it was your job to investigate such statements, wasn't it?
A. Yes.
Q. It was your job to determine if Mr. Middlebrook's statement were true or not.
A. That's correct.
Q. It was your job to determine if there was evidence that Mr. Middlebrook believed his statements were true. Right?
A. Believed that they were true?
Q. Yes.
A. My job was to investigate whether or not the allegations were, in fact, true, not whether he believed that they were true.
Q. So during your investigation over four years, you didn't look at all into whether or not Mr. Middlebrook actually

believed his statements?
A. I don't think my investigation could go towards his actual belief.
Q. So it just wasn't your job.
A. No.
Q. As case agent.
A. No.
Q. I'm gonna talk to you about Roderick Bowling. Um, so he first contacted the FBI on March 13th back in 2020; right?
A. I believe so.
Q. And you spoke with Bowling three days later on March 16th.
A. Yes.
Q. You discussed Mr. Middlebrook's COVID business.
MR. CARBAJAL: Objection, hearsay.
THE COURT: Just yes or no.
THE WITNESS: Yes.
BY MR. BARRIENTOS:
Q. And then the next day, on March 17th, you had another call with Bowling, the undercover agent, and another FBI agent named Raymond Peteski; right?
A. That's correct.
Q. And the undercover agent that we're referring to here was Mr. Sean Sterle?
A. Yes.

Q. And y'all discussed a plan to have Mr. Bowling introduce Sean Sterle to Mr. Middlebrook; right?
A. Yes.
Q. And the plan was that the undercover agent, Sean Sterle, would pose as a potential investor?
A. That is correct.
Q. And as part of your investigation, the FBI gave Roderick Bowling a recording device; right?
A. At some point, yes.
Q. To record calls with Mr. Middlebrook?
A. Yes.
Q. And Mr. Bowling, in fact, participated in recorded calls with Mr. Middlebrook; right?
A. He did.
Q. And he connected the undercover officer, Sean Sterle, to Mr. Middlebrook.
A. Yes.
Q. And Mr. Bowling told Mr. Middlebrook that the undercover was a potential investor.
A. I believe so.
MR. CARBAJAL: Objection. Hearsay.
THE COURT: Overruled.
BY MR. BARRIENTOS:
Q. And in particular, a potential investor who had a marijuana business; right?

A. Yes, I believe so.
Q. And Mr. Bowling participated in a call with Mr. Middlebrook and the undercover on March 18th of 2020; right?
A. Uh, I can't recall specifically if Mr. Bowling was on that call.
Q. Um, this case has been pending for four years; right?
A. Yes.
Q. And you've been sitting here in court throughout trial?
A. I have.
Q. And you were listening to all of the audio clips that everyone else listened to?
A. Yes.
Q. Okay. And so you don't know right now if Roger Bowling participated in a phone call with Mr. Middlebrook and the undercover agent on March 18th of 2020?
A. We listened to multiple calls. If there's something that you can use to refresh my recollection, that would be great.
Q. So it's correct that you just don't know right now; is that right?
A. I can't recall right now.
Q. Well, Roderick Bowling has a felony conviction, doesn't he?
A. I believe so, but I -- I can't say for certain.

Q. Well, uh, you wrote, um, an affidavit in this case, didn't you?
A. Yes.
Q. Um, and that affidavit laid out, um, the course of your investigation. Right?
A. I believe in part. It's been several years since I've looked at it.
Q. And it would refresh your recollection about Mr. Bowling if you looked at your sworn affidavit, wouldn't it?
A. Yes.
Q. Okay. So please turn to Exhibit 264, it should be in the black binder in front of you, um, at Footnote 1 on page 8. Please don't read it, just look at it, and let me know when you've had a chance to review.
A. What was the number again?
Q. It's Exhibit 264, and it's page 8, Footnote 1. Now, you remember now, don't you, that Mr. Bowling pleaded guilty to fraud; right?
A. I recall that he had a prior criminal case, yes.
Q. Well, he didn't just have a case. He -- he plead guilty to wire fraud, didn't he?
A. I -- I don't recall the specifics of that case in detail.
Q. I'm sorry. Did you say you don't remember the specifics of Mr. Bowling's case?

A. In -- in great detail.
Q. Okay. Well, you had, you were aware that he pleaded guilty; correct?
A. Yes.
Q. Um, and you reviewed, didn't you, as part of your work in this case his plea agreement.
A. I don't recall reviewing his plea agreement.
Q. Okay. Can you please turn to Exhibit 256? Please just take a look at it. Let me know when you've had a chance to look at it.
A. Okay.
Q. You reviewed this plea agreement as part of work on this case; right?
A. I can't recall.
MR. CARBAJAL: Objection, asked and answered.
THE COURT: Overruled.
THE WITNESS: I can't recall ever reviewing this.
BY MR. BARRIENTOS:
Q. So in four years as the case agent, you can't recall looking at Roderick Bowling's plea agreement.
A. No.
Q. Um, so you're not aware if he plead guilty to wire fraud, are you?
A. I'm generally aware that he has a prior conviction.
Q. So the answer to the question was no?

A. To wire fraud specifically, no.
Q. But you know, though, don't you, that he was charged with wire fraud; right?
A. I don't know the specifics of what he was charged with.
Q. Okay. So I want you to go back to, uh, Exhibit 264, that same page 8, Footnote 1. Let me know when you've had a chance to look at it.
A. Yes.
Q. So is it your testimony today that, um, you don't know if Mr. Bowling was indicted for wire fraud?
A. It's my testimony that I don't recall that case in specific detail.
Q. Okay. Um, and now having looked at, um, your affidavit in this case, your memory is refreshed, right, that Mr. Bowling was, in fact, indicted for wire fraud.
MR. CARBAJAL: Objection.
Asked and answered, misstates the testimony.
THE COURT: Ask a different question.
BY MR. BARRIENTOS:
Q. I want to go back, um, to the plea agreement that we looked at a second ago. Um, you said that you didn't review it; is that right?
A. I don't recall reviewing it, no.
Q. And none of your other agents reviewed it, did they?
MR. CARBAJAL: Objection.

THE WITNESS: Can you be more specific?
BY MR. BARRIENTOS:
Q. None of the agents that worked on this case reviewed Roderick Bowling's plea agreement.
MR. CARBAJAL: Objection, personal knowledge.
THE COURT: If you know.
THE WITNESS: I don't know.
BY MR. BARRIENTOS:
Q. You didn't ask them?
A. No.
Q. So you don't know if Roderick Bowling and his codefendants in this case participated in a pump and dump scheme, do you?
MR. CARBAJAL: Objection. Relevance.
THE COURT: Sustained.
BY MR. BARRIENTOS:
Q. Now, in this particular case, the government is alleging that Mr. Middlebrook lied when he made statements about his COVID business; right?
A. Made misrepresentations, yes.
Q. As part of your investigation, uh, you seized four bags containing three pills each; right?
A. That's correct.
Q. That was during Mr. Middlebrook's arrest?
A. Yes.

Q. And you asked the DEA to conduct a rush analysis of those contents of those bags, didn't you?
A. Yes.
Q. And the DEA tested those items in the bags?
A. They did.
Q. And it found that one of the pills in each of the bags contains Niacinamide; right?
A. Without looking at the DEA report, I can't tell specifically which reports go to which pills.
Q. Okay, so let's look at Exhibit 223. It's in the black binder. So your memory's been refreshed, hasn't it, that the DEA, um, tested the three pills in each of those four bags.
A. Without looking at an evidence log to confirm that Item 1B-2 is, um, one of whichever bags you're referring to, I wouldn't be able to confirm that.
Q. You don't know what -- I guess 1B-2, that's a label for one of the bags; right?
A. Yes.
Q. Okay. And so you don't know today, um, what bag that that label 1B-2 refers to?
A. I don't have all of the evidence memorized.
Q. You've had four years working on this case; right?
A. I have a worked on several other things since.
Q. Well, if we look at the first page of 220. . .
THE COURT: 220?

MR. BARRIENTOS: Yes, Your Honor.
Q. Agent, having looked at the first page of Exhibit 220, your memory has been refreshed, hasn't it, that Item 1-B2 was three unidentified pills; correct?
A. Yes. Thank you.
Q. Now, with that, you know, don't you, that Item 1-B2 contains Niacinamide, don't you?
A. That's what the DEA report says.
Q. And that's what you relied on in this case; right?
A. Can you be more specific as to relied on?
Q. Well, you asked the DEA to test the pills.
A. That's correct.
Q. And the DEA found that there was Niacinamide in one of the pills; right?
A. According to the report, yes.
Q. You know that Niacinamide is a form of Vitamin B3; right?
A. I don't know that.
Q. You didn't ask anyone during this case, what is Niacinamide?
A. I did not.
Q. Now, some of the pills that you collected during this case were stamped with the word Citracal, weren't they?
A. I believe so.
Q. And on the other side of those pills, there was a stamp,

petite; right?
A. I believe so.
Q. And you know, don't you, that Citracal petites are a calcium and Vitamin D supplement?
A. I don't know that.
Q. You never bothered to Google Citracal petites during this investigation?
A. I may have, but I don't recall.
Q. You know, though, that Vitamin D is important for your health?
A. I'm not a doctor.
Q. And you didn't ask a doctor, um, about Vitamin D during this investigation, did you.
A. At some point, we have had a conversation with a doctor about vitamins or Vitamin D.
Q. Now, earlier in this case, um, we saw some videos. You recall the videos with a green box and a vial?
A. Yes.
Q. Okay. You never seized that vial during your investigation, did you?
A. We did not.
Q. So their contents were never tested.
A. That's correct.
Q. And so you don't know, do you, if that vial is what Mr. Middlebrook was -- what that vial contained, do you.

A. I don't.
Q. Agent, can you turn to Exhibit 270 in the black binder in front of you? Have you had a chance to look at it?
A. Yes.
Q. Those were some pills that were seized during the investigation in this case; right?
A. That is correct.
Q. Okay. Um, and you took a look at these during the investigation; right?
A. Yes.
Q. And that picture 270 is a fair and accurate representation of the pills that were seized during the investigation.
A. It's in black and white, but yes.
MR. BARRIENTOS: At this time, the defense moves Exhibit 270 into evidence.
THE COURT: Any objection?
MR. CARBAJAL: No, Your Honor, no objection.
THE COURT: That's admitted.
(Exhibit 270 admitted.)
MR. BARRIENTOS: And I'm gonna publish Exhibit 270.
Q. So Agent, so we're clear for the jury, these are four bags of three pills each that were seized during the case?
A. Yes.
Q. And the larger white pill is the one that's stamped

Citracal?
A. I can't tell from this photo.
Q. Well, you know that this image contains Item 1B-2, don't you?
A. Yes.
Q. And in Item 1B-2, there was a pill that was stamped Citracal and petite; right?
A. I don't recall seeing that on the DEA report.
Q. Now, I want to talk to you about, uh, the one sheet that was discussed earlier in this case. On March 18th, 2020, the undercover, Sean Sterle, had a conversation with Mr. Middlebrook and Mr. Bowling?
A. Yes.
Q. And during that conversation, Mr. Middlebrook referenced legal docs.
A. I believe so.
Q. And you know that a Private Placement Memorandum is a legal document, don't you?
A. I'm not an attorney. I'm not familiar with legal documents.
Q. You -- you work in the White Collar Division of the FB -- or you used to work in the White Collar Division of the FBI; right?
A. Yes.
Q. So you're familiar with Private Placement Memorandum;

right?
A. I'm familiar with a variety of different financial agreements, contracts, documents, yes.
Q. Yeah. And I'm just asking you Private Placement Memorandum is one of the documents that you're familiar with. Isn't it?
A. In -- in a layperson understanding, sure.
Q. And those types of memoranda can be referred to as PPMs; right?
A. Yes.
Q. And they're essentially contracts.
A. Again, I'm not an attorney.
MR. CARBAJAL: Objection.
Asking to testify as to legal opinion.
THE COURT: Well, she answered the question, but don't ask for legal opinions.
MR. BARRIENTOS: Understood, Your Honor.
Q. And not asking for any legal opinions, but just your understanding, um, contracts provide agreements between people; right?
MR. CARBAJAL: Objection, relevance.
THE COURT: Sustained.
BY MR. BARRIENTOS:
Q. Now, you said earlier that you are familiar with PPMs; right?

A. In a general layperson understanding, yes.
Q. And they can contain disclaimers?
A. Possibly.
Q. They can contain representations?
A. Yes.
Q. And they can contain other terms.
A. Possibly, yes.
MR. BARRIENTOS: Can we publish Exhibit 41, the one sheet?
Q. Now, Agent McDonald, you reviewed this documents during your investigation; right?
A. Yes.
Q. This is the one sheet?
A. Yes.
Q. Okay. It's not entitled PPM, is it?
A. No.
Q. Or Private Placement Memoranda?
A. No.
Q. And this document doesn't have a place for anyone to sign, does it.
A. It does not.
Q. And in fact, the one sheet looks like a draft document, doesn't it?
MR. CARBAJAL: Objection.
THE COURT: Sustained.

BY MR. BARRIENTOS:
Q. Now, this document contains the term patent pending; right?
A. It does.
Q. And it mentions a Dr. D. Patterson?
A. I believe on the second page?
MR. BARRIENTOS: Can we go to the second page?
THE WITNESS: Yes.
BY MR. BARRIENTOS:
Q. So Dr. Patterson is listed here with Mr. Middlebrook himself; right?
A. Yes.
Q. And Mr. Dustin T. Johnston?
A. Yes.
Q. And a Roderick Bowling?
A. Yes.
Q. And Earvin Magic Johnson.
A. That's correct.
Q. Now, you investigated whether there were any patents associated with Mr. Middlebrook's products; right?
A. I did.
Q. And you, in fact, found that there were patents for a Dr. David Patterson; right?
A. I did not personally conduct that query.
Q. So are you saying today you don't know whether there are

patents associated with a Dr. David Patterson?
A. That's not what I'm saying, no. But if we were to review the records that we received as a result of the request for the Patent Office, they did indicate that there are records for a Dr. D. Patterson, but they needed additional information to confirm that it was the same one.
Q. And you never got that additional information, did you?
A. No.
Q. You never spoke to any Dr. Patterson?
A. I did not.
Q. Including the one who you identified while investigating patents; right?
A. Again, the records from the Patent Office indicated that there were multiple Dr. D. Pattersons and not one in particular.
Q. And you didn't talk to any of the Dr. D. Pattersons that you identified; right?
A. That were identified in the patent records, no.
Q. I want to talk to you about Mr. Johnson. He played for the LA Lakers?
A. Yes.
Q. He was an executive for the Lakers?
A. I'm not a huge basketball fan so I'm not familiar with his entire background.
Q. I mean, you were sitting here in court when he

testified, right, with all of us?

