E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
KENNETH R. CARBAJAL (Cal. Bar No. 338079)
JOSEPH S. GUZMAN (Cal. Bar No. 310493)
Assistant United States Attorneys
General Crimes Section
1200 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-3172/2438
Facsimile: (213) 894-0141
E-mail: Kenneth.Carbajal@usdoj.gov
Joseph.Guzman2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KEITH LAWRENCE MIDDLEBROOK,<br><br>Defendant. | No. 2:20-cr-00229-DSF<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29<br><br>Hearing Date: October 21, 2024<br>Hearing Time: 10:00 a.m.<br>Courtroom: Courtroom of the Hon. Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kenneth R. Carbajal and Joseph S. Guzman, hereby files its opposition to defendant's motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure (Dkt. 285.)

//

//

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 23, 2024

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

/s/
KENNETH R. CARBAJAL
JOSEPH S. GUZMAN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION PAGE

TABLE OF AUTHORITIES....................ii

MEMORANDUM OF POINTS AND AUTHORITIES....................1

I. INTRODUCTION....................1

II. RELEVANT BACKGROUND....................1

A. Procedural History....................1

B. Summary of Relevant Trial Evidence....................1

III. LEGAL STANDARD....................7

IV. ARGUMENT....................8

A. A Rational Jury Could Find, and Did Find, that Defendant Committed Wire Fraud....................8

1. Defendant Knowingly Participated In a Scheme or Plan to Defraud....................10

2. Defendant's Fraudulent Representations Were Material Because They Had A Natural Tendency To Induce Anyone To Part With Money....................16

V. CONCLUSION....................22

# TABLE OF AUTHORITIES

DESCRIPTION PAGE

Cases

AEG Holdco LLC v. Vazquez, No. 221CV05290VAPAGRX, 2021 WL 4859975, at *16 n. 11 (C.D. Cal. Sept. 22, 2021) .......... 11
Anderson v. United States, 369 F.2d 11 (8th Cir. 1966) .......... 9
Burnham v. City of Rohnert Park, No. C 92-1439 SC, 1992 WL 672965 n.2 (N.D. Cal. May 18, 1992) .......... 11
Jackson v. Virginia, 443 U.S. 307 (1979) .......... 7, 8, 22
Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990) .......... 11
Mays v. Wal-Mart Stores, Inc., No. CV 18-02318-AB (KKX), 2018 WL 5024919 (C.D. Cal. Aug. 22, 2018) .......... 11
Neder v. United States, 527 U.S. 1 (1999) .......... 16, 17
United States v. Alvarez-Valenzuela, 231 F.3d 1198 (9th Cir. 2000) .......... 8
United States v. Amrep Corp., 560 F.2d 539 (2d Cir. 1977) .......... 9
United States v. Besmajian, 910 F.2d 1153 (3d Cir. 1990) .......... 13
United States v. Carpenter, 95 F.3d 773 (9th Cir. 1996) .......... 17
United States v. Chang, 2020 WL 5702131 (N.D. Cal. Sept. 24, 2020) .......... 19
United States v. Del Toro-Barboza, 673 F.3d 1136 (9th Cir. 2012) .......... 8
United States v. Gomez-Osorio, 957 F.2d 636 (9th Cir. 1992) .......... 13
United States v. Halbert, 640 F.2d 1000 (9th Cir. 1981) .......... 9, 10, 11
United States v. Jordan, 626 F.2d 928 (D.C. Cir. 1980) .......... 9
United States v. Lindsey, 850 F.3d 1009 (9th Cir. 2017) .......... 16, 17, 19
United States v. Loftis, 2018 WL 3193196 (D. Mont. June 27, 2018) .......... 19
United States v. Lucas, 963 F.2d 243 (9th Cir. 1992) .......... 7
United States v. Milovanovic, 678 F.3d 713 (9th Cir. 2012) .......... 16
United States v. Nevils, 598 F.3d 1158 (9th Cir. 2010) .......... 7, 8

**TABLE OF AUTHORITIES (CONTINUED)**


DESCRIPTION PAGE

United States v. Peterson,
538 F.3d 1064 (9th Cir. 2008) .................................17, 19

United States v. Richter,
782 F.3d 498 (9th Cir. 2015) ..................................7, 11

United States v. Rocha,
598 F.3d 1144 (9th Cir. 2010) ..................................... 7

United States v. Rojas,
554 F.2d 938 (9th Cir. 1977) ....................................... 8

United States v. Stull,
743 F.2d 439 ............................................................... 9

United States v. Turner,
400 F.3d 491 (7th Cir. 2005) ...................................... 13