THE COURT: She's not gonna testify based on what she heard while he was testifying so ask a different question.

BY MR. BARRIENTOS:

Q. Now, Mr. Middlebrook mentioned Mr. Johnson in the one sheet; right?

A. Yes.

Q. And in calls with the undercover agent?

A. Yes.

Q. And Mr. Middlebrook also mentioned other former Lakers' players during those calls.

A. He mentioned basketball players, yes.

Q. One of them was Matt Barnes?

A. Again, I'm not a huge basketball enthusiast. I don't -- I don't know my athletes that well.

Q. Well, you recall that the calls mentioned a person named Matt Barnes, don't you?

A. Yes.

Q. And Shaquille O'Neal?

A. Yes.

Q. And you're aware, aren't you, that Mr. Middlebrook, in fact, knows Mr. Barnes.

MR. CARBAJAL: Objection, personal knowledge.

THE COURT: He's asking if she has personal

knowledge.

THE WITNESS: I don't.

MR. BARRIENTOS: So I'm gonna ask you to turn to Defense Exhibit 1206.

Q. Have you had a chance to look at it?

A. Yeah.

Q. That's a picture of Mr. Middlebrook with Matt Barnes; right?

A. I have no idea who that man is.

Q. You didn't bother to look into him during your investigation?

A. No.

Q. Well, you know, don't you, that Mr. Middlebrook knows Shaquille O'Neal; right?

A. I don't know that.

Q. In the same Defense Exhibit 206, I think it's the third picture?

A. Okay.

Q. You know, don't you, that that's an image of Mr. Middlebrook with Shaquille O'Neal; right?

A. It appears to be.

Q. And during your investigation, you didn't talk to Mr. O'Neal, did you?

A. No.

Q. Now, Mr. Middlebrook also knows a former Los Angeles

Laker player John Salley; right?
A. I don't know.
Q. Can you look at I think it's the second page of Exhibit 206? Have you had a chance to look at it?
A. Yeah.
Q. Okay. And that's a picture with Mr. Middlebrook with former LA Laker John Salley; right?
A. I have no idea who this man is.
Q. And you didn't bother to look -- to go and find out who this man during your investigation; right?
A. I've never seen this picture before.
Q. Because you didn't find it during your investigation.
A. That's correct.
Q. And during this investigation, you didn't talk to John Salley?
A. No.
Q. You didn't talk to Matt Barnes?
A. No.
Q. And you didn't talk to Shaquille O'Neal.
A. No.
Q. So for Magic Johnson, um, you spoke to him during the course of your investigation; right?
A. Yes.
Q. And -- and you spoke to him once.
A. That's correct.

Q. And during the course of your investigation, you also spoke to other people; right?
A. Yes.
Q. You spoke to someone named Dustin Johnston?
A. Yes.
Q. You spoke to Ari Friedman?
A. Yes.
Q. Uh, Carlos St. Mary?
A. Yes.
Q. And during all of these interviews, you discussed Mr. Middlebrook; right?
A. That's correct.
Q. But you never asked, uh, Mr. Johnson about Mr. Middlebrook, did you?
MR. CARBAJAL: Objection, hearsay.
THE COURT: Overruled.
THE WITNESS: I can't recall without reviewing my report.
MR. BARRIENTOS: Can you turn to Exhibit 298 -- or excuse me, 219?
Q. And -- and before we get into this, and I just want to make sure I understand, um, you didn't talk to Mr. Johnson about Mr. Middlebrook, did you?
A. Oh, we're talking about Earvin Johnson? I thought you were talking about Dustin Johnston.

Q. So to be clear, when you met with Earvin Magic Johnson, you didn't talk to him about Keith Middlebrook, did you?

MR. CARBAJAL: Objection hearsay.

THE COURT: Overruled.

THE WITNESS: I never met with Mr. Johnson in person.

BY MR. BARRIENTOS:

Q. Well, you had a call with him; right?

A. Yes.

Q. And on that call, you did not ask him about Mr. Middlebrook, did you?

A. Not during this call, no.

Q. And he didn't tell you, no, I don't know Mr. Keith Middlebrook; right?

A. Not during this meeting, no. Or call, no.

Q. And you didn't ask, did you?

A. That wasn't the purpose of this call, no.

Q. So you're the case agent; right?

A. One of them, yes.

Q. And you spoke, uh, to Mr. Johnson once during your four-year investigation; right?

A. Yes.

Q. And that was back in 2020; right? Oh, excuse me. That was in March of 2024.

A. Yes.

Q. So you went about four years without talking to Mr. Johnson at all. Right?
A. Him personally? Yes.
Q. And during your one meeting with Mr. Johnson, you didn't bother to ask him about Mr. Middlebrook, did you?
A. Not during this call, no.
Q. So I want to talk to you, uh, about some other folks. Now, Mr. Middlebrook during, uh, calls that were recorded for your investigation mentioned someone named Larry; right?
A. Yes.
Q. And he said that Larry was doing projections for an Initial Public Offering.
A. Yes.
Q. And you know that Initial Public Offering is when a private company goes to the public stock market; right?
A. Yes.
Q. They're called IPOs?
A. Yes.
Q. Uh, and the undercover agent asked Mr. Middlebrook if Larry was an accountant, didn't he?
A. Yes.
Q. And Mr. Middlebrook replied that Larry helps with IPOs.
A. Yes.
Q. And the undercover never asked Mr. Middlebrook for Larry's last name, did he?

A. No.
Q. Have you ever asked the undercover to get Larry's last name?
A. I did not.
Q. Or his phone number?
A. No.
Q. Or his email address?
A. No.
Q. And you never spoke to anyone named Larry during your investigation, did you?
A. No.
Q. But you did, uh, seize a phone from Mr. Middlebrook's person during this case; right?
A. Yes.
Q. And someone in your office downloaded that phone?
A. Yes.
Q. And you examined its contents?
A. I did.
MR. BARRIENTOS: Now, I want you to look at Exhibit 289.
Q. Exhibit 289 is a Cellebrite report for Mr. Middlebrook's phone; right?
A. It appears to be.
Q. Well, you pulled information from Mr. Middlebrook's phone, didn't you?

A. This doesn't look like a report I generated.
Q. You didn't bother to ask, um, for Mr. Middlebrook's contacts from his phone as part of your investigation?
MR. CARBAJAL: Objection, argumentative.
THE COURT: Overruled.
THE WITNESS: Did I bother to ask for the contacts?
BY MR. BARRIENTOS:
Q. So you said I think that you didn't personally look at this contact information, right, during your investigation?
A. That's not what I said. I said I didn't generate this report.
Q. And you didn't look at this report either; right?
A. I've never seen this report before. I don't even know if the FBI generated this.
Q. Okay. And you never asked the FBI, um, to pull a report for anyone named Larry in Mr. Middlebrook's phone, did you.
A. No.
Q. And you never spoke as part of your investigation to anyone named Larry Stockett, did you?
A. Again, no.
Q. Now, during Mr. Middlebrook's, uh, conversations with the undercover mentioned, he mentioned someone named Gerald Tolliver; right?
A. Yes.
Q. And that was about, uh, Mr. Earvin Johnson?

A. I believe so.
Q. And about Mr. Middlebrook's COVID business; right?
A. Yes. Generally, that's what they were talking about.
Q. The FBI never spoke to Mr. Tolliver, did it?
A. To. . . I recall meeting someone called Gerald, but I didn't catch his last name.
Q. You know that Mr. Middlebrook's phone had Gerald Tolliver's contact information; right?
MR. CARBAJAL: Objection, hearsay.
THE COURT: Overruled.
THE WITNESS: It may have.
MR. BARRIENTOS: Um, I'm gonna ask you to look at Exhibit 290?
Q. And before I ask you any questions about it, um, when you say it may have, um, do you mean you can't remember right now?
A. I can't recall how the number or contact name was saved in the phone. If it was explicitly Gerald Tolliver? There were several contacts in that phone.
Q. Okay. So please look at Exhibit 290?
A. Okay.
Q. Um, that's, uh, contact information for Mr. Tolliver, isn't it?
A. I have no way of authenticating this report.
Q. So you don't know whether or not Mr. Middlebrook had a

Gerald Tolliver as a contact on the phone that you seized during this investigation; is that right?
A. I can't recall without going through the extraction report again, no.
MR. BARRIENTOS: If I can have one moment?
THE COURT: Sure.
BY MR. BARRIENTOS:
Q. Agent McDonald, as part of your investigation, you had asked for specific information to be collected from Mr. Middlebrook's phone; right?
A. I didn't ask anyone to collect information for me.
Q. Um, well, information was collected; right?
A. Yes.
Q. By a gentleman Andrew Jaung?
A. He's a CART examiner. He conducts the extractions for us.
Q. And you were listed on the case agent -- as the case agent, um, in the reports that he generated as part of your investigation; right?
A. Yes.
MR. BARRIENTOS: Um, permission to approach with what's been marked as Exhibit 466.
THE COURT: Has the government seen it?
MR. CARBAJAL: No.
MR. BARRIENTOS: May I approach?

THE COURT: Any reason counsel can't show that to the witness?

MR. CARBAJAL: I don't see the relevance to the document, Your Honor.

THE COURT: All right. Approach.

(The following proceedings were held at side bar.)

MR. BARRIENTOS: So, Your Honor, as you can see at the top, it's listed Special Agent McDonald as the case agent. If we go to the last page here, it details the information that was pulled from the phone that we've been discussing, the one found on Mr. Middlebrook's person. It's a little difficult to see, but you can see that the contacts box has been checked and data types that were being withdrawn from the phone.

THE COURT: Well, your eyes are much better than mine. What's the point of this interrogation?

MR. BARRIENTOS: So the point is the FBI did in fact pull these contacts, but didn't bother to call any of these people that Mr. Middlebrook actually mentioned on phone calls they recorded.

THE COURT: Okay.

(Side bar concluded.)

MR. BARRIENTOS: Ms. Kim, I'm gonna ask you to show a document just to Agent McDonald. Can we pull up Exhibit 466?

Q. Agent McDonald, are you able to see the document up there?
A. Yes.
Q. Okay. Now, this report has Federal Bureau of Investigation stamped at the top left corner; right?
A. Yes.
Q. And then there is a box for the case agent's name; right?
A. Yes.
Q. And you're listed, aren't you?
A. I am.
Q. And you reviewed this as part of your investigation; right?
A. At some point, yes.
Q. And you know, don't you, that the FBI pulled Mr. Middlebrook's contacts from the phone that was taken from his person; right?
A. Not the entire contacts, I don't believe so. We had a very narrow focus of what we were looking in the phone for.
Q. So to be clear, are you saying you don't know whether the FBI pulled all of the contacts on the phone?
A. I can't recall without looking at it.
Q. Well, you know the FBI pulled the contacts that were relevant to this case; right?
A. I believe so.

Q. So it would have pulled, uh, contacts for Gerald Tolliver; right?
A. Not necessarily.
Q. What about Mr. Larry Stockett? It pulled his information, didn't it?
MR. CARBAJAL: Objection, relevance.
THE COURT: Overruled.
THE WITNESS: I don't think so.
BY MR. BARRIENTOS:
Q. Because you didn't request information for Mr. Stockett; right?
A. Because we didn't have Mr. Stockett's last name.
Q. Because you didn't ask for it.
A. That's correct.
Q. So now aside from this gentleman, Larry, Mr. Middlebrook mentioned a gentleman named Ahmad Alyasin during the recorded calls; right?
A. Yes.
Q. And Mr. Middlebrook had Ahmad Alyasin's contact information on his phone, didn't he?
A. I can't recall.
Q. Well, in any case, you never spoke to Mr. Alyasin, did you?
A. I don't believe so.
Q. You know, though, that, um, he runs a company called

Optima Global Financial?

A. I don't know that.

Q. During your investigation, you didn't Google Mr. Alyasin?

A. No.

Q. You didn't Google Optima Global Financial?

A. I did not.

Q. So you don't know if, um, or where Optima Global Financial has offices?

A. I don't.

Q. You don't know if it provides financial services?

A. I don't.

Q. You know, though, don't you, that there was a Dave Patterson in Mr. Middlebrook's contact information on his phone; right?

A. Without looking at the phone, I can't recall.

Q. You know that there was contact information for John Salley?

A. I can't recall.

Q. Do you know there was contact information for Jim Weatherly?

A. I can't recall.

Q. I want to talk to you about some videos that were admitted into evidence earlier. As part of your investigation, you reviewed, um, some videos that were taken

from Mr. Middlebrook's Instagram account; correct?
A. Yes.
Q. And in the videos on Mr. Middlebrook's Instagram account, he never solicited any investments, did he.
A. I don't believe so.
Q. And he didn't offer to sell his COVID products to any of his Instagram followers, did he.
A. I don't believe so.
Q. Now, you've been working on this case since 2020; right?
A. Yes.
Q. You were there for Mr. Middlebrook's arrest?
A. Yes.
Q. Now, you know, don't you, that back in 2020, Assistant U.S. Attorney Valerie Makarewicz represented to the Court that the social media posts were not the fraud that occurred here?
MR. CARBAJAL: Objection, Your Honor. Relevance, hearsay.
THE COURT: Overruled.
THE WITNESS: Sorry. Can you repeat your question?
BY MR. BARRIENTOS:
Q. Yeah. You know, don't you, that back in 2020, Assistant U.S. Attorney Valerie Makarewicz represented to the Court that Mr. Middlebrook's Instagram posts were not the fraud that occurred here.

A. I don't recall if she said that.
Q. So I'm gonna ask you to look at Exhibit 297. If you would turn to page 4 of that.
A. Okay.
Q. First off, you recognize this as a transcript of a bond hearing that was held in this case?
A. It says that.
Q. And you were present for that hearing, weren't you?
A. I was.
Q. And so I would like you to look at on page 4, lines 19 through 20. Let me know when you've had a chance to review.
A. Okay.
Q. Your memory's refreshed, isn't it, that that AUSA represented to the Court that Mr. Middlebrook's social media posts were not the fraud that occurred here; right?
MR. CARBAJAL: Objection, Your Honor. Your Honor, I also request that the Court remind the jury that questions are not evidence.
THE COURT: Questions are not evidence.
MR. CARBAJAL: Thank you.
THE COURT: Overruled. Go ahead.
THE WITNESS: It does not refresh my recollection.
BY MR. BARRIENTOS:
Q. You didn't go back and look at the transcripts of proceedings that you sat in on in this case?

THE COURT: Move on.

MR. BARRIENTOS: Your Honor, uh, the defense would offer Exhibit 297 into evidence. Um, we think it's self-authenticating.

THE COURT: All right. I'll consider that.

BY MR. BARRIENTOS:

Q. Agent McDonald, I wanna talk to you about, um, the potential transfer of money in this case. The undercover had a call -- well, excuse me. On the March 18th call between Mr. Middlebrook and the undercover, um, there was discussions of potential investment money; right?