Statutes

18 U.S.C. § 1343.............................................................. 1

Rules

Federal Rules of Criminal Procedure Rule 29......................... 1

Other Authorities

Ninth Circuit Model Jury Instruction No. 15.35...................... 16

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

After three days of trial, the jury found defendant KEITH LAWRENCE MIDDLEBROOK ("defendant") guilty of eleven counts of wire fraud. In his motion, defendant ignores the abundant evidence supporting each of the jury's guilty verdicts and instead asks this Court to set aside the jury's verdicts and direct entry of a judgement of acquittal as to all counts of conviction. Rule 29 asks whether, after viewing the evidence in the light most favorable to the prosecution, any rational factfinder could have found the essential elements of the crimes beyond a reasonable doubt. Because that standard was easily met as to each count of conviction, defendant's motion should be denied.

## II. RELEVANT BACKGROUND

### A. Procedural History

The indictment charged defendant with eleven counts of wire fraud, in violation of 18 U.S.C. § 1343. (Dkt. 40.) On May 7, 2024, defendant proceeded to trial. (Dkt. 260.) After deliberating for less than one day, the jury returned a verdict of guilty on all counts on May 10, 2024. (Dkt. 263.)

### B. Summary of Relevant Trial Evidence

In its case-in-chief, the government called seven witnesses and introduced 61 exhibits into evidence, including text messages, recorded calls, videos, and business records. As set forth below, that evidence established beyond a reasonable doubt that at the onset of the COVID-19 global pandemic, defendant falsely claimed that he had developed the cure and treatment for COVID-19. Defendant filmed videos of himself holding the fake cure and treatment, posted those

videos to his millions of social media followers, and sent those videos to potential investors. The evidence further established that defendant built an elaborate investment fraud scheme around his fake cure and treatment. Defendant created fake companies, lied about high profile individuals endorsing his product, lied about having a patent pending for his cure and treatment, and lied about how investments in his non-existent companies were risk free and 100% guaranteed. Defendant pitched his investments through text messages, phone calls, and emails, including by sending a detailed prospectus to prospective investors. He sent his bank account information to those prospective investors, and he peppered them with requests to send him hundreds of thousands of dollars. In short, the evidence at trial showed defendant made false representations that were designed to cause prospective investors to part with their money.

First, the evidence at trial demonstrated that defendant's representations that QC 20 and QP 20 were a cure and a treatment for COVID were both false and designed to induce prospective investors to part with money. At trial, the evidence showed that the defendant knowingly falsely claimed that QC 20 was a cure for COVID-19 and that QP 20 was a treatment that would prevent the person taking it from contracting COVID-19. Defendant repeated this lie to prospective investors via phone calls, text messages, and email. (Trial Ex. 4 (Video attached to text message to A.F. on 3/16/20), 41 (March 19, 2020 email sent by defendant with subject matter "1 Sheet for company QP20 and QC20."), 42 (March 24, 2020 email sent by defendant with subject matter "I have created the COVID19 Prevent Pill and the Cure for the coronavirus YOUR Commission is 40 percent."), 134-137 (Text Messages to E.S., R.M., W.J., and A.F.); Def. Ex. A, May 7, 2024,

Trial Tr. at 121:15-23; Def. Ex. C, May 9, 2024, Trial Tr. at 27:15-34:3.) At trial, defendant admitted he sent these communications to obtain money from prospective investors. (Def. Ex. C, May 9, 2024, Trial Tr. at 41:17-19 ("Q. In fact you used this non-finalized document [the one-sheet marked as Trial Exhibit 41] to raise money, didn't you? A. Yes."); Id. at 24:19-25:2 (defendant admits his messages were "made in order to entice people to get excited about investing in [his] product" and "designed to create excitement in [his] product.").) And he admitted that an "effective and real" cure for COVID "had the potential to make billions of dollars." (Id. at 28:11-14.)

Second, the evidence at trial demonstrated that defendant knowingly falsely claimed that QC 20 and QP 20 were "patent pending" and did so to try to obtain money. Former Federal Bureau of Investigation ("FBI") Special Agent ("SA") Sean Sterle testified that, while acting as a prospective investor in an undercover operation, he had a phone call with defendant in which defendant falsely claimed to have a patent pending for his fake cure. (Def. Ex. B, May 8, 2024, Trial Tr. at 10:12-17; Trial Ex. 116 (Recording of call between defendant and Agent Sterle in which defendant claims to have a patent-pending for his product.) Defendant also claimed via email to have a patent pending product when he emailed a one-sheet to both SA Sterle and prospective investor W.J. (Trial Ex. 42.) In that one-sheet, defendant referenced a patent-pending product five times. (Trial Exs. 41 and 42.) SA Mila McKnight testified regarding her review of a United States Patent and Trademark Office ("USPTO") certified document which indicated that there were no patent applications assigned to defendant or from