A. I believe so.

Q. By a wire transfer?

A. I believe so.

MR. CARBAJAL: Objection, Your Honor.

Could we have a side bar?

(The following proceedings were held at side bar.)

MR. CARBAJAL: Counsel is deliberating asking questions based on motions in this case. There was a motion to dismiss where Prosecutor Valerie Makarewicz made these exact statements and that motion was denied. There's no relevance at this point trying to elicit the same arguments made in that motion through this witness.

THE COURT: I'm sorry. I don't get what you're talking about.

MR. GUZMAN: As we get into these particular questions, there's an issue as to a motion in liminae about what they can ask about what she knows about loss.

THE COURT: What who knows about loss?

MR. GUZMAN: This agent.

THE COURT: Why?

MR. GUZMAN: Defense counsel is testifying and I do want to raise there was that motion in liminae outstanding. I object on that basis for any questions on loss.

THE COURT: Whether any individual lost money? Don't do that.

MR. GUZMAN: There's a lot of testimony coming in through him.

THE COURT: There's no testimony coming in from him. The testimony is coming from the witnesses on the stand. It's leading questions.

MR. GUZMAN: Understood. This is close to talking about loss. That motion in liminae is out there just to remind the Court.

THE COURT: Remind him not to go into that area.

MR. BARRIENTOS: Yes.

MR. GUZMAN: All right, thanks.

(Side bar concluded.)

BY MR. BARRIENTOS:

Q. Agent McDonald, I'm gonna, um, ask you my question again

so we can get on the same page. Um, during the March 18th call between Mr. Middlebrook and the undercover, there were discussions of potential investment money; right?
A. I believe so.
Q. Um, and specifically wire transfers of that money.
A. I believe so.
Q. Um, but on this call, Mr. Middlebrook did not ask the undercover to transfer him an amount of money less than $10,000, did he?
A. I don't recall specific amounts.
Q. Uh, would looking at a transcript of that call refresh your recollection?
A. I looked at the --
THE COURT: Isn't that a call we heard?
MR. BARRIENTOS: I'm sorry?
THE COURT: Isn't that a call we heard?
MR. BARRIENTOS: Um, I don't believe we heard all of the call.
THE COURT: All right.
MR. BARRIENTOS: If you could look at Exhibit 250?
Q. Agent McDonald, you recognize Exhibit 250 as a transcript of the March 18th call with Mr. Middlebrook and Mr. Bowling?
A. Yes.
Q. And you actually listened in on this call; right?

A. I did.
Q. You had a chance to look at the transcript?
A. I have.
Q. Okay. And your memory's refreshed then that on this call, Mr. Middlebrook did not ask the undercover agent to transfer him an amount of money less than $10,000.
A. I wouldn't say my memory is refreshed, no. This was a very long call. Is there something more specific in this transcript?
Q. So all I'm asking you is if during this call Mr. Middlebrook ever, um -- ever asked the undercover to send him money in the amount of less than $10,000.
A. Again, without reviewing it all, I -- I can't recall.
Q. Okay. Well, please take a look at the transcript and --
THE COURT: She's not gonna look through that whole transcript right now.
BY MR. BARRIENTOS:
Q. The undercover had another call with Mr. Middlebrook on March 19th; right?
A. He had two calls on the 19th, I believe.
Q. Yeah. And one was at about 10 -- uh, 2:45 p.m.
A. Possibly.
Q. And the undercover told Mr. Middlebrook that he was gonna have problems moving money with the bank because he was engaged in a marijuana business that was not legal. Right?

A. I think it was something along those lines, yes.
Q. And he told Mr. Middlebrook if I end up sending a wire with 400,000, it's gonna end up -- scratch that. I'll ask the question again. The undercover told Mr. Middlebrook that if he sent a wire transfer of $400,000, it would send up red flags for dope money; right?
A. Something along those lines, yes.
Q. And it was after that comment about the undercover's marijuana business that there were discussions about transfers under $10,000; right?
A. Around that time, yes.
MR. BARRIENTOS: No further questions.
THE COURT: From the government?

CROSS-EXAMINATION

BY MR. CARBAJAL:
Q. Agent McDonald, are you aware of evidence that Mr. Bowling conned the defendant to sending out any of the messages that we saw in evidence during this trial?
A. Not that I recall.
Q. And do you typically work with cooperating witnesses who have criminal histories?
A. All the time.
Q. You mentioned, uh, Gerald -- or the defense asked you about Gerald Tolliver, and you mentioned that you had met with a Gerald during this case; is that correct?

A. I did.

Q. Okay. Under what circumstances did you speak to that Gerald?

A. Gerald accompanied an individual who was the registered owner of the Land Rover that Mr. Middlebrook drove to his meeting with the undercover agent.

MR. CARBAJAL: No further questions.

THE COURT: Recross?

MR. BARRIENTOS: No, Your Honor.

THE COURT: Thank you, you can step down.

We'll take our break now. Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We'll take a 15-minute break.

THE CLERK: All rise.

(Jury not present.)

THE COURT: Anything we need to discuss?

MS. EKE: No, Your Honor. We were just gonna talk to the government about whether or not Agent Zellhart is here because we would be calling her next.

THE COURT: She seems to be back there.

And then who else?

MS. EKE: After Agent Zellhart, uh, we might be calling our investigator, Ryan Jawetz.

THE COURT: Okay.

MR. CARBAJAL: I have just one more matter. I received what look like invoices for Dr. Phillips. They're unsigned. I just want the final versions just to make sure these are the actual ones that were finalized.

MR. BARRIENTOS: Okay. I'm happy to get them to you.

MR. CARBAJAL: We'll coordinate.

THE COURT: All right.

Counsel? Juror No. 2 has apparently announced that he was trying to get out of commitment that he has tomorrow, but he has to take tomorrow off.

MR. GUZMAN: May we have one moment?

THE COURT: Yes.

MR. CARBAJAL: We wouldn't object to excusing Juror No. 2.

MS. EKE: Your Honor, if I can -- I took my laptop out to the witness room. If I can just get it real quickly?

THE COURT: Sure.

MS. EKE: Your Honor, we defer to the Court.

We're happy to continue on Friday if that --

THE COURT: I'm not -- I'm not recessing tomorrow so I'm either ordering him to return or I'm excusing him. So if you want a very unhappy juror or one for whom the Court has to send a marshal out to find him?

MR. GUZMAN: Your Honor, the government believes

that the alternate should be sat. They've been attentive. There's no reason to make either that juror or the jury angry.

MS. EKE: Your Honor, as I stated, we defer to the Court.

THE COURT: All right. So you have no objection then.

MS. EKE: No, Your Honor.

THE COURT: All right. Do you want me to send him home now and then seat the alternate?

MS. EKE: Yes, Your Honor.

MR. GUZMAN: I think that would be appropriate.

THE COURT: All right. So Ms. Kim, you can tell him he's ordered to return to then jury room, and he's excused. All right.

(Recess taken.)

MR. GUZMAN: Just to clarify, after Agent Zellhart, you may call an investigator? Is that right?

MS. EKE: That is correct.

MR. GUZMAN: Your Honor, we just ask for an offer of proof. We're not sure what he's going to be testifying about. If it's evidentiary issues, we might be able to just stipulate to get that in.

THE COURT: All right. I guess we'll discuss that before he takes the stand.

MS. EKE: Your Honor, he'll be our next witness after Agent Zellhart, and we don't envision that Agent Zellhart's testimony will be long.

THE COURT: Okay.

MS. EKE: So if we want to discuss it now?

THE COURT: Well, the jury is coming in. So yes, when I ask if there's anything to talk about, that would have been the time to.

THE CLERK: All rise.

(Jury present.)

THE COURT: You may be seated.

Juror No. 2 has been excused.

Ms. M., would take Seat No. 2? You're now Juror No. 2.

All right. We're all here. Does the defense have another witness?

MS. EKE: Yes, Your Honor. The defense calls Special Agent Zellhart to the stand.

THE CLERK: Please come forward to be sworn.

Please raise your right hand.

(Witness sworn.)

THE CLERK: You could take a seat. And speaking into the microphone, could you please state and spell your name for the record?

THE WITNESS: Yes. My name Lynne Zellhart,

L-y-n-n-e, last name Z like Zebra e-l-l-h-a-r-t.

THE COURT: You may proceed.

MS. EKE: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. EKE:

Q. Agent Zellhart, you're employed by the Federal Bureau of Investigations; right?

A. Correct.

Q. That's the FBI?

A. Yes.

Q. And your title with the FBI is Special Agent? Correct?

A. Yes.

Q. And as a special agent, it's your job to investigate cases.

A. Yes.

Q. It's your job to assist the government in prosecutions; right?

A. Yes.

Q. And Ms. Zellhart, you held the same position back in March of 2020; right?

A. Correct.

Q. And, in fact, you assisted the prosecution in this case involving Mr. Middlebrook.

A. No, because this wasn't my case. I wasn't the case agent on this. That's my job as an investigator, but I

wasn't a case agent on this. It wasn't my case. I was a helper.
Q. You were still involved in this case; right?
A. I had two involvements on two occasions. I was, uh, assisted on the undercover operation, and I assisted with some evidence review which required two people.
Q. So you assisted with the undercover agent; right?
A. No. I assisted with the undercover operation. My role was limited to surveillance. I was like a -- I was kind of a team member that day. I was a -- a -- I was a helper. I was a team member.
Q. Okay. And as a team member, you consulted with the other members of the team; right?
A. So we were briefed before the operation, um, but, again, it wasn't my case, and I didn't have a lot of hands-on. I was sort of a surveillance -- a perimeter surveillance, um, person, and then when it was kinda concluded, um, I, uh, recall assisting, pulling the undercover kinda to of out-of-the-way place, and he sat in my car for a little bit. And that's really about all.
Q. But just to be clear, you're talking about March 25th, 2020; right?
A. I believe so, yes.
Q. You were present when the undercover agent and Mr. Middlebrook were arrested; right?

A. Uh, correct. I was at the parking lot.
Q. And you were part of debriefs before March 25th, 2020, right, to discuss what was going to happen.
A. No. The only brief I was part of was the day of. So I didn't know anything about the case until the day of.
Q. Okay. So on March 25th, 2020, you learned about the case; right?
A. Uh, correct.
Q. And you assisted with the case; right?
A. On that day.
Q. And as we mentioned, this wasn't your main job. You were a helper, but you consulted with other people on the case. You talked to them.
A. They talked to me. So, I mean, it's hard -- to be very precise, we had a brief before the op. Prior to that, I didn't know anything about it. I showed up at the -- at the briefing location. Um, we stood in a circle. I remember we stood very far apart because it was COVID time. And the case agents told us what the case was about, and they told us what we were gonna do that day.
Q. Well, Agent, you've been a part of other investigations before; right?
A. Uh, yes.
Q. You've been a part of other fraud investigations?
A. Yes.

Q. And you're aware that some cases are more complex than others.
A. Yes.
Q. You're aware that some investigations can take months, for example.
A. Yes.
Q. And some investigations can take years; right?
MR. GUZMAN: Objection, Your Honor. Relevance.
THE COURT: Just a couple more questions, Ms. Eke.
MS. EKE: That's all I need, Your Honor.
THE COURT: Okay.
THE WITNESS: Yes.
BY MS. EKE:
Q. And Agent, you're aware that this investigation into Mr. Middlebrook only lasted 12 days; right?
A. Uh, no, I have no idea.
Q. Well, Agent, you believe that the investigation into Mr. Middlebrook was rushed; right?
MR. GUZMAN: Objection, Your Honor. Argumentative, goes to the state of mind, assumes fact not in evidence.
THE COURT: Overruled.
MR. GUZMAN: Also relevance as to her belief.
THE COURT: Overruled.
BY MS. EKE:
Q. Agent, you believe that the investigation into

Mr. Middlebrook was rushed; right?
A. I have no idea.
Q. Well, Agent, in your own words, you said this investigation was rushed; right?
A. No.
Q. Agent, this is not the first time you and I are meeting; right?
A. Correct.
Q. We met on April 19th, 2024 at the FBI office?
A. Correct.
Q. You were there with Special Agent McKnight; right?
A. Yes.
Q. And I was there with my colleague, Alejandro Barrientos; correct?
A. Correct.
Q. I was also there with my investigator, Ryan Jawetz; right?
A. Right. Yes.
Q. And we talked to you about the case; correct?
A. We talked about the evidence we were examining.
Q. That is correct. We talked about the evidence that we were examining; right?
A. Uh, correct.
Q. And during that conversation, you stated that the investigation was rushed; right?

A. I don't remember saying that.
Q. You don't remember saying that this was an on-the-fly investigation?
A. No. If -- if I said something, words to that the effect, it was from my perspective because I didn't know about the case until the day we were briefed from the undercover op, and I didn't know anything after that. So I only knew -- my introduction to this case was in March of 2020, and then I didn't have any other activity in the case until I helped review evidence, um, a few weeks ago.
Q. And, Agent, even though you had a limited involvement in this case --
A. Right.
Q. -- you still expressed the opinion that this investigation was rushed. Right?
A. I don't remember that.
MS. EKE: Thank you.
Your Honor, I don't have any further questions.
THE COURT: From the government?
MR. GUZMAN: No, Your Honor.
THE COURT: Thank you. You're excused.
Does the defense have another witness?
MS. EKE: Yes, Your Honor.
THE COURT: All right. Let's approach.
(The following proceedings were held at side bar.)

THE COURT: What's your witness going to be testifying to?

MS. EKE: Our witness was present when Agent Zellhart made the comments about this investigation being rushed, on-the-fly. I anticipate she will testify about that. Also, our investigator also reviewed the contents of Mr. Middlebrook's phone and will introduce contacts that are in the phone.

MR. GUZMAN: Those contacts were already spoken about. As I mentioned earlier, we introduced contacts in his phone and she can talk about that. If they're bringing him to impeach Agent Zellhart, she testified she didn't say anything.

THE COURT: Go ahead.

(Side bar concluded.)

MS. EKE: Your Honor, we call Ryan Jawetz.

THE CLERK: Please raise your right hand.

(Witness sworn.)

THE CLERK: Thank you. You could take a seat.

Speaking into the microphone, can you please state and spell your name for the record?

THE WITNESS: Ryan Jawetz. It's R-y-a-n J-a-w-e-t-z.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MS. EKE:

Q. Good afternoon, Mr. Jawetz.

A. Good afternoon.

Q. What do you do for a living?

A. Uh, I'm an investigator, uh, for a law office in Los Angeles.

Q. Do you work for the office that is representing Mr. Middlebrook in this case?

A. I do.

Q. Are you a member of Mr. Middlebrook's defense team?

A. I am.

Q. Now, Mr. Jawetz, how long have you work as an investigator?

A. Uh, I've worked as a investigator for about 12 years.

Q. Now, I want to turn your attention to this case. As part of your role as an investigator, did you review any records in this case?