Quantum Prevention CV, Inc., Quantum Cure CV 2020, Inc. and Quantum Immunity CV 2020, LLC. (Def. Ex. B, May 8, 2024, Trial Tr. at 63:20-64:12.; Trial Ex. 43 (April 17, 2020 certification of no patent application).) And Trial Exhibit 116 provided evidence regarding defendant's intent behind his false claim that he had a patent pending. (Def. Ex. B, May 8, 2024, Trial Tr. at 10:12-23). In that clip, defendant explains to Agent Sterle that, without a patent, someone might be able to "change one molecule" of his cure and then "reproduce it" and negatively impact his expected sales. (Trial Ex. 116.)

Third, the evidence showed that defendant knowingly falsely claimed that as of March 19, 2020, businessman and former NBA basketball player Earvin "Magic" Johnson was the Director and/or Officer of QC 20. Defendant repeated this lie in phone calls with SA Sterle (Trial Exs. 19, 20, 103.) and in the one-sheet that he emailed to SA Sterle and W.J. (Trial Exs. 41 and 42.) In the one-sheet, defendant falsely claimed that as of March 19, 2020, Magic Johnson was on the board of directors of Quantum Prevention CV Inc. (Trial Ex. 41 at 2, Trial Ex. 42 at 4.) And defendant expressly revealed on cross examination why he made up this lie: "Q. You would agree with me that having a famous person that is trusted endorse a product may cause more people to buy that product; correct? A. Yes." (Def. Ex. C, May 9, 2024, Trial Tr. at 25:14-17.)

Magic Johnson testified regarding defendant's false claims. Before doing so, he explained that he cares about his community and seeks to balance making a profit and doing good when evaluating potential investments. (Def. Ex. B, May 8, 2024, Trial Tr. at 13:11-21:3.) He also discussed how valuable his endorsement is, which he

referred to as a "Q rating" -- a rating that people use to evaluate a celebrities' appeal -- and how his rating is usually the second highest in California and approximately ninety percent nationwide. (Id. at 20:13-21.) When questioned about defendant and his fake companies, Magic Johnson testified that he has never supported, invested in, or been an officer or a member of the board of directors of, Quantum Prevention CV, Inc. (Id. at 21:7-24:12.) Magic Johnson also testified that he did not know defendant and had never committed to working with him. (Id.)

Fourth, the evidence showed that defendant knowingly falsely claimed that investments in QP 20 and/or QC 20 were risk free and were 100 percent guaranteed and that he made these lies to obtain money from prospective investors. (Trial Exs. 22, 25, 31.) Defendant further falsely claimed that a billionaire in Dubai had offered to purchase the companies for $10 billion, and this offer would secure the investors' investments in QP 20 and/or QC 20. (Trial Exs. 20 and 26.) On one occasion he told SA Sterle, "I'll guarantee you this, at least-you put three hundred grand, I'll guarantee you, I'll guarantee you the value of your shares and stocks, and you can do whatever you want, minimum thirty million." (Trial Ex. 22.) On another occasion he told SA Sterle, "so I'll say this; I wouldn't take a dollar unless your money is secured one thousand percent; and it already is." (Trial Ex. 25.) On a third occasion he told SA Sterle, "I want you to know, your money's secured a hundred percent. You won't lose, I'll tell you that. You won't lose a single dollar." (Trial Ex. 31.) Defendant also falsely claimed that billionaires based out of Dubai had expressed interest in his companies and that he had already received a $10 billion offer. (Trial Exs. 20 and 26.) Notably,

defendant himself told the jury that he agreed that a "risk free and 100% guaranteed" investment objectively is capable of influencing a person to part with money: "Q. Would you agree that the fact an investment was risk free would induce somebody or cause them to be more likely to invest in that product? A. If -- yeah, if it was risk free, yeah. Q. If it was risk free; correct? A. Sure." (Def. Ex. C, May 9, 2024, Trial Tr. at 26:21-27:1.)