A. I did.

Q. And did you review evidence in this case?

A. I did.

Q. I wanna talk about some of the records and evidence you reviewed. Did you ever review any phone records from Mr. Middlebrook's phone?

A. Yes, I did.

Q. Can you please explain generally what you reviewed?
A. Um, I reviewed, uh, a Cellebrite extraction from Mr. Middlebrook's phone.
Q. What is a Cellebrite extraction?
A. Cellebrite is a program that is used to analyze and extract data from digital devices.
Q. Do you have experience using the Cellebrite program?
A. Yes, I do.
Q. Have you received training in using the Cellebrite extraction?
A. Yes.
Q. And did you use your training and experience when reviewing the Cellebrite extraction in this case?
A. Yes.
Q. Mr. Jawetz, how did you receive the phone data from Mr. Middlebrook's phone that you reviewed?
A. We received it from the government.
MR. EKE: Now, Mr. Jawetz, I wanna draw your attention to Exhibit 230. It should be in the binder -- it should be a defense exhibit binder. I want you to look at Exhibits 230 through 238.
MR. GUZMAN: Your Honor, no objection to their admissibility.
THE COURT: Do you want them admitted?
MS. EKE: Yes, Your Honor.

THE COURT: All right. Those are admitted.

(Exhibits 230 through 238 admitted.)

MS. EKE: I also want Mr. Jawetz to look at 285 to 291.

MR. GUZMAN: Your Honor, no objections to their admissibility.

THE COURT: All right. Those are admitted.

(Exhibits 285 through 291 admitted.)

MS. EKE: Mr. Jawetz, I wanna start with Exhibit 230, and I'm gonna put it up on the screen.

Q. Can you tell us what Exhibit 230 is?

A. Um, this is a page from the extraction report, um, from the Cellebrite extraction of Mr. Middlebrook's phone.

Q. And what does this page show?

A. Um, it shows the, uh, contact information for a contact in Mr. Middlebrook's phone. This one you can see the name is Ahmad Alyasin.

MS. EKE: I wanna go to the next exhibit, 231.

Q. Can you tell us what Exhibit 231 depicts?

A. Uh, this also depicts a page from the extraction report of Mr. Middlebrook's phone.

Q. And what information is contained on this page?

A. Um, this one has contact information for Matt Barnes.

Q. And how does that contact read?

A. Um, it says Matt Barnes, NBA.

MS. EKE: I wanna then go to Exhibit 232.
Q. Can you tell us what Exhibit 232 depicts?
A. This is, uh, an extraction report from Mr. Middlebrook's phone for one of his contacts.
Q. And which contact is that?
A. Joe Benacasa.
MS. EKE: Let's go to Exhibit 233.
Q. Can you tell us what Exhibit 233 depicts?
A. This is a page from the extraction report for Mr. Middlebrook's phone depicting one of his contacts.
Q. And which contact is that?
A. Jose Canseco.
MR. EKE: Let's go to the next exhibit, Exhibit 234.
Q. Mr. Jawetz, can you tell us what Exhibit 234 depicts?
A. Uh, it depicts another one of Mr. Middlebrook's contacts from the Cellebrite extraction.
Q. And what contact is this?
A. Lee Kaplan.
MS. EKE: Next let's go to Exhibit 235.
Q. Same question, Mr. Jawetz. What does Exhibit 235 depict?
A. A page from the extraction report from Mr. Middlebrook's phone depicting one of his contacts.
Q. And which contact is this?

A. This is Jerry Kaplan.

MS. EKE: Let's next go to Exhibit 236.

Q. And can you tell us what this exhibit depicts?

A. A page from the extraction report from Mr. Middlebrook's phone depicting one of his contacts.

Q. And which contact is this?

A. Alan Mandelberg.

Q. And then we if go to Exhibit 237, what does Exhibit 237 depict?

A. Page from the extraction report of Mr. Middlebrook's phone with one of his contacts.

Q. And what contact is that?

A. Floyd Mayweather.

Q. And does this exhibit show when that contact was created?

A. Yes, it does.

Q. And when was this contact created?

A. February 10th, 2017.

MS. EKE: Let's go to Exhibit 238.

Q. What does Exhibit 238 depict?

A. This is a page from the extraction report from Mr. Middlebrook's phone depicting one of his contacts.

Q. And which contact is this?

A. Lamar Odom.

Q. And does this exhibit depict when this contact was

created in Mr. Middlebrook's phone?
A. Yes, it does.
Q. And what was that?
A. Uh, November 19th, 2019.
MS. EKE: Let's go to Exhibit 285.
Q. Mr. Jawetz, can you tell us what Exhibit 285 depicts?
A. This is a page from the extraction report for Mr. Middlebrook's phone depicting one of his contacts.
Q. And which contact is this?
A. Shaquille O'Neal.
Q. And --
MR. GUZMAN: Objection, Your Honor. Misstates the document.
MS. EKE: If I may, Your Honor, I can clarify.
Q. Mr. Jawetz, how does this contact read?
A. Uh, the contact reads Shaquille O'Neal, NBA.
Q. And does this exhibit depict when this contact was created in Mr. Middlebrook's phone?
A. Yes, it does.
Q. And when was that?
A. February 10th, 2017.
MS. EKE: Let's go to Exhibit 286.
Q. What does Exhibit 286 depict?
A. This is a page from the extraction report from Mr. Middlebrook's phone with one of his contacts.

Q. And which contact is that?
A. Dave Patterson.
MS. EKE: Let's go to Exhibit 287.
Q. What does Exhibit 287 depict?
A. A page from the extraction report from Mr. Middlebrook's phone with one of his contacts.
Q. And which contact is that?
A. Sean Roberts.
Q. Exhibit 288, what does Exhibit 288 depict?
A. A page from the extraction report of Mr. Middlebrook's phone with one of his contacts.
Q. And how does that contact read?
A. John Salley, NBA.
Q. And does this exhibit depict when that contact was created in Mr. Middlebrook's phone?
A. Yes.
Q. When was that?
A. February 10th, 2017.
MS. EKE: Let's go to Exhibit 289.
Q. What does Exhibit 289 depict?
A. A page from the extraction report of Mr. Middlebrook's phone with one of his contacts.
Q. And which contact is that?
A. Larry Stockett.
MS. EKE: Now let's go to Exhibit 290.

Q. And can you tell us what Exhibit 290 depicts?
A. A page from the extraction report of Mr. Middlebrook's phone with one of his contacts.
Q. And which contact is that?
A. Gerald Tolliver.
Q. And does this exhibit state when that contact was created in Mr. Middlebrook's phone?
A. Yes.
Q. And when was that?
A. November 20th, 2019.
MS. EKE: And finally, let's go to Exhibit 291.
Q. What does Exhibit 291 depict?
A. A page from the extraction report of Mr. Middlebrook's phone with one of his contacts.
Q. And which contact does it depict?
A. Jim Weatherly.
MS. EKE: Thank you. You can take that off the screen.
Q. Mr. Jawetz, you mentioned as part of your duties, you also review evidence. Did you review evidence in this case?
A. Yes, I did.
Q. Did you ever speak with FBI Special Agent Zellhart?
A. Yes, I did.
Q. When was that?
A. I believe it was April 19th of this year.

Q. Where was that?
A. At the, uh, FBI building, um, in Los Angeles.
Q. Who was present during that meeting?
A. Uh, it was myself, uh, Ijeoma Eke, Alejandro Barrientos, uh, Special Agent Lynne Zellhart and Special Agent Jamila McKnight.
Q. And did Special Agent Zellhart make any comments about the investigation to Mr. Middlebrook?
A. Yes, she did.
Q. And what comments did she make?
A. She said that, um, there has been a rush order, um, on the -- on the investigation, and that it was done, I believe she said, on-the-fly.

MS. EKE: Thank you.

Your Honor, I have no further questions.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. GUZMAN:

Q. Good afternoon. Just to clarify, you said at the end, it was a rush order?
A. Uh, I believe that's what she said, yes.

MR. GUZMAN: Thank you. No further questions, Your Honor. Oh, may I take that back, please?

THE COURT: All right.

MR. GUZMAN: Now no more questions, Your Honor.

THE COURT: All right. Thanks very much, sir.
You're excused.
Does the defense have another witness?
MS. EKE: Yes, Your Honor. If I may have a moment?
THE COURT: Sure.
MS. EKE: The defense calls Keith Middlebrook to the stand.
THE COURT: Ladies and gentlemen, Mr. Middlebrook as you saw was directed to go the long way around to the witness stand. A lot of our traditions come from England including the black robes, and reference to the area in front of Ms. Kim's desk, we call that the well. I'm not sure why we call it the well.
I always sort of envisioned it as something that the floor is going to come open, and you're going to be sucked down into a moat if you walk there. But one of our traditions is that no one walks in the well except court staff so that's why Mr. Middlebrook walked around.
THE CLERK: Please raise your right hand.
(Defendant sworn.)
THE CLERK: You can take a seat.
Speaking into the microphone, can you please state your name for the record?
THE WITNESS: Keith Middlebrook, K-e-i-t-h, Middlebrook, M-i-d-d-l-e-b-r-o-o-k.

THE COURT: You may proceed.

MS. EKE: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. EKE:

Q. Good afternoon, Mr. Middlebrook.

A. Good afternoon.

Q. What do you do for a living?

A. I'm an entrepreneur.

Q. As an entrepreneur, what does that entail?

A. Um, fitness, nutrition, wellness and 33 other companies.

Q. Mr. Middlebrook, do any of your companies involve acting?

A. Yes.

Q. Have you worked as an actor before?

A. Yes, I have.

Q. How long have you worked as an actor?

A. Um, I got my SAG card, Screen Actor's Guild card, in 2008.

Q. And just for the record, what is a SAG card?

A. It's a pay grade professional actor, certified.

Q. And why did you decide to pursue acting?

A. I said if I hear it 1 million times, because of my colorful personality, I would go to L.A. And so when I heard it for the 2 millionth time, I went to L.A.

Q. Is networking part of acting?

A. Um, absolutely. In fact, your network is your net worth. Who you roll with is very important.
Q. Mr. Middlebrook, what kind of projects have you been involved with over the years?
A. Um, 37 major films and TV shows. Just to name a few, Iron Man 2, Money Ball, CSI, Bones, Entourage, Sopranos, et cetera.
Q. And were you able -- were you ever photographed on set?
A. Absolutely, all the time.
Q. Mr. Middlebrook, I want you to look at one of the binders in front of you. It's a defense exhibit binder. And I want you to turn to Exhibit 200.
A. Okay.
Q. And I want you to just flip through the pages of Exhibit 200 and look up at me when you're done. So first, generally, what does Exhibit 200 depict?
A. Um, I'm Officer Woodcock in the CW TV show 90210.
Q. And do the pages of Exhibit 200 depict you on set?
A. Yes, they do.
Q. And are these fair and accurate depictions of you on set on different projects?
A. These are exact screen captures from the shows and movies.
MS. EKE: At this time, the defense moves Exhibit 200 into evidence.

THE COURT: Any objection?

MR. GUZMAN: No objection, Your Honor.

THE COURT: That's admitted.

(Exhibit 200 admitted.)

MS. EKE: I'm gonna show you Exhibit 200, and let's go to first image contained in that. Let's start with the top image.

Q. Can you tell us what project this top image is from?

A. CW, 90210, Officer Woodcock.

Q. And where are you located in this picture?

A. I'm to the right.

Q. And let's go to the second image. What project is this second image from?

A. This is the finale of Iron Man 2. Scarlet Johanssen, Black Widow and Gwenyth Paltrow have ordered me to arrest Justin Hammer.

Q. And where are you located in this picture?

A. I'm the arresting officer in the middle.

Q. Let's go to the third image. Mr. Middlebrook, what project is third image from?

A. This is J. Edgar Hoover with Leonardo DiCaprio and Armie Hammer, um, about FBI Director J. Edgar Hoover.

Q. And then let's go the fourth image. What project is this from?

A. I'm on the TV show Justified. I'm Marshall Rock.

Q. And where are you located in this image?
A. Directly in the middle.
Q. Mr. Middlebrook, due to your status as an actor, have you had occasion to meet and interact with other celebrities outside the set?
A. Um, continually, all the time.
Q. So are you interacting with other actors?
A. Absolutely.
Q. Are you interacting with professional athletes?
A. Absolutely.
Q. How do you interact with other celebrities or athletes outside a set?
A. I'm at, um, movie premieres, charity galas, um, TV shows, Golden Globes, Oscars, MTV Movie Awards and more.
Q. And do you ever take pictures at those events?
A. On occasion, sometimes, yeah.
Q. I want you to turn to Exhibit 201 in that same binder. And if you can just flip through the images contained in Exhibit 201?
A. Yeah. I did.
Q. And generally, what do the images in 201 depict?
A. I'm at movie premieres. I'm at dinner at the Chateau Marmont. I'm at the Hall of Fame Lifetime Achievement Awards. I'm at, uh, the Golden Globes.
Q. And are these fair and accurate depictions of you at

those different events you just mentioned?
A. Yes. These are direct screenshot photos.
MS. EKE: At this time, the defense moves Exhibit 201 into evidence.
THE COURT: Any objection?
MR. GUZMAN: No objection.
THE COURT: That's admitted.
(Exhibit 201 admitted.)
MS. EKE: We're going to show Exhibit 201. We're gonna start with the first image.
Q. On the top part of the screen, what event is this?
A. This is the MTV Movie Awards, uh, and Avengers, and Jon Voight played the President.
Q. And where are you located in this image?
A. I'm to the left, and my friend Jon's to the right.
Q. And let's go to the second image. What event is this from?
A. This is the Hall of Fame Lifetime Achievement Awards, and that is the NBA All-Time Rebounder Dennis Rodman.
Q. And where are you located in this image?
A. Um, he has his hand in my hand, and I'm located to the right.
Q. And let's go to the third image. What event is this?
A. I meeting Elon Musk at Chateau Marmont in Hollywood for dinner.

Q. And where are you located in the picture?
A. I'm to the left, and he's to the right.
MS. EKE: And then is there one more?
Q. What event is this from?
A. This is the Golden Globe Awards just shortly after the Black Panther World Premiere with Lupita who played Wakanda(sic) in Marlo's Black Panther.
Q. Mr. Middlebrook, the images that we just saw, are they on the Internet?
A. Yes.
Q. Now, have you developed personal relationships with some of the celebrities you've interacted with?
A. Yes.
Q. And as a result, have you interacted with celebrities outside of formal settings?
A. Yes, all the time.
Q. Have you developed personal relationships with some of these celebrities?
A. Sure, absolutely.
Q. I want you to look at Exhibit 203. And what does Exhibit 203 depict?
A. Um, these are, um, filmed with Jose Canseco. And this is -- yeah. This is a picture of me and Jose Canseco. These are two films with me and Jose Canseco.
Q. I think you're in Exhibit 202. Can you look at 203?