Fifth, the evidence showed that defendant falsely claimed that he had secured funding from seven investors who had each already invested between $750,000 and $1 million, and that he used these lies in an attempt to raise money. (Trial Ex. 107.) The evidence at trial showed, however, that defendant did not have anything close to that amount of funds -- from wealthy investors or otherwise -- in his bank accounts identified by law enforcement. In defendant's one-sheet that he distributed to potential investors, he included wire instructions for a Bank of America bank account under the name KM Legal Power LLC and an account number ending in 3866 that was meant to receive funds from potential investors (the "KM Legal Power account"). (Trial Ex. 41 at 3.) As SA McKnight testified, agents obtained bank records for various bank accounts associated with defendant. (Def. Ex. B, May 8, 2024, Trial Tr. at 65:12-66:5.) After reviewing financial records for over thirty bank accounts, SA McKnight created a chart summarizing the records. (Id. at 66:6-72:25.) That summary chart showed that in March 2020 defendant's various bank accounts all had ending balances below $300 and that five of the accounts had negative ending balances. (Trial Ex. 44 at 1.) Specifically, defendant's KM Legal Power account -- the same account that defendant directed potential investors to wire funds

into -- had a beginning balance of $124.37 on March 1, 2020, and an ending balance of -$542.82 on March 31, 2020. (Trial Ex. 68 at 3.) The only deposits into the account in March over $300 were a counter credit for $9,990 on March 3, 2020, a wire transfer for $5,000 on March 13, 2020, and a second wire transfer for $5,000 on March 16, 2020. (Id. at 5.) In that same time period, defendant had $19,966.49 in withdrawals, including one $700 withdrawal on March 4, 2020 for "My 7 Billion Followers Fans Global Pop Capital Injection DBL" and a $600 withdrawal on March 17, 2020 for "Social Media Follower Views Likes Pop Capital Injection DBL." (Id. at 6.)

## III. LEGAL STANDARD

A court may not set aside a jury's verdict and enter a judgment of acquittal unless no rational juror could have voted to convict. A motion for judgment of acquittal pursuant to Rule 29 is governed by the two-step process set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also United States v. Nevils, 598 F.3d 1158, 1161, 1164 (9th Cir. 2010) (en banc). First, the Court "construe[s] the evidence in the light most favorable to the prosecution." Nevils, 598 F.3d at 1161 (internal quotations omitted). In performing this first step, "[t]he government is entitled to all reasonable inferences that can be drawn from the evidence." United States v. Lucas, 963 F.2d 243, 247 (9th Cir. 1992). Second, the Court must evaluate whether the evidence "is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." United States v. Richter, 782 F.3d 498, 501 (9th Cir. 2015) (citations omitted). The Ninth Circuit has explained, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high," United States v. Rocha, 598 F.3d 1144,

1153 (9th Cir. 2010), and "any conflicts in the evidence [must] be resolved in favor of the jury's verdict," United States v. Alvarez-Valenzuela, 231 F.3d 1198, 1201–02 (9th Cir. 2000). A jury's determination should be upset only on those "rare occasions in which a properly instructed jury may convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." Nevils, 598 F.3d at 1164 (cleaned up).

In ruling on a Rule 29 motion, the Court "must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." United States v. Rojas, 554 F.2d 938, 943 (9th Cir. 1977). For those reasons, even "when 'faced with a record of historical facts that supports conflicting inferences,' a reviewing court 'must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" United States v. Del Toro-Barboza, 673 F.3d 1136, 1143 (9th Cir. 2012) (quoting Jackson, 443 U.S. at 326).

## IV. ARGUMENT

### A. A Rational Jury Could Find, and Did Find, that Defendant Committed Wire Fraud

As the parties agree, to convict defendant of wire fraud, the government was required to prove that: (1) defendant knowingly participated in a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representation or promises; (2) the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to

part with money or property, and they directly or indirectly were designed to deceive the person about the nature of the bargain at issue; (3) defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and (4) defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme. (Dkt. 267 (Jury Instructions) at 18-19; Dkt. 285 at 1.)

The government is not required to prove the falsity of every misrepresentation charged in the indictment to prove the existence of the fraudulent scheme. See United States v. Halbert, 640 F.2d 1000, 1008 (9th Cir. 1981) ("[T]he Government need not prove every misrepresentation charged conjunctively in the indictment."); United States v. Stull, 743 F.2d 439, 442 n. 2 (6th Cir. 1984) ("It is well established that proof of every allegation is not required in order to convict; the government need only prove that the scheme to defraud existed."); United States v. Jordan, 626 F.2d 928, 930 (D.C. Cir. 1980) ("The Government is not required to prove the details of a scheme; it is, however, required to prove beyond a reasonable doubt . . . that the defendant . . . willfully and knowingly devised a scheme or artifice to defraud . . . ."); United States v. Amrep Corp., 560 F.2d 539, 546 (2d Cir. 1977) ("A scheme to defraud may consist of numerous elements, no particular one of which need be proved if there is sufficient overall proof that the scheme exists."); Anderson v. United States, 369 F.2d 11, 15 (8th Cir. 1966) (all instances of illicit conduct need not be proved to sustain a conviction).