A. Okay. Yeah.
Q. What is Exhibit 203?
A. I'm with my friend, Floyd Mayweather.
Q. And are these fair and accurate depictions of you and Floyd Mayweather?
A. Yes, that's -- these are direct screenshots, yes.
Q. And you mentioned Exhibit 202. Are those fair and accurate depictions of you and Jose Canseco?
A. Absolutely.
Q. And first, who is Jose Canseco?
A. He's arguably one of the Top 10 greatest power hitters in history. He broke 87 records. He still holds 34 records. He's nicknamed 4040.
Q. And what sport did he play?
A. Major league baseball champion.
Q. And what about Floyd Mayweather, who is he?
A. He's the undefeated light heavyweight Champion of the World at 50 and 0.
Q. And for the non-sports fans, what sport is that?
A. Professional Boxing.
MS. EKE: At this time, defense moves Exhibit 202 and Exhibit 203 into evidence.
THE COURT: Any objection?
MR. GUZMAN: Your Honor, no objection to 203, but I do not believe the defendant was asked by 202.

MS. EKE: He was. He mentioned 202 first.
THE COURT: It's Jose Canseco.
MR. GUZMAN: I'm sorry, I must have missed it.
MS. EKE: 202 is Jose Canseco.
203 is Floyd Mayweather.
It also has videos. There's two videos in it.
MR. GUZMAN: No objection.
THE COURT: Those are admitted.
(Exhibits 202 and 203 admitted.)
MS. EKE: I'm gonna start with Exhibit 202. Let's start with the third page of this exhibit.
Q. What does this picture depict?
A. This is me and Jose Canseco working out in Las Vegas.
Q. And where are you in this picture?
A. I'm to the right. He's to the left.
MS. EKE: And I wanna show you the two videos contained in this exhibit if you can give me one second. Okay. Okay. I'm showing you one of the videos contained in Exhibit 202, and I'm gonna play a few seconds of this video.
(Video played.)
MS. EKE: We can stop at 19 seconds.
Q. Mr. Middlebrook, what does this video depict?
A. We are at his house filming our TV show/podcast Gym Talk.
Q. And what is this?

A. Legends of the Game.

Q. What does the podcast Legends of the Game discuss generally?

A. I'm with the biggest pro athletes in history in NBA, NFL, Major League Baseball, Boxing, and we're discussing current events, fun stuff, training strategies, laughing and joking, uh, everything.

MS. EKE: I'm gonna show you the other video that was contained in Exhibit 202. And then we're gonna play a bit of this one.

MS. EKE: And then I'm gonna stop it at 20 seconds.

Q. Mr. Middlebrook, what does video depict?

A. A Team Z cameraman asked me -- dared me to bench 405 pounds with no warm-up, and I asked Jose, can we film this, and will you spot me. And so I'm gonna do that for three reps, and he spots me.

MS. EKE: And we're gonna take this exhibit down, and we're gonna pull up Exhibit 203. I want to start with the first top image.

Q. Mr. Middlebrook, you already testified that these were pictures of you and Floyd Mayweather. Starting with the first image, where this picture taken?

A. We were at his Penthouse Floor in L.A. Live Ritz Carlton in the kitchen.

Q. And who is in the picture?

A. Myself to the left, Floyd Mayweather and his long-time best friend, Deshawn Wayne, since he was 16 years old. He's also my best friend, too.
Q. And let's go to the second image. Where was this picture taken?
A. This is in Las Vegas at his nightclub. He's giving me the tour and showin' me all of his new club he just opened.
Q. And let's go to the third image. Where was this one taken?
A. This was outside the Palms Casino Resort. As we go in, I got Manny Pacquiao to agree to do 200 million, 60-40 split, and we signed right there about one hour later.
Q. And let's go to the fourth picture. Where was this one taken?
A. This is 2009, my first tour of Caesars Palace Forum Shops as Floyd took me around in, uh, Mont Blanc and showed me Louis Vuitton, you know, all the shops and stuff.
Q. I think there's one more. Where was this one taken?
A. Uh, I -- I was leaving this is L.A. Live Ritz Carlton at the bottom, and we're in valet.
Q. Mr. Middlebrook, did you have a personal relationship with Jose Canseco?
A. Definitely. They call him my brother.
Q. And did you have a personal relationship with Floyd Mayweather?

A. Oh, yeah.
Q. And are these the only celebrities you had a personal relationship with?
A. Uh, no. There's approximately over 4,000 in the last 27 years.
Q. And how did you meet these people over the last few years?
A. I do -- I just do events, average 5 to 20 events per month for the last 25 years, and I end up developing relationships. I have a magnetic personality, I am very transparent, and then I'm invited places.
Q. Mr. Middlebrook, in addition to the athletes and celebrities you've interacted with, have you ever had the occasion to interact with politicians?
A. Yes, I have.
Q. What politicians have you interacted with?
A. President Donald J. Trump.
Q. How did you meet Former President Trump?
A. At the Bills Anchor Wealth Expo. So it's five days of creating wealth and prosperity. Tony Robbins, Grant Cordone, et cetera, and Donald Trump went on last.
Q. And did you interact with Former President Trump at this wealth expo?
A. Yes. We were sitting with -- I was sitting with my daughter, and I believe it was the fifth row, and he said if

anyone wants to come over and do meet-and-greet, that's great. And, you know, before we got trampled, we actually went up there, and I said some great things about him that he never forgot. I said you should be President, and that was 2005 or 2006.

Q. After you met Former President Trump in 2005 or 2006, did you interact with him again?

A. Yes, I did.

Q. How?

A. Um, there's a social media platform called Twitter, and he had just signed on. I signed on, and I noticed he was following me so I followed him back.

Q. And did you two interact on Twitter?

A. Yes, we did.

Q. How did you two interact on Twitter?

A. Um, I posted some things starting in March 2015, and I said you've gotta get into the race, get in there now. You're a huge brand. You're the only one that could beat Hillary. And he took that tweet, and he tweeted it on his Twitter.

Q. And I wanna break it down. What is a tweet?

A. A tweet is on Twitter at the time which is now X, my friend, Elon, bought it, you take a post, you say something, and you send it out to your followers. At the time, I had 2.4 million followers. He had 2.8 million. So I sent it

from my -- from my Twitter, sent it out to my followers. He saw it, and then he sent out to his followers. He re-tweeted my tweet.

Q. And did you ever take screenshots of Former President Trump re-tweeting your tweets?

A. I took 24 screenshots of him re-tweeting my tweets.

Q. I want you to look at Exhibit 204. Mr. Middlebrook, if you can look at Exhibit 204 in the binder?

A. Okay, got it. Yes.

Q. And can you tell us what Exhibit 204 depicts?

A. These are all screen captures of him re-tweeting my tweets.

Q. And who took these screen captures?

A. On my Beverly Hills phone, I screen captured him on the -- you press the side buttons, and it screen captures a picture of the tweet or whatever's on the screen.

Q. And are these fair and accurate depictions of when Former President Trump retweeted you?

A. These are exact screen captures of him retweeting my tweets.

MS. EKE: The defense moves Exhibit 204 into evidence.

MR. GUZMAN: No objection, Your Honor.

THE COURT: That's admitted.

(Exhibit 204 admitted.)

MS. EKE: And we're gonna publish Exhibit 204.
Q. Mr. Middlebrook, I wanna start with the first page. How does this show that Former President Trump retweeted you?
A. Cause he took may tweet -- my handle at the time before they took it down, it was at @4kmiddlebrook. So he took my tweet -- I said wake up America. Donald's policies are the real game plan to win. He's also the only one who can beat Hillary. So he retweeted my tweet.
Q. And how does this exhibit show that he retweeted it onto his platform or to his followers?
A. At the top left, it says Donald J. Trump, and it has the certified blue check.
Q. And are we looking at a screenshot of Former President Trump's Twitter page?
A. Verified. The blue check means it's verified.
Q. And let's go to the next image. Mr. Middlebrook, is this another example of Former President Trump retweeting one of your tweets?
A. Yes. I tagged it bigger, better, stronger, faster, smarter, richer, winner, Trump 2016, and sent it out to the world, yes.
Q. And is this an image of your tweet being reposted on Former President Trumps' Twitter page?
A. He picked up my tweet and shot it to his followers.
Q. Let's go to page 3. I want you to look at the top

portion. Is this another example of Former President Trump retweeting one of your tweets?

A. That's an exact screenshot of him retweeting one of my tweets.

MS. EKE: And then let's go to the fourth page. We're gonna make it a little bit bigger.

Q. And if we look at the first, the second and the third item, are these examples of Former President Trump retweeting your tweets?

A. That's President Trump retweeting three of my tweets in one day.

MS. EKE: We can take this exhibit down.

Q. Mr. Middlebrook, you mentioned that you've attended different events over the years; right?

A. Yes.

Q. I think you said you attended 5 to 20 events for the last 25 years?

A. Yes.

Q. Did any of those events include sporting events?

A. Absolutely. Um, NBA games, football games, championship games, play-off games, Super Bowls, um, Floyd Mayweather, Manny Pacquiao, uh, the -- the biggest of the big, yeah.

Q. Did you ever attend Laker games?

A. Absolutely.

Q. I want you to look in that binder again at Exhibit 205.

A. Got it.
Q. Mr. Middlebrook, what does Exhibit 205 depict?
A. I'm bench seats behind my friend, Kobe Bryant. Behind my head is Ron Artest, Meta World Peace. To the right is Pau Gasol. To the left is my boy, Matt Barnes. And then Steve Blake, we were on Entourage together.
Q. And is this a fair and accurate depiction of you at a Laker game?
A. That's Lakers' bench seat. Yes, it is, that's the exact screen photograph.
MS. EKE: The defense moves Exhibit 205 into evidence.
THE COURT: Any objection?
MR. GUZMAN: No objection, Your Honor.
THE COURT: That's admitted.
(Exhibit 205 admitted.)
MS. EKE: And I'm showing Exhibit 205 to the jury.
Q. Mr. Middlebrook, where are you located in this image?
A. That's me right there directly at the bottom middle left.
Q. And the people that you mentioned, Kobe Bryan, Matt Barnes, who are they?
A. These are the NBA champions of the Lakers. My seat is directly behind my friend, Kobe Bryant.
MS. EKE: We can take that exhibit down.

Q. Mr. Middlebrook, did you ever develop a personal relationship with players that played on the Lakers?
A. All the time. We discussed relationships, movies, strategies, goals, business, everything.
Q. Did you ever take any pictures with them?
A. All the time. Sure. Yeah. When -- when the moment's right. Some you don't because you just -- you know, you kind of feel it out.
Q. I want to go back into that binder and look at Exhibit 206.
A. Yes.
Q. Does Exhibit 206 show you with different players who played on the Lakers?
A. Yes.
Q. Are these fair and accurate depictions of you with Laker players?
A. Absolutely.
MS. EKE: The defense moves Exhibit 206 into evidence.
MR. GUZMAN: Your Honor, the images, the government has no objection to. There's a disk here. Um, I'm not sure if that's being introduced at this time as well.
MS. EKE: As part of Exhibit 206.
MR. GUZMAN: I just don't know if he's established the foundation of what it is.

MS. EKE: We're not introducing the disk at this time.

THE COURT: Okay. 206, the document.

MR. GUZMAN: Just for the record then, I think it's pages 3 through 5 of Exhibit 206. The government has no objection to it.

THE COURT: All right.

MR. GUZMAN: I'm sorry. 1 through 3.

THE COURT: Okay.

(Exhibit 206, pages 1 through 3 admitted.)

MS. EKE: Let's show Exhibit 206.

Q. Mr. Middlebrook, I wanna start with the top picture.

A. Yes.

Q. Who are the individuals in that top picture?

A. That's my boy, Matt Barnes, to the left. We're at his house in Manhattan beach at the dinner table. And that's me to right.

Q. And is Matt Barnes a person that played for the Los Angeles Lakers?

A. He's one of my 42 LA Lakers on my roster.

Q. And did you have Matt Barnes' phone number in your phone back in 2020?

A. Absolutely.

Q. I wanna go down to the second image? Mr. Middlebrook, who is in that second image?

A. That's the four-time NBA Champion, great friend of mine, John Salley, LA Laker.

Q. And did you develop a personal relationship with John Salley?

A. Over 20 years, absolutely.

Q. And let's go to the third image. Mr. Middlebrook, who is -- who are the individuals in the third image?

A. That is my friend, Shaquille O'Neal, and myself at Prime 112 in Miami eating dinner.

Q. And did you develop a personal relationship with Shaquille O'Neal?

A. Absolutely.

Q. Mr. Middlebrook, you mentioned that you knew more than the Laker players pictured in this exhibit. Do you have a personal relationship with other Lakers that we haven't seen in this exhibit?

A. I have exactly 42 personal relationships with the Los Angeles Lakers over last 20, 25 years? Yes.

Q. I wanna ask you about another former Laker player. Did you ever meet Lamar Odom?

A. Great friend. He was Kobe's best friend, and then he'd say hey, say hi to Lamar, and we became great friends.

Q. And were you ever photographed or videoed with Lamar Odom?

A. We went to dinners, and we hung out at his place, um,

worked out, all kinds of stuff.
Q. So in Exhibit 206, there is a video contained in there. Did you review that video prior to today?
A. Yes.
Q. And what does that video depict?
A. That's myself and Lamar Odom at his place in Studio City. And I'm pumping him up, um, telling him to come back in the NBA, to come back pro -- pro basketball. And he made it to the three team, Ice Cube's three team.
MS. EKE: Your Honor, the defense moves the last image or video contained in 206 into evidence.
MR. GUZMAN: Just for the record, I think this is page 4 of Exhibit 206-A. There's another disk as well. So no objection to the first disk that he just authenticated.
THE COURT: All right. That's admitted.
(Exhibit 206 first video admitted.)
BY MS. EKE:
Q. And we talked about John Salley. Were you ever videoed with John Salley before?
A. Oh, yeah. We did, um -- because he's into wellness, and I'm into fitness and wellness, nutrition, a lot of our stuff was synergistic so ESPY awards, um, nutritional events. He did a natural healing cannabis event. He invited me to come. I said absolutely.
Q. And is there a video of you and John Salley contained in

Exhibit 206 as well?
A. Sure is.
Q. And have you reviewed that video?
A. Yes, I have.
Q. And is that a fair and accurate depiction of you and John Salley?
A. That's an exact, um, excerpt of our interview.
MS. EKE: The defense also moves in the second video from Exhibit 206.
MR. GUZMAN: No objection.
THE COURT: All right, that's admitted.
(Exhibit 206, second video admitted.)
MS. EKE: And I wanna start with the first video that you mentioned with Lamar Odom. And I'm gonna start playing it.
(Video played.)
MS. EKE: And we can pause at 15 seconds.
Q. Mr. Middlebrook, is this an example of you with Lamar Odom?
A. Yes. We're filming for the podcast show Legends of the Game.
Q. And is that the podcast you previously explained to us?
A. Yes.
MS. EKE: And if we can go to the second video contained in 206?