1. Defendant Knowingly Participated In a Scheme or Plan to Defraud

To find that the government proved that defendant participated in a scheme or plan to defraud, the jury was required to find that defendant made one of the following statements, that the statement was false, and that defendant knew it was false: (1) QC20 was a cure for COVID-19; (2) QP20 was a treatment that would prevent the person taking it from contracting COVID-19; (3) QC20 and QP20 were "patent pending"; (4) Magic Johnson was a director and/or officer of QC20; (5) investments in QP20 and/or QC20 were risk free and were 100% guaranteed; (6) an unnamed party in Dubai had offered to purchase the companies for $10 billion, and this offer would secure the investors' investments in QP20 and/or QC20; and (7) he had secured funding from seven investors who had each already invested between $750,000 and $1,000,000. (Dkt. 267 at 18.) The jury was not required to agree on the same statement as long as each member of the jury found that at least one of the statements was false, and the government is not required to prove every misrepresentation included in the indictment as part of defendant's scheme. Halbert, 640 F.2d at 1008. (Id. at 19.)

In his motion for judgment of acquittal, defendant only challenges the sufficiency of the evidence as to two of the misrepresentations, namely, that defendant's "COVID-19 cure and prevention lacked efficacy" and his "representation regarding investments being risk free and guaranteed by a party in Dubai was false." (Mot. at 6-7.) He does not challenge, and therefore concedes, that construing the evidence at trial in the light most favorable to the government, any rational juror could have found that

defendant made the other misrepresentations beyond a reasonable doubt. Richter, 782 F.3d at 501; see also Burnham v. City of Rohnert Park, No. C 92-1439 SC, 1992 WL 672965, at *1 n.2 (N.D. Cal. May 18, 1992) ("reply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion") (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990)); AEG Holdco LLC v. Vazquez, No. 221CV05290VAPAGRX, 2021 WL 4859975, at *16 n. 11 (C.D. Cal. Sept. 22, 2021) (same); Mays v. Wal-Mart Stores, Inc., No. CV 18-02318-AB (KKX), 2018 WL 5024919, at *7 (C.D. Cal. Aug. 22, 2018) (same). This includes conceding that defendant misrepresented to prospective investors that Magic Johnson was a director and/or officer of QC20, that defendant had a patent pending, and that he had secured funding from seven investors who had each already invested between $750,000 and $1,000,000. (Dkt. 267 at 18.) Accordingly, these representations are sufficient to prove that defendant participated in a scheme or plan to defraud prospective investors at trial. Halbert, 640 F.2d at 1008.

But in any event, when viewing the evidence in the light most favorable to the government and the jury's guilty verdicts, there was sufficient evidence presented at trial that would lead a rational juror to find that defendant's "COVID-19 cure and prevention lacked efficacy" and his "representation regarding investments being risk free and guaranteed by a party in Dubai was false." (Mot. at 6-7.)

First, defendant knowingly lied by claiming that QC 20 was a cure for COVID-19 and that QP 20 was a treatment that would prevent the person taking it from contracting COVID-19. Throughout the trial, there were various examples of defendant soliciting investments into QC 20 and QP 20 through fraudulent means, whether by

representing that Magic Johnson was on the board of directors, by claiming that his products were patent-pending, or by lying about how many individuals had invested and how much capital defendant had raised. (Trial Exs. 41, 107.) Defendant resorted to lying about the corporate backdrop of his supposed companies because he knew that the very products he was advertising, the COVID-19 cure and prevention pill, lacked efficacy because they didn't exist. On March 21, 2020, defendant posted a video to his Instagram account in which he held a white pill that he claimed to have created and represented was a COVID-19 prevention pill. (Trial Ex. 130.) A few days later, on March 25, 2020, defendant met with SA Sterle in a parking lot to conduct a $400,000 cash transaction. (Trial Exs. 123-125; Def. Ex. A, May 7, 2024, Trial Tr. at 149:3-13.) During that meeting, defendant provided SA Sterle not with the white pill he claimed to have created in his Instagram video but instead provided SA Sterle with four plastic sandwich bags filled with what appeared to be grocery store vitamin pills. (Id. at 151:4-8; Def. Ex. B, May 8, 2024, Trial Tr. at 209:25-210:5 (Defendant testifying that prevention pill contained garlic, ginseng, ginger, white willow bark, Mauang, L-Lysine, L-Taurine, L-Arginine, Vitamin C, Vitamin B complex, Vitamin D, magnesium, zinc, and sea salt)). A reasonable juror could find that these vitamins and minerals were around before Covid-19 began and could infer that many individuals were already regularly taking these vitamins and minerals. A reasonable juror could further infer that these grocery store vitamins could not be Covid-19 cures – and that defendant knew they could not be cures - because the disease would not have spread if there was an effective cure already being taken by a large portion of the population.