(Video played.)

BY MS. EKE:

Q. Mr. Middlebrook, is this an example of you interacting with John Salley?

A. Yes. We're filming for Legends of the Game. At the same time, we're promoting his natural healer and also his Vegan Burgers, a restaurant he started, yes.

Q. Now, Mr. Middlebrook, there's one athlete that we've heard throughout this trial, Earvin Magic Johnson.

A. Yes.

Q. Who is Magic Johnson?

A. He's the Top 4 Laker player of all time -- excuse me, the Top 4 NBA player of all time, and he's an icon with the Los Angeles Lakers.

Q. And did you ever meet Earvin Magic Johnson?

A. Well over a hundred times over the last 25 years.

Q. Let's talk about the first time you met him. How did you meet Mr. Johnson?

A. I was at the Cigar Bar in Beverly Hills with me and John, and he goes Keith, we -- we gotta -- we gotta call Magic, my boy Magic, and I said -- I said Magic Johnson? He goes yeah, this is cool, I'm just gonna call him up. So we got him on the phone, and we all talked for like 20 minutes. He goes Keith, we gotta hook up, meet up, and I said great.

Q. And you said your boy, John. Who are you referring to?

A. John Salley.
Q. And is that the person we just saw in that video?
A. That's him.
Q. Now, you mentioned that you interacted with Magic hundreds of times. What kind of interactions were those?
A. Um, mainly, we're just seeing each other and saying, you know -- you know, and saying hi, but, you know, we're crossing paths at the BET awards, at, um, NBA games, NBA championships, NBA playoffs, NFL championships, uh, NFL playoffs, Super Bowls, um, Cherry Galas, Autism Speaks. Um, uh, Kids For -- I mean, one was Killing Cancer for Kids, um, Habitat for Humanity.
Um, my brand is fitness and business, health and wealth which is synergistic with his brand so there was so much synergy there. And then, um, we met so many times, we -- we ended up sitting next to each other at Mayweather versus Maidana, um, for two-and-a-half hours. As you can see, he's -- he's very colorful. He can talk forever.
Q. Mr. Middlebrook, when was that Mayweather Maidana fight?
A. Um, I'm -- I'm gonna recollect, uh, 12 years ago, 2012, summer, like May. Huge event.
Q. And at that fight, did you speak with Mr. Johnson?
A. He sat directly next to me because Floyd got my ticket for me. We're like fourth row to the -- to the ring.
Q. And sitting next to Magic Johnson, did you engage in

conversations?
A. Oh, yeah.
MS. EKE: Now, Mr. Middlebrook I want to show you an exhibit that's already introduced into evidence, Exhibit 210.
MR. GUZMAN: I'm just not sure that that's in evidence. I think it was asked questions about.
MS. EKE: It was introduced during the cross-examination of Magic Johnson.
THE COURT: Ms. Kim, do you have 210 in evidence?
THE CLERK: I have it.
THE COURT: Yes. All right, it is in evidence.
MR. GUZMAN: Thank you.
BY MS. EKE:
Q. Mr. Middlebrook, have you seen this video before?
A. Uh, we saw it this morning with the sound off, yes.
Q. And prior to today, have you also seen it?
A. Yes. This went all over online, um, when it was first filmed everywhere.
MS. EKE: I'm gonna start playing.
(Video played.)
MS. EKE: I'm gonna stop at 27 seconds.
Q. Mr. Middlebrook, who's on the screen?
A. Myself.
Q. And what area is this?

A. This is the VIP valet back side of the Staples Center.

MS. EKE: Keep playing for little bit longer.

(Video played.)

MS. EKE: I'm gonna stop it at 36 seconds, and I'm actually fast forward to 2:28.

Q. And before I do that, Mr. Middlebrook, do you engage with the people filming you at the Staples Center?

A. You mean the paparazzi?

Q. Yes.

A. Yes, I do. All the time. Because I -- I know like most of 'em because we've seen each other.

MS. EKE: And let's forward to 2 minutes and 28 seconds.

(Video played.)

BY MS. EKE:

Q. Now, Mr. Middlebrook, when we were fast forwarding, we saw you. Were you interviewed by the paparazzi?

A. Yes, I was.

MS. EKE: I'm gonna start at 2:28, and I'm gonna play.

(Video played.)

MS. EKE: Okay, I'm gonna stop at 2:40 for the record.

Q. Mr. Middlebrook, who did we just witness on this video?

A. This is Earvin Magic Johnson. He's also filmed going

into the Staples Center, too.
Q. And did you interact with Mr. Johnson inside of the Staples Center?
A. All the time. When you go to the VIP, it's a secluded, safe area, and you can just hang out and talk and wait for the game to start and all the pre-stuff.
Q. And specifically, on this date, when this was filmed, did you interact with Magic Johnson?
A. Definitely.
MS. EKE: We can take this off of the screen.
Q. Now, you mentioned talking to Magic in passing as well as at different sporting events.
A. Yes.
Q. What types of conversations without giving us specifics do you and Mr. Johnson have?
A. At the events?
Q. In general, what type of topics have you discussed?
A. Success, goal setting, strategies, um. . . uh, sports, uh, nutrition, um, minerals, uh, holistic healing. Um, he -- he -- he was telling me about when he put up the -- a -- a Black movie theater. And also, what was it? He -- there's something else, and I can't remember, I'm sorry.
Q. Okay. Did you ever talk to Mr. Johnson about Covid-19?
A. Yes, we did.
Q. Did you ever talk to him about a Covid-19 cure

prevention?
A. Yes.
Q. When was that?
A. This was in March of 2020.
Q. And how did you talk to Mr. Johnson?
A. Gerald Tolliver started two of his companies. He had Boss Auto Group, Luxury Auto Rental and Sales. That was his company. And he calls me, and he says I got Magic on the phone, and I told him about your products, and he goes -- he goes I know Middlebrook, I know Middlebrook. And so we talked on the phone, it must have been well over an hour, hour-and-a-half, like an interview and, um, about the properties, and we went into, you know, the framework of it. And he said Man, I'm in Dallas right now, I'm gonna return in two weeks, we gotta sit down.
Q. Now I wanna break that down a little bit. Who called you?
A. Gerald Tolliver.
Q. Gerald Tolliver called you, was Magic Johnson already on the phone?
A. Yes, he was.
Q. And did Magic Johnson announce himself when he got on the phone?
A. Yeah. Yes.
Q. And when you discussed your Covid-19 cure and prevention

with Mr. Johnson, what was his reaction?

A. He was enthusiastic. He was excited cause mine was more holistic mineral based on the, uh, immunity, and then Z-Pak and hydroxychloroquine which has already had clinical trials was the two main things, and I 10x'd it with some other stuff. So he was excited about it, and I said I still got FDA approval to go, but it's what's needed right now.

Q. And you mentioned that he was out of town. Did you two discuss next steps when he was coming back into town?

A. He goes I'm in Dallas, Texas right now. I gotta wrap up some business, and then I'll be back in about two weeks so stay ready, and I said I'm ready.

Q. Did you ever have that meeting with Mr. Johnson?

A. I was arrested.

Q. When was the last time you spoke with Magic Johnson?

A. Uh, a couple, two, three, days prior to the 25th when I was arrested on March 25th.

Q. Now, Mr. Middlebrook, you mentioned a lot about health and fitness and wellness in your testimony so far.

A. Yes.

Q. How did your interest in health and fitness and wellness begin?

A. I saw the movie Pumping Iron, and since I was also a comic book collector, and my first comic book was The Invincible Iron Man. And I -- and here's the physiques;

Arnold Schwarzenegger, Lou Ferrigno, Franco Columbo. Here's the physiques of the Marvel characters in real life. I said wow, so this is possible. So then I started working out myself seriously in 1977 after seeing the movie Pumping Iron. And so it's synergistic. It goes hand-in-hand with cell tissues and, you know, proteins, amino acids, everything.

Q. Now, Mr. Middlebrook, when you started working out back in the '70s, did you start following a regimented diet?

A. Absolutely.

Q. And in order to learn about body building and health and fitness, did you do any research?

A. I read everything I can get my hands on, Muscle Fitness, Muscle Builder, Power, every nutritional magazine, and I got the real Bible, the Nutritional Almanac.

Q. Mr. Middlebrook, were you ever involved in body building?

A. I still am today.

Q. And how often do you work out being involved in body building?

A. I'm -- in the gym, roughly, I'll average four to six days per week.

Q. And do you still follow a specific duty?

A. For health reasons, absolutely.

Q. And what does that diet include?

A. Um, mainly lean protein sources; chicken breast, turkey

breast, eggs, eggs' whites, whey protein, um, on rare occasion, lean, red beef. Um, the basis of my diet are lean proteins, and vegetables for minerals. And carbs are, uh, that's how you get -- you wanna get leaner? You wanna get size? You know, that's -- you regulate with carbohydrates.

Q. Do you use any dietary supplements or vitamins?

A. Absolutely.

Q. What types of supplements or vitamins do you use?

A. I do the full spectrum. People say I'm crazy. I mean, I do -- you just saw me in the break room there. I hit everything. You know, I do the multiple with 23. I do the trace minerals, you know, the B Complex, C, Vitamin E, um, Vitamin D. I do the full spectrum.

Q. Mr. Middlebrook, based on your own research and experience, did you ever share your knowledge and health and fitness with others?

A. Yes. I worked at a fitness center for 17 years, and I owned two of my own fitness centers for six years, and I was always Number 1.

Q. And what do you mean you're always Number 1?

A. I was Number 1 in sales, Number 1 in referrals, Number 1 in client base. Everyone came to me cause I work direct with you and explaining not what to do, but here's why to do it. And I would walk you through the entire program. I would analyze and break down your diet. I would suggest your

mineral base to get your health back up because, of course, in today's society of processed foods, every -- 90 percent of the people are walkin' around mineral deficient, malnutrition and dehydrated.

Q. And Mr. Middlebrook, when you give your advice to the people at the different fitness centers, would your suggestions on what exercises to do work?

A. Both. The exercises and the nutritional advice that I gave worked so well, I had a huge following. Yes, it worked. Yes.

Q. How did you know it worked?

A. Because they would bring me all their friends and say help this person here, they've gone through a divorce, they went through this or they're battling cancer or ailments or whatever, and then I would analyze and break it down and make a program specific for them for their lifestyle.

Q. Mr. Middlebrook, did your health and wellness, knowledge and experience inform your creation of your COVID-19 cure and prevention?

A. When COVID hit, I said -- because when I went to the store, I eat 12 egg whites every day with two egg yokes. So I go to the store, and they're cleaned out, no eggs, no toilet paper. I said this is crazy. Really? And so I says let me -- let me sit down and crack the code with this with my biotechnology. And, of course, I found out it's the

second cousin of the common flu.
Q. And so when you were sitting down to crack it, were you relying on the material you had read and your experience in the fitness world?
A. I'm such a detailed -- I'm 100 percent details 100 percent of the time. I don't do anything half-assed. I go into it so deep, it's OCD. So that being said, diving into all the literature, everything out there, you gotta keep in mind the source. Keep in mind the source.
And so the media had, like they do everything else, just embellished, and scare the hell out of people. At the bottom right of the screen of every news channel was the claims of the infected and the claims of the death not admitting, um, pre-existing conditions. Anyway, I dove into it scientifically.
Q. And Mr. Middlebrook, why were you interested in Covid-19? Why did you want to dive into it?
A. Because they shut down -- I'm a member of six gyms. They shut down LA Fitness, 24-Hour Fitness, Crunch Fitness, Planet Fitness --
THE COURT: Slow down.
THE WITNESS: Oh, I'm sorry. They shut down everywhere you go to build a strong immune system; the beaches, Pilates, the swimming pools, the basketball courts, the hiking trails, LA Fitness, 24-Hour Fitness, Planet

Fitness, Crunch Fitness, Gold's Gym. They shut down everything where you build a strong immune system, but yet you could walk right into Walmart, CVS and get nicotine, alcohol, synthetic drugs. It made no sense. It made no sense.

BY MS. EKE:

Q. Mr. Middlebrook, did you find something that you believed prevented a person from contracting Covid-19?

A. Well, myself plus 156,000 organic nutritionists throughout the United States of America, yes.

Q. I wanna talk about what you created. Did you have a name for your Covid-19 prevention?

A. Yes. Since it was Covid-19, and we were in 2020, I called it Quantum Cure 20 and Quantum Prevention 20; QP 20, QC 20.

Q. I wanna start with QP 20, the prevention.

A. Okay.

Q. Mr. Middlebrook, what was contained in QP 20?

A. First, let's prevent someone from catching a virus. So I picked the top 43 elemental minerals in the world for anti-virus, the top 43. And the packaging people I talked to by the way of Darius Love in Florida and also Michael Kislak of the Cowboys in Dallas, they said Keith, 43 in one pill is too many. You gotta cut it to one third because everybody like Lee Kaplan and all my friends, everybody else goes

Keith, I'll take one pill. One. I'm not gonna sit there like you take 25 or 30 three times a day. I'm not doin' it. So I structured -- I picked the top 15 of the top 43, and I said let me put that in there, and they said we can do that.

MS. EKE: Your Honor, may I be heard at side bar briefly?

THE COURT: Yes.

(The following proceedings were held at side bar.)

MS. EKE: Just briefly, Your Honor, but I think the issue is Juror No. 9 was asleep. I just wanted to see if we can wake him up. I just noticed him move right now. He looks like he's awake right now.

THE COURT: I'll try to keep an eye on him. With your voice, I don't know how he's falling asleep.

MS. EKE: I felt the same way. He looked okay.

THE COURT: A juror slept through most of the trial once and turned out to be foreperson.

(Side bar concluded.)

BY MS. EKE:

Q. When we left off, Mr. Middlebrook, you had just said that you identified 15 ingredients for your COVID prevention.

A. I narrowed it down to the top 15 from the top 43, yes, I did.

Q. And can you tell us what some of those ingredients are?

A. Sure. Garlic, ginseng, ginger, white willow bark,

Mauang, M-a-u-a-n-g, L Lysine, L Taurine, L-arginine Vitamin C, Vitamin B complex, Vitamin D, magnesium, zinc, and the king daddy of all, sea salt from the ocean which has 87 trace minerals including electrolytes that create a powerful immune system.