This meeting occurred after defendant had repeatedly tried to get SA Sterle to deposit $9,999 into defendant's bank account, on one occasion telling SA Sterle "because I'm spending hours on this. Can you deposit something in my account, like nine thousand, nine hundred ninety-nine dollars, just- just to show me, Keith-I'm real-I believe in Roddy. I believe in you-… I've had-I've had a hundred and fifty thousand dollars put in my account at nine thousand, nine ninety-nine. Fifteen times." (Trial Ex. 100.) On another occasion telling SA Sterle, "Can you go to my bank and just put in Like nine thousand, nine nine, to keep proof-trust me, I'm real. Hang with me? Can you do that?... I did fifteen deposits in the state of Florida at nine thousand, nine-ninety, nine- ninety each." (Trial Ex. 108.) Defendant wanted transactions below the $10,0000 threshold in order to avoid a Cash Transaction Report ("CTR") from being filed with FINCEN. (Id. at 144:16-145:9.) In the light most favorable to the government, this conduct, also known as "structuring" is evidence of consciousness of guilt. Defendant's structure financial deposits to avoid detection from law enforcement. See United States v. Turner, 400 F.3d 491, 497 (7th Cir. 2005)("[W]e know that certain types of transactions may be indicative of a design to conceal. These include transactions surrounded in unusual secrecy, structured transactions, depositing ill-gotten funds into another's bank accounts, using third parties to conceal the real owner, or engaging in unusual financial moves which culminate in a transaction."); United States v. Besmajian, 910 F.2d 1153, 1159 (3d Cir. 1990) (finding that defendant's structuring of transactions to be beneath the $10,000 reporting requirement "imply deliberate calculation to thwart [financial institution's] reporting duty"); United States v. Gomez-

Osorio, 957 F.2d 636, 641 (9th Cir. 1992) (finding "sufficient evidence that [defendant] had knowledge of section 5313(a)'s reporting requirements" in part because "[h]is actions made no sense unless he had knowledge of the banks' reporting requirements").

Defendant's behavior, namely, agreeing to receive a $400,000 cash payment in a parking lot, soliciting $9,999 deposits, lying about investors, and lying about protection for intellectual property all indicate that defendant was also lying about his supposed cure and prevention pill and chose to do so because he saw that the COVID-19 pandemic created a market for defendant to defraud.

Second, defendant knowingly lied in saying that QP 20 and QC 20 were patent pending. He indicated on the one-sheet and on calls with SA Sterle that he had a patent pending for QP 20 and QC 20. (Trial Ex. 41.) However, a search with the USPTO revealed that there were no patent applications assigned to defendant or from Quantum Prevention CV, Inc., Quantum Cure CV 2020, Inc. and Quantum Immunity CV 2020, LLC. (Trial Ex. 43.) Defendant lied because he understood the value to potential investors of protecting the intellectual property rights to a novel product and explained this value to SA Sterle on recorded calls. (Trial Exs. 114, 116.)

Third, the evidence at trial was overwhelming that defendant knowingly lied that as of March 19, 2020, businessman and former NBA basketball player Magic Johnson was the Director and/or Officer of QC 20. Given the weight of the evidence, a reasonable juror could find and did find that defendant lied about this claim. Magic Johnson repeatedly testified that he did not know defendant and certainly did not agree to serve as a director and/or officer of QC 20. In determining whether to believe defendant or Magic Johnson – a

businessman who views supporting his community to be as important as turning a profit – the analysis isn't close.

Fourth, defendant knowingly falsely claimed that investments in QP 20 and/or QC 20 were risk free and were 100 percent guaranteed. But in fact, defendant had no money and had no investors. See, Trial Ex. 44 (summary chart showed that in March 2020 defendant's various bank accounts all had ending balances below $300 and that five of the accounts had negative ending balances.); Trial Ex. 68 (KM Legal Power account – the same account that defendant directed potential investors to wire funds into – had a beginning balance of $124.37 on March 1, 2020, and an ending balance of -$542.82 on March 31, 2020.) Defendant's various representations that investments in QP 20 and/or QC 20 were risk free and 100 percent guaranteed were not supported by any outside investment and certainly could not have been secured by defendant himself since he had no funds available to him.

Fifth, similarly to defendant's claims about investments being risk free and 100 percent guaranteed, defendant knew that his claims about having seen investors who had already invested between $750,000 and $1 million were lies. Defendant solicited investments by sending out a one-sheet to potential investors, and in that one-sheet he included bank account information for potential investors to wire funds to. (Trial Ex. 41 at 3.) The FBI obtained copies of defendant's bank accounts, including the account listed on the one-sheet – defendant's KM Legal Power account. The March 2020 statement for that account showed that defendant lied about having seven investors who had contributed at least $750,000, in fact, this account had a negative balance at the end of March 2020. (Trial Ex. 68 at 3.)