Q. Mr. Middlebrook, what are the benefits of these ingredients that you just listed?

A. It aids the auto-immune system meaning like if you're on auto pilot, it just keeps your immune system at full throttle, 100 percent potential versus today's processed foods depleted, you know, Del Taco, white bread, sugars and all that, it's depleted in minerals. And your body has a -- it has a priority list, and the first thing to go is gonna be the immune system. Because the heart, the liver, the lungs, the mind, the brain, the nervous system holds priority so the first thing that's gonna go with today's processed foods is the immune system.

Q. And why is it important to have a healthy immune system in relation to Covid-19?

A. So you don't -- we'll start with a short list. So it's anti-viral, anti-cancer. It helps you slow the aging process. It's for the health. It's for the full function of your body. It's for the full function of your mind. This way, you don't have things like depression, strokes, anxiety, et cetera.

Q. And do you believe that strengthening one's immune system is a way to prevent someone from getting COVID-19?
A. Me and 1,226,000 homeopathic organic nutritionists around the world.
Q. Mr. Middlebrook, did you ever take your ingredients in QP 20 or the COVID-19 prevention?
A. I still do today. Yes, I do.
Q. And have you ever caught Covid-19?
A. I have never caught COVID. I'm at restaurants, airports, Super Bowls, dinners. I have never caught COVID.
Q. And why do you think you never caught COVID?
A. Because my immune system according to my four doctors is so infallible because of the minerals that I take three to four times a day including the amino acid structures for my salt tissue walls. And so that's why.
Q. And do you believe that the ingredients you mentioned, the ingredients in your QP 20, is the reason why you never caught Covid-19?
A. Absolutely. That's why I rarely ever get sick.
Q. Now, Mr. Middlebrook, did you ever create something that you believed cured people once they contracted COVID-19?
A. After deep, thorough, scientific research, yes, I did.
Q. And is this QC 20 that you mentioned earlier?
A. Yes, it is.
Q. Now, can you tell us some of the ingredients in QC 20?

A. There was something that was approved with clinical trials called Z-Pak from Zinc Pantothenic. That was one ingredient. The other was hydroxychloroquine which also had clinical trials, FDA approval. It's been around for a while. Now, I took those, and I 10x'd it with nandrolone decanoate which is a tissue builder, nandrolone decanoate, deca durabolin, Primobolan, testosterone cypionate, and also sodium hydrochloride which will kill anything except for the human host.

Q. Mr. Middlebrook, you said you 10x'd it. What does that mean?

A. Means I took the Z-Pak and the hydroxychloroquine and amplified it.

Q. Now, you mentioned a lot of ingredients with long names. Are these ingredients you identified based on your research and your experience in the health field?

A. Yes, plus they're all -- they're individually already FDA approved.

Q. Now, Mr. Middlebrook, if you never caught Covid-19, how did you know that QC 20 or your COVID cure worked?

A. A friend of mine who played in the Oakland Raiders' Super Bowl, Jim Weatherly, says Keith, I'm in the hospital, I've caught COVID.

Q. And did you provide the list of ingredients to Jim Weatherly?

A. I said here's the list of ingredients. Get this with prescription, take it and then call me.
Q. And did he? Did he call you?
A. Yes, he did.
Q. And did he tell you if he took it?
A. He said oh, my God. I just tested negative for COVID. Keith, you've gotta take this to market.
Q. And did you believe Jim Weatherly when he said that your COVID cure worked?
A. I met with him the next day, and I have a 6-foot 300-pound man grab me by the shoulders and say Keith, you don't understand, you must take this to market now. I said I'm trying. Give me a minute.
Q. Mr. Middlebrook, was Jim Weatherly's phone number in your phone in 2020?
A. Uh, for 15 years, yes. There's also two other phones that had the original numbers. I reloaded that phone because they had to sync it together in 2017.
MS. EKE: If you can just give me one moment.
Q. Mr. Middlebrook, I want to talk about your social media presence. We saw some video that was posted on your Instagram account?
A. Yes.
Q. Did you ever try to solicit investors off of social media?

A. No.
Q. Did you ever post a video to social media saying that you were looking for investors?
A. No.
Q. Did you ever accept any money from somebody off of social media?
A. Because of my six attorneys and my advisors, they said Keith, listen to me carefully, this is SEC regulations, and I'm not f'ing around. Listen closely. Yes. Do not take $1.00 from anyone. There's a process, and we've gotta go through the process, and you gotta protect yourself and protect Keith Middlebrook Enterprises. You've got to protect yourself. We gotta do this right.
Q. And did you follow --
A. So I --
Q. Oh, I'm sorry.
A. I declined everyone trying to buy my product, and I said I'm -- she goes my kids have COVID, they're gonna die, and it's your fault. I said, ma'am, I'm goin' as fast I can. You gotta -- but there's a process. There's a process. I've got to follow my attorneys on their lead. This has to be done right. I had threats. I had everything and everyone tryin' -- I did not take one penny. I declined it, turned it down.
Q. Well, Mr. Middlebrook, I want to talk about the one

sheet that we saw in trial. Do you remember seeing the one sheet?

A. Yes, I wrote it.

MS. EKE: I'm gonna put it up on the screen. I believe it's Government Exhibit 41? Or 42. It's Government Exhibit 41.

Q. Mr. Middlebrook, you said that you wrote the one sheet. Is that what we're looking at on this page?

A. Yes, it is.

Q. I'm sorry, if you could just talk into the microphone.

A. Yes, it is. Yes, it is.

Q. Now, did you consult with anybody before putting together this one sheet?

A. My -- my friend Dustin Johnston has done shares of stocks in companies with shares in stocks, Larry Stockett, Dr. Allen Mandelberg. Uh, I went to people who seasoned experience in launching this product. This is my first investment share stock product so all my other companies I've launched with my own resources. This had to be launched correctly.

Q. Now, is -- this one sheet that we see, is intended to be a final draft?

A. No. This is a -- the one sheet is intended to be a rough sketch bullet point, yeah, just a rough sketch bullet point that you put together that's tentative. There's

nothing definitive -- I mean nothing absolute.
Q. I wanna go through this one sheet. I want to start with the use of proceeds section.
A. Okay.
Q. Mr. Middlebrook, what's the purpose of this use of proceeds section?
A. The proceeds offering tells the -- the patent pending prevention immunity bills prior to activate sports team and sells --
THE COURT REPORTER: Wait, wait, wait.
THE COURT: You're talking --
THE WITNESS: Oh, I'm sorry. I'm sorry.
THE COURT: -- too fast. And are you --
THE WITNESS: Use of proceeds --
MS. EKE: Just a minute, Mr. Middlebrook.
THE COURT: Don't read. She asked you a question.
BY MS. EKE:
Q. I just want a general idea. What's the purpose of that use of proceeds section?
A. It is an explanation of the proceeds of the money and how it's directed in specific areas.
Q. And on the first line, it mentions Quantum Prevention CV, Inc.? Do you see that?
A. Yes, I do.
Q. Is that the company for your COVID-19 cure and

prevention?

A. Yes, it is.

Q. Now, I wanna direct your attention to the business section. What's the purpose of a business section? So don't read it to us, just tell us generally what the purpose is.

A. It's giving the business structure of the product, of allocations of funds. And, again, it's a tentative structure of the business allocation.

Q. Now, I want to highlight the fifth paragraph under the business section that starts with the company plans. And first, Mr. Middlebrook, can you read this statement to us?

A. The company plans and will develop and market proprietary patent-pending product in mass quantities to meet current and ongrowing -- ongoing, growing demand.

Q. Now, in this sentence, it mentions patent pending. What is your definition of patent pending?

A. Meaning I -- I'm known as the Real Ironman because I invent things and da, da, da, da, and I try to get the Real Ironman patent. So I hired a company, gave him $200,600, and they did not deliver what they said. So pending means I need to research this time and get it done right and find a law firm that will do what they say they're gonna do and understand the magnitude and just get this thing done correctly. So I was in search of finding a company for patents or a law firm for patents.

Q. And did you ever tell anybody that you had already applied for a patent?
A. No.
Q. Did you tell anybody you had already secured a patent?
A. No.
Q. Your definition that you just gave us in court, is that what you meant by patent pending when you put it in your one sheet?
A. Means it's pending. I'm in search of it. It's -- it's mandatory, and I'm gonna have it, but I don't have it right now. It's pending, coming.
MR. EKE: We can take that down and put that up.
Q. I want to then go to the management section on the second page. Do you see that management section at the bottom?
A. I have to lean forward. Just. . .
Q. We can blow it up for you. Do you see the management section now?
A. Yes, I do.
Q. And what is the purpose of this section?
A. These are tentative, potential management people in the company.
Q. First, did you discuss your COVID-19 cure and prevention with the individuals listed in this section?
A. Individually, yes.

Q. I want to start with Dr. D. Patterson. Who is Dr. Patterson?
A. He is an experienced doctor of three hospitals, rehabilitation, physical wellness, uh, nutrition for over 30 years. And he runs three hospitals.
Q. And why did you consult with him with COVID-19 cure prevention?
A. Just a great friend. We have incredible conversations about everything, especially anything concerning medical science, things are coming new, um, just again everything with nutrition medicine. He's very schooled, and he -- he's awesome.
Q. And did you have discussions with him about the COVID-19 cure and prevention before putting together this one sheet?
A. Briefly.
Q. And did he agree to be a part of this COVID-19 cure and prevention company?
A. Because if he can launch it, you've got to understand the amount of money this is gonna take.
Q. And did you discuss the company with him?
A. Yes.
Q. And was he interested in the company?
A. Absolutely.
Q. I want to then move to Dustin T. Johnston. Who is Mr. Johnston?

A. A friend of mine for 20 plus years who's done stock shares and dividends and real estate stuff and so on. I called him to get the template, because this is my first investment company, the template for a mandatory piece called the one sheet and also for the critical mandatory PPM which means Private Placement Memorandum.
Q. And we'll talk about the PPM in a minute, but when you say the template for a one sheet, are you talking about a template for the document that we're looking at right now?
A. He sent me over the one sheet for a different company, and so I build my one sheet from that example, but my covers more areas. It more thorough.
Q. And did Mr. Johnston agree to be a part of your COVID-19 cure and prevention company?
A. Absolutely.
Q. And did you consult with him prior to putting his name down on this one sheet?
A. Yes. He wanted -- he had to be a part of it.
Q. And next we have Roderick Bowling. Who is Mr. Bowling?
A. Um, I thought he was a friend. Um, he was an associate. We've done business many times together. And I called him because he has a huge rolodex in this. He really does. And he said he wants to be key management in this company cause he knows some huge people for -- for launch.
Q. When you say he has a huge rolodex, what do you mean by

that?

A. Means he -- he -- he's in Florida. Um, he has some of the biggest contacts that have been some of my -- my biggest players in his phone so he -- he's -- he knows a lot of people.

Q. And what was his role supposed to be in the COVID-19 cure and prevention company?

A. He was bringing investors.

Q. And did he agree to be a part of the company when you spoke with him?

A. Absolutely.

Q. Then next we have Earvin Magic Johnson who we've talked about, but under his position, it says TBD. What does that mean?

A. Means at this present time, he expressed -- even put his face on the bottle. He expressed in some way, shape or form part of this project, but there's nothing definitive so it says TBD, To Be Determined. Nothing -- nothing's in stone yet.

MR. EKE: And then I wanna zoom out of that.

And if we go to the next page?

THE COURT: Unless you have two minutes.

Otherwise, we'll break.

MS. EKE: I have more than two minutes, Your Honor.

THE COURT: On this document?

MS. EKE: Actually, I -- I might be able to get this document done in two minutes.
Q. Mr. Middlebrook, I wanna talk about the security ownership section. Do you see that at the top? We're gonna zoom in for you.
A. Yes.
Q. Can you tell us briefly without reading it out loud what purpose of this section is?
A. It means the security of ownership are the main players and the owners of the company, um, a tentative breakdown.
Q. And then underneath that, there is beneficial owners and management. What is the purpose of this section?
A. The owners and management of the companies, how funds are dispersed, how the power of, you know, who's the director, who's the manager, who's the key player, you know, what's the breakdown.
Q. On the first line of this, we see at the very end of the first line par value TBD. What is par value?
A. Par value is a -- like a evaluation of standard basic par value of stock, shares and dividends.
Q. And why does it say TBD?
A. To Be Determined. We don't know yet.
Q. On the last line, we see the shareholders TBD? Do you see that?
A. Yes.

Q. Why does it say TBD down there as well?
A. Again, nothing's in stone. Nothing's exact at this point. It's the first step of ten steps in an SEC regulated investment company.
Q. And would the information contained in this document be finalized at some point in time?
A. Yes, it would be.
Q. Now, Mr. Middlebrook, when we're talking about security ownership and things contained in this one sheet, did you consult with anybody in regards to that?
A. Yes, Larry Stockett, uh, who's been the launched Fortune 500 companies, Johnson & Johnson, Pfizer, Ford, Toyota. He does major stock evaluations in NASDAQ and SEP 500 for over 40 years. He's the most educated mind I've ever talked to.
Q. Is this the same Larry that you mentioned on the recorded calls that we had played throughout this trial?
A. That's him, Larry Stockett, yes ma'am.
Q. And did you consult with Mr. Stockett about your COVID-19 pure and prevention?
A. Absolutely.
Q. And did you consult with him about your company?
A. Absolutely.
Q. And the information you were giving about stock and valuation, was that based on your conversation with Larry Stockett?

A. Absolutely. And so it -- as it turns out, Big Pharma made over $20,000,000,000.

THE COURT: Mr. Middlebrook, you answered the question.

Ask a --

THE WITNESS: And then he --

THE COURT: Don't talk.

BY MS. EKE:

Q. I just want to clarify. Did you speak with Mr. Stockett about your COVID-19 cure and prevention?

A. Yes.

MS. EKE: Your Honor, I am done with this document for right now.

THE COURT: Ladies and gentlemen, we're moving along quickly so the case will be to you either tomorrow or certainly by Friday. You should consider whether you want to keep the, uh, 8 o'clock to 2:30 schedule or whether you want to take a break, uh, for lunch and, uh, stay later.

Certainly once you start deliberating, you won't need me for much of anything so you can continue deliberating for long as it takes you. So just keep that in mind, and we'll check with you tomorrow and see what your thoughts are, but obviously, you would all have to agree on the time because you all have to -- you all have to be here.

In the meantime, don't talk about the case or form

or express any opinions about the case until it's finally submitted to you. We'll see you tomorrow morning, ordered to return no later than 8:00 a.m., and you're ordered to have a good evening.

THE CLERK: All rise.

(Jury not present.)

THE COURT: So we'll finish up Mr. Middlebrook tomorrow. Do you have a time estimate?

MS. EKE: Yes, Your Honor.

It should be no more than 20 more minutes.

THE COURT: Does the government have any thoughts on time for cross?