Based on these facts a rational factfinder could find that defendant knowingly participated in a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representation or promises.

2. Defendant's Fraudulent Representations Were Material Because They Had A Natural Tendency To Induce Anyone To Part With Money

Defendant next argues the government failed to introduce sufficient evidence that the alleged false misrepresentations were material. Defendant is wrong as a matter of law and fact. First, defendant wholly ignores that materiality of a statement may be established based on the intrinsic capabilities of a false statement itself. Second, the jury heard lots of evidence about the materiality of the alleged false representations. On this record, the jury reasonably concluded that the fraudulent statements were material. Defendant cannot and does not demonstrate that "no rational" jury could have found the fraudulent statements were material beyond a reasonable doubt.

"Materiality" for purposes of the wire fraud statute means that a statement "had a natural tendency to influence, or were capable of influencing, a person to part with money or property." See Ninth Cir. Model Jury Instr. No. 15.35; Neder v. United States, 527 U.S. 1, 25 (1999); United States v. Milovanovic, 678 F.3d 713, 726-27 (9th Cir. 2012) (en banc). Whether representations "had a natural tendency to influence, or were capable of influencing a person to part with money" -- and are therefore material -- is assessed under an objective, and not a subjective, test. United States v. Lindsey, 850 F.3d 1009, 1014 (9th Cir. 2017) (internal alterations omitted). Under this test, the trier of fact must examine "the intrinsic

capabilities of the false statement itself." Id. (quoting United States v. Peterson, 538 F.3d 1064, 1072 (9th Cir. 2008)). Materiality is a question of fact for the jury. United States v. Carpenter, 95 F.3d 773, 776 (9th Cir. 1996) (mail fraud). The "intrinsic capabilities" of representations alone are sufficient under the law for a rational jury to conclude the representations "had a natural tendency to influence, or were capable of influencing, a person to part with money." Lindsey, 850 F.3d at 1014. "[T]he government does not have to prove actual reliance upon the defendant's misrepresentations' to satisfy materiality." Id. at 1014 (quoting Neder, 527 U.S. at 25).

Here, a rational juror could conclude the false representations were capable of influencing a person to part with money based solely on the "intrinsic capabilities" of the representations. For example, a rational juror easily could conclude that a risk free and 100% guaranteed investment objectively is capable of influencing a person to part with money. In the context of a global pandemic that caused society-wide shutdowns, a rational juror could also easily conclude that the opportunity to invest early in a first-of-its-kind cure or treatment would objectively drive investor interest. A rational juror could conclude that a company that has protected its intellectual property may be more enticing to invest in, as would a company that has already secured millions of dollars in investments. And a rational jury could conclude that there is intrinsic value to the assertion that a high-profile and well-respected individual has endorsed a product by agreeing to serve on the company's board.

Moreover, the evidence at trial demonstrated that defendant repeatedly employed these fraudulent representations in his scheme to

raise money from the potential investors. Defendant sought investments through text messages that coupled his false claim that he had developed the cure for COVID with requests for investments and promises of handsome profits. (E.g. Trial Exs. 134, 135, 136, 137 (text messages to E.S., R.M., W.J., and A.F.).) Defendant sought investments through his one-sheet, which included his false statements about having a "patent pending" cure and treatment and having Magic Johnson on the board of his companies. (Trial Ex. 42 (one-sheet sent to W.J.); Trial Ex. 41 (one-sheet sent to Agent Sterle).) Magic Johnson testified as to how valuable his endorsement is, which he referred to as a "Q rating" -- a rating that people use to evaluate a celebrities' appeal -- and how his rating is usually the second highest in California and approximately ninety percent nationwide. (Def. Ex. B, May 8, 2024, Trial Tr. at 20:13-21.) And defendant sought investments through phone calls in which he made his false statements about how investments were guaranteed, that he had a large offer from Dubai, and that he had already solicited hundreds of thousands of investment. (E.g. Trial Ex. 25 ("Shawn, I want you to know, your money's secured a hundred percent. You won't lose, I'll tell you that. You won't lose a single dollar."); Trial Exs. 25-26 (discussing offer from Dubai); Trial Ex. 107 (describing offers of "between $750,000 and $1 million"). Defendant even provided potential investors with his bank routing numbers, instructed investors to wire funds to these accounts, and promised to issue shares in his companies upon receipt of wired investment funds into his bank accounts. (Trial Ex. 96 ("Call me after wire sent[.] Stock Share Docs to be prepared and FedEx to you today[.]"); Def. Ex. A at 141:17-21 ("Q. What did you believe Mr. Middlebrook to be referring

to with just deposit 5K so I can start docs? A. He was saying he wanted me to deposit $5,000 into his bank account so he can start processing the documents for my share, you know, documenting my -- my shares in his company.")