MR. GUZMAN: I -- not at this time.

THE COURT: Okay. Uh, then we'll have Dr. Phillips?

MS. EKE: That is correct, Your Honor.

THE COURT: And I'll remind you about my admonition in case he plans to say anything relying on the testimony that's hearing.

Anyone other than Dr. Phillips?

MS. EKE: Your Honor, we have one more witness on our witness list that we may call. That is Giovani Paredes. We will let the Court know in the morning if we intend to call him.

THE COURT: All right. So I don't know whether

you've had anything at all to eat. So we can take a break for you to eat. And then we need to discuss the jury instructions. Since we're getting really close, I need to get them as close as possible. So do you want to take a half hour or so and then come back?

MR. EKE: Yes, Your Honor.

THE COURT: Are you -- are you good, Laura?

THE COURT REPORTER: Could we have 45 minutes, Judge?

THE COURT: 45 minutes. We'll see you in 45 minutes.

THE CLERK: This court's in recess.

(Recess taken.)

THE COURT: All right. I want to get as many of these done as possible. And I put a series of question marks on any page where I thought we needed to have a discussion just because that's the way I would search the document to see what things needed to be looked at. So for the most part, the standard 9th Circuit jury instructions in my view did not need to be tinkered with.

The first instruction that we need to look at is Instruction No. 4 on page 4. Maybe we can't finalize it yet, but Item 3 says any facts to which the parties have agreed. Have you agreed to anything yet?

MS. EKE: No, Your Honor.

THE COURT: Any chance you will agree to something?

MR. GUZMAN: Your Honor, with respect to the request for judicial notice on a couple items, I think the defense mentioned that stay at home order in their opening as did we. So at this point, I would just ask the Court to take judicial notice of the California governor's stay at home order as well as the executive order -- the executive proclamation by the president. Those are the two documents in the trial exhibits.

MS. EKE: We have no objection to the Court taking judicial notice of that fact.

THE COURT: I will keep that line in, and then we'll need an instruction for me to tell them exactly what I'm taking judicial notice of.

MS. EKE: Your Honor, similarly we can file something today, but we would also be requesting judicial notice for the statements made by the AUSA at the bail hearing. We did find that a Court can take judicial notice of things that are said in court appearances. We can provide that to Your Honor this evening.

THE COURT: All right. And judicial notice as I recall is something that they may find to be true, but are not required to be true as opposed to stipulations.

MR. GUZMAN: I think that's correct, Your Honor. In criminal cases there is an additional instruction that

probably is appropriate when you take judicial notice and it's along the lines of what you just said.

THE COURT: All right. Then page 5 I bolded some language there. I don't recall whether I instructed them -- I don't think I instructed them to consider any evidence in a limited way.

MS. EKE: That is correct, Your Honor. I don't believe the court did.

MR. GUZMAN: Same.

THE COURT: I'll take that out. I obviously took out the language about defendant not testifying.

How about page 10, Instruction No. 9? You are here only to determine whether the defendant is guilty or not guilty of the charges in the indictment. The defendant is not on trial for any conduct or offense not charged in the indictment.

MS. EKE: The defense would requesting this instruction, Your Honor.

THE COURT: Look at it before we finalize it.

Look at page 15. I stopped numbering because after the first group, I wasn't sure what we'd be taking out. Do you want both 10 and 15?

MS. EKE: Your Honor, I think page 10 makes more sense. I don't think we necessarily heard about wrongs or acts not charged. I do think that -- actually, if I can have

a moment.

THE COURT: Sure. It says acts. Doesn't necessarily have to be crimes.

MS. EKE: Your Honor, the defense is not requesting page 15. We're satisfied with page 10.

MR. GUZMAN: Your Honor, this instruction seems okay for now. We'll take a look at it and do some more research. I just -- I think I need to see it in the context of all the instructions.

THE COURT: 15 you mean?

MR. GUZMAN: Page 10.

THE COURT: Oh, 10.

MR. GUZMAN: I'm just not sure -- I don't think that if defense is not gonna request 15, I don't think the government would request it. I need to look a little bit more at page 10.

THE COURT: I think you have to consider it in connection with all of the other stuff that has come in and how we're now going to make sure that the indictment doesn't get expanded inappropriately and there's several ways to do that. One would be to use something along the lines of what the defense had proposed just to tell them what those items are that are part of the scheme and the other is just to handle it with closing.

MR. GUZMAN: I understand that. I'd like to look

at the context of all of the instructions to make that determination on ten. On its face to me, ten seems like it is conflicting a bit with the case law that does allow some of the uncharged fraudulent conduct to support an overall scheme. If that's clarified later on, then I think this would be fine.

THE COURT: No, you're right. Obviously I wouldn't have let it in if it wasn't relevant to the overall scheme and to provide context. We'll leave 10 and 15 in abeyance and we need to have those in mind by tomorrow morning.

On page 12 because they don't have the indictment, I added a date range there.

MR. GUZMAN: No objection from the government.

MS. EKE: No objection, Your Honor.

THE COURT: All right. Got a blank page somehow. Whoever does these, I understand you don't have secretaries any more, but if you put a page break in there instead of just spaces, then we end up with fewer empty pages.

So the transcript of the recording, I just moved that later. How about 16?

MS. EKE: Your Honor, we would be requesting 16. I would propose that maybe the parties can discuss. If we can agree on language to provide to fill in the blanks for 16 or if we can provide language to the Court to fill in the blanks of 16.

THE COURT: Well, I'm gonna make whatever changes we've agreed on and then email them to you. And I will expect that you will be working on them so we're much closer tomorrow. Sounds like I will be giving the instructions tomorrow.

MS. EKE: So the defense would be asking for 16.

THE COURT: I'm not sure contradictory testimony, though. This is not generally what this is for, but I'll let you see if you can agree.

Page 17, this is the one that you agreed would have to wait.

MS. EKE: Yes, Your Honor. The defense doesn't believe this one is necessary. We didn't imply that anything was nefarious about the use of an undercover agent. And the cases in which this instruction was given, the defense made an argument that the government was somehow sneaky or conniving based on the use of an undercover agent.

THE COURT: I did set the issue and told the jury that it was all right and nobody on the jury found it troubling.

MR. GUZMAN: Your Honor, I think this is appropriate. There was questioning of Mr. Sterle about what his purpose was, um, and there obviously are little bits and pieces of allegations about agents, the last agent in particular for example so I think it's appropriate.

THE COURT: This is specific to the undercover agent.

MR. GUZMAN: I understand, Your Honor, and I think that this -- the testimony in this case merits this instruction. It's just a reminder to the jury what they said in the beginning and it should be offered, I believe.

THE COURT: All right. I'll consider that.

Next one is the expert instruction so I've inserted the names. Page 19 should I say charts and summaries or just a chart? You want it the way it is? It's the next one, actually. It's page 20. The charts and summaries, whatever it is.

MR. GUZMAN: Right. I think 19, I don't believe there were any demonstrative exhibits at this point.

THE COURT: No.

MR. GUZMAN: And so I think 19 is not necessary whereas 20 is appropriate given the 1006 summary that went in.

THE COURT: So should I take out charts and just leave summaries?

MR. GUZMAN: I think that's appropriate.

MS. EKE: Your Honor, just to be clear, are we still talking about Instruction 19? I think the government --

THE COURT: The instruction at page 20. There

weren't any demonstratives so far. Do you plan to use a demonstrative, if anybody plans on using?

MR. GUZMAN: In closing?

MS. EKE: It's possible, Your Honor, actually.

THE COURT: Okay. So leave that in. What I'm going to do is put them on the same page. That way my numbering won't get messed up.

And then 21 and 22 is my current draft of Counts 1 through 11 so you can look at that.

Page 23 is a draft of a venue instruction that I had drafted to use for a different case, but I didn't have to use because I dismissed it instead. But I think this is, it's just a first draft because the indictment says at Paragraph 2 in Los Angeles and Orange Counties within the Central District of California and elsewhere, Defendant Middlebrook knowingly and with intent to defraud, et cetera.

MR. GUZMAN: Your Honor, the government agrees with this instruction.

THE COURT: Should I take out the other counties?

MR. GUZMAN: I don't believe so, Your Honor. The venue is just about the district.

THE COURT: Yeah, but the indictment limits it, well, it says and elsewhere.

MR. GUZMAN: I think the and elsewhere would include other portions of the district.

MR. BARRIENTOS: And, Your Honor, from the defense perspective, I think we would want some time to research the issue and we can confer with the government about what we might propose.

THE COURT: You have this evening.

MR. BARRIENTOS: Thank you.

THE COURT: Was there any other reference to location? I'll let you take a look at that and make sure you think that that works. So, for example, in 11 is via a server located outside of California sufficient?

MR. GUZMAN: Your Honor, are you on the indictment?

THE COURT: Yes.

MR. GUZMAN: That's regarding the interstate nexus not venue.

THE COURT: So Paragraph 2 is the only thing that has the venue reference if that's your thought.

MR. GUZMAN: Your Honor, I think Paragraph 1 talks about him living in the Central District of California in Huntington Beach. It does not specify the county. And then the wires themselves talk about him being in Los Angeles, California so. . .

THE COURT: All right. Well, if anybody has a different thought, as I said you need to email it to the chambers email. I won't get it otherwise. I believe I said, maybe I didn't, I don't believe unanimity is required as to

particular false statements so unless the government wants me to add unanimity language.

MR. GUZMAN: No, Your Honor.

THE COURT: All right. Anything else we can discuss or agree on that will get this closer?

MS. EKE: Your Honor, I would just say the instruction on page 24, it seems as if the Court incorporated that information in its instruction for wire fraud. Looks like that is contained, um, I want to say on the second page.

THE COURT: I think that's why it has those question marks to remind me to make sure.

MS. EKE: And the defense did propose some language regarding materiality. And I know the government agreed to some of the language from the recent Supreme Court decision in their trial brief.

THE COURT: The recent Supreme Court decision?

MR. GUZMAN: There was a decision that came out called United States versus Milheiser.

MS. EKE: I'm just turning to their trial brief. We proposed language from that case in our materiality instruction.

THE COURT: Page 21. I added, "and they directly or indirectly were assigned to deceive the person about the nature of the bargain at issue."

MR. GUZMAN: I think that was the proposal we made

in the trial brief.

THE COURT: Right.

MR. GUZMAN: Because Milheiser is about a different context, we do not agree with the defense's proposed instruction in the jury instructions.

THE COURT: Nor do I. So I added your language.

MS. EKE: Your Honor, I'm sorry, I must have missed the part.

THE COURT: On line 16 of page 21.

MS. EKE: Your Honor, the only thing I would ask is that we make note of the reasonable person standard. I don't think it's -- the objective standard rather. It's whether or not a reasonable person would have been influenced or affected by the misrepresentation.

MR. GUZMAN: Your Honor, I don't see a reason why we would divert from the model 9th Circuit jury instruction on that.

THE COURT: I will note that the 9th Circuit has occasionally reversed even when it had an instruction so it's not a sure thing. And as you noted, the Supreme Court came out with a decision that may or may not impact this, but I added the language that you suggested. I thought there was materiality in here somewhere. Are we saying we don't need 24 at all?

MR. GUZMAN: Your Honor, the government proposed

24. It's in line with a case that specifically the 9th Circuit approved of this specific instruction. I believe it's verbatim.

THE COURT: Well, the question is whether it's duplicative.

MR. GUZMAN: The government does not think it's duplicative. It goes towards --

THE COURT: Stop talking while I look. I can't remember if we stuck it somewhere else.

MS. EKE: Your Honor, page 22, the lines 1 through 4.

THE COURT: Right.

MR. GUZMAN: Those are different issues in our view, Your Honor. There is an issue as to what is material. That's an objective standard. I think lines 1 through 4 on page 22 address that. The proposed jury instruction on 24 goes to whether or not the government is obligated to prove actual loss in order to sustain a wire fraud conviction. That was the intent behind including that and we believe it is still appropriate at this time.

THE COURT: All right. I'll take a look at that. That must by why I had my question marks on there.

MS. EKE: Your Honor, if I may?

THE COURT: Yes.

MS. EKE: There was no testimony elicited about any

loss amount or anything of that nature. And because the government didn't elicit anything of that nature neither did defense. So we don't think that this statement is relevant based on the evidence that has been presented.

THE COURT: Well, there has been no evidence that anyone lost any money. So without us telling them that that doesn't mean he's not guilty, they may or may not know that. I will take a look at it.

I'm still looking for materiality. How in the world did you do your joint jury instructions? I may be losing it, but the index doesn't bear any resemblance to the actual pages things are on.

MR. GUZMAN: Your Honor, if you're looking for the materiality proposal in ours, it's on page 51 of the actual document and then the defense's is right after that.

THE COURT: So there's no 9th Circuit instruction?

MR. GUZMAN: The 9th Circuit model instruction under the second element talks about materiality and states that is they had a natural tendency to influence or were capable of influencing a person to part with money or property.

Our view initially was we needed to explain a few more pieces of materiality. I think defense agreed and we just dispute as to how much more we need to explain. And I think what's on page 22, lines 1 through 4 is sufficient in

our view as well the addition that reflects the Milheiser issue that you put.

MS. EKE: Your Honor, we would ask for additional explanation. As I mention in our proposal, we talked about the context in which the statements -- that materiality must be assessed in the context in which the statements occurred and it further explained what the objective standard means. That it's a reasonable person would have been influenced by the misrepresentation. The other part of it has already been incorporated into the Court's other instruction.

THE COURT: All right. Well, I'll look at that, but it may stay the way it is. Anything else you want to address?

MR. GUZMAN: The patent pending instruction is out?

THE COURT: Yeah. That was deliberate; right?

MR. GUZMAN: I just want to make sure. We proposed it and it sounds like Your Honor decided not to --

THE COURT: Oh, yeah, that was explaining what the patent pending meant. Yeah, I don't think that's relevant any more than whether there was FDA approval or what that process was.

All right. So you have tasks to do to talk about several of these instructions like the impeachment one. I will as I said, make the changes that have been agreed to and email this to you. And, again, any comments, changes,

anything you can agree to should be sent to the chambers email.

MS. EKE: Yes, Your Honor.

Just a question logistically, does the Court instruct before or after closing argument?

THE COURT: Before.

MS. EKE: Thank you, Your Honor.

THE COURT: All right. Try to have a good evening.

MS. EKE: Thank you, Your Honor. You, too.

(Proceedings were concluded at 3:54 p.m.)

CERTIFICATE OF REPORTER

COUNTY OF LOS ANGELES )
) SS.
STATE OF CALIFORNIA )

I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES.

DATE: JULY 8, 2024

/s/ LAURA MILLER ELIAS

LAURA MILLER ELIAS, CSR 10019

FEDERAL OFFICIAL COURT REPORTER