Critically, on cross examination, defendant admitted that the very purpose of these communications was to obtain money from prospective investors. (Def. Ex. C at 41:17-19 ("Q. In fact you used this non-finalized document [the one-sheet marked as Trial Exhibit 41] to raise money, didn't you? A. Yes."); Id. at 24:19-25:2 (defendant admits his messages were "made in order to entice people to get excited about investing in [his] product" and "designed to create excitement in [his] product.").)

Far from lacking any evidence of materiality, the trial was chockful of examples where the defendant peppered potential investors with false representations and genuine solicitations designed to induce his targeted victims to send him money. The context in which the false representations were made and the "intrinsic capabilities" of the representations are sufficient by themselves for a reasonable juror to conclude they were material. See Lindsey, 850 F.3d at 1014; United States v. Peterson, 538 F.3d 1064, 1072 (9th Cir. 2008) ("'[C]apable of influencing' is an objective test, which looks at the intrinsic capabilities of the false statement itself.") (internal quotation marks omitted); United States v. Loftis, 2018 WL 3193196, at *6 (D. Mont. June 27, 2018) ("The inessential nature of the identity of the victim himself is evinced by the fact that this standard is not concerned with a statement's subjective effect on the victim, but only the intrinsic capabilities of the false statement itself.") (internal quotation marks and alterations omitted); United

States v. Chang, 2020 WL 5702131, at *3 (N.D. Cal. Sept. 24, 2020). Defendant does cite any cases to the contrary. (Mot. at 8.)

Moreover, the jury explicitly heard evidence about the materiality of the fraudulent statements. For example:

- Defendant agreed that a "risk free and 100% guaranteed" investment objectively is capable of influencing a person to part with money: "Q. Would you agree that the fact an investment was risk free would induce somebody or cause them to be more likely to invest in that product? A. If -- yeah, if it was risk free, yeah. Q. If it was risk free; correct? A. Sure." (Def. Ex. C, May 9, 2024 at 26:21-27:1.)
- Defendant agreed that his use of Magic Johnson's name had a natural tendency to influence someone to part with money: "Q. You would agree with me that having a famous person that is trusted endorse a product may cause more people to buy that product; correct? A. Yes, . . . ." (Id. at 25:14-17.)
- Defendant acknowledged that, in the context of a global pandemic that caused society-wide shutdowns, the opportunity to invest early in a first-of-its-kind cure or treatment would objectively drive investor interest: "Q. I understand. And in March 2020 given the context, a product that cured COVID or treated COVID, had the potential to make billions of dollars; correct? A. If it was effective and real, yes." (Id. at 28:11-14.)

The jury heard lots of evidence regarding the materiality of defendant's false statements about having developed the cure and treatment for COVID-19.

Q. And as you just testified, it was your belief that you

created a cure and a treatment for COVID.
A. Correct.
Q. And would you agree that if that was in fact a cure or a treatment, you were sitting on a gold mine?
A. Yes.
Q. In fact you went through the process to build a company apparently to market and sell that cure; correct?
A. I was told that -- to do that from everyone around me, yes.
Q. You were told to do that, but the point was you wanted to have an entity to sell, to market your cure and treatment; correct?
A. Yes.
Q. And you thought that by doing that, you would make a lot of money.
A. Save people and in the process, yes.

Id. at 21:12-22:3. Defendant testified that instead of "mass market[ing]" his purported cure and treatment to the public, he reached out to a select group of people who he already knew specifically to provide them "the opportunity to invest in his company." (Id. 22:10-23:25.) He solicited their investments through the text messages and emails that contain the alleged false representations. (Id. at 23:4-22; Trial Exs. 137, 4, and 14 (text messages and videos sent to A.F.); Trial Exs. 134 (text messages sent to C.S.); Trial Exs. 136, 2, 42 (text messages, videos, and one-sheet sent to W.J.); Trial Ex. 135 (text messages sent to R.M.).) Defendant even admitted that his messages were "made in order to entice people to get excited about investing in [his] product" and "designed to create excitement in [his] product." (Def. Ex. C, May 9, 2024 at 24:19-25:2.).

Contrary to defendant's unsupported statements, the trial was full of evidence of materiality. At the very least, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential element[of

materiality] beyond a reasonable doubt." Jackson, 443 U.S. at 319-20.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion for judgment of acquittal